UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      - against -<br><br>WESAM El HANAFI, et al.,<br><br>                  Defendants. | Criminal Docket No.<br><br>10-CR-162 (KMW) |

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WESAM EL-HANAFI'S MOTION TO DISMISS AND SUPPRESS

---

JaneAnne Murray
MURRAY LAW LLC
233 Broadway
New York, New York 11215
Tel.  (212) 941-9266

Justine Harris, Esq.
COLSON & HARRIS LLP
10 East 40th St., Suite 3307
New York, New York 10016
Tel: (212) 257-6455

*Attorneys for Mr. Wesam El-Hanafi*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .................................................................................................... 1

RELEVANT FACTS ................................................................................................ 2

    A.    Indictment ................................................................................... 2

    B.    The Circumstances Surrounding Mr. El-Hanafi's Statements to the FBI ............. 2

    C.    The Warrant Applications For Mr. El-Hanafi's Email Accounts .......................... 9

    D.    Probable Cause to Search the Email Accounts ................................................... 11

    E.    The Seizure and Search of Mr. El-Hanafi's E-mail Accounts ............................ 12

ARGUMENT ........................................................................................................ 14

I.    The Court Should Dismiss the Indictment Or, In the Alternative, Order a *Kastigar*
Hearing ....................................................................................................... 14

    A.    Because the Government Obtained Mr. El-Hanafi's Privileged
Communications the Indictment Should be Dismissed ...................................... 14

    B.    In the Alternative, the Court Should Schedule a *Kastigar* Hearing...................... 17

II.    The Court Should Suppress Mr. El-Hanafi's Statements to the FBI and if the
Government Fails to Satisfy its Burden at a *Kastigar* Hearing, Dismiss the
Indictment .................................................................................................. 18

    A.    Mr. El-Hanafi's Statements to the FBI were Involuntary.................................... 19

    B.    The Statements Should Also Be Suppressed Because After Mr. El-Hanafi
Asked for An Attorney, He Was Subjected to Custodial Interrogation
Without Being Advised of His *Miranda* Warnings ............................................ 27

    C.    Unless the Government Can Demonstrate at a *Kastigar* Hearing that Mr.
El-Hanafi's Compelled Statements Were Not Used Either Directly or
Indirectly, the Indictment Should be Dismissed .................................................. 29

III.    All Evidence Seized As A Result of Search Warrants Executed on Mr. El-
Hanafi's Yahoo and Hotmail Email Accounts Should Be Suppressed............................ 30

    A.    The Warrants Clause and the Search of Electronic Data ..................................... 31

    B.    The Warrants Were Overbroad ........................................................................... 34

C.    The Search Warrants Lacked Particularity  ............................................... 37

D.    The Executing Officers Failed to Comply With the Warrants' Terms ................. 40

E.    The Executing Officers Failed to Take Steps to Protect Privacy .......................... 41

F.    The Court Should Order an Evidentiary Hearing ................................................... 42

G.    The Court Should Order a Taint Hearing ............................................................. 43

CONCLUSION ........................................................................................................................ 45

# TABLE OF LEGAL AUTHORITIES

## Cases

*Alderman v. United States*, 394 U.S. 165 (1969) .................................................................. 44, 44

*Andresen v. Maryland*, 427 U.S. 463 (1976) .................................................................. 17, 33, 41

*Balzac v. Porto Rico*, 258 U.S. 298 (1922) .................................................................. 25

*Berkemer v. McCarty*, 468 U.S. 420 (1984) .................................................................. 28

*Brinegar v. United States*, 338 U.S. 160 (1949) .................................................................. 35

*Brown v. Mississippi*, 297 U.S. 278 (1936) .................................................................. 19

*Colorado v. Connelly*, 479 U.S. 157 (1986) .................................................................. 19

*Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971) .................................................................. 31

*Franks v. Delaware*, 438 U.S. 152 (1978) .................................................................. *passim*

*Gardner v. Broderick*, 392 U.S. 273 (1968) .................................................................. 21

*Garrity v. State of New Jersey*, 385 U.S. 493 (1967) .................................................................. *passim*

*Groh v. Ramirez*, 540 U.S. 551 (2004) .................................................................. 39

*Illinois v. Gates*, 462 U.S. 213 (1983) .................................................................. 35

*Illinois v. Perkins*, 496 U.S. 292 (1990) .................................................................. 26

*In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177 (2d Cir. 2008) .................................................................. 20

*Jackson v. Denno*, 378 U.S. 358 (1964) .................................................................. 22

*Kastigar v. United States*, 406 U.S. 441 (1972) .................................................................. *passim*

*Kent v. Dulles*, 357 U.S. 116 (1958) .................................................................. 25

*Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) .................................................................. *passim*

*Lewis v. United States*, 385 U.S. 206 (1966) .................................................................. 26

*Lynumn v. Illinois*, 372 U.S. 528 (1963) .................................................................. 25

*Maryland v. Garrison*, 480 U.S. 79 (1987) .................................................................. 32

*Mincey v. Arizona*, 437 U.S. 385 (1978) ...................................................................... 29

*Minnesota v. Murphy*, 465 U.S. 420 (1984) ............................................................... 20

*Miranda v. Arizona*, 384 U.S. 436 (1966) ........................................................... *passim*

*Nardone v. United States*, 308 U.S. 338 (1939) ........................................................ 44

*New Jersey v. Portash*, 440 U.S. 450 (1979) ............................................................. 29

*Nguyen v. INS*, 533 U.S. 53 (2001) ........................................................................... 25

*Oregon v. Elstad*, 470 U.S. 298 (1985) ..................................................................... 20

*Parsad v. Greiner*, 337 F.3d 175 (2d Cir. 2003) ....................................................... 20

*Sher v. Dep't of Veterans Affairs*, 488 F.3d 489 (1st Cir. 2007) ............................... 30

*Stansbury v. California*, 511 U.S. 318 (1994) ........................................................... 28

*Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998) ............................................ 20, 28

*United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991) .................................. 22, 27, 41

*United States v. Bowen*, 689 F.Supp.2d 675 (S.D.N.Y. 2010) ................................... 35

*United States v. Cioffi*, 668 F.Supp.2d 385 (E.D.N.Y. 2009) ..................... 32, 33, 35, 39

*United States v. Cohan*, 628 F.Supp.2d 355 (E.D.N.Y.2009) .................................... 32

*United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2009) ....... 33, 34, 39

*United States v. Friedrick*, 842 F.2d 382 (D.C. Cir. 1988) ....................................... 22

*United States* v. *George*, 975 F.2d 72 (2d Cir. 1992) ................................................ 32

*United States v. Hill*, 459 F.3d 966 (9th Cir. 2006) .................................................. 32

*United States v. Hubbell*, 530 U.S. 27 (2000) ........................................................... 14

*United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) ............................................ 16, 41

*United States v. Kristel*, 762 F. Supp. 1100 (S.D.N.Y. 1991) ........................... 15, 17, 18

*United States v. Liu,* 239 F.3d 138 (2d Cir. 2000) .................................................... 40

*United States v. Matias,* 836 F.2d 744 (2d Cir. 1988) .................................................. 40

*United States v. McCall*, 489 F.2d 359 (2d Cir. 1973) ................................................ 45

*United States v. McDarragh*, 2006 WL 1997638 (S.D.N.Y. 2006) ............................ 35

*United States v. Montes-Reyes*, 547 F. Supp. 2d 281 (S.D.N.Y. 2008) ................................ 26, 27

*United States v. Morales*, 834 F.2d 35 (2d Cir. 1987) .................................................. 28

*United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009) .................................................. 34

*United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010) ......................................... 34, 37, 42

*United States v. Ruggles,* 70 F.2d 96 (2d Cir. 1991) ................................................ 25

*United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991) .............................. 15, 17, 18

*United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989) ........................................ 18

*United States v. Slough*, 677 F. Supp. 2d 112 (D.D.C. 2009) .................................... 22, 30

*United States v. Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006) ................................. *passim*

*United States v. Travisano,* 724 F.2d 341 (2d Cir. 1983) ............................................ 35

*United States v. Vilar*, 2007 WL 1075041 (S.D.N.Y. 2007) ............................... 33, 45, 43

*United States v. Vilar*, 530 F.Supp.2d 616 (S.D.N.Y. 2008) ........................................ 44

*United States v. Weissman*, 1996 WL 751386 (S.D.N.Y. 1996) ............................... 15, 16, 17, 18

*Wong Sun v. United States*, 371 U.S. 471 (1963) ................................................ *passim*

**Statutes**

18 U.S.C. § 2339B ........................................................................................... 2

18 U.S.C. § 2703(b) ........................................................................................ 41

18 U.S.C. § 2705 ............................................................................................ 41

18 U.S.C. § 3501 .......................................................................................... 20, 22

50 U.S.C. §1705(a) ........................................................................................... 2

## INTRODUCTION

Defendant Wesam El-Hanafi respectfully submits this memorandum of law in support of his motion to dismiss and suppress.

The government conducted indiscriminate searches of the contents of Mr. El-Hanafi's email accounts, knowing that these accounts would contain privileged communications with his attorney, Victor Knapp, and without taking any steps to prevent their seizure. This conduct warrants dismissal of the indictment. At the very least, a hearing should be held under *Kastigar v. United States*, 406 U.S. 441 (1972), at which the government must demonstrate that the evidence it proposes to use against Mr. El-Hanafi was derived from legitimate independent sources.

The government also compelled statements from Mr. El-Hanafi under threat of continued exile from his place of birth. He was placed on the no-fly list, and deceived into believing that submission to an interview with the FBI was the only mechanism to secure his removal from the list. The statements obtained as a result of these interviews were coerced and therefore involuntary. They should be suppressed on this ground, as well as on the separate ground that when the questioning turned hostile, Mr. El-Hanafi was subjected to custodial interrogation without being advised of his *Miranda* rights. Moreover, because Mr. El-Hanafi's statements were coerced, the government should prove at a *Kastigar* hearing that no direct or derivative use was made of those statements.

