# LAW OFFICE OF ELIZABETH M. FINK
36 PLAZA STREET • BROOKLYN, NEW YORK 11238
(718) 783-3682 • FAX (718) 783-5853 • WWW.FKOLAW.COM

Sarah Kunstler, Rebecca Heinegg, Of Counsel

June 17, 2013

Honorable Kimba M. Wood
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re: *United States v. Wesam El-Hanafi*
       10 Cr. 162 (KAW)

Dear Judge Wood,

  Wesam El-Hanafi is not your average criminal defendant. He rose above a difficult childhood to become a well-educated man with no criminal record. He was professionally successful, and he lived a comfortable life with a family that adores him. However, for reasons that even Mr. El-Hanafi himself cannot now understand or explain, he turned down a path towards religious extremism. Now, six years later, Mr. El-Hanafi's life is in shambles. His family has been torn apart and bankrupted, his three young children have lost their father, and Mr. El-Hanafi himself has developed deep-vein thrombosis (DVT) due to being immobilized during a long flight from the United Arab Emirates to the United States. Because the Bureau of Prisons misdiagnosed and then delayed treatment for an egregiously long period of time, Mr. El-Hanafi now faces a lifetime of pain, impaired mobility, and the threat of sudden death from an embolism. While Mr. El-Hanafi's offense was unquestionably deplorable, he has already been punished exceptionally harshly, and I respectfully request that this Court impose a non-Guidelines sentence of five years imprisonment. Given the cruel and unusual punishment that Mr. El-Hanafi has withstood, a sentence of five years would be sufficient but not greater than necessary to meet the goals of the sentencing statute.

## OBJECTIONS TO THE PRE-SENTENCE REPORT

**Paragraph 12** of the PSR states that starting in around 2007, "El-Hanafi and Hasanoff regularly sent approximately $300 per week to al Qaeda in Yemen." This number should be $300 per month, not per week.

**Paragraph 27** of the PSR states, "Wesam El-Hanafi also received various assignments from CC-4, which he was instructed to relay to Hasanoff and CC-1. El-Hanafi was directed to research specific types of military jackets, military boots, military pants, video camcorders, and remote control cars. With respect to the remote control cars, El-Hanafi was directed to research cars with specific frequencies of radio signals. Al Qaeda desired these remote-control cars because they could be modified into components for explosives for use against U.S. and Coalition forces. After researching these items, El-Hanafi and Hasanoff were supposed to purchase and ship them to al Qaeda in Yemen."

Importantly, Mr. El-Hanafi's understanding was that his money was going only to Somalia, where there were no U.S. or Coalition forces. Mr. El-Hanafi had no interest in activities directed against the United States or United States citizens. Mr. El-Hanafi also never purchased any remote-control cars.

**Paragraph 32** of the PSR states that, "In addition to recruiting CC-1 for al Qaeda, Wesam El-Hanafi performed taskings for al Qaeda while in New York City in May 2008. El-Hanafi purchased a remote control car at a store in Manhattan and looked for Casio 'G-Shock' watches, which were also items that were desired by al Qaeda." As stated above, Mr. El-Hanafi never purchased any remote-control cars.

Hon. Kimba M. Wood
June 17, 2013
Page 3 of 11

## THE APPROPRIATE SENTENCE

Wesam El-Hanafi pled guilty pursuant to a plea agreement to a superseding information charging him with providing and attempting to provide material support and resources to a designated foreign terrorist organization in violation of 18 U.S.C. §§ 2339B and 2, and conspiring to provide material support and resources to a designated foreign terrorist organization in violation of 18 U.S.C. § 371. All parties agree that Mr. El-Hanafi's base offense level is 26, and he is subject to a two-level increase under U.S.S.G. § 2M5.3(b)(1), a twelve-level increase under U.S.S.G. § 3A1.4(a), and a three point decrease for acceptance of responsibility. Mr. El-Hanafi has no criminal history. However, because the offenses charged were felonies that involved a federal crime of terrorism, the defendant's Criminal History Category is VI, pursuant to U.S.S.G. § 3A1.4(b). Therefore his adjusted Guidelines offense level is 37, and the applicable Guidelines range is 360 months to life, however, because the combined statutory maximum sentence permitted under 18 U.S.C. §§ 2339B and 371 is 240 months' imprisonment, the applicable Guidelines sentence is 240 months imprisonment.