In addition, this Court should suppress the evidence seized as a result of search warrants executed in Mr. El-Hanafi's Hotmail and Yahoo email accounts – and the fruits of such evidence – because the warrants were unconstitutionally overbroad and lacking in particularity. Essentially the equivalent of general warrants, they authorized whole-sale rummaging through Mr. El-Hanafi's personal communications and affairs, unlimited by scope, time or number of

searches.  Compounding these violations of the Fourth Amendment is the fact that the searching

agents exceeded the scope of the warrants when they disregarded the warrants' requirement of

selective seizure, thus ensuring that the "file cabinet" of several years of Mr. El-Hanafi's daily

communications would be at the government's disposal indefinitely.  The impermissible scope

and execution of the warrants mandate suppression.  To the extent the issues may not be resolved

on the papers alone, the Court should hold an evidentiary hearing to elucidate the issues raised in

this motion, as well as analyze both the government's assertions in support of the issuance of the

warrant, pursuant to *Franks v. Delaware*, 438 U.S. 152 (1978), and to determine the extent to

which the unauthorized seizures tainted other evidence to be offered at trial, pursuant to *Wong*

*Sun v. United States*, 371 U.S. 471, 488 (1963).

## **<u>RELEVANT FACTS</u>**

A.    <u>Indictment</u>

Mr. El-Hanafi is charged in a four-count indictment with providing and conspiring to

provide material support to al Qaeda, in violation of 18 U.S.C. § 2339B, and making and

conspiring to make a contribution of funds, goods or services to al Qaeda, in violation of 50

U.S.C. §1705(a).

B.    <u>The Circumstances Surrounding Mr. El-Hanafi's Statements to the FBI</u>

Wesam El-Hanafi was born in Brooklyn, New York.  He is a United States citizen, as are

his wife and three young children.  His parents and five siblings still live in Brooklyn, New

York.  From 2006 until his arrest in this matter, he lived in Dubai, United Arab Emirates (UAE),

with his wife and children.  (*See* Declaration of Wesam El-Hanafi ("El-Hanafi Decl.") ¶ 2).

1. *Mr. El-Hanafi and his family are denied the ability to board a flight to the United States and Mr. El-Hanafi seeks help from the Embassy*

In December 2009, Mr. El-Hanafi bought tickets on Emirates Airlines for his family to travel to New York on January 15, 2010. However, when they tried to board the plane on January 15, 2010, they were told by Emirates Airlines security, in sum and substance, that they were not allowed to travel because the United States Department of Homeland Security (DHS) had placed Mr. El-Hanafi on a "no-fly list." Mr. El-Hanafi was advised to call the United States Embassy in order for him and his family to travel to the United States. (*See* El-Hanafi Decl. ¶ 3).

That same day, Mr. El-Hanafi called the United States Embassy in Abu Dhabi. Because it was a Friday, when offices in the UAE are officially closed, Mr. El-Hanafi spoke to the "on-call" staff person handling emergencies for United States citizens, Don Steele. Mr. El-Hanafi explained his problem to Mr. Steele. He told Mr. Steele that Emirates Airlines security personnel had instructed him to talk to the United States Embassy in order to obtain assistance in getting a flight back to the United States. Mr. Steele advised Mr. El-Hanafi that he would see what he could do. (*See* El-Hanafi Decl. ¶ 4).

On either Sunday January 17, 2010, or Monday, January 18, 2010, Mr. El-Hanafi sent two emails to the American Citizen Services (ACS) division of the United States embassy in Abu Dhabi, requesting assistance in traveling back to the United States. (*See* El-Hanafi Decl. ¶ 5).

Mr. El-Hanafi also sought help from the United States Embassy in person. On January 18, 2010, he went to the Embassy and spoke to a woman working at the ACS information window. She referred Mr. El-Hanafi to a different desk, where he spoke with an Embassy employee named Saeed. Mr. El-Hanafi told Saeed about his family's inability to travel to the United States. Saeed told Mr. El-Hanafi that his problem was "common" and that it could be

resolved within a few days – or a "week, at most."  (*See* El-Hanafi Decl. ¶ 6).

Two days later, on January 20, 2010, Mr. El-Hanafi called and spoke with Saeed again. Saeed told Mr. El-Hanafi that he was going to put him in touch with Gary Price, who could address his no-fly problem.  (*See* Declaration of JaneAnne Murray ("Murray Decl.") Ex. A, consisting of four redacted internal FBI emails addressing efforts to secure an interview with Mr. El-Hanafi).  Saeed gave Mr. El-Hanafi Mr. Price's phone number.  (*See* El-Hanafi Decl. ¶ 7).

That same day, Mr. El-Hanafi called Mr. Price and told him that he needed help getting off the no-fly list.  Mr. Price said that in order to assist Mr. El-Hanafi**,** they needed to meet in person.  Because Mr. El-Hanafi believed that meeting with Mr. Price was the only way for him and his family to get off the no-fly list, he arranged to meet Mr. Price the following day, January 21, 2010, at the Embassy.  At that time, Mr. Price did not identify himself as an FBI agent.

Mr. El-Hanafi also sought assistance from the Department of Homeland Security.  On January 20, 2011, Mr. El-Hanafi completed and filed on-line a Traveler Inquiry Form with the DHS Traveler Redress Inquiry Identity Program ("TRIP"), and assigned a "control number."  As directed by the TRIP website, Mr. El-Hanafi forwarded a copy of the signed form to trip@dhs.gov.  (*See* El-Hanafi Decl., Ex. C).

> 2. *The Embassy directs Mr. El-Hanafi to speak with Gary Price, the FBI liaison to the Embassy, who tells Mr. El-Hanafi that he can help him get off the no-fly list*

On January 21, 2010, Mr. El-Hanafi met with Mr. Price at the Embassy.  They met in the Embassy cafeteria.  Mr. Price asked Mr. El-Hanafi about his jobs, family members and travel history.   He told Mr. El-Hanafi that he would find out what agency put him on the no-fly list, and would "take it from there."  When Mr. El-Hanafi asked Mr. Price how long it might take for Mr. El-Hanafi to be able to fly, Mr. Price told him that (i) it was not a "48-hour turnaround," (ii) Mr. El-Hanafi should go back to work, and (iii) send his wife and children back to New York.

Mr. Price made it clear that he could help Mr. El-Hanafi and told him that he would provide him with a contact person within the department responsible for making a decision about Mr. El-Hanafi's travel.  Mr. Price also asked Mr. El-Hanafi if he was willing to co-operate in order to get off the no-fly list.  Mr. El-Hanafi answered that he was willing to do whatever necessary to get off the list – including "interviews."   (*See* El-Hanafi Decl. at ¶ 10; *see also* Murray Decl. Ex. A).

Towards the end of the interview, Mr. Price asked Mr. El-Hanafi to send him an email with copies of his wife and children's passports, as well as other information concerning his travel.  He then gave Mr. El-Hanafi his business card.  It is only when he saw Mr. Price's business card that Mr. El-Hanafi realized he was with the FBI.  (*See* El-Hanafi Decl. ¶ 10).

Later that same day, Mr. El-Hanafi sent Mr. Price an email with a copy of his passport and ticket.  (*See* El-Hanafi Decl., Ex. D).   Between January 21, 2010 and February 4, 2010, Mr. El-Hanafi exchanged several emails with Mr. Price.  Based on what Mr. Price had told him, Mr. El-Hanafi believed that he could and would put Mr. El-Hanafi in touch with individuals who could arrange for him to be removed from the no-fly list and travel home.  (*See* El-Hanafi Decl., Ex. E).

On Sunday, January 24, 2010, Mr. El-Hanafi called Mr. Price's office, but was informed that Mr. Price was traveling.  John Harley from Mr. Price's office told Mr. El-Hanafi that he was trying to get in touch with Mr. Price, but that in the meantime he could arrange for Mr. El-Hanafi's wife and children travel home to the United States.  Mr. El-Hanafi was told by John that when Mr. Price returned he could help with his travel.  (Murray Decl., Ex. A; El-Hanafi Decl. ¶ 13).  On January 27, 2010, Mr. El-Hanafi's wife and children returned to the United States.  (*See*

El-Hanafi Decl. ¶ 15). [1]

3.      *Mr. Price puts Mr. El-Hanafi in touch with FBI Agents Daniel Withers and Joe Landers, who interrogate Mr. El-Hanafi under the pretext that if he cooperates with the FBI, he can get off the no-fly list and travel home*

On Thursday, February 4, 2010, Mr. El-Hanafi spoke with Mr. Price by phone. He informed Mr. El-Hanafi that the individuals responsible for putting him on the no-fly list wanted to talk to him, and that an interview could be arranged on Friday, February 5, 2010. (*See* El-Hanafi Decl. ¶ 18).

Mr. El-Hanafi was subsequently instructed to go to the Hilton Hotel for the February 5, 2010 meeting. He did, and met Daniel Withers from the FBI in the lobby of the hotel. Agent Withers escorted Mr. El-Hanafi upstairs to a room, where he also met Agent Joe Landers. Agent Withers used a key to unlock the hotel room. The room appeared to be a suite, and there was another room adjacent to the room where Mr. El-Hanafi was questioned. (*See* El-Hanafi Decl. ¶ 19).

Agents Withers and Landers began the interrogation by stating, in sum or substance, that President Obama had made a "big mess" with the no-fly list and that after the "Christmas bomber," a lot of people got added to the list. They told Mr. El-Hanafi, in sum or substance, that they were there "to fix the problem." Mr. El-Hanafi then asked whether his placement on the list was anything particular to him, and they said "no," the "President put everyone on the list." They told Mr. El-Hanafi, in sum or substance, "We are here to help you. We are giving priority

---

[1] Also, on January 27, 2011, Mr. El-Hanafi spoke with Erinn C. Stott, a Citizen Services Specialist with the Department of State. Mr. El-Hanafi spoke with Ms. Stott about his inability to travel and explained that he had been seeking assistance from Mr. Price. Ms. Stott subsequently emailed Mr. El-Hanafi suggesting that in addition to working with the Embassy, he should contact the Transportation Security Administration (TSA). (*See* El-Hanafi Decl. ¶ 16). Following her direction, Mr. El-Hanafi called the TSA and spoke with a TSA supervisor named Carmen in the TSA Redress office. (*See* El-Hanafi Decl., Ex. G).

to you because you are a United States citizen." (*See* El-Hanafi Decl. ¶ 20).

Based on the statements made to him by Embassy officials, Gary Price, and Agents Withers and Landers, Mr. El-Hanafi believed that he had no choice but to speak to the FBI agents if he wanted to travel to the United States and be reunited with his family. Moreover, Agents Withers and Landers led Mr. El-Hanafi to believe that his placement on the no-fly list was an administrative mistake, and that they could help him get off the list if he cooperated with them. Accordingly, Mr. El-Hanafi agreed to meet with them and answer their questions. (*See* El-Hanafi Decl. ¶ 21).