Title 18, United States Code section 3553(a) directs a sentencing court to impose a reasonable sentence that is "sufficient, but not greater than necessary" to comply with the purposes of the sentencing factors outlined in the subsection. In *Gall v. United States*, 552 U.S. 38, 50 (2007), the United States Supreme Court held that while the Guidelines should be "the starting point and the initial benchmark" of a reasonable sentence, the sentencing judge "may not presume that the Guideline range is reasonable" and "must make an individualized assessment based on the facts presented." The Court also "reject[ed] an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Id.* Thus, a

Hon. Kimba M. Wood
June 17, 2013
Page 4 of 11

sentencing Court, after considering the advisory Guidelines, is now free to fashion a reasonable sentence that it deems appropriate based upon all of the sentencing factors set forth in 18 U.S.C. §3553(a).

1. **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT (18 U.S.C. § 3553(a)(1))**

    a. <u>The history and characteristics of the defendant</u>

Wesam El-Hanafi was born in Brooklyn on May 19, 1975. He is the eldest child, and often would help his parents care for his five younger siblings. When he was five years old, his family relocated to Egypt and lived in Cairo. His father invested in an egg-farm, and the family lived off the small earnings the farm provided.

Wesam's childhood was difficult and marked by abuse. His father would frequently beat his mother in front of the children, and would also beat Wesam and his siblings. When they got older, Wesam began interceding to try to physically protect their mother, and as a result, brought more beatings upon himself. In spite of the hardship he endured in his home life, his family members report that he was always kind, respectful, polite, and generous. *See* Exhibits C-Y.

When he was nine, Wesam's family moved back to New York. Wesam had forgotten how to speak English, and had some difficulty readjusting to life in America. His family was very poor. Wesam's father worked three jobs, and the family of six lived in one-bedroom apartment in Bensonhurst. When the landlord came by, the children would hide under the bed, to keep him from learning how many people were living in the apartment.

Wesam attended public school and at the age of 14 began working to help support his family. He worked whatever jobs he could find, from delivering food, working at Burger King,

Hon. Kimba M. Wood
June 17, 2013
Page 5 of 11

to acting as a security guard. At the same time, he graduated from high school with good grades, and attended a city college, earning a degree in business administration.

Every summer, Wesam would return to Egypt with his mother and siblings, and stay with his grandmother. It was during one of these summers that he began a romantic relationship with Nashwa Sedki. Over the next two years, Wesam would see Nashwa in the summer in Egypt, and when he returned to New York, they wrote each other letters and spoke on the phone as frequently as possible.

Following his graduation, Wesam married Nashwa by the Nile River in Egypt. The couple began living in Brooklyn, and Wesam got a job in the IT department at Lehman Brothers, where he worked for eight years. They have three children; ▮▮▮▮▮, who is thirteen years old, ▮▮▮▮▮, who is nine, and ▮▮▮▮▮, who is five. In their letters to this Court, the children describe their father's active involvement and presence in their lives, and the pain that his absence has caused them. *See* Exhibits D and E.

In 2005, a friend of Wesam's from Lehman Brothers returned from Dubai and told Wesam that there were great job opportunities in Dubai. Wesam began applying for jobs. He was hired for an IT position in Dubai, and he and his family moved to the United Arab Emirates. They lived in Dubai until Wesam's arrest in this case.

We have received an outpouring of support from Wesam's family. In the twenty-three letters submitted to this Court, each of his relatives speaks of Wesam's kindness, respect, and generosity. *See* Exhibits C-Y. Mohamed El-Hanafi, Wesam's younger brother, discusses his brother's compassion and care: "There are many other memories that I can recall, which can highlight his many positive traits; like when he caught me 'borrowing' clothes from his room

and instead of getting angry, he helped me pick out what I wanted to wear. Or the time when we were playing football and I got injured and he carried me all the way home. Or when he was only 17 years old, but woke up everyday at 7am to take me to my doctor's appointments, even though he had work and school the night before. Wesam has so much love in his heart, that there is no way I can explain to you what an amazing person he is." Exhibit H.