4. *When Mr. El-Hanafi tries to terminate the interview and asks for a lawyer, the Agents ignore his request, lie to him about the consequences of getting counsel, refuse to let him leave, and continue to interrogate him*

After Mr. El-Hanafi answered questions posed by Agent Landers for approximately one hour, Agent Withers accused Mr. El-Hanafi of making inconsistent statements. At that point, Mr. El-Hanafi asked for an attorney. Yet Agents Withers and Landers did not stop questioning him. Instead, they told Mr. El-Hanafi that his life "was about to change," and said that if a lawyer got involved, "all deals were off." Agents Withers and Landers told Mr. El-Hanafi that once a lawyer was involved, the only way to deal with the agents was through the "prosecutors." (*See* El-Hanafi Decl. ¶ 22). The agents then asked him questions about, and showed him copies of Western Union transactions. Mr. El-Hanafi again asked to speak to a lawyer. Again, the agents ignored his request, and asked him questions about how well he could speak and write Arabic and showed him various documents, including an identification document. Mr. El-Hanafi again asked to speak to a lawyer and requested that he have his lawyer present for future meetings. Finally, the agents ended the interview and escorted Mr. El-Hanafi back down to the lobby by Agent Withers. (*See* El-Hanafi Decl. ¶ 23).

While in the lobby with Agent Withers, Mr. El-Hanafi again reiterated his desire to have a lawyer present for future interviews.  Agent Withers told Mr. El-Hanafi that if he wanted an attorney, they could only "talk to [him] in court" and accused him of "not wanting to tell the truth anyway."  Agent Withers then asked Mr. El-Hanafi further questions about the wire transfers.  (*See* El-Hanafi Decl. ¶ 24).

5.     *Mr. El-Hanafi immediately retains an attorney and puts the government on notice that he has counsel*

Immediately after being interrogated by Agents Withers and Price, Mr. El-Hanafi called one of his brothers for help retaining a U.S. lawyer.  That same day, his brother arranged to have Victor Knapp, Esq. represent Mr. El-Hanafi in connection with the no-fly list and any related investigation.  (*See* El-Hanafi Decl. ¶ 26).

Late in the middle of the night of February 5, 2010, or early in the morning of February 6, 2010, Mr. El-Hanafi received a call from Agent Withers.  Agent Withers told Mr. El-Hanafi that he had arrested Mr. El-Hanafi's "friend" and that the "friend" was about to be offered the "golden cookie" – i.e. the opportunity to cooperate with law enforcement.  Agent Withers informed Mr. El-Hanafi that he had a "short time" to decide if he wanted to work with the FBI.  Mr. El-Hanafi told Agent Withers that he had an attorney named Victor Knapp.  (*See* El-Hanafi Decl. ¶ 27).

On March 31, 2010, Mr. El-Hanafi signed an Authorization to Release Information with TRIP, listing Victor Knapp, Esq. as his representative.  (El-Hanafi Decl., Ex. H).

On February 25, 2010, Victor Knapp wrote a letter to AUSA John Cronan and advised him that he and Scott Bookstein, Esq. represented Mr. El-Hanafi in connection with "all matters related to his being placed on the No-FLY list and any pending investigation."  (*See* Murray Decl., Ex. B).

8

C.      The Warrant Applications For Mr. El-Hanafi's Email Accounts

On March 2, 2010, and March 22, 2010, respectively, the government obtained warrants to search two of Mr. El-Hanafi's email accounts: one to Hotmail relating to the email address welhanafi@live.com and one to Yahoo, Inc., relating to the email address welhanafi@yahoo.com.  (*See* Murray Decl., Ex. C (Hotmail Warrant); Ex. D (Hotmail Warrant Application) (sealed), Ex. E (Yahoo Warrant) and Ex. F (Yahoo Warrant Application) (sealed)).  Both Warrant Applications asserted that it was impractical to delegate the search task to Hotmail or Yahoo, or to conduct the search on the premises of Hotmail or Yahoo.  The Hotmail Application states as follows, with an identical provision in the Yahoo Application:

> As a federal agent, I am trained and experienced in identifying communications relevant to the crimes under investigation.  The personnel of Hotmail are not.  I also know that the manner in which the data is preserved and analyzed may be critical to the successful prosecution of any case based on this evidence.  Computer Forensic Examiners are trained to handle digital evidence.  Hotmail employees are not.  It would be inappropriate and impractical, however, for federal agents to search the vast computer network of Hotmail for the relevant accounts and then to analyze the contents of those accounts on the premises of Hotmail.  The impact on Hotmail's business would be severe[.]

(Hotmail Application at ¶ 6(h); *see also* Yahoo Application at ¶ 6(h)).

Accordingly, the Applications sought authorization to obtain a mirror image of the contents of each account:

> In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Hotmail, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Hotmail to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A.  That copy will be provided to me or to any authorized federal agent.  The contents will then be analyzed to identify records and information subject to seizure.

(Hotmail Application at ¶ 6(i); *see also* Yahoo Application at ¶ 6(i)).  Section II of Attachment

A, in the Hotmail Application, in turn, sought:

> All stored electronic mail and other stored content information
> presently contained in, or on behalf of, the following electronic
> mail account, or any related accounts:
>
> welhanafi@live.com
>
> related to: terrorism or terrorism-related activities; violence; efforts
> to contact and/or support al Qaeda or other terrorist organizations;
> the relationship between Wesam El-Hanafi, a/k/a "Khaled," and
> Sabirhan Hasanoff, a/k/a "Tareq," travel, financial transactions;
> use of aliases; ownership and/or use of the accounts; and efforts to
> thwart or avoid law enforcement activity.

(Hotmail Warrant, Attachment A, Section II).  There was in fact no Section II in Attachment A

to the Yahoo Application.  Section II of Attachment B to the document sought "[a]ll stored

electronic mail and other stored content information presently contained in, or on behalf of, the

following electronic mail account, or any related accounts 'welhanafi@yahoo.com.'"  (Yahoo

Warrant, Attachment B, Section II).  In addition, the list of material to be seized from both

Hotmail and Yahoo included "all histories, profiles and 'buddy lists' and/or 'friend lists'"

associated with the target accounts, logs of all access to the accounts, all transactional

information of all activity of the accounts, all business records and subscriber information, all

records relating to services available to the subscribers of the accounts, and all contents of

"Briefcase and Photo areas."  (Hotmail Warrant, Attachment A, Section II; Yahoo Warrant,

Attachment B, Section II).  Notably, the Yahoo Warrant declared that *all* the information sought

in Section II of Attachment B "constitutes evidence of violations" of the material support statute.

(Yahoo Warrant, Attachment B, Section I).

The Applications sought broad authority to review the entirety of the contents of each

account:

> Executing a search warrant to search a Hotmail e-mail account
> requires an approach similar to the standard approach for executing
> a warrant to search papers stored in a file cabinet.  Searching the
> subject e-mail account in this case for evidence of the target crimes
> will require that agents cursorily inspect all e-mails produced by
> Hotmail in order to ascertain which contain evidence of those
> crimes, just as it [is] necessary for agents executing a warrant to
> search a filing cabinet to conduct a preliminary inspection of its
> entire contents in order to determine the documents which fall
> within the scope of the warrant.  In addition, keyword searches
> alone are inadequate to ensure that law enforcement can discover
> all information subject to seizure.  Keywords search text, but many
> common electronic mail, database and spreadsheet applications
> files (which files may have been attached to electronic mail) do not
> store data as searchable text).

(*See* Hotmail Application at ¶ 6(j); *see also* Yahoo Application at ¶ 6(j)).

D.    <u>Probable Cause to Search the Email Accounts</u>

The Applications contained a narrative of the government's investigation of the

defendants and a cooperating co-conspirator ("CW-1") for alleged terrorism activities.  The

Applications noted that "CW-1, El-Hanafi, and Hasanoff utilized electronic communications and

email accounts to communicate with each other, sometimes employing coded language,

regarding their efforts to support and join al Qaeda."  (*See* Hotmail Application at ¶ 12(g);

Yahoo Application at ¶ 12(g)).  The Applications noted in particular that the three allegedly

communicated on Gmail via instant message chats utilizing two specific Gmail accounts,

mahkabab1@gmail.com and mahkabab2@gmail.com.  (*Id.* at ¶ 16).

With respect to the email accounts that are the subject of this suppression motion, the

Applications noted that Mr. El-Hanafi had utilized welhanafi@yahoo.com to communicate with

a Special Agent of the FBI regarding his placement on the no-fly list.  (Hotmail Application at ¶

19(a); Yahoo Application at ¶ 19(a)).  In particular, Mr. El-Hanafi had sent an email from that

account on January 21, 2009, attaching an airline ticket and copies of his passport and that of his

wife's.  *Id.* at ¶ 19(b).  The Applications also recounted that Mr. El-Hanafi had been interviewed

by FBI agents on February 5, 2010, in the United Arab Emirates.  (Hotmail Application, ¶ 20;

Yahoo Application, ¶ 20).  During that interview, Mr. El-Hanafi allegedly volunteered that he

communicated with individuals in the United States using, *inter alia*, welhanafi@yahoo.com and

welhenafi@live.com.  *Id.*  There was no reference in the Applications that Mr. El-Hanafi had

ever utilized either the Hotmail or the Yahoo email accounts to communicate with CW-1.

       E.      <u>The Seizure and Search of Mr. El-Hanafi's E-mail Accounts</u>

The Hotmail Warrant was to be executed according to the following search procedure:

       I.      Search Procedure

       a.      The search warrant will be presented to Hotmail ("Hotmail") personnel, who will be directed to isolate those accounts and files described in Section II below;

       b.      In order to minimize any disruption of computer service to innocent third parties, Hotmail employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein;

       c.      Hotmail employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant; and

       d.      Law enforcement personnel will thereafter review all information and records received from Hotmail employees to determine the information to be seized by law enforcement personnel.

(*See* Hotmail Warrant, Attachment A, Section I).

The Yahoo Warrant required Yahoo to send the entirety of the contents of the targeted account to the government.  (*See* Yahoo Warrant, Attachment B).  The Yahoo Warrant then required that the government seize from the produced materials the following items:

> All information . . . that constitutes fruits, evidence and instrumentalities of violations of [the material support statute], among other statutes, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:
>
> a.   Documents and records relating to: terrorism or terrorism-related activities; violence; efforts to contact and/or support al Qaeda or other terrorist organizations; the relationship between Wesam El-Hanafi, a/k/a "Khaled" and Sabirhan Hasanoff, a/k/a "Tareq"; travel; financial transactions; use of aliases; ownership and/or use of the accounts; and efforts to thwart or avoid law enforcement scrutiny.
>
> b.   Records relating to who created, used or communicated with the account or identifier.