Wesam has always given to his family with open hands, caring for them and supporting them emotionally and financially. His mother explains that Wesam was always very protective of her and his siblings, and that even as a child, Wesam would work on the weekends and give the money to his mother and his younger brothers. *See* Exhibit F. His brother Sherief El-Hanafi writes that Wesam paid the tuition for his last year in college when Sherief's financial aid ran out. *See* Exhibit I. Wesam's aunt Samia Abdel Fattah Hamed writes that Wesam checked on her every day when she had a mastectomy for breast cancer, and helped pay for her surgery and medications. *See* Exhibit M. His aunt and uncle, Fayza Fati and Mamdouh Shaban describe how Wesam paid for Mr. Shaban's open heart surgery, which he would not otherwise have been able to have. *See* Exhibits L and N. His cousin Mohammad Medhat writes that Wesam supported him in his search for a job in Dubai, and bought him a plane ticket home when he ran out of money. *See* Exhibit R.

Everyone who knows Wesam has a similar story. Hanaa Hamed, Wesam's aunt, writes that Wesam always stood by her, checked in on her and daughter when they were sick, and paid her daughter's medical bills. *See* Exhibit S. His cousin Ahmed Mamdouh Shaban explains that Wesam always assisted him with his education, and helped him pay his tuition for school, as well as donating money to orphans and the poor. *See* Exhibit O. Naglaa Sidqi, Wesam's cousin,

Hon. Kimba M. Wood
June 17, 2013
Page 7 of 11

writes that Wesam helped her financially with her son's medical treatment. *See* Exhibit P. His mother-in-law writes that Wesam sends her money and takes care of her when she is sick. *See* Exhibit Y.

In sum, Wesam El-Hanafi is a kind and incredibly generous man, whose actions in this case were so shockingly uncharacteristic that those who know him well have struggled to believe it. Wesam's arrest stunned and devastated his family. Now that he fully understands the extent and potential repercussions of his wrongdoing, as well as the heavy toll his incarceration has taken on his family, he is deeply remorseful, and he will not repeat his offense.

<u>Medical problems and treatment</u>

Mr. El-Hanafi has been in custody in the United States since April 30, 2010. As a result of being immobilized during the long flight from the UAE to the United States, he developed deep-vein thrombosis (DVT) in his leg. In spite of Mr. El-Hanafi's continuous reporting of his symptoms in each of the facilities in which he was held, his condition was not diagnosed for 17 months, and even after diagnosis, was still not properly treated. This egregious deprivation of appropriate medical care has caused Mr. El-Hanafi, pain, suffering, and difficulty walking that will last for the rest of his life.

We have had Mr. El-Hanafi's complete medical records reviewed and evaluated by Dr. Laura Chalfin, a family physician with 30 years of experience. In her report, Dr. Chalfin explains that DVT is considered a medical emergency with the potentially life-threatening complication of a pulmonary embolism, which is when a piece of the clot breaks off and travels through the bloodstream to the lungs, and that immediate treatment is necessary for a patient to have a chance at a full recovery. *See* Exhibit A, Medical Report by Dr. Laura Chalfin. Dr. Chalfin

Hon. Kimba M. Wood
June 17, 2013
Page 8 of 11

explains that a DVT is considered "chronic" when it remains from 7-30 days, and that allowing a DVT to go untreated for 17 months is unheard of in the medical literature, and "far outside the boundaries of acceptable medical practice." *Id.* She also notes that the level of medication that Mr. El-Hanafi received after finally being diagnosed was not therapeutic, and as a result the clot in his leg increased and progressed into the thigh. *Id.* Furthermore, when Mr. El-Hanafi was provided with compression stockings, which took several months, they were improperly fitted, and therefore "may have actually increased the risk of further thrombosis." *Id.*

As a result of the untreated DVT, Mr. El-Hanafi developed post-thrombosis syndrome (PTS), which causes pain, swelling, discoloration, varicose veins, and an increased risk of a deadly pulmonary embolism. *Id.* He will suffer pain and limited mobility for the rest of his life, and is in continuous danger of further clotting and a deadly pulmonary embolism. *Id.* The executive branch of the United States government has given Mr. El-Hanafi a sentence far more harsh than any that could be imposed by this Court.

      b.   <u>The nature and circumstances of the offense</u>

Mr. El-Hanafi's involvement in this offense arose from what was at first a generous and humanitarian impulse, but was gradually perverted into a crime. Mr. El-Hanafi has spent his life giving generously to charities, orphanages, and any family member in need. *See* Exhibits C-Y. During the war in Kosovo, Mr. El-Hanafi, who previously had little interest in politics, began collecting clothing to send to Albanian refugees in coordination with a mosque in Staten Island.