(Yahoo Warrant, Attachment B, Section III).

In March and April, 2010, Hotmail and Yahoo provided materials responsive to the Warrants.  Upon information and belief, and despite the fact that the government was aware that Mr. El-Hanafi was represented by counsel with regard to his placement on the no-fly list and the pending investigation, no effort was made to search the data received using a "wall" team of agents and prosecutors to ensure that privileged communications were protected from disclosure. Moreover, once the search was conducted, the materials deemed unresponsive to the Warrants were never returned to Hotmail, Yahoo or Mr. El-Hanafi.  Notably, however, the government agreed to a defense request that Mr. El-Hanafi's thumb-drive – seized from him at the time of his arrest – would be searched first by a privilege team.

The search yielded several privileged communications between Mr. El-Hanafi and Mr. Knapp.  These communications addressed Mr. El-Hanafi's strategy to defend against his

placement on the no-fly list, and more broadly, the terrorism-related allegations leveled against him during the February 5, 2010 interview by the FBI.  Copies of two of the emails are attached as Exhibits G and H (sealed) to the Murray Declaration.  In addition, the search yielded scores of privileged emails between Mr. El-Hanafi and his wife.  These calls are outlined in a spreadsheet attached as Exhibit I (sealed) to the Murray Declaration.

## ARGUMENT

### I

### THE COURT SHOULD DISMISS THE INDICTMENT OR, IN THE ALTERNATIVE, ORDER A *KASTIGAR* HEARING

In executing search warrants on Mr. El-Hanafi's email accounts, the government seized several privileged communications between Mr. El-Hanafi and his attorney, Victor Knapp.  The government had no probable cause to seize the emails, and despite being on notice that the accounts would contain privileged communications, failed to take minimal steps to prevent their seizure.  As such, the government improperly intruded upon Mr. El-Hanafi's attorney-client relationship with Mr. Knapp.  The appropriate remedy is dismissal, or, in the alternative, the Court should schedule a *Kastigar* hearing.

A.   Because the Government Obtained Mr. El-Hanafi's Privileged Communications the Indictment Should be Dismissed

In *Kastigar v. United States*, 406 U.S. 441 (1972), the Court held in the context of testimony obtained under a grant of immunity that the government has a "heavy burden" to prove that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."  *Id.* at 461-62.  To the extent that burden cannot be met, dismissal is appropriate.  *See United States v. Hubbell*, 530 U.S. 27, 45 (2000) (*Kastigar* requires dismissal of indictment unless the Government proves that the evidence it used in

obtaining the indictment and proposed to use at trial was derived from legitimate sources "wholly independent" of the immunized testimony); *United States v. Kristel*, 762 F. Supp. 1100, 1108 (S.D.N.Y. 1991) (dismissing indictment based on conclusion "that the use of the immunized testimony or cooperating information of Mr. Kristel played an important part in the government's decision to investigate and prosecute Mr. Kristel").

The Second Circuit has held the government's direct or indirect use of attorney-client privileged information is forbidden in the same way that the use of immunized testimony is forbidden. *See United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991) (the "government must demonstrate the evidence it uses to prosecute an individual was derived from legitimate, independent sources") (citing *Kastigar*, 406 U.S. at 461-62 ); *accord, United States v. Weissman*, 1996 WL 751386, at *5-9 (S.D.N.Y. 1996), *aff'd*, 195 F.3d 96 (2d Cir. 1999).  As the court acknowledged in *Weissman*, there is "no principled reason for distinguishing between" cases involving immunized testimony and privileged communications, because "[i]n both, there are policy reasons for safeguarding the material in question."  *Id.* at 5-9 (applying to attorney-client privilege case the same "heavy burden" that the Supreme Court fashioned with respect to immunized testimony in *Kastigar*).

Where prosecutors intentionally intrude into the attorney-client "domain," dismissal of an indictment is appropriate under the broad heading of "governmental misconduct," if the government's conduct has been manifestly and avowedly corrupt or if the defendant can "show prejudice to his case resulting from the intentional invasion of the attorney-client privilege."  *See Schwimmer*, 924 F.2d at 446-47 (finding no prejudice to defendant where government intentionally obtained privileged papers where *Kastigar* "hearing evidence demonstrated that no preview of defense strategy was derived from the workpapers and that no other violative use of

privileged information had occurred"); *Weissman*, 1996 WL 751386 at *12 (finding no basis for dismissal where *Kastigar* hearing established that government's "investigation and presentation to the grand jury were generated by, based upon and derived from legitimate independent sources of proof, rather than from the direct or indirect use of privileged information").

Here, there has been a wholly unauthorized and unjustified invasion of the relationship between Mr. El-Hanafi and his attorney, Mr. Knapp.  It is well-settled that the government may not seize privileged communications in the absence of a basis for invoking the crime-fraud exceptions.  *See United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) ("[a] party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime").  The government did not – and could not – attempt to meet this standard prior to the issuance of the search warrants in this case.  The government had no basis for believing that Mr. Knapp had been retained for any reason other than representing Mr. El-Hanafi with respect to his placement on the no-fly list and the pending investigation.  Indeed, Mr. El-Hanafi advised the government on February 5, 2010, that he had just retained Mr. Knapp on Mr. El-Hanafi's behalf earlier that day to address the no-fly issues, (*see* El-Hanafi Declaration at ¶ 27), and shortly thereafter, Mr. Knapp communicated several times with government representatives, including one of the prosecutors assigned to this case, regarding Mr. El-Hanafi's placement on the no-fly list.  (*See* Murray Decl., Ex. B).  In the absence of probable cause to pierce the attorney-client privilege, and explicit authorization to intercept attorney-client communications, the government was precluded from doing so.

Furthermore, despite clearly being advised of the existence of the attorney-client relationship, the government failed to take reasonable steps in executing the warrant to avoid

improper seizures of privileged communications.  *See Andresen v. Maryland*, 427 U.S. 463, 481, n.11 (1976) (noting that in searches of an individual's papers, "responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy").  Here, despite being on notice that Mr. El-Hanafi had retained an attorney, the government failed to use a "wall" or "taint" team of agents and prosecutors to review the contents of the seized email accounts.  Indeed, DOJ policy requires the establishment of a separate review team where, as here, privileged communications are likely to be seized.  *See Searching and Seizing Computers and Obtaining Elec. Evidence in Computer Investigations*, Dep't of Justice Search and Seizure Manual, at 57-58 (2002) (available at www.justice.gov/criminal/cybercrime/searchmanual.rtf).

In sum, there was a clear invasion of Mr. El-Hanafi's attorney-client "domain" through the search of an email account known to contain privileged communications without authority or justification, requiring the dismissal of the indictment.  *Schwimmer*, 924 F.2d at 446-47; *Weissman*, 1996 WL 751386 at *12; *cf. Kristel*, 762 F. Supp. at 1108 (S.D.N.Y. 1991) (dismissing indictment based on conclusion "that the use of the immunized testimony or cooperating information of Mr. Kristel played an important part in the government's decision to investigate and prosecute Mr. Kristel").   Notably, the privileged emails seized addressed defense strategy in connection with Mr. El-Hanafi's placement on the no-fly list, and the allegations that he supported terrorist activity generally.

      **B.**    <u>In the Alternative, the Court Should Schedule a *Kastigar* Hearing</u>

In the alternative, the Court should schedule a *Kastigar* hearing at which it will be the government's burden to prove that it made no direct or indirect use of the privileged communications.  Where there has been an invasion of the attorney-client relationship, taint is

presumed, and the government bears the "heavy" burden of proving that the "evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."  *Weissman* 1996 WL 7513856 at*6, ("since [Weissman] prevailed with respect to at least a portion of his privilege claim, the burden has shifted to the government to establish that its case was not derived in any respect from a breach of the attorney-client privilege") (*quoting Kastigar*, 461-62); *United States v. Schwimmer*, 892 F.2d 237, 245 (2d Cir. 1989) ("the district court should have conducted an evidentiary hearing to determine whether the government's case was in any respect derived from a violation of the attorney-client privilege in regard to confidential communications passing from Schwimmer to Glickman").

Importantly, the *Kastigar* sanctions apply to direct and derivative use of the privileged evidence.  *See Weissman*, 1996 WL 751386 at *9 (privileged information may not "properly be used as an investigatory lead or as a means of focusing an investigation") (*quoting Kristel*, 762 F. Supp. at 1107); *cf. Schwimmer*, 924 F.2d at 446-47 (*Kastigar* hearing addressed whether privileged communications "preview[ed] defense strategy").  Here, if the Court does not dismiss, it should hold a hearing to determine whether the government made direct or derivative use of the improperly-obtained privileged information in its investigation of Mr. El-Hanafi and its presentation to the grand jury.

## II.

### THE COURT SHOULD SUPPRESS MR. EL-HANAFI'S STATEMENTS TO THE FBI, AND, IF THE GOVERNMENT FAILS TO SATISFY ITS BURDEN AT A *KASTIGAR* HEARING, DISMISS THE INDICTMENT

There are two grounds to suppress Mr. El-Hanafi's statements to the FBI.  First, the government deliberately and deceptively forced him to make statements under threat of continued exile from his place of birth.  In addition, after Mr. El-Hanafi asked the FBI on

February 5, 2010 for an attorney, thereby expressing a desire to terminate the interview, the agents' continued hostile questioning of him amounted to custodial interrogation.  Because at no time during the interrogation did the agents advise Mr. El-Hanafi of his *Miranda* warnings or honor his repeated requests to speak to counsel, the statements Mr. El-Hanafi made after he asked for a lawyer are both involuntary under the Fifth Amendment and obtained in violation of *Miranda*.  Finally, not only should the statements be suppressed, but the presumed taint of the coerced statements should also be the subject of a *Kastigar* hearing, and, unless the government can satisfy its heavy burden at such a hearing, the indictment should be dismissed.

A.   Mr. El-Hanafi's Statements to the FBI were Involuntary

Mr. El-Hanafi's statements to the FBI were not made voluntarily.  The government secured Mr. El-Hanafi's statements by making it clear that if he remained silent, and did not cooperate with questioning, he would have no way of returning to the United States and would remain effectively exiled from the United States for an indefinite period of time.  While in fact the FBI was deceiving Mr. El-Hanafi, and it had no intention of actually helping him get off the no-fly list, that fact does nothing to lessen the ploy's coercive effect.  By the time he met with the FBI, Mr. El-Hanafi reasonably believed, based on the deliberate lies of the FBI agents, that he had no choice but to answer their questions if he wanted to return to his home country and be reunited with his wife and children.