However, on the fringes of the charitable activities in which he engaged, he began to encounter extremist teachings. Over time Mr. El-Hanafi's charitable nature began to be corrupted by jihadist doctrine. By 2007, when Mr. El-Hanafi met the man referred to by the government as

"CC-2" in Dubai, he had been, in his words, "blinded by ideology." Through his contacts in Dubai, Mr. El-Hanafi began contributing money to support jihadist insurgents in Somalia.

In the years following his arrest, Mr. El-Hanafi has fully realized the immorality of his chosen path. Mr. El-Hanafi's efforts were directed at Somalia, not the United States. However, he understands that this is not an excuse, and that his support of terrorism anywhere in the world was appalling.

Mr. El-Hanafi takes full responsibility for his actions. He understands the wrongness of what he did, and looking back, can no longer understand his reasons. In his letter to this Court, Mr. El-Hanafi writes that he will forever regret the choices that he made, and that he "hates his actions deeply." Exhibit B. He is acutely aware of the pain that he has inflicted on his family, who he once took such pride in supporting, and is deeply ashamed of the suffering he is causing his children. "I sincerely ask for the opportunity to amend for my wrong doing and would be thankful for the opportunity to get out and be a productive member of society and repay my family for their support and love by being there for them," he writes. "All I ask for is another chance [to] amend my wrong doing. I want to be able to teach the vulnerable youth of the community of the dangers on this path and the faults in its ideology. I want to be there to teach this to my children and to the youth of the community. To be able to teach them from experience, from my long dark nights in jail and from my pain and sufferings, from the tears of my mother, wife, and children." *Id.*

Mr. El-Hanafi's conduct since his arrest is further evidence of his desire to begin to atone for his crime; he has been a model prisoner, with no disciplinary problems in the three years he has been incarcerated, and he has been willing and prepared to meet and cooperate with the

government. This meeting did not take place because the individual the government was interested in died before a meeting could be arranged, not due to any unwillingness on Mr. El-Hanafi's part. Mr. El-Hanafi understands the magnitude of his offense, and is deeply remorseful.

2. **THE NEED FOR THE SENTENCE IMPOSED (18 U.S.C. § 3553(A)(2)), (A) TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE; (B) TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT; (C) TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT; (D) TO PROVIDE THE DEFENDANT WITH NEEDED EDUCATION OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTION TREATMENT IN THE MOST EFFECTIVE MANNER**

Mr. El Hanafi's medical needs, and the abysmal medical care that he has received while incarcerated thus far, further demonstrates the appropriateness of a below-Guidelines sentence. Dr. Chalfin's report recommends a lifelong treatment with anticoagulant medication, along with rest and elevation of the leg when it is painful or swollen, and compression with properly-fitted stockings. *See* Exhibit A. However, she also notes that at this point no treatment will be 100% effective. *Id.* Mr. El-Hanafi will continue to be at risk for further blood clots and pulmonary embolism, and if the latter occurs, immediate medical treatment will be "critical for his survival." *Id.* Given the unresponsiveness of the BOP to Mr. El-Hanafi's serious medical needs to date, a prolonged prison sentence could easily become a death sentence.

Hon. Kimba M. Wood
June 17, 2013
Page 11 of 11

## CONCLUSION

We ask that this Court weigh all the factors in this case, including the serious and chronic medical condition that the United States government has inflicted on Mr. El-Hanafi. For all of the reasons stated above, we respectfully request that this Court impose a non-Guidelines sentence of five years imprisonment on Mr. El-Hanafi.

    Respectfully yours,

    *[signature: Elizabeth M. Fink]*

    ELIZABETH M. FINK
    REBECCA HEINEGG
    SARAH KUNSTLER
    *Attorneys for Mr. El-Hanafi*