1.   *Applicable Law*

The Fifth Amendment of the United States Constitution prohibits the use at trial of statements "not freely and voluntarily given."  *Colorado v. Connelly*, 479 U.S. 157 (1986).  Due process also forbids the use at trial of statements obtained by coercion.  *See Brown v. Mississippi*, 297 U.S. 278, 286 (1936).  "If a defendant's confession was obtained by 'techniques

19

and methods offensive to due process' or under circumstances in which the suspect clearly had

no opportunity to exercise 'a free and unconstrained will,' the statements are inadmissible under

the Fifth Amendment." *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998) (quoting

*Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (internal quotations marks and other citations

omitted)).

No single factor controls whether a suspect's confession was coerced.  Rather, a court

must examine the "totality of the circumstances" surrounding the questioning, including "(1) the

accused's characteristics, (2) the conditions of the interrogation, and (3) the conduct of the

police." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 213 (2d Cir.

2008) (*citing Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003)).  A court is required to take

into consideration whether "the defendant knew the nature of the offense with which he was

charged or of which he was suspected at the time of making the confession," whether the

defendant "was advised or knew that he was not required to make any statement and that any

such statement could be used against him" and whether or not counsel was present during the

interrogation.  18 U.S.C. § 3501(b).

The law is clear that coercion can be "mental as well as physical; the blood of the

accused is not the only hallmark of an unconstitutional inquisition." *Garrity v. State of New

Jersey*, 385 U.S. 493, 496 (1967) (internal citations and quotations omitted).  When the

government "compels testimony by threatening to inflict potent sanctions unless the

constitutional privilege is surrendered that testimony is obtained in violation of the Fifth

Amendment." *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977).  *Cf. Minnesota v. Murphy*,

465 U.S. 420 (1984) (Because state did not require probationer "to choose between making

incriminating statements and jeopardizing his conditional liberty by remaining silent," the Court

held that defendant's "Fifth Amendment privilege was not self-executing."). The penalty imposed on silence need not be economic in order to be coercive. *See Cunningham*, 431 U.S. at 806 ("the touchstone of the Fifth Amendment is compulsion, and direct economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids").

Thus, in *Garrity v. State of New Jersey*, 385 U.S. 493, 496 (1967), the Supreme Court affirmed the lower court's decision to suppress statements police officers had made when the State threatened to fire them unless they answered investigators' questions. *Id.* The Supreme Court held that by putting the defendants between the "rock and the whirlpool," *Garrity*, 385 U.S. at 498, the government's conduct was "likely to exert such pressure . . . as to disable [them] from making a free and rational choice." *Id.* at 497. *See also Gardner v. Broderick*, 392 U.S. 273, 279 (1968) ("[T]he mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment."). Similarly, in *United States v. Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006), Judge Kaplan suppressed statements made at proffers by KPMG employees when KPMG, at the government's insistence, had conditioned "payment of legal fees upon cooperating with the prosecutors." In so holding, Judge Kaplan wrote, "It no longer may be doubted that economic coercion to secure a waiver of the privilege against self-incrimination, where it is attributable to the government, violates the Fifth Amendment if the pressure is sufficient to 'deprive [] the accused' of his 'free choice to admit, to deny, or to refuse to answer.'" *Id.* at 326 (quoting *Garrity*, 385 U.S. at 496).

Courts have applied a two prong test for determining whether the penalty attached to remaining silent rises to the level of unconstitutional coercion in violation of the Fifth

Amendment.  First, the defendant must have subjectively believed that he was compelled to give a statement, and second, that belief must be reasonably held.  *See Stein*, 440 F. Supp. 2d at 328 (S.D.N.Y. 2006) ("These considerations strongly suggest, and this Court holds, that an individual claiming that a statement was compelled in violation of the Fifth Amendment must adduce evidence *both* that the individual subjectively believed that he or she had no real choice but to speak *and* that a reasonable person in that position would have felt the same way.").  To determine whether a defendant's fear that his or her silence will be penalized is objectively reasonable, a Court should examine the totality of circumstances; implied, as well as direct, threats to penalize silence can be sufficient to establish coercion.  *See United States v. Friedrick*, 842 F.2d 382 (D.C. Cir. 1988). *See also United States v. Slough*, 677 F. Supp. 2d 112 (D.D.C. 2009) ("the absence of an express *Garrity* warning does not indicate a lack of objective reasonableness"), *rev'd on other grounds*, --F.3d -- , 2011 WL 1516148 (D.C. Cir. April 22, 2011).

A defendant challenging a confession has the right to "a fair hearing and a reliable determination on the issue of voluntariness." *Jackson v. Denno*, 378 U.S. 368, 377 (1964); *see also* 18 U.S.C. § 3501(a) ("the trial judge shall, out of the presence of the jury determine any issue as to voluntariness").  "Once the voluntariness of a statement is properly placed in issue, the burden of proving that it was voluntary is on the government." *Stein*, 440 F. Supp. 2d at 328, n.68 (citations omitted).  *See also United States v. Anderson*, 929 F.2d, 96, 99 (2d Cir. 1991).

    2.    *Mr. El-Hanafi's Statements to the FBI Were Coerced*

Here, Mr. El-Hanafi's statements were not the product of a "free and unrestrained will." After the government placed Mr. El-Hanafi on the no-fly list, thereby preventing him from returning to the country of his birth, Mr. El-Hanafi met twice with the FBI.  Mr. El-Hanafi was

first interviewed by the FBI on January 21, 2010, by an agent with the FBI's legal attaché office ("LEGAT") at the United States Embassy in Abu Dhabi.[2]  Eleven days later, on February 5, 2010, two different FBI agents interviewed Mr. El-Hanafi at the Hilton Hotel in Abu Dhabi.[3] Prior to these interviews, a series of government officials made it abundantly clear to Mr. El-Hanafi that in order for him to travel home to the United States and be reunited with his wife and children, he would have to meet with, and answer the questions of, the FBI – the agency that was purportedly responsible for putting him on the list in the first place.  Effectively banished from his home country, and separated from his wife and children, Mr. El-Hanafi was, by the time of the FBI interviews, increasingly desperate to find a way to travel home.  The government, in order to secure his cooperation and compel him to make statements, deliberately misled Mr. El-Hanafi into believing that if he remained silent, he would remain barred from traveling and going home to be with his family.

Before Mr. El-Hanafi met with Mr. Price – who, unbeknownst to Mr. El-Hanafi at the time of the interview, was the official FBI liaison to the Embassy – State Department employees had told Mr. El-Hanafi that Mr. Price could help him get off the no-fly list.  Indeed, Mr. Price himself made that clear to Mr. El-Hanafi.  Over the phone, but before the interview, Mr. Price told Mr. El-Hanafi that in order to help him travel, Mr. El-Hanafi needed to come for an in-person interview.  At the January 21, 2010 interview, when Mr. El-Hanafi asked Mr. Price how

---

[2] According to a 2004 report from the Office of the Inspector General, "special agents assigned to these [Legat] offices work with their counterparts in foreign countries to obtain information for the FBI on crimes and criminals that could harm U.S. citizens or interests."  *See* U.S. Department of Justice, Office of the Inspector General Audit Division, *Federal Bureau of Investigation Legal Attache Program*, Audit Report 04-18, March 2004 at i (Redacted and Unclassified), available at *http://www.fas.org/irp/agency/doj/fbi/legat.pdf*  (last checked January 12, 2010).  The report further states that the Legat Offices' number one priority is "counterterrorism investigations and activities." *Id.* at iv.

[3] At no point in time was Mr. El-Hanafi advised of his *Miranda* warnings.

long it would take before he was able to travel, Mr. Price told him that it would not be a "48-hour turnaround," but that his office could arrange for Mr. El-Hanafi's wife and children to travel back to New York sooner.

The circumstances leading up to the February 5, 2010 interview put Mr. El-Hanafi under even greater pressure. By the time that Mr. El-Hanafi met with Agents Withers and Landers, he was alone (his wife and children had returned to New York on January 27) and had been unable to travel home for over two weeks. Mr. Price had told Mr. El-Hanafi that Agents Withers and Landers were from the agency responsible for putting Mr. El-Hanafi on the no-fly list and thus were the only ones who could help get him off the list. Moreover, Mr. Price had made it clear that in order to get off the list, he would have to "cooperate," including, specifically, by providing "interviews."

Beyond that, at the beginning of the February 5, 2010 interview, Agents Withers and Landers purposefully told Mr. El-Hanafi a series of lies – including that his placement on the no-fly list was not particular to him, and that the agents were there to "fix" Mr. El-Hanafi's "problem." They even went so far as to tell Mr. El-Hanafi that they wanted to "help" him and were giving him "priority" because he was a United States citizen.

These lies exerted extraordinary pressure on Mr. El-Hanafi and understandably made him believe that if he wanted to travel home, he had no choice but to answer the questions posed by the FBI. The pressure exerted on Mr. El-Hanafi was severe and certainly "sufficient to 'deprive [] the accused' of his 'free choice to admit, to deny, or to refuse to answer.'" *Stein*, 440 F. Supp. at 326 (quoting *Garrity*, 385 U.S. at 496).

Indeed, the penalty imposed on Mr. El-Hanafi's silence – effective exile from his home country – was a *more* "potent sanction" than the penalties threatened in *Stein*, *Cunningham*, and

*Garrity* which involved, respectively, the loss of attorney fees, political office, and employment. Here, by placing Mr. El-Hanafi on the no-fly list, the government deprived him of his right to citizenship under the Fourteenth Amendment of the U.S. Constitution.  *See Nguyen v. INS*, 533 U.S. 53, 67 (2001); *Balzac v. Porto Rico*, 258 U.S. 298, 308-09 (1922).  As the Supreme Court explained more than fifty years ago, "Travel abroad, like travel within the country, may be necessary for a livelihood.  It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads.  Freedom of movement is basic in our scheme of values."  *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) (internal citations omitted).

The government concedes the key factual underpinnings for Mr. El-Hanafi's suppression claim, namely: that both interviews "were conducted in the pretext of assisting him in securing his removal from the no-fly list."  *See* Government Opposition to Defendants' Motion For Discovery at 10.  Yet the government insists that the agents' deception was entirely proper. Ignoring the highly coercive effect of the pretext used to induce Mr. El-Hanafi to meet and speak with the FBI, the government cites the unremarkable proposition that "the use of ruses by law enforcement has long been held to be proper."  (*See* Gov. Br. at 9).  While law enforcement ruses are sometimes approved, trickery is not sanctioned when the misrepresentations have the potential to "overbear a defendant's will."  *United States v. Ruggles,* 70 F.3d 96, 100-02 (2d Cir. 1991).  Thus, in *Lynumn v. Illinois*, the Supreme Court suppressed statements made by a suspect after a police officer had suggested that if she did not cooperate she could lose custody of her children.  372 U.S. 528 (1963).

While police are free to lull suspects into a false sense of security – so that perhaps they are unaware that they are even speaking with the police – that sort of deception is entirely distinct from what was practiced here.  A defendant speaking to a jailhouse informant or an

undercover police officer still makes a free and unconstrained choice as to whether to speak.  *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners.").  Here, on the other hand, the trick deployed *coerced* Mr. El-Hanafi such that he felt that he had no choice but to speak.  Trickery is indeed sometimes sanctioned.  *See, e.g.*, *Lewis v. United States*, 385 U.S. 206 (1966) (finding that the concealment of an undercover agent's identity was proper where the petitioner's only concern was whether the agent was willing to engage in an illegal narcotics sale).  However, a coercive ruse that overbears a defendant's free will is not.  *See, e.g., United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 289-92 (S.D.N.Y. 2008) (noting that consent should not be found valid in cases where police misrepresentation of purpose is so extreme as to deprive a person of the ability to make a fair assessment of the need to surrender their privacy) (omitting internal quotations and citations).

Nor is it relevant that Mr. El-Hanafi ultimately left the interview.  As in *Stein*, *Garrity*, and *Cunningham*, where none of the defendants were in custody and all left the interviews voluntarily, the fact that Mr. El-Hanafi eventually left the interview has little, if any, bearing on the analysis.  More significant is that Mr. El-Hanafi could not leave when he first wanted to.  As soon as the FBI agents accused of him of lying and began asking him a series of hostile, accusatory questions, Mr. El-Hanafi asked to consult a lawyer.  But instead of honoring Mr. El-Hanafi's request for a lawyer and to terminate the interview, Agents Withers and Landers lied to Mr. El-Hanafi yet again, telling him that if he got a lawyer he could not deal with the agents anymore and that they would then only be able to talk to him "in court."  After being told that getting a lawyer would prevent him from dealing with the agents, Mr. El-Hanafi reasonably

believed not only that he had to speak to the agents to get off the no-fly list, but that he had to do so without seeking the assistance of a lawyer.

It is precisely these "kinds of misleading statements" that the Second Circuit has found to pose "a serious constitutional problem." *Anderson*, 929 F.2d at 100 (confession involuntary where suspect told that if he asked for a lawyer, he would be precluded from cooperating with the government).  Affirmative misrepresentations by law enforcement that compel a suspect to speak constitute impermissible coercion in violation of the Fifth Amendment.  *See, e.g.*, *Montes-Reyes*, 547 F. Supp. 2d at 288.

In short, Mr. El-Hanafi had every reason to believe that in order to get off the no-fly list he had to talk to the FBI agents and that he had to do so without an attorney.  Because, as the government has essentially conceded, that belief was objectively reasonable, Mr. El-Hanafi's statements were coerced and should be suppressed.

B.    Mr. El-Hanafi's Statements Should Also Be Suppressed Because After Mr. El-Hanafi Asked for An Attorney, He Was Subjected to Custodial Interrogation Without Being Advised of His *Miranda* Warnings

Under *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  The Supreme Court explained that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id.*

Custodial interrogation exists whenever an individual is interrogated in "custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak," and "when the inquiry is conducted by officers who are

27

aware of the potentially incriminatory nature of the disclosures." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987).   To determine whether an individual is in custody, courts examine all the circumstances surrounding the interrogation. *See Stansbury v. California*, 511 U.S. 318, 322 (1994).  The test is objective, namely, "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *see also Stansbury*, 511 U.S. at 323.  Courts have considered a number of factors in making the custody determination, including: "whether a suspect is or is not told that she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the police, whether the suspect is searched, frisked, or patted down, and the length of the interrogation." *Tankleff v. Senkowski*, 135 F. 3d 235 (2d Cir. 1998) (internal citations omitted).

Here, at the moment that Agents Withers confronted Mr. El-Hanafi, accused him of lying, and told him that his life "was about to change," Mr. El-Hanafi was subjected to custodial interrogation.  His request to consult with an attorney, and thereby terminate the questioning, was ignored.  Mr. El-Hanafi was separated from his family, barred from leaving the country to return home, and alone with two angry FBI agents in a foreign hotel room.  Escorted to the locked hotel room, and then subject to hostile and aggressive questioning, Mr. El-Hanafi did not feel free to leave without that escort.  *See Tankleff*, 135 F.2d at 244 (murder suspect who voluntarily accompanied police to station but then was subjected to "increasingly hostile questioning" was in custody).  When the questioning turned hostile, and the agents ignored Mr. El-Hanafi's requests for an attorney, he was thereafter subject to "pressures that sufficiently impair[ed] [his] free exercise of [his] privilege against self-incrimination to require that she be warned of his constitutional rights." *See Berkemer*, 468 U.S. at 421.

At the moment that the questioning turned into custodial interrogation, the agents should have advised Mr. El-Hanafi of his *Miranda* warnings, and scrupulously honored his request for an attorney.  The agents failed on both counts.  Not only did they fail to warn Mr. El-Hanafi at any point in time that his statements could be used against him and that he had the right to remain silent, but when Mr. El-Hanafi did ask for an attorney, the agents did not stop questioning him, but aggressively escalated the interrogation and threatened that if he got a lawyer, he would no longer be able to "deal" with them.  The agents' dual violation of *Miranda* – the absence of any warnings and the deliberate disregard for Mr. El-Hanafi's persistent requests for an attorney –provides additional grounds to suppress any Mr. El-Hanafi's statements that followed the custodial interrogation.

C.    <u>Unless the Government Can Demonstrate at a *Kastigar* Hearing that Mr. El-Hanafi's Compelled Statements Were Not Used Either Directly or Indirectly, the Indictment Should be Dismissed</u>

The fact that Mr. El-Hanafi's statements were coerced in violation of the Fifth Amendment provides yet another ground to hold a *Kastigar* hearing, and, if the government fails to satisfy its heavy burden at such a hearing, to dismiss the indictment.  Unlike statements obtained in violation of *Miranda*, which can be used to obtain leads or to impeach a testifying defendant at trial, coerced or involuntary statements may not be used, directly or indirectly, by the government in any way at all.  *See New Jersey v. Portash*, 440 U.S. 450, 459 (1979) ("a defendant's compelled statements, as opposed to statements taken in violation of *Miranda*, may not be put to any testimonial use whatever against him in trial"); *Mincey v. Arizona*, 437 U.S. 385 (1978) ("But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law.") (Emphasis in original).

Thus, courts have routinely applied the *Kastigar* rule when the government has obtained statements in violation of *Garrity*. "The Fifth Amendment automatically confers use and derivative use immunity on statements compelled under *Garrity*; this means that in seeking an indictment from a grand jury or a conviction at trial, the government is prohibited from using such compelled statements or any evidence obtained as a result of those statements." *Slough*, 677 F. Supp. 2d at 115. *See also Sher v. Dep't of Veterans Affairs*, 488 F.3d 489,. 501-02 & n.2 (1st Cir. 2007); s*ee also Stein*, 440 F. Supp. 2d at 338 ("The coerced statements and their fruits must be suppressed.").

As with the presumed taint flowing from the government's seizure of Mr. El-Hanafi's privileged communications, unless the government can sustain its "heavy" burden at a *Kastigar* hearing that the evidence used to prosecute Mr. El-Hanafi derives from sources other than his coerced statements and privileged communications with his attorney, the indictment must be dismissed.

III.

## ALL EVIDENCE SEIZED AS A RESULT OF SEARCH WARRANTS EXECUTED ON MR. EL-HANAFI'S YAHOO AND HOTMAIL EMAIL ACCOUNTS SHOULD BE SUPPRESSED

This Court should also suppress the evidence seized from searches of Mr. El-Hanafi's Hotmail and Yahoo email accounts – and the fruits of such evidence – because the Warrants failed to comply with the Fourth Amendment's essential pre-requisites, and because the searching agents failed to abide even by the Warrants' minimal limitations. The Warrants suffered from two fatal defects. First, they were facially overbroad. Under the Fourth Amendment, a warrant may authorize seizure of an item only with probable cause to believe the item represents evidence or the fruit of a crime. The Warrant Affidavits, however, set forth no

basis for believing that these email accounts were repositories of any terrorist-related communications.  Second, the Warrants lacked constitutionally-mandated particularity.  The Fourth Amendment requires that warrants particularly list the items to be seized.  Because the search warrants in this case described what may be seized in such inclusive general terms, they essentially authorized whole-sale rummaging through Mr. El-Hanafi's personal communications and affairs, unlimited by scope, time or number of searches.  Compounding these violations of the Fourth Amendment is the fact that the searching agents exceeded the scope of the Warrants when they disregarded the provision that the agents search the data produced by Hotmail and Yahoo to determine precisely what to seize, electing instead to seize everything and thus ensure that the "file cabinet" of Mr. El-Hanafi's daily communications for six years would be at the government's disposal indefinitely.  The agents also violated the requirement that they minimize privacy intrusions in the execution of a warrant for papers, where, particularly egregious here, they seized scores of communications subject to the attorney-client and spousal privileges.  The impermissible scope and execution of the Warrants mandate suppression.  To the extent the issues may not be resolved on the papers alone, the Court should hold an evidentiary hearing to elucidate the issues raised in this motion, as well as analyze both the government's assertions in support of the issuance of the warrant, pursuant to *Franks v. Delaware*, 438 U.S. 152 (1978), and to determine the extent to which the unauthorized seizures tainted other evidence to be offered at trial, pursuant to *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

>    A.      The Warrants Clause and the Search of Electronic Data

The Fourth Amendment was intended as a bulwark against "the 'general warrant' abhorred by the colonists" and protects against "a general, exploratory rummaging in a person's personal belongings."  *Coolidge* v. *New Hampshire*, 403 U.S. 443, 467 (1971).  Its overarching

purpose is to ensure that "those searches deemed necessary should be as limited as possible." *Id.*

To achieve its goal, the Warrants Clause forbids overbreadth and requires particularity, two

related but legally distinct constitutional objections to a warrant. "Particularity is the requirement

that the warrant must clearly state what is sought.  Breadth deals with the requirement that the

scope of the warrant be limited to the probable cause on which the warrant is based." *United*

*States v. Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009) (quoting *United States v. Hill*, 459

F.3d 966, 973 (9th Cir.2006)).  Thus, "a warrant can violate the clause 'either by seeking specific

material as to which no probable cause exists, or by giving so vague a description of the material

sought as to impose no meaningful boundaries.'"  *Id.* at 390 (quoting *United States v. Cohan*,

628 F. Supp. 2d 355., 359 (E.D.N.Y.2009)).

    A warrant is sufficiently particular if it "enable[s] the executing officer to ascertain and

identify with reasonable certainty those items that the magistrate has authorized him to seize."

*United States* v. *George*, 975 F.2d 72, 75 (2d Cir. 1992).  By limiting searches "to the specific

areas and things for which there is probable cause to search, the requirement ensures that the

search will be carefully tailored to its justifications, and will not take on the character of the

wide-ranging exploratory searches the Framers intended to prohibit."  *Maryland v. Garrison*, 480

U.S. 79, 84 (1987).

    As the Supreme Court recognized, document searches pose unique Fourth Amendment

concerns:

> [T]here are grave dangers inherent in executing a warrant
> authorizing a search and seizure of a person's papers that are not
> necessarily present in executing a warrant to search for physical
> objects whose relevance is more easily ascertainable.  In searches
> for papers, it is certain that some innocuous documents will be
> examined, at least cursorily, in order to determine whether they
> are, in fact, among those papers authorized to be seized . . .
> [R]esponsible officials, including judicial officials, must take care

> to assure that they are conducted in a manner that minimizes
> unwarranted intrusions upon privacy.

*Andresen v. Maryland*, 427 U.S. 463, 482 n. 11 (1976).   "The dawn of the Information Age has only heightened those concerns."  *Cioffi*, 668 F. Supp. 2d at 392.   The *Cioffi* court explained: "[t]he risk of exposing intimate (and innocent) correspondence to prying eyes is magnified because '[c]omputers ... often contain significant intermingling of relevant documents with documents that the government has no probable cause to seize.'" *Id.* (quoting *United States v. Vilar*, 2007 WL 1075041, at *35 (S.D.N.Y. 2007)).

The necessity for balancing privacy interests and legitimate law-enforcement concerns in the context of computer searches has led one court to endorse the creation of "firewalls" to prevent investigators and prosecutors from obtaining the results of a computer search until documents within the scope of the warrant had been segregated by a third party.  In *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2009) (CDT), an *en banc* opinion, the Ninth Circuit addressed "the procedures and safeguards that federal courts must observe in issuing and administering search warrants and subpoenas for electronically stored information." *Id.* at 1166.  CDT administered a steroid testing program for the Major League Baseball Players Association, and after the Government learned that ten players had tested positive for steroid use, it sought and obtained a subpoena limited to the records of those ten players.  *Id.*  After the players and CDT moved to quash the subpoena, the government "obtained a warrant in the Central District of California authorizing the search of CDT's facilities in Long Beach. Unlike the subpoena, the warrant was limited to the records of the ten players as to whom the government had probable cause.  When the warrant was executed, however, the government seized and promptly reviewed the drug testing records for hundreds of players in Major League Baseball (and a great many other people)."  *Id.*

The Ninth Circuit concluded that CDT was "an obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause." *Id.* at 1172. To prevent the Government overreaching in the future, the Ninth Circuit imposed stringent requirements including that the government should "forswear reliance on the plain view doctrine or any similar doctrine that would allow it to retain data to which it has gained access only because it was required to segregate seizable from non-seizable data," *id.* at 1178, and that the warrant application "should normally include, or the judicial officer should insert, a protocol for preventing agents involved in the investigation from examining or retaining any data other than that for which probable cause is shown." *Id.* at 1179.  The Ninth Circuit suggested that an independent expert or special master segregate the material, and allow the investigating officers to search only the information responsive to the warrant.  *Id.*

While no court in this circuit has yet required the government to specify its search protocol in advance, the Second Circuit in *United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010), held that a warrant's uncircumscribed search of defendant's electronic equipment violated the Fourth Amendment, acknowledging:

> The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important.

*Id.* at 62 (quoting *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir.2009)).

  B.   The Warrants Were Overbroad

The Warrants authorized the seizure and subsequent search of the entirety of the contents of two email accounts used by Mr. El-Hanafi, despite the absence of any evidence that these

accounts had been used by Mr. El-Hanafi for the purpose of engaging in communications related to alleged terrorist activities.  As such, they were unconstitutionally overbroad.

The probable cause requirement of the Fourth Amendment is location-specific: there must be "a fair probability that contraband or *evidence of a crime will be found in a particular place*."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis added); *see also United States v. Travisano,* 724 F.2d 341, 346 (2d Cir. 1983) (when determining whether probable cause is sufficient to support a search warrant for a particular location, "the applicable standard ... is that there be a fair probability that *the premises will yield the objects specified in the search warrant*") (emphasis added).  While probable cause is not equivalent to the evidence necessary to secure a conviction, it cannot be based on mere speculation and suspicion.  *See Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (indicating that probable cause requires "less than evidence which would justify ... conviction," but "more than bare suspicion") (internal quotation marks omitted).

The probable cause requirement applies equally to searches of a communication medium used by someone allegedly engaged in criminal activity.  Indeed, the requirement of probable cause is heightened in the context of a search of an individual's personal communications, because of the risk of unwarranted intrusion into private matters.  *See Cioffi*, 668 F. Supp. 2d at 392.  Thus, courts authorizing search warrants of email accounts have required a nexus between the email account and the criminal activity under investigation.  *See*, *e.g.*, *United States v. Bowen*, 689 F.Supp.2d 675 (S.D.N.Y. 2010) (probable cause to search entire email account where "Defendants' alleged enterprise was primarily or solely criminal and Defendants used the target email accounts as their primary email accounts for conducting that business"); *United States v. McDarragh*, 2006 WL 1997638 (S.D.N.Y. 2006) (probable cause to search entire email

account for further evidence of the crime of enticing a minor, where warrant application "extensively documented the continued use of the email account in perpetrating the alleged crime").

Here, no such nexus existed.  The Applications go to great lengths to endeavor to establish probable cause that Mr. El-Hanafi engaged in a conspiracy to provide material support to terrorists, and repeatedly point out that he allegedly communicated with others by email.  But nowhere in the Applications is there any suggestion that he used the Hotmail or Yahoo accounts for terrorism-related communications.  While the Affidavits note extensive debriefings with an alleged co-conspirator, the Applications do not state that Mr. El-Hanafi used the targeted email accounts to communicate with this individual about anything, much less, subject matter that was terrorism-related.  Indeed, the proposition is undermined by other claims in the Affidavits, including that Mr. El-Hanafi allegedly communicated with co-conspirators in code and advised the use of encryption techniques.  (*See* Hotmail Application at ¶ 12; Yahoo Application at 12). The one email address identified in the Affidavit as allegedly used by Mr. El-Hanafi to communicate with the cooperating witness on matters relating to charges in the indictment, mahkabab1@gmail.com, was a code name that was not on its face linked to Mr. El-Hanafi.  In fact, there is no mention whatsoever of the contents of any email from the Hotmail account, and the only emails specified from the Yahoo address were manifestly non-criminal communications between Mr. El-Hanafi and the State Department.  At the very least, the Applications fail to limit the seizure authority to communications between and among the defendants and CW-1.

In sum, the Applications fail to connect either target email account with criminal activity, rendering the warrants impermissibly overbroad.

C.      <u>The Search Warrants Lacked Particularity</u>

The Warrants authorized precisely the kind of general "rummaging" prohibited by the Fourth Amendment.  The violation of particularity is especially egregious here, where the government seized everything prior to the search, and has never returned unutilized material to Yahoo, Hotmail or Mr. El-Hanafi, thus ensuring that the government may conduct unlimited searches again and again of the search premises, without every having to seek an additional warrant.

The recent case of *United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010), is directly on point. In *Rosa*, the Second Circuit held that a search warrant's authorization of an uncircumscribed search of a child pornography suspect's electronic equipment "violated the Fourth Amendment's core protection against general searches." *Id.* at 61.  The warrant at issue in *Rosa* authorized law enforcement officers to seize and search computer, electronic and video equipment without setting forth the suspected criminal activity, or incorporating by reference the search warrant application that specified the crimes under investigation.  It provided the government with "unrestrained access to electronic records of his daily activities and private affairs." *Id.* at 61. As such, "[t]he warrant was defective in failing to link the items to be searched and seized to the suspected criminal activity . . . and thereby lacked meaningful parameters on an otherwise limitless search of Rosa's electronic media." *Id.* at 62.  The Court therefore concluded "that the warrant failed to describe with particularity the evidence sought and, more specifically, to link that evidence to the criminal activity supported by probable cause. As a result, the warrant violated the Fourth Amendment's proscription against general searches." *Id.*

The Warrants here authorized the same unlimited search of an electronic record "of [Mr. El-Hanafi's] daily activities and private affairs." *Id.* at 61.  The Warrants directed Hotmail and

Yahoo to produce to the FBI mirror images of the entire contents of Mr. El-Hanafi's email accounts, including all stored emails, all histories, profiles and buddy/Friend lists, all log access records, all related transactional information such as IP addresses, all subscriber information and any other data and photos stored in the account.  (*See* Warrants).

There are minor differences between the two Warrants regarding search procedures, but essentially, both permitted an unlimited search of the entire contents of each account.

While the Hotmail Warrant indicated that the FBI would conduct its own search of the data produced by Hotmail, it contained "no guidance as to the type of evidence sought." *Rosa*, 626 F.3d at 62; *see*, *e.g.*, (Hotmail Warrant at ¶ I.d ("Law enforcement personnel will thereafter review all information and records received from Hotmail employees to determine the information to be seized by law enforcement personnel")).  The Hotmail Warrant's direction to Hotmail to produce all stored email content relating to "terrorism or terrorism-related activities, violence, efforts to contact and/or support al Qaeda or other terrorist organizations; the relationship between Wesam El-Hanafi, a/k/a 'Khaled,' and Sabirhan Hasanoff, a/k/a 'Tareq,'; travel; financial transactions; use of aliases; ownership and/or use of the accounts; and efforts to thwart or avoid law enforcement scrutiny" does not cure the particularity problem.  First, that direction is addressed to Hotmail, not the investigation agents.  In any event, since the Warrant also required Hotmail to produce mirror images of the targeted email accounts, the Hotmail Warrant effectively equated *every* email with terrorist activity.  By requiring the wholesale seizure of everything in the email accounts, the Warrants authorized general "rummaging" searches with no parameters.  Notably, nothing in the Hotmail Application could cure the Warrant's particularity defects, since they were not incorporated by reference into the Warrants themselves. *See Rosa*, 626 F.3d at 63 ("[t]he fact that the application adequately described the

'things to be seized' does not save the warrant from its facial invalidity because the Fourth

Amendment 'by its terms requires particularity in the warrant'") (quoting *Groh v. Ramirez*, 540

U.S. 551, 557 (2004)).

The Yahoo Warrant directed the government to seize only information that "constitutes

fruits, evidence, and instrumentalities" of the material support statutes but adds that  they may

also seize evidence of violations of unnamed "*other statutes*," making it essentially a general

warrant.  Moreover, the list of responsive documents is so vague and limitless, that it effectively

authorizes a general rummaging anyway.  (Yahoo Warrant, Attachment B, Section II); *see Cioffi*,

668 F. Supp. 2d at 390 (warrant can violate particularity requirement "by giving so vague a

description of the material sought as to impose no meaningful boundaries") (citation omitted).

Not only did the Warrants fail to set any boundaries to the FBI's search, they also failed

to require that that search be conducted by teams of walled agents, as required by the Ninth

Circuit in *CDT*.  While no court in this circuit has adopted *CDT*'s protocol, the Warrants clearly

contemplated some kind of selection process, whereby emails and account information related to

terrorist activity would be seized, and implicitly, whatever was left over would be returned or

otherwise rendered off-bounds from additional government scrutiny.  The Warrants, however,

contained no such requirement, leading to the specter of not just one general search, but multiple

general searches, since the government maintained control over the searched "premises."  The

government, therefore, was free (and is still free) to conduct another general search at whim

whenever a new piece of evidence or new theory presented, justifying additional rummaging

through Mr. El-Hanafi's emails.  This carte-blanche to engage in limitless general searches

mandates blanket suppression.

    **D.**    <u>The Executing Officers Failed to Comply with the Warrants' Terms</u>

Even if the Warrants here are to be interpreted as limiting any seizure to emails relating to alleged terrorist activities and communications between alleged terrorists, the search agents manifestly transgressed their limits, seizing items not authorized to be seized and failing to comply with the Warrants' notice provisions.  The fruits of the searches should be suppressed on this separate ground.  *See United States v. Liu,* 239 F.3d 138, 140 (2d Cir.2000) (government agents "flagrantly disregard" the terms of a warrant requiring wholesale suppression when "(1) they effect a 'widespread seizure of items that were not within the scope of the warrant,' ... and (2) do not act in good faith") (quoting *United States v. Matias,* 836 F.2d 744, 748 (2d Cir.1988)) (citations omitted).  As the Second Circuit has noted, "[t]he rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search."  *Liu*, 239 F.3d at 141.  Therefore "to satisfy the first prong of the two-part test described above, the search conducted by government agents must *actually resemble* a general search."  *Id.*

The Warrants authorized the agents to search a mirror image of the entire Hotmail and Yahoo accounts from the service providers and thereafter "determine the information to be seized."  (Hotmail Warrant, Attachment A, Section I.d.; Yahoo Warrant, Attachment B, Section II).  The agents, however, conducted no selection, but seized everything, manifestly far more material than was authorized, even by these overbroad Warrants.  40,000 emails were seized, none of which addressed any terrorist activities.  They did, however, include hundreds of privileged and personal emails, including communications between Mr. El-Hanafi and his lawyer, Victor Knapp, and emails between Mr. El-Hanafi and his wife.  Notably, the Affidavits contained no facts supporting a finding that the crime-fraud exception applied here with respect

to spousal or attorney-client communications.  *See, e.g.*, *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir.1997) ("[a] party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime").  Clearly, the executing agents seized the entirety of the data received from Hotmail and Yahoo, and failed to conduct the analysis and selection contemplated by the Warrants.

Nor did the agents comply with the notice provision of the Warrants.  The Warrants authorized delayed notification to Mr. El-Hanafi of the seizure of the contents of his email accounts by a period of 30 days, pursuant to 18 U.S.C. § 2705 (permitting delayed notification required under 18 U.S.C. § 2703(b) of court orders authorizing searches of electronic communications under certain circumstances).  There is no indication that the government sought an extension of this delayed notification period; nor did the government ever in fact notify Mr. El-Hanafi that his email accounts had been seized and searched, until the emails were turned over in their entirety in discovery.

E.  The Executing Offices Failed to Take Steps to Protect Privacy

As noted above at p. 16, the executing officers failed to take reasonable steps to avoid unnecessary intrusions into Mr. El-Hanafi's privacy.  *See Andresen*, 427 U.S. at 481 (noting that in searches of an individual's papers, "responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy").  Here, despite being on notice that Mr. El-Hanafi had retained an attorney, the searching agents failed to "block out" emails to or from Mr. Knapp, or utilize a privilege review team.  In addition, the agents seized scores of private emails between Mr. El-Hanafi and his wife – similarly, without any basis for invoking the crime-fraud exception.

F.      The Court Should Order an Evidentiary Hearing

This Court should order an evidentiary hearing on all the factual issues relating to the improper seizure of the entirety of Mr. El-Hanafi's email accounts.  Included among the factual issues to be resolved is a determination as to whether certain inaccuracies and omissions in the affidavits submitted by the case agent in support of the application for search and seizure were the product of intentional falsehoods or a reckless disregard for the truth.  These inaccuracies and omissions include:

- The failure to advise the issuing magistrate that, despite extensive debriefing of its cooperating witness, the government had no evidence that Mr. El-Hanafi had used either his Hotmail or his Yahoo account to engage in any terrorist-related communications.

- The failure to advise the issuing magistrate that its chief cooperating witness had an extensive history of engaging in crimes of deceit, including large-scale financial frauds.

- The failure to advise the issuing magistrate that the government had no plan in place to review the produced materials using a wall team of agents and prosecutors, but rather that the entire email account would be reviewed and analyzed by the investigating agents.

- The failure to advise the issuing magistrate that the government had no plan in place to return the seized emails after they had been searched in accordance with the authorization in the warrants.

- The preposterous claim that Hotmail and Yahoo cannot be charged with conducting more targeted searches than a dump of an individual's entire email account.

- The equally preposterous claim that Hotmail and Yahoo employees cannot handle digital evidence with integrity, just as one might expect from any other custodian of records.

Accordingly, as part of the evidentiary hearing requested, Defendants seek a *Franks* hearing.  In *Franks v. Delaware*, 438 U.S. 152 (1978), the Supreme Court authorized the suppression of evidence obtained pursuant to a warrant in a narrow category of cases. This includes cases "where an affiant deliberately or recklessly disregards the truth in a warrant application, and where the application's 'remaining content is insufficient to establish probable cause.'"  *United States v. Vilar*, 2007 WL 1075041, at *25 (S.D.N.Y. Apr. 4, 2007) (citing *Franks*, 438 U.S. at 156).  In order to make this finding, the Court must first apply a two-part test to determine whether an evidentiary hearing is necessary.  First, "there must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  *Franks*, 438 U.S. at 171.  Second, a hearing is required "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there [is] [in]sufficient content in the warrant affidavit to support a finding of probable cause." *Id.* at 171-172.

A *Franks* hearing is required here because Mr. El-Hanafi has made the requisite preliminary showing through the allegations set forth in these motion papers.  Further, after thorough examination, the Court should conclude that, even including the omissions and excluding the false statements, the allegations in the warrant application do not support a finding of probable cause.

      G.      The Court Should Order A Taint Hearing

It is well-settled that, given an illegal search, evidence that "has been come at by exploitation of that illegality" is "taint[ed]" and must be excluded from use at trial.  *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  The government "has the ultimate burden of persuasion to show that its evidence is untainted."  *Alderman v. United States*, 394 U.S. 165, 183

(1969).  Given a "primary illegality," *Wong Sun*, 371 U.S. at 488, the defendant must be given

some opportunity to resolve issues of taint.  As the Supreme Court held in *Nardone v. United*

*States*, 308 U.S. 338 (1939):

> The burden is, of course, on the accused in the first instance to
> prove to the trial court's satisfaction that wire-tapping was
> unlawfully employed. Once that is established-as was plainly done
> here-the trial judge must give opportunity, however closely
> confined, to the accused to prove that a substantial portion of the
> case against him was a fruit of the poisonous tree. This leaves
> ample opportunity to the Government to convince the trial court
> that its proof had an independent origin.

*Id.* at 341; *see United States v. Vilar*, 530 F. Supp. 2d 616, 641 (S.D.N.Y. 2008) (it is clear that,

once the defendant establishes that an illegal search has occurred, the Court "must" give some

sort of "opportunity" for the defendant to satisfy his initial burden of showing taint in a

"substantial portion" of the Government's case; "there is no pre-hearing burden on the defendant

to demonstrate taint in a substantial portion of the Government's case").  Moreover, while a

hearing is not mandated, the Supreme Court has emphasized in *Alderman* the value of an

adversary proceeding in resolving such claims:

> Adversary proceedings will not magically eliminate all error, but
> they will substantially reduce its incidence by guarding against the
> possibility that the trial judge, through lack of time or unfamiliarity
> with the information contained in and suggested by the materials,
> will be unable to provide the scrutiny which the Fourth
> Amendment exclusionary rule demands.

*Id.*, 384 U.S. at 184.

Here, Mr. El-Hanafi's opportunity to demonstrate taint should be provided in the form of

a full pretrial evidentiary hearing.  At issue is the government's exploitation of illegally-obtained

evidence.  Such serious misconduct should not be deferred until after a trial on the merits.  *See,*

*e.g., United States v. McCall*, 489 F.2d 359 (2d Cir. 1973) (disapproving of practice of postponing a taint hearing until after trial).

**Conclusion**

For the foregoing reasons, Mr. El-Hanafi respectfully request that the Court (a) dismiss the indictment or order a Kastigar hearing; (b) suppress Mr. El-Hanafi's statements; (c) suppress all evidence seized as a result of searches in Mr. El-Hanafi's email accounts; (d) permit Mr. El-Hanafi to join the motions filed by Defendant Sabirhan Hasanoff to the extent they apply to him, and (e) grant leave to make additional motions as and if they become appropriate in light of further discovery.

Date:   New York, New York
        June 3, 2011

JaneAnne Murray
MURRAY LAW LLC
233 Broadway
New York, New York 11215
Tel.  (212) 941-9266


              /s/

Justine Harris, Esq.
COLSON & HARRIS LLP
10 East 40th St., Suite 3307
New York, New York 10016
Tel: (212) 257-6455

*Attorneys for Mr. Wesam El-Hanafi*