UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **PARTIALLY REDACTED AND** <br> **ELECTRONICALLY FILED** |
| - v. – | : | S7 10 Cr. 162 (KMW) |
| WESAM EL-HANAFI, <br> a/k/a "Khaled," | : | |
| | : | |
| Defendant. | | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM**

PREET BHARARA
United States Attorney
Southern District of New York

JOHN P. CRONAN
AIMEE HECTOR
Assistant United States Attorneys
    - Of Counsel -

## TABLE OF CONTENTS

I. Preliminary Statement ................................................................................. 1

II. Background ............................................................................................. 3

  A.    El-Hanafi's Offense Conduct ................................................................. 3

    1.  Al Qaeda ................................................................................................ 5

    2.  El-Hanafi's Introduction to CC-2 ......................................................... 6

    3.  El-Hanafi's Provision of Financial Support to al Qaeda ...................... 6

    5.  El-Hanafi's March 2008 Purchase of a Subscription to an Encryption  Service .......... 18

    6.  El-Hanafi's May 2008 Trip To Recruit the CW in New York City.............. 18

    7.  El-Hanafi's Direction of Hasanoff to Conduct Surveillance of the the New  York Stock Exchange in August 2008 ............................................................. 19

    8.  El-Hanafi's April 2009 Purchase of Casio Watches ...................................... 22

    9.  El-Hanafi's Desire to Receive Military-Style Training and to Fight *Jihad*  Overseas .. 22

  B.    El-Hanafi's Guilty Plea ......................................................................... 26

  C.    The Presentence Investigative Report .................................................. 28

III.  Argument ........................................................................................... 29

  A.    Applicable Law ...................................................................................... 30

  B.    The Court Should Impose a Guidelines Sentence of Twenty Years' Imprisonment ..... 31

  C.    The Defense's Counter-Arguments Are Unavailing .................................... 35

    1.  The Defendant's Medical Condition Does Not Warrant Any Reduction of  His Sentence .......................................................... 35

    2.  El-Hanafi's Alleged Offer To Cooperate Is Inaccurate and Irrelevant ......................... 42

IV. Conclusion .......................................................................................... 44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :

    - v. –                   :         S7 10 Cr. 162 (KMW)

WESAM EL-HANAFI,        :
   a/k/a "Khaled,"

                              :

            Defendant.

                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the

sentencing of Wesam El-Hanafi ("El-Hanafi"), which is scheduled for January 23, 2014, and in

response to El-Hanafi's sentencing letter of June 17, 2013 ("Deft. Sent. Ltr.").

El-Hanafi is a United States citizen, born in Brooklyn, who worked for years in New

York as an information technology specialist at a well-known investment bank.  But in spite of

this background, over the course of a number of years, El-Hanafi devoted himself to supporting

al Qaeda.   He swore an oath to al Qaeda and backed it up by recruiting others to the cause.  El-

Hanafi made regular financial contributions to al Qaeda and acquired various tangible items

desired by the terrorist group.  El-Hanafi offered his technical expertise to his al Qaeda contacts,

teaching them sophisticated methods for communicating covertly over the Internet.  El-Hanafi

worked to fight in Afghanistan and Somalia as a "*mujahid*."[1]  And he served as an intermediary

between his al Qaeda contacts and his co-defendant, Sabirhan Hasanoff ("Hasanoff"), relaying

tasks to Hasanoff from those terrorist operatives that resulted in Hasanoff conducting

---

[1]  *Mujahid* is an Arabic term used to refer to a Muslim who engage in fighting a *jihad*, or
struggle on behalf of Islam.  *Mujahidin* is the plural form of *mujahid*.

surveillance of the New York Stock Exchange in August 2008 --- an act whose clear purpose was to obtain information that would be useful for planning a terrorist attack in Manhattan.

El-Hanafi pled guilty on June 18, 2012 to providing and conspiring to provide material support to al Qaeda. His conduct implies a United States Sentence Guidelines range of thirty years to life in prison --- a sentence well in excess of the statutory maximum here of twenty years in prison. It is that sentence of twenty years that should be imposed.

Terrorism is a crime that requires maximal deterrence. *See United States* v. *Meskini*, 319 F.3d 88, 93 (2d Cir. 2003). Indeed, this Court noted at the sentencing of El-Hanafi's co-defendant, Hasanoff, that general deterrence is "the most important factor" for imposing a sentence in this case. Transcript, *United States* v. *Hasanoff*, 10 Cr. 162 (KMW), Sept. 30, 2013 (Exh. A) ("Hasanoff Sent. Tr."), at 21. And El-Hanafi revealed the content of his character by working to support al Qaeda --- an organization fanatically devoted to the murder of American citizens, of whom El-Hanafi is one. El-Hanafi should be sentenced as the Guidelines set out --- to a term of imprisonment of twenty years.

Nor does El-Hanafi's medical condition or purported efforts to cooperate warrant any departure from a twenty-year sentence --- a sentence that is *already* below what the Guidelines suggest. While El-Hanafi appears to suffer from deep vein thrombosis, it is plain both that this condition was not caused in any way by his arrest in connection with this case, and also that his condition can be effectively treated by the Bureau of Prisons while he is incarcerated. Moreover, El-Hanafi simply did not make any efforts to cooperate with the Government, let alone any efforts that would justify any leniency at sentencing.

## II. Background

**A.      El-Hanafi's Offense Conduct**

From 2007 to late 2009, El-Hanafi provided extensive support to al Qaeda.  El-Hanafi made regular cash donations to individuals that he understood were affiliated with al Qaeda, recruited others to join al Qaeda, provided technical assistance to al Qaeda, acquired items desired by al Qaeda, and conveyed directions from al Qaeda to his co-conspirators.

In the course of his work for al Qaeda, El-Hanafi interacted principally with four men.  Two of the men, like El-Hanafi, were United States citizens:  El-Hanafi's co-defendant, Hasanoff, and another man who, long after the events described in this memorandum, became a cooperating witness (the "CW").[2]  The other two men were based in Yemen, and El-Hanafi knew them not by their true names, but by their aliases, "Suffian" and "the Doctor."[3]  El-Hanafi understood that Suffian and the Doctor were affiliated with al Qaeda[4] in Yemen, with the Doctor holding a senior position within the group and responsible for arranging travel for persons seeking to receive military-style training and to join the *mujahidin* fighting in such locations as Afghanistan.

After a period of time when El-Hanafi, Hasanoff, and the CW sent money to Suffian and the Doctor, Suffian facilitated an in-person meeting for El-Hanafi with the Doctor in Yemen in

---

[2] The CW is referred to as "CC-1" in the Presentence Investigation Report.

[3] Suffian is referred to in the Presentence Investigation Report as "CC-3," and the Doctor is referred to in the Presentence Investigation Report as "CC-4."

[4] The Government's proof that El-Hanafi and his co-conspirators believed the individuals to whom they were providing support were affiliated with al Qaeda, as opposed to some other terrorist organization, is based on information provided by the CW.  And of course, at El-Hanafi's guilty plea, El-Hanafi allocuted to seeking out contacts within al Qaeda and to providing material support, to include expertise, to al Qaeda.  *See* Transcript, *United States* v. *El-Hanafi*, 10 Cr. 162 (KMW), June 18, 2012, at 17, 21.  El-Hanafi's intent to provide support to the *mujahidin* fighting against American forces in Afghanistan and other locations overseas, and to personally join that fight, whether on behalf of al Qaeda or another organization, is clear.

February 2008.  The Doctor, a self-proclaimed career jihadist, received an oath of allegiance, called *bayat*, from El-Hanafi; received money and various other items from El-Hanafi, Hasanoff, and the CW that had been solicited for the purposes of supporting terrorist causes; and professed to be able to arrange travel for El-Hanafi, Hasanoff, and the CW to a place where they could receive military-style training and fight in armed combat.  El-Hanafi additionally provided instructions to the Doctor on ways for al Qaeda to communicate covertly over the internet.

In addition, at the Doctor's direction, El-Hanafi assigned Hasanoff to conduct surveillance of the New York Stock Exchange in Manhattan in 2008, unquestionably with the purpose of gathering information for a future terrorist attack.  Hasanoff conducted this surveillance and prepared a one-page report with information about the New York Stock Exchange that was sent to the Doctor.  The report was rudimentary and of limited use to the Doctor.

The evidence establishing the above-described criminal conduct is extensive.  Among other things, it includes information from the CW --- a close associate of El-Hanafi and Hasanoff in their joint efforts to support al Qaeda.  The CW, who conspired with El-Hanafi and Hasanoff to support al Qaeda well before he started to cooperate with the Government, has provided extensive, detailed, and corroborated information about the various forms of support that El-Hanafi provided to al Qaeda.

The evidence here also includes travel records of multiple trips that El-Hanafi made to New York City during which he sought to obtain items desired by his al Qaeda associates, business records showing El-Hanafi's purchase of Casio watches and an encryption software, emails sent from Hasanoff to the CW regarding the financial support the men agreed to provide

to their terrorist contacts, and bank records showing money transferred by the CW to Hasanoff for that purpose.

Additional evidence consists of interviews that agents of the Federal Bureau of Investigation ("FBI") conducted of Suffian and the Doctor in March 2009, while Suffian and the Doctor were in the custody of another country.[5]  Both detainees provided reporting that was consistent with the CW's information, particularly with respect to El-Hanafi's interaction with Suffian and the Doctor in February 2008; the taskings that Suffian and the Doctor assigned to El-Hanafi, Hasanoff, and the CW; and the financial support and other items that El-Hanafi, Hasanoff, and the CW provided.  The Doctor and Suffian also made entirely consistent statements regarding El-Hanafi's tasking of Hasanoff to conduct surveillance of the New York Stock Exchange in August 2008 --- which is further corroborated by August 2008 email messages written by El-Hanafi and Hasanoff to Suffian.

### 1.     Al Qaeda

Since around 1989, al Qaeda has been an international terrorist organization, dedicated to opposing non-Islamic governments with force and violence.  Usama Bin Laden served as the leader or "emir" of al Qaeda until his death on May 2, 2011.  Members of al Qaeda typically have pledged an oath of allegiance, called *bayat*, to al Qaeda.  The core purpose of al Qaeda, as stated by Bin Laden and other leaders, is to support violent attacks against Americans.

Members and associates of al Qaeda have executed a number of such terrorist attacks, all in furtherance of the organization's unambiguously stated conspiracy to kill Americans, including the August 1998 bombings of the United States Embassies in Tanzania and Kenya,

---

[5] Redacted reports of the FBI's March 2009 interviews of Suffian and the Doctor, which were declassified following El-Hanafi's guilty plea, are attached to this memorandum as Exhibits B and C, respectively.

which resulted in the deaths of 224 people; the October 2000 bombing of the *USS Cole*, a U.S. Navy Destroyer, in Aden, Yemen, which killed 17 American sailors; and the attacks on the United States on September 11, 2001 in New York, Virginia, and Pennsylvania, which killed approximately 2,976 people.

### 2.    El-Hanafi's Introduction to CC-2

El-Hanafi, along with Hasanoff and the CW, had aspired to support violent extremist Islamic causes since at least 2003, when El-Hanafi was living in Brooklyn.  *See* Presentence Investigation Report ("PSR") ¶ 10.  After 2006, at which time both were living in the United Arab Emirates ("UAE"), El-Hanafi and Hasanoff met a supporter of al Qaeda ("CC-2").[6]  *Id.* Through CC-2, El-Hanafi and Hasanoff established additional contacts with the terrorist group. *Id.*  CC-2 put El-Hanafi in contact with another al Qaeda supporter --- the man based in Yemen who went by the name, Suffian.  In turn, Suffian was associated in Yemen with the Doctor --- a more senior al Qaeda terrorist who was responsible for facilitating the travel of *mujahidin*.  *Id.* ¶ 11.

### 3.    El-Hanafi's Provision of Financial Support to al Qaeda

Starting in around 2007, after El-Hanafi and Hasanoff met with CC-2 in the UAE, El-Hanafi, Hasanoff, and the CW began to provide financial support to their contacts in Yemen with the intention of supporting al Qaeda.  *See* PSR ¶ 12.  El-Hanafi and Hasanoff often sent their donations through Western Union or a similar company in Dubai, using fake names, as well as through a courier in Dubai, who they understood delivered the money to their al Qaeda contacts

---

[6] So as to avoid the need for redactions, the co-conspirator who helped to connect El-Hanafi and Hasanoff with al Qaeda is referred to as "CC-2" throughout the instant memorandum.  In a sealed submission also submitted today to the Court, the Government discloses the identity of CC-2.  The person referred to as CC-2 herein also is referred to as "CC-2" in the Presentence Investigation Report.

in Yemen. *Id*. El-Hanafi and Hasanoff hoped that sending money to al Qaeda would help the

men to deepen their connections to al Qaeda by proving their bona fides.

### 4. El-Hanafi's 2008 Trip to Yemen to Meet with Suffian and the Doctor

In early 2008, El-Hanafi accepted an invitation to travel to Yemen to meet in person his

al Qaeda contacts, Suffian and the Doctor, with whom El-Hanafi had previously been

communicating over email following CC-2's introduction. *See* PSR ¶ 21. On January 17, 2008,

prior to traveling, El-Hanafi sought advice from Hasanoff for a cover story to explain his travel

to Yemen, asking Hasanoff over email, "help me think of a good way to take a week off from

work." *Id*. Hasanoff replied by brainstorming false excuses that El-Hanafi could provide to his

employer: "1. Family emergency requiring you to travel – ill father, etc. 2. You need to travel

back home to seek medical treatment for your neck as you don't believe the Dubai medical

center is adequately helping you recover – so you would request for a medical leave of absence.

Can't think of anything that may be believable." *Id*.[7]

Travel records show that, on February 8, 2008, El-Hanafi flew from Dubai to Sana'a,

Yemen, and that he returned to Dubai on February 14, 2008. While in Yemen, El-Hanafi met

with Suffian and the Doctor; swore an oath of allegiance, called *bayat*, to the Doctor; delivered

$12,000 in cash, a laptop computer, and a translation device; and received various taskings to

perform on behalf of al Qaeda. *Id*. ¶ 23.

The Government has learned the details of El-Hanafi's February 2008 trip to Yemen

from three sources: debriefings of the CW,[8] FBI interviews of Suffian, and FBI interviews of the

---

[7] El-Hanafi maintained a cover story when he was interviewed by the FBI on February 5, 2010, just shortly before his arrest, claiming that his February 2008 trip to Yemen was for purposes of a job interview. *See* PSR ¶ 27.

[8] The CW's knowledge of El-Hanafi's February 2008 trip to Yemen comes from conversations the CW had with El-Hanafi and Hasanoff in the UAE in June 2008, subsequent to

Doctor.[9]  The information supplied by these three individuals about El-Hanafi's meeting with Suffian and the Doctor in February 2008 is detailed, and the accounts of all three witnesses closely inter-lock.  All three men have provided, in essence, a substantially similar account of El-Hanafi's 2008 Yemen trip.

### a.   Information Provided by the CW

The CW learned that El-Hanafi's February 2008 trip to Yemen was facilitated by Suffian, who arranged for El-Hanafi to travel to Yemen to meet with the Doctor.  Shortly after arriving in Yemen, El-Hanafi was picked up at a previously agreed-upon location, had a hood placed over his head, and was transported to a house, where he met with the Doctor.  *See* PSR ¶ 24.  El-Hanafi learned that the Doctor was responsible for sending *mujahidin* fighters to battle, using Yemen as a hub.  For operational security purposes, the Doctor directed El-Hanafi not to ask any personal questions of him and not to provide any personal information to the Doctor.  In turn, El-Hanafi, who has sophisticated technical know-how, provided instructions to the Doctor on ways for al Qaeda to communicate covertly over the internet.  *Id*. ¶ 25.

The CW also learned that El-Hanafi swore *bayat* to the Doctor and al Qaeda, and told the Doctor about his group of like-minded associates, which included Hasanoff and the CW.  *See* PSR ¶ 25.  The Doctor then directed El-Hanafi to recruit Hasanoff and the CW to join al Qaeda.

El-Hanafi's trip.  The CW visited El-Hanafi and Hasanoff in the UAE in June 2008 for a little over three weeks.  *See* PSR ¶ 33.  During this time, El-Hanafi, Hasanoff, and the CW frequently discussed their efforts to support al Qaeda and, in particular, El-Hanafi and Hasanoff revealed additional details concerning El-Hanafi's February 2008 trip to Yemen.  *Id.*  Before discussing these subjects, El-Hanafi, Hasanoff, and the CW would turn off their cellular telephones for operational security purposes, reflecting their concern that their conversations could be intercepted if they left on their cellular telephones.  *Id*. ¶ 34.

[9] Suffian was interviewed by the FBI, with the assistance of an Arabic linguist, on March 10, 2009, March 11, 2009, and March 14, 2009.  *See* Exh. B.  The Doctor was interviewed by the FBI, with the assistance of an Arabic linguist, on March 2, 2009, March 3, 2009, March 4, 2009, March 7, 2009, and March 8, 2009.  *See* Exh. C.

*Id.* ¶ 26.  Consistent with this direction, while the CW was in the UAE in June 2008, El-Hanafi gave the CW the opportunity to join al Qaeda, and the CW (like Hasanoff had before him) accepted the invitation by swearing an oath of allegiance to El-Hanafi.  *Id.* ¶ 34.

The CW further learned that the Doctor instructed El-Hanafi on how the group should avoid detection by law enforcement --- instructions that El-Hanafi shared with Hasanoff and the CW.  *See* PSR ¶ 26.  For example, the Doctor advised El-Hanafi that the group could more fluidly blend into Western culture by not attending mosques, not growing beards, and not wearing their pants short.  *Id.*  El-Hanafi also was instructed that his group should run five or six miles a day, because physical training was necessary preparation for fighting against United States forces, and should memorize certain parts of the Koran, because, as explained in substance to El-Hanafi, "this is a fight for religion."  *Id*. ¶ 30.  According to the CW, El-Hanafi and Hasanoff revealed to the CW that, upon El-Hanafi's return from Yemen (and consistent with the instructions El-Hanafi received in Yemen), Hasanoff swore allegiance to al Qaeda through El-Hanafi.  *Id.* ¶ 33.

El-Hanafi also received various assignments from the Doctor, which he was instructed to relay to Hasanoff and the CW.  *See* PSR ¶ 27.  El-Hanafi was directed to research specific types of military jackets, military boots, military pants, video camcorders, and remote control cars.  *Id.*  With respect to the remote control cars, El-Hanafi was directed to research cars with specific frequencies of radio signals.  Al Qaeda desired these remote-control cars because they could be modified into components for explosives for use against U.S. and Coalition forces.  *Id.*  After researching these items, El-Hanafi and Hasanoff were supposed to purchase and ship them to al Qaeda in Yemen.  *Id.*

The Doctor also sought Visa gift cards, because they allow the user to make purchases covertly without revealing his or her identity, and Hasanoff bought such gift cards during one of his trips to New York.  *See* PSR ¶ 28.  El-Hanafi also tasked the CW with researching and purchasing a video camera, with certain specifications, that could be used by al Qaeda to record tactical operations against the United States military and Coalition forces, so that the footage could later be disseminated on the Internet as propaganda.  *Id.* ¶ 29.[10]

### b.   Information Provided by Suffian

Suffian explained that he learned about some Americans who wanted to travel to fight in *jihad* and who also had money that they wanted to send to support the *mujahidin*.  Suffian made contact with El-Hanafi, who then started wiring Suffian money for the *mujahidin*, using fraudulent identities.  Suffian estimated that El-Hanafi sent Suffian approximately $10,000 before El-Hanafi traveled to meet with Suffian in February 2008.  Suffian recalled that each transfer was for $500 and El-Hanafi transmitted $2,000 per month.  Suffian received the funds at Western Union and other money exchanges, never utilizing the same money exchange office more than once.

Suffian provided details of El-Hanafi's February 2008 trip to meet with him and the Doctor.  El-Hanafi contacted Suffian by email upon arriving and Suffian set a time and place for them to meet.  Suffian first brought El-Hanafi to an internet café, where they accessed an email account that they would use to communicate after El-Hanafi's departure.  From that internet café, El-Hanafi was brought to the Doctor's home, where El-Hanafi stayed for two or three days.  Suffian revealed that, while at the Doctor's house, El-Hanafi swore *bayat* to the Doctor.  In addition, according to Suffian, El-Hanafi hand-delivered to the Doctor's house $12,000 in cash, a

---

[10] The CW never in fact purchased a camcorder for al Qaeda.  *See* PSR ¶ 29.

laptop computer, and an Atlas translation device.  The Doctor was supposed to send the computer to Afghanistan, although Suffian later took it after he had a dispute with the Doctor. *See infra.*

      After El-Hanafi returned to the UAE, El-Hanafi sent an additional $2,000 to Suffian. Then, in around November 2008, El-Hanafi had an unidentified individual deliver $45,000 to Suffian to support the *mujahidin*.   In total, Suffian estimated that El-Hanafi sent him and the Doctor about $67,000.  When asked what El-Hanafi expected to receive for providing this money, Suffian explained that El-Hanafi expected to go to "paradise."

      Suffian also reported that the three Americans --- that is, El-Hanafi, Hasanoff, and the CW --- wanted to travel for *jihad*, but the Doctor was concerned that, as Americans, they would draw suspicion if they were to travel for *jihad* training.  Suffian explained that El-Hanafi, Hasanoff, and the CW wanted to go to Afghanistan and "not come back," and that they had the desire and expectation to die fighting in Afghanistan.  Suffian noted that these three Americans planned on selling their homes and belongings, which indicated that they did not expect to return after receiving training in Pakistan.  While Suffian did not assess El-Hanafi as someone who would "make a good jihadi," he did believe that El-Hanafi was serious about traveling for *jihad*. Suffian advised that the Americans were supposed to travel to Pakistan some time shortly after Suffian had traveled to Pakistan in January 2009.[11]

      Suffian also explained how he communicated with El-Hanafi.  Suffian primarily utilized email to communicate with El-Hanafi, and explained that they used several different email addresses to communicate.  After El-Hanafi would create a new account, he would send Suffian

---

[11] Suffian also asked El-Hanafi and (through El-Hanafi) Hasanoff and the CW whether they would be willing to conduct a martyrdom operation.  El-Hanafi, Hasanoff, and the CW communicated, via El-Hanafi, that they did not want to do a martyrdom operation, but still desired to travel for *jihad*.

an encrypted message with the new password.  Suffian also revealed that he communicated with El-Hanafi about ten times by calling El-Hanafi from public telephones.

Suffian also detailed the various pieces of equipment that El-Hanafi and Hasanoff had sent to him, most notably remote-controlled devices capable of use in an explosives attack.  The items that El-Hanafi and Hasanoff sent to Suffian, which generally were mailed from a post office in the UAE to Suffian, included, among other things:

- **Remote-Controlled Devices.**  The Doctor asked for a remote-controlled toy car, an advanced remote control, and a receiver, for use in an explosives attack.  The toy car was intended to serve as a cover, since it would look suspicious if the advanced remote control and the receiver were sent alone.  El-Hanafi sent Suffian an Internet link with information about the remote control, and Suffian showed those specifications to the Doctor.  Hasanoff then sent Suffian the remote-controlled toy car, a separate "advanced remote control," and a receiver.  Per Suffian, the advanced remote control would be used for "explosions," and the range for the advanced remote would be "line of sight" or within one's "eyesight."  Suffian gave the advanced remote control and receiver to another individual between October and December 2008.  These items were taken so that they could be sent to the *mujahidin* in Somalia.[12]

- **Outerwear and Boots.**  While in the United States, El-Hanafi bought three heavy Columbia brand jackets, designed for cold weather, and three pairs of boots, that he later mailed to Suffian.  Suffian, the Doctor, and another individual kept the jackets.

---

[12] Suffian did not know if the advanced remote and receiver in fact were ever sent to Somalia.

- **Three GPS Devices.**  El-Hanafi also bought three Garmin GPS units in the UAE and mailed them to Suffian.  The Doctor had one of these GPS devices, and another individual had the other two.

Suffian also discussed a disagreement that the Americans (*i.e.*, El-Hanafi, Hasanoff, and the CW) had with the Doctor around October or November 2008.  Suffian and the Americans were frustrated with the Doctor's failure to facilitate their travel for *jihad*.  Suffian felt that, to keep the money coming in, the Doctor tried to make Suffian and the Americans believe that they were going to travel sometime soon and that they were involved in an important operation.  Suffian and El-Hanafi, however, felt that the Doctor was using the money that El-Hanafi and Hasanoff were sending only for his own agenda of helping his "needy friends."  El-Hanafi and Suffian thus agreed to end their relationship with the Doctor.

### c.    Information Provided by the Doctor

The Doctor characterized himself as a seasoned jihadist who had sworn *bayat* to an Egyptian Islamic Jihad leader, who later became al Qaeda's second-in-command.  The Doctor also readily acknowledged that he long had hoped to conduct an attack on U.S. soil, noting his hatred of the United States and its policies.

The Doctor reported that, in mid-2007, Suffian told the Doctor that he had learned about three young men with U.S. passports, who wanted to become jihadists and were willing to provide financial assistance to the "brothers" and to the *jihad*.  According to the Doctor, in February 2008, El-Hanafi, who at the time was living in Dubai, wanted to meet with the Doctor in person.  El-Hanafi offered to bring cash to support the *jihad*, and the Doctor also asked that El-Hanafi bring a computer and an Atlas electronic translation device.  Communicating through

13

Suffian, the Doctor gave instructions for El-Hanafi's travel and routine, including providing advice that El-Hanafi should shave his beard and avoid suspicious relationships.

El-Hanafi traveled to meet with the Doctor in early February 2008.  Upon arriving, El-Hanafi contacted Suffian, who then brought El-Hanafi to meet the Doctor at a restaurant where the three of them had dinner.  The Doctor was aware of El-Hanafi's two other associates who were also U.S. citizens (*i.e.*, Hasanoff and the CW), and assigned each of them fake names to use.  El-Hanafi was "Khaled," while his two associates were "Tareq" (Hasanoff) and "Umar" (the CW).  After their dinner, the Doctor invited El-Hanafi to check out of his hotel and to stay at the Doctor's house.  Over the following two days at the Doctor's house, the Doctor and El-Hanafi discussed El-Hanafi's life in the UAE, Islam, and *jihad*.

The Doctor's reporting on El-Hanafi's two days at his house was identical to Suffian's reporting, and also consistent with what El-Hanafi told the CW.  During this time, El-Hanafi swore *bayat* to the Doctor and pledged to obey the Doctor and to "listen to him."  El-Hanafi delivered to the Doctor a laptop computer and an Atlas translation device, which were for the Doctor's own use.  El-Hanafi also gave the Doctor $12,000 in cash, understanding that the money would go to support the families of the martyrs, "the brothers," and others "in need," and agreeing to continue to send the Doctor more money in the future.  The Doctor and El-Hanafi also discussed *jihad* and ways of traveling for *jihad*, and the Doctor recalled that El-Hanafi mentioned that he had attempted to travel to Iraq, via Syria, to engage in *jihad*, but was unable to make it to Iraq.  The Doctor instructed El-Hanafi to tell his two American associates (Hasanoff and the CW), who also wanted to travel with El-Hanafi for *jihad*, that they should not communicate with a particular individual, who the Doctor considered to be a security risk.  After El-Hanafi spent two days at the Doctor's house, the Doctor drove El-Hanafi to Suffian so El-

Hanafi could return to the UAE.  Prior to El-Hanafi's departure, they arranged that the Doctor's future communications with El-Hanafi would be through Suffian.

The Doctor also reported that he learned that El-Hanafi in fact told Hasanoff and the CW about "a brother (*i.e.*, the Doctor) in *jihad*" who could help them travel to engage in *jihad*.  The Doctor also learned that Hasanoff and the CW affirmed that they were "with" the Doctor, which the Doctor understood to mean that Hasanoff and the CW had sworn *bayat* to him through El-Hanafi.  Under the Doctor's understanding of their hierarchical arrangement, El-Hanafi was under his (the Doctor's) command for all matters of *jihad*.

The Doctor explained that, as they had agreed, he continued to communicate with El-Hanafi after the February 2008 trip through Suffian's email account.  In addition, in Internet chat sessions, the Doctor and El-Hanafi discussed ways that El-Hanafi could send additional money.  One suggestion was sending a used car that the Doctor would sell.  The Doctor, however, abandoned this option after determining that it would not be profitable.  El-Hanafi also offered to have money hand delivered to the Doctor, but the Doctor declined this option and instructed El-Hanafi not to send anyone from the UAE.  The Doctor also learned that El-Hanafi compiled about $50,000 in November 2008, but the Doctor never received this money.  The Doctor estimated that, in 2008, El-Hanafi sent several Western Union wire transfers, totaling approximately $8,000, $4,000 of which was sent prior to El-Hanafi's February 2008 trip.  The Doctor recalled that El-Hanafi would generally send $1,000 at a time, split into two $500 wire transfers, with the first transfer sent through Western Union and the other sent through a money exchange.  The transfers that occurred prior to El-Hanafi's visit were received by Suffian.  The Doctor reported that El-Hanafi used different fake names each time he made these wire transfers.  Generally, El-Hanafi would send the money about two or three days after receiving a request for

the money from Suffian.  In total, the Doctor estimated that he received about $20,000 from El-Hanafi.  The Doctor believed that El-Hanafi, Hasanoff, and the CW thought that the money they were sending to him was for their future training.  The Doctor reported that he gave some of the $12,000 that El-Hanafi delivered to families in need --- appearing to refer to families of purported "martyrs" and others who had died in fighting *jihad* --- and that he also bought two cars with the remainder of the money.  The Doctor intended to resell those cars for profit, so he would be able to send additional money to those families.

       The Doctor also discussed the items that El-Hanafi, Hasanoff, and the CW sent to him and Suffian.  The Doctor, who wanted to send shoes and jackets to the "brothers," asked El-Hanafi (through Suffian) to send these items to Suffian.  Fulfilling these requests, El-Hanafi sent the Doctor three heavy, cold weather reversible jackets and three pairs of boots prior to El-Hanafi's February 2008 visit.  The Doctor reported that, although the boots and jackets were originally meant to be used by the Americans (*i.e.*, El-Hanafi, Hasanoff, and the CW) for when they travelled for *jihad*, the Doctor instead kept a jacket and a pair of boots for himself, and provided the others to Suffian and another individual.  In addition, as Suffian also reported, El-Hanafi sent to the Doctor, at different times, a GPS device, binoculars, and a remote-control toy car.  The Doctor described the remote-control car as being about a foot long, battery-powered, and with a remote control and three other pieces.  El-Hanafi believed that the range for the remote was less than a kilometer.  The Doctor explained that, during his time engaging in *jihad* in Afghanistan against the Soviets, he learned about explosives and he wanted the remote-control car to help him learn about new explosives technology.  The car was given to Suffian around November 2008.

According to the Doctor, El-Hanafi asked the Doctor to arrange for El-Hanafi, Hasanoff, and the CW to travel to any *jihad* arena, whether Iraq, Afghanistan, or Somalia, where they would receive military-style training and then engage in fighting.  The Doctor noted that the Americans (El-Hanafi, Hasanoff, and the CW) continued to make requests to travel for training and *jihad*, but the Doctor repeatedly told them their path to travel was not clear.  The Doctor believed that these individuals would be more valuable assets in connection with potential future attacks on U.S. soil, than they would be were they to travel to Afghanistan, Pakistan, Somalia, or another front to fight.  As discussed below, the Doctor took advantage of Hasanoff's travel to the United States to have him conduct surveillance of a domestic target for a possible terrorist attack.

The Doctor also reported that, around November 2008, a dispute arose between him, Suffian, and the Americans (El-Hanafi, Hasanoff, and the CW), concerning the Doctor's use of the money and equipment that the Americans were sending him.  According to the Doctor, Suffian told the Americans that the Doctor was the hindrance to their path to *jihad*, and the Americans and Suffian were growing impatient with the Doctor's failure to facilitate their travel and training for *jihad*.

The Doctor reported that, around December 2008, he made efforts to contact El-Hanafi to alleviate this problem.  After eventually making contact, the Doctor and El-Hanafi opened an email account so they could communicate.  According to the Doctor, El-Hanafi indicated by email in December 2008 that he (El-Hanafi) was going to *jihad*.  The Doctor responded that he wanted to take advantage of El-Hanafi and had long-term plans for El-Hanafi, Hasanoff, and the CW, concerning something in the future in America.

**5.      El-Hanafi's March 2008 Purchase of a Subscription to an Encryption Service**

El-Hanafi was particularly valuable to Suffian and the Doctor because of his technological sophistication and computer expertise.[13]  The CW reported that El-Hanafi taught the Doctor in February 2008 how to communicate covertly over the Internet with advanced encryption.

Records for El-Hanafi's checking account further reveal that he made debit card purchases on March 12, April 14, and May 12, 2008 --- that is, starting immediately after El-Hanafi's return from his February 2008 trip to Yemen --- for "2CO.COM*HOTSPOTVP."  A hotspot VPN creates a secure tunnel between the user and a secured and hardened server that encrypts and protects the user and the user's information.  When someone connects to the Internet through a hotspot VPN, the internet protocol ("IP") address becomes the address of the server that the person is connected to.  A hotspot VPN thus allows a person to mask the IP address from which they are accessing the internet and prevent identification based on an IP address.

**6.      El-Hanafi's May 2008 Trip To Recruit the CW in New York City**

The CW further reported that in May 2008, just three months after El-Hanafi met with Suffian and the Doctor in Yemen and swore *bayat* to the Doctor, El-Hanafi recruited the CW in New York to join in providing support to his new al Qaeda contacts.  In May 2008, the CW traveled to New York City to meet with El-Hanafi, who was in town at the time, as confirmed by travel records showing that El-Hanafi traveled from Dubai to New York City for two weeks on May 16, 2008.  The CW reported that, in a park in Brooklyn, El-Hanafi told the CW that "some

---

[13] El-Hanafi formerly worked as a senior systems administrator for a major firm in New York City, in which capacity he received extensive training in computer security.

good stuff has been happening," and that El-Hanafi had been "introduced to a group in Yemen." El-Hanafi additionally told the CW that this group wanted the CW to join.  The CW understood that the group El-Hanafi was referring to was al Qaeda.

The CW further reported that, in addition to recruiting the CW for al Qaeda, El-Hanafi performed taskings for al Qaeda during his May 2008 visit to New York City.  According to the CW, El-Hanafi purchased a remote control car at a store in Manhattan and looked for Casio "G-Shock" watches.

### 7.   El-Hanafi's Direction of Hasanoff to Conduct Surveillance of the the New York Stock Exchange in August 2008

In addition to information about El-Hanafi's February 2008 trip, FBI interviews of Suffian and the Doctor revealed that, during El-Hanafi's February 2008 trip to Yemen, the Doctor gave El-Hanafi --- and through El-Hanafi, Hasanoff --- an assignment that related to possible plans for an attack on U.S. soil.  Both Suffian and the Doctor reported that El-Hanafi was tasked to direct Hasanoff to conduct surveillance of the New York Stock Exchange, and that Hasanoff in fact conducted that surveillance and reported to Suffian and the Doctor what he (Hasanoff) had learned.  Both detainees are remarkably consistent in their reporting about the surveillance assignment, and their statements are corroborated by emails written by El-Hanafi and Hasanoff.

Specifically, the Doctor stated that he had contemplated an attack on the New York Stock Exchange, but that he had very little information about the site, including its location, size, and security.  Accordingly, the Doctor asked that El-Hanafi ask Hasanoff to perform surveillance of the New York Stock Exchange, which information the Doctor hoped would be beneficial for purposes of planning an attack in the United States.  In the Doctor's eyes, El-Hanafi, Hasanoff, and the CW were ideal for these plans, and he believed that the three Americans would be better

put to use for attacks on U.S. soil rather than traveling to fight in Afghanistan, Pakistan, Somalia, or another front.  The Doctor also recalled that, around May or June of 2008, El-Hanafi advised him (through Suffian) that Hasanoff would be traveling from the UAE to the United States.  The Doctor also reported that he received information concerning the New York Stock Exchange from Hasanoff following that trip.

Suffian's account of relevant events is very closely consistent with the Doctor's account.  Suffian likewise reported that Hasanoff traveled to New York shortly after El-Hanafi's visit in February 2008, on instructions from the Doctor relayed through himself and El-Hanafi.

Suffian and the Doctor's statements about Hasanoff's surveillance of the New York Stock Exchange are strongly corroborated not only by Hasanoff's travel to New York City, but also by communications, written over email, that El-Hanafi and Hasanoff had with Suffian in August 2008.[14]  For instance, on August 4, 2008, Hasanoff wrote a message to Suffian in which he explained that he had not yet been able to conduct the surveillance because he had been sick, but planned to do so in the next two days.  Specifically, Hasanoff wrote, "How are you brothers?  I am visiting the place you asked about in two days -- I will email you once I have visited there.  Let me know if you need anything more from me while I am here.  I have been sick for some days so I couldn't go earlier."  At the time Hasanoff wrote this email, he was in the United

---

[14] Both Hasanoff's and El-Hanafi's emails to Suffian were written over email accounts that incorporated the phrase "andcompany@yahoo.com" with different letter combinations before and after the word "and" that signified the participants in the communication.  Suffian elaborated on how those email accounts were used.  For example, Suffian explained to the FBI that communication between El-Hanafi and Suffian occurred over the kandscompany@yahoo.com account, with the "k" standing for Khaled, an alias El-Hanafi used, and the "s" for Salah, an alias Suffian used.

States, as he had landed at John F. Kennedy Airport in Queens, New York, on July 29, 2008.[15]

On August 7, 2008, Hasanoff, while still in the United States, wrote another message to Suffian

in which he communicated that he had conducted the surveillance:  "I will find out your request.

I have visited the tourist locations you asked me about and will report to you after two weeks in

more detail."

Hasanoff returned from the United States to Dubai on August 15, 2008.  Three days later,

El-Hanafi wrote an email message to Suffian confirming that Hasanoff had returned to the UAE

and promising to provide Suffian with an update in the near future.  Specifically, El-Hanafi

wrote, "Tariq [Hasanoff] is back and al hamidoilallah.[16]  I will give you information from him on

his visit and update you in a few days."

As both the Doctor and Suffian reported to the FBI, Hasanoff subsequently sent the

Doctor a report of his surveillance of the New York Stock Exchange.  According to the Doctor,

Hasanoff sent a one-page report to Suffian, via email, which Suffian printed out for the Doctor.

In the report, Hasanoff relayed that the New York Stock Exchange was surrounded by

approximately four streets that were blocked off from vehicular traffic and that someone would

have to walk to the building.  The Doctor revealed that, although the information provided by

Hasanoff could be used by someone who wanted to do an operation, he was not satisfied with the

report, and he accordingly disposed of it.  (The report apparently lacked sufficient detail about

New York Stock Exchange security matters to be as helpful as the Doctor had hoped.)

---

[15] Travel records show that Hasanoff flew from Dubai to John F. Kennedy Airport in New York City on July 29, 2008, and that he flew back from John F. Kennedy Airport to Dubai on August 15, 2008.

[16] The phrase, "al hamdillah," is an Arabic expression that translates to, "Praise to God."

### 8.     El-Hanafi's April 2009 Purchase of Casio Watches

The CW reported that El-Hanafi was tasked by al Qaeda with purchasing Casio "G-Shock" watches.  Business records confirm that El-Hanafi in fact purchased Casio watches and had them shipped to his residence in Brooklyn just prior to traveling to New York in April 2009. According to Amazon.com records, on April 15, 2009, El-Hanafi placed an order for four Casio Men's G-Shock Classic Digital Watches and three Casio Men's G-Shock Classic Solar Powered Digital Sports Watches.  The following day, on April 16, 2009, these watches were shipped to "Wesam Elhanafi," at his family's address in Brooklyn.  Records for El-Hanafi's Citibank Mastercard likewise confirm the purchase of these watches.  Travel records show that, on April 17, 2009 (the day after Amazon.com shipped the seven Casio watches), El-Hanafi traveled from Dubai to New York, and that he returned to Dubai about two weeks later.

### 9.     El-Hanafi's Desire to Receive Military-Style Training and to Fight *Jihad* Overseas

Throughout their dealings with the Doctor and Suffian, El-Hanafi, Hasanoff, and the CW repeatedly articulated their strong and unwavering desire to travel overseas for the purposes of receiving military-style training and then fighting *jihad*.  There can be no serious question about the sincerity of their desire to do so.  Suffian, for example, told the FBI that the three Americans planned on selling their homes and belongings before traveling, clear evidence that they intended to fight, possibly dying in battle, and not returning to their families.  Moreover, as noted above, the Doctor's failure to facilitate their travel for the purposes of foreign fighting caused a significant rift in the relationship between not only El-Hanafi and Hasanoff and the Doctor, but also between Suffian and the Doctor.

By the end of 2008, El-Hanafi, Hasanoff, and the CW were awaiting instructions from the Doctor and were preparing to be sent to fight in Afghanistan or Iraq.  If they were directed to

go to Afghanistan, they would have had to travel first to Pakistan and to wait there until al Qaeda secured a route to Afghanistan.  If they were instructed to go to Iraq, they would have traveled to either Syria or Saudi Arabia, and then would have crossed into Iraq.  El-Hanafi and Hasanoff previously had traveled to Syria and Turkey in an unsuccessful attempt to travel to Iraq to join in the fighting.

El-Hanafi, Hasanoff, and the CW regularly discussed the possible locations where they could fight, including Afghanistan, Iraq, and Somalia.  In electronic communications throughout 2009, El-Hanafi, Hasanoff, and the CW discussed, using slightly coded language, their desire to fight, their general efforts to support terrorist causes overseas, and how they might identify additional contacts within al Qaeda who could facilitate their travel.  According to the CW, during these communications, the CW participated from the United States, while El-Hanafi and Hasanoff were together in the UAE.[17]

Thus, for example, in a January 24, 2009 electronic communication involving Hasanoff, El-Hanafi and the CW (attached as Exhibit D), the three men discussed their loss of contact with the Doctor, and the locations where they could travel for *jihad*.  El-Hanafi wrote, "I lost contact completely[.] I think something happened over there," adding, "I think he's been hospitalized." According to the CW, El-Hanafi was referring to losing contact with the Doctor, with "hospitalized" being code for being in prison --- which he in fact was.  The CW told El-Hanafi that "now it's time to move on" and noted that they had a "couple of options."  First, El-Hanafi, Hasanoff, and the CW could travel to Yemen to attempt to establish new al Qaeda contacts: "we

---

[17] As noted, the CW explained that El-Hanafi and Hasanoff were often sitting together at a computer terminal in the UAE during their communications with the CW in the U.S. Accordingly, it is sometimes difficult to determine whether Hasanoff or El-Hanafi is physically typing each message.  Where the particular "speaker" is identifiable either through context or by information provided by the CW, that person is noted in the text.

either can go visit ur hospitalized friend and then from there . . . we can go to his city . . . and from there we can pick up a new trip."  Second, they could travel to Afghanistan or another country in the region to join fighting in support of al Qaeda.  Their third option was to travel to Somalia to support al-Shabaab, a designated foreign terrorist organization that operates primarily out of Somalia.

El-Hanafi proposed two business ventures that could provide a cover for the true purpose of their travel:  "1) send a car there 4x4 and try to sell it . . . 2) send women's clothing like the ones our friend is doing business in."  These businesses also could help sustain them financially while they sought to establish new contacts to facilitate their travel to receive training and to fight in *jihad*.

El-Hanafi, Hasanoff, and the CW also made clear that the purpose of their travel was to engage in fighting and not return.  When El-Hanafi asked, "so our first trip is just to discovery?", the CW replied, "nooo[.]  one way[.] and whatever it takes," further adding, "just remember if we give it 100%, it'll give us back everything."  Toward the end of the January 24, 2009 chat, they determined that traveling to Somalia would be the easiest option, although they would have to wait until the "airport" was under "their control."  Based on information from the CW, here, they were referring to al-Shabaab gaining control of the airport --- a reference to the much fought-over Mogadishu International Airport.

In a March 7, 2009 electronic communication (attached as Exhibit E), El-Hanafi, Hasanoff, and the CW continued to speak in coded language about their concern for their former al Qaeda contacts, *i.e.*, Suffian and the Doctor, and their disappearance's impact on their ability to fight.  For instance, the CW commented, "I hope the other guys are out of the hospital."  Suspecting that Suffian and the Doctor had been imprisoned, the group was desperate to

establish new contacts that could facilitate their travel for *jihad*.  In an effort at least in part to

establish a new contact with al Qaeda, El-Hanafi and Hasanoff asked the CW to join them for an

*Umrah* trip (a pilgrimage to Mecca in Saudi Arabia) around June 2009.   Around this time, El-

Hanafi and Hasanoff also reinitiated contact with CC-2.  El-Hanafi and Hasanoff hoped that CC-

2, who was involved in facilitating travel for al Qaeda fighters, could help them reestablish

communication with al Qaeda.

El-Hanafi, Hasanoff, and the CW had another electronic communication on June 12,

2009 (attached as Exhibit F).  In this communication, El-Hanafi, Hasanoff, and the CW

discussed their trip to Saudi Arabia, their efforts to make new contacts within al Qaeda, and

concern that their prior al Qaeda contacts had been arrested.  The June 12, 2009 conversation

began with El-Hanafi confirming Hasanoff's presence: "me and the other brother are here."  El-

Hanafi asked the CW, "have u applied for visa already?," and the CW responded that he had

started the process.  During this conversation, El-Hanafi and Hasanoff recited much of their

history with CC-1 (referred to as "sammy"), Suffian (referred to as "the communicator"), and the

Doctor (referred to as "the manager"):

> I need to tell u the story from the beginning so u can have info then we can all
> make a decision[.] as u know[,] we met a brother "sammy" a few years ago while
> he was here visiting[.] he's the one that introduced us to the manager and the
> communicator. . . .  We worked with both sammy and these guys for about 8 or 9
> months simultaneously[,] then the manager and the communicator asked us to join
> their team officially[.] once we did.....they told us not to speak with sammy at
> all[.] sammy is a very good brother.....but, he is known all over and watched[.]
> anyone who is in contact with him....will get the same treatment[.] so they said if
> u want us to help u study abroad u need to stop contacting sammy[.]

This account confirms information provided by the CW, Suffian, and the Doctor:  El-Hanafi and

Hasanoff met CC-1 in the UAE; CC-1 introduced El-Hanafi to the al Qaeda contacts (the Doctor,

a/k/a "the manager," and Suffian, a/k/a "the communicator"); El-Hanafi and Hasanoff agreed to

assist al Qaeda ("join their team officially"); and the Doctor instructed El-Hanafi to cease communications with CC-1, a too-prominent jihadist.

**B.      El-Hanafi's Guilty Plea**

On June 18, 2012, El-Hanafi pled guilty to Information S7 10 Cr. 162 (KMW) (the "Information"), pursuant to a plea agreement with the Government.  The Information charged two counts: (1) providing, and attempting to provide, material support and resources to a designated foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Section 2339B; and (2) conspiring to provide material support and resources to a designated foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Section 371.

Pursuant to the terms of El-Hanafi's plea agreement with the Government, the parties stipulated to an advisory Guidelines offense level of 37, calculated as follows:  (1) because Counts One and Two involve the same act or transaction, the counts are grouped, pursuant to U.S.S.G. § 3D1.2(a); (2) the base offense level for the two offenses is 26, pursuant to U.S.S.G. § 2M5.3; (3) because the offenses involved the provision of funds or other material support or resources with the intent, knowledge, or reason to believe that they were to be used to commit or assist in the commission of a violent act, two levels are added, pursuant to U.S.S.G. § 2M5.3(b); (4) because the offenses were felonies that involved, or were intended to promote, a federal crime of terrorism, 12 levels are added, pursuant to U.S.S.G. § 3A1.4(a); and (5) a three-level reduction for acceptance of responsibility is warranted, pursuant to U.S.S.G. § 3E1.1(a), (b).  In addition, because the offenses were felonies that involved, or were intended to promote, a federal crime of terrorism, El-Hanafi's Criminal History Category is VI, pursuant to U.S.S.G. § 3A1.4(b).

Based on this calculation, the parties agreed that the advisory Guidelines range is 360 months to life.  However, because the combined statutory maximum sentence for Counts One and Two is twenty years, the parties stipulated to an applicable Guidelines range of twenty years' imprisonment.  The parties further agreed that, after determining El-Hanafi's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2 and that, at Guidelines offense level 37, the applicable fine range is $20,000 to $200,000.

El-Hanafi also admitted the forfeiture allegations in the Information.  In his plea agreement with the Government, El-Hanafi agreed to forfeit to the United States:

> (i) all right, title, and interest in all assets, foreign and domestic, affording a source of influence over al Qaeda; (ii) all right, title and interest in all assets, foreign and domestic, acquired and maintained with the intent and for the purpose of supporting, planning, conducting, and concealing a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property; and (iii) all right, title and interest in all assets, foreign and domestic, derived from, involved in, and used and intended to be used to commit a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property.

On or about June 18, 2012, this Court entered a consent order of forfeiture consistent with the terms of the plea agreement.  Under the terms of the plea agreement, payment of forfeiture shall not be treated as satisfaction of any other penalty that the Court may impose on El-Hanafi, including the imposition of a fine.

During his guilty plea allocution, El-Hanafi acknowledged that he provided, and conspired to provide, material support and resources to al Qaeda, knowing full well the purpose and objective of the terrorist group.  *See* Transcript, *United States* v. *El-Hanafi*, 10 Cr. 162 (KMW), June 18, 2012, at 17-21.  El-Hanafi explained that, in July 2009, he had a conversation with others regarding seeking out additional contacts within al Qaeda.  *Id.* at 17.  El-Hanafi further acknowledged that he realized that al Qaeda was a terrorist organization under U.S. law,

27

that he sought out contacts with al Qaeda with the purpose of assisting that terrorist organization, and that he additionally provided expertise to al Qaeda.  *Id.* at 20-21.

## C.      The Presentence Investigative Report

The Probation Department issued its Presentence Investigation Report in this case on October 15, 2012.  The Probation Department calculated an offense level of 37, a Criminal History Category of IV, and a resulting applicable Guidelines range of 240 months' imprisonment, in light of the statutory maximum sentence.  *See* PSR ¶¶ 42-56, 91.  This Guidelines calculation and sentencing range reflected the same offense level and criminal history calculations contained in the plea agreement.  *Id.* ¶ 92.

The Probation Department recommended a term of imprisonment of 13 years' imprisonment.  *See* PSR p. 22.  In arriving at this recommendation, the Probation Department observed that El-Hanafi "willingly participated and actively took steps in furtherance of the conspiracy to aid" al Qaeda.  *Id.*  The Probation Department noted, however, that, because of El-Hanafi's "lack of candor" at his plea allocution and "lack of any expression of remorse or an explanation for his motivation, we are unaware if El-Hanafi truly appreciates the severity of his actions."  *Id.* p. 23.  Nonetheless, the Probation Department recommended a sentence of 13 years' imprisonment, well below the advisory Guidelines range of twenty years' imprisonment. In reaching this conclusion, the Probation Department observed that this District

> has been host to large-scale terrorist defendants prior to the convictions of Hasanoff and El-Hanafi, all of whom potentially could have caused destruction to the United States and a significant loss of life to its citizens.  Some of these defendants were sentenced to periods of 12 years' incarceration and some of them to a term of life incarceration.  We believe, as shown by his actions, his personal circumstances and his apparent intent, that Hasanoff falls more in-line with the former group of defendants.

*Id.* p. 23.  The Government strongly disagrees with the Probation Department's analysis and recommended sentence.  The Government also notes that the information from the Doctor and Suffian, including their reporting on El-Hanafi directing Hasanoff to surveil the New York Stock Exchange, and the email messages written by El-Hanafi and Hasanoff concerning that surveillance, had not yet been declassified, and therefore were not considered by the Probation Department at the time the Presentence Investigation Report for El-Hanafi was drafted.[18]

### III.  ARGUMENT

The offense conduct in this case is enormously serious --- providing material support to al Qaeda that included money, technical advice, and equipment sought by the terrorist group to engage in further violence against Americans, and surveilling a potential target in New York City for a domestic terrorist attack.  Against this backdrop, it is frankly hard to see why a lenient, below-Guidelines sentence would be appropriate here --- let alone a sentence that is one-fourth the Guidelines range, and that would effectively imply an additional period of incarceration of only a few months, as the defense seeks.[19]  An American citizen who works with al Qaeda --- and works to further a terror plot on United States soil --- should be treated as firmly as the Guidelines envision, both because of the depravity of assisting al Qaeda and because would-be terrorists must be made aware that the courts of the United States will impose long sentences on anyone who would work to assist al Qaeda, especially through actions taken right here in Manhattan.

---

[18] On June 4, 2012, Hasanoff also pled guilty to an Information that charged him with providing and conspiring to provide material support to al Qaeda.  On September 30, 2013, this Court sentenced Hasanoff to a term of imprisonment of 216 months (18 years), a three-year term of supervised release, a $200 special assessment, and forfeiture in the amount of $70,000, which is to be owed jointly and severally with El-Hanafi.

[19] El-Hanafi was arrested on April 30, 2010.  Assuming his receipt of good conduct credit of 54 days per year, a five-year sentence for El-Hanafi would result in his release from incarceration in around early August 2014.

**A.      Applicable Law**

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" --- that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 50 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).  *See Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
>
> (B)      to afford adequate deterrence to criminal conduct;
>
> (C)      to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 522 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## B.     The Court Should Impose a Guidelines Sentence of Twenty Years' Imprisonment

Pursuant to *Gall*, the sentencing analysis starts with the advisory Guidelines range. *See also* 18 U.S.C. § 3553(a)(4). The parties agree that in this case, if not for the combined statutory maximum of twenty years' imprisonment, the applicable Guidelines range would be 360 months to life. However, because the combined statutory maximum sentence is twenty years, the applicable Guidelines range is twenty years' imprisonment. This Guidelines range reflects the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a

31

long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). *Rita*, 551 U.S. at 349. The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," and accordingly, the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.*

A sentence of twenty years' imprisonment is appropriate to address the goals of punishment and deterrence and in light of the nature of the offense in this case. El Hanafi's offense is an enormously serious one, both in terms of the nature of his conduct and the length of his involvement. As noted, El-Hanafi's initiation into extremist ideology began in 2003, when he was living in Brooklyn, New York, as a United States citizen. In 2007, El-Hanafi began to provide financial and other forms of support to al Qaeda, and continued to do so through approximately March 2010. El-Hanafi provided various forms of support which he intended to be utilized to support the *mujahidin* fighting against his fellow citizens --- American forces in Afghanistan and other locations overseas. El-Hanafi sent not only money, which could be used in various ways to further acts of terrorism, but also provided a technical know-how so that al Qaeda could covertly communicate over the Internet. Moreover, El-Hanafi also repeatedly expressed his desire personally to join armed combat against Coalition forces in Afghanistan and elsewhere.

El-Hanafi's insistence that he "had no interest in activities directed against the United States or United States citizens," Deft. Sent. Ltr. at 2, and that his "efforts were directed at Somalia, and not the United States," *id.* at 9, not only reflects a remarkable lack of remorse and appreciation for his crime, but is simply belied by his criminal conduct. El-Hanafi did not merely "contribut[e] money to support jihadist insurgents in Somalia." *Id.* Far from engaging in conduct that evinced "no interest in activities directed against the United States or United States

citizens," *id.* at 2, El-Hanafi spent multiple years working to support a terrorist organization whose *raison d'etre* is to attack the United States and has been responsible for the murders of thousands of Americans.  El-Hanafi not only provided guidance, funding, and tangible items to al Qaeda, he directed, on behalf of a terrorist operative, surveillance of locations *in the United States for potential terrorist attacks*.  Surveillance of the New York Stock Exchange in lower Manhattan on behalf of al Qaeda has virtually nothing to do with Somalia.  Suggesting that it does, *id* at 2, 9, utterly belies El-Hanafi's claim that he has "fully realized the immorality," *id.* at 9, of his conduct and reformed.  El-Hanafi's actions were without question "directed against the United States [and] United States citizens," *id.*

Moreover, El-Hanafi cannot claim that influences or difficult circumstances beyond his control led to his desire to engage in *jihad* and assist al Qaeda.  El-Hanafi has been afforded every opportunity imaginable to succeed both professionally and personally.  He received an excellent education in the United States, graduating from high school and college with a degree in business administration.  *See* Deft. Sent. Ltr. at 5.  He secured a lucrative job at Lehman Brothers, which put him in a position to provide financially for other family members.  *See id.* at 5-6.  He was blessed with a loving family.  *See* Deft. Sent. Ltr. at 5-6; Deft. Sent. Ltr., Exh. B. He received United States citizenship.  As El-Hanafi himself put it, he "lived most people's dreams."  *See* Deft. Sent. Ltr., Exh. B, at 1.  Yet, despite all this, El-Hanafi chose to turn his back on the country that naturalized him by supporting a terrorist organization whose primary objective is to kill Americans.  This remarkable decision, made in the face of "liv[ing] most people's dreams," *id.*, only amplifies "the immorality of his chosen path" to support terrorism, Deft. Sent. Ltr. at 9.  And it speaks volumes about the kind of person El-Hanafi is, in spite of the contention he now expresses.

And there can be no serious question that El-Hanafi's offense was of the upmost seriousness and calls for a substantial term of imprisonment.  As this Court explained at Hasanoff's sentencing, the offense conduct in this case is "very serious . . . both in terms of the nature of his conduct and the length of his involvement."  Hasanoff Sent. Tr. at 19.  For Hasanoff, this Court imposed a sentence of 18 years' imprisonment, reflecting two years of credit for Hasanoff's apparent rehabilitation at the Metropolitan Correctional Center.  *See* Hasanoff Sent. Tr. at 21.  Yet in many respects, El-Hanafi's criminal conduct was even more serious, egregious, and offensive than Hasanoff's.  El-Hanafi took the initiative to travel to Yemen in February 2008 to meet face-to-face with the Doctor, a senior member of al Qaeda; El-Hanafi swore *bayat* to the Doctor; and El-Hanafi received several assignments from the Doctor and Suffian, which he conveyed to Hasanoff and the CW.  Following his February 2008 trip to Yemen, El-Hanafi assembled Hasanoff and the CW to join his efforts to support his newly-established al Qaeda contacts, and El-Hanafi received oaths of allegiance from Hasanoff and the CW and tasked them with assignments, including directing Hasanoff to conduct surveillance of the New York Stock Exchange.

Nor can El-Hanafi's conduct be dismissed as a short period of aberrant conduct during which time his mindset was briefly "corrupted by jihadist doctrine."  Deft. Sent. Ltr. at 8.  For several years of his adulthood, El-Hanafi devoted himself to al Qaeda, by providing regular financial contributions to his terrorist contacts, guiding those contacts on ways to communicate covertly over the Internet, conveying assignments on behalf of al Qaeda to his co-conspirators, and performing taskings for the terrorist group.  *See supra* Part II.A; *see also* Hasanoff Sent. Tr. at 19 (explaining that "the length of [Hasanoff's] involvement" reflects the seriousness of the offense).

34

In all, the length and severity of El-Hanafi's conduct calls for a term of imprisonment that will not only deter others from engaging in similarly dangerous conduct, but will also deter El-Hanafi from future crimes and protect the public. Nothing less than a sentence at the statutory maximum of twenty years would accomplish those goals.[20]

## C.     The Defense's Counter-Arguments Are Unavailing

### 1.     The Defendant's Medical Condition Does Not Warrant Any Reduction of His Sentence

El-Hanafi asks this Court to impose a sentence 75% below the Guidelines in large part because of the "serious and chronic medical condition that the United States government has inflicted" upon him. Deft. Sent. Ltr. at 11. El-Hanafi argues that he is entitled to this drastic reduction in sentence because the United States caused him to suffer a chronic medical condition by (1) rendering him immobile during the flight from the UAE to the United States after his arrest; and (2) failing to diagnose the condition for 17 months after his arrival at the Metropolitan Corrections Center. *See* Deft. Sent. Ltr. at 7-8. As described in further detail below, the first allegation is false, as El-Hanafi was permitted to move around the airplane during the flight and did in fact do so. Further, as explained in the attached report of Dr. James F. McKinsey, Chief of Vascular Surgery and Endovascular Interventions, Director of the New York Presbyterian

---

[20] Pursuant to the Consent Order of Forfeiture, El-Hanafi must forfeit to the Government, among other things, "all right, title and interest in all assets, foreign and domestic, derived from, involved in, and used and intended to be used to commit a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property." Based on information provided by the CW, Suffian, and the Doctor, El-Hanafi and Hasanoff sent to Suffian and the Doctor approximately $67,000. In addition, El-Hanafi and Hasanoff provided such items as a laptop computer, an Atlas translation device, a remote-control car with an advanced remote control and receiver, three heavy jackets, three boots, three GPS devices, binoculars, and two Casio G-Shock watches. Taking into account the value of these items, the Government estimates the total amount of forfeiture for El-Hanafi and Hasanoff to be $70,000, for which El-Hanafi and Hasanoff should be jointly and severally liable. At his sentencing on September 30, 2013, Hasanoff was ordered to pay forfeiture in the amount of $70,000, to be owed jointly and severally with El-Hanafi.

Vascular Fellowship of Columbia and Cornell and Co-Executive Director of the Vascular

Service Line New York Presbyterian Hospital System, El-Hanafi's deep vein thrombosis

("DVT") ███████████████████████████████████████████

███████████████████████████████████████ As for the second

allegation, regardless of whether the delay in diagnosis was reasonable in light of appropriate

medical standards, the Bureau of Prisons ("BOP") is fully capable of handling El-Hanafi's

medical condition going forward --- and a man convicted of providing material support to al

Qaeda should not be prematurely released into the community based on the factually erroneous

supposition that the BOP cannot handle his medical condition going forward.

El-Hanafi first argues that, "[a]s a result of being immobilized during the long flight from

the UAE to the United States, he developed deep-vein thrombosis (DVT) in his leg."  Deft. Sent.

Ltr. at 7.  Neither El-Hanafi's claim regarding the conditions of his flight, nor the cause of his

DVT, is accurate.  El-Hanafi simply was not immobilized during the approximately 14-hour

flight from Dubai to the United States on April 30, 2010.  As set forth more in the attached

affidavit from FBI Special Agent Ryan Maxwell, who participated in the transport of El-Hanafi

and Hasanoff to the United States, El-Hanafi was never placed in shackles during the flight, his

arms and legs were not restrained, and he was permitted to get up during the flight, including to

pray and to use the restroom.  *See* Exh. H at ¶ 3.  Special Agent Maxwell, who was responsible

for transporting El-Hanafi and for any related security issues, and therefore sat in close proximity

to El-Hanafi for the duration of the flight from Dubai to the United States, *see id.* ¶ 2, explained:

> At no point during the flight was El-Hanafi in shackles or otherwise restrained.
> El-Hanafi was permitted to leave his seat with an escort to use the bathroom and
> to pray at multiple points during the flight.  El-Hanafi went to the restroom about
> three times while on board the plane.  El-Hanafi also was provided with Halal
> meals and non-alcoholic beverages during the flight.  I am not aware of any
> complaints by El-Hanafi during the flight concerning his seating situation or

indicating any discomfort, nor am I aware of any request that El-Hanafi made to leave his seat that was denied.

*Id.* ¶ 3.

El-Hanafi has submitted, as Exhibit A to his sentencing letter, a two-page "case review" from Dr. Laura Chalfin, a family medicine doctor out of British Columbia, Canada. *See* Deft. Sent. Ltr., Exh. A. Dr. Chalfin's determination that El-Hanafi's DVT was caused by his flight from the UAE to the United States is severely undermined by the simple fact that, contrary to her assumptions, El-Hanafi was not shackled and was permitted to move during the flight. *See id.* at 1 ("I must emphasize that any third-year medical student would have suspected this diagnosis [of DVT], since it is classic for DVT to occur after prolonged immobilization, such as a long plane ride."); *id.* at 2 ("Mr. El-Hanafi clearly has [post-thrombosis syndrome] due to his DVT, which developed on the prolonged plane trip in shackles when he was first arrested."). Indeed, Dr. Chalfin even noted that, for El-Hanafi in the future, "[t]ravel by airplane is acceptable only if he can get up and walk around, and wears properly fitted compression stockings during the flight." *Id.* at 2. But that is exactly what occurred on the April 2010 flight from the UAE to the United States: El-Hanafi was permitted to get up and walk around during that flight.





It is clear that El-Hanafi simply is not being forthright when, through his attorney's sentencing submission, he alleges that he was shackled and not permitted to move during the April 2010 flight from the UAE. *See* Deft. Ltr. at 1 ("Mr. El-Hanafi himself has developed deep-vein thrombosis (DVT) due to being immobilized during a long flight from the United Arab Emirates to the United States."), 7 ("As a result of being immobilized during the long flight from the UAE to the United States, he developed deep-vein thrombosis (DVT) in his leg."). Indeed, the defense's expert also relied on El-Hanafi's false recitation of the circumstances of his aerial transfer to the United States. *See* Deft. Sent. Ltr., Exh. A at 1 ("[I]t is classic for DVT to occur after prolonged immobilization, such as a long plane ride. (In fact some airlines are now having their passengers do exercises during long flights to prevent this.)"). El-Hanafi's factually inaccurate assertions concerning his transfer are nothing more than a thinly veiled attempt to mislead the Court with the hopes of receiving an unwarranted reduction of his sentence, and only further reflect his continued lack of remorse for and appreciation of the seriousness of his criminal activity.

Second, with respect to El-Hanafi's medical prognosis, while the Government does not dispute that El-Hanafi appears to have DVT, the Government certainly disputes the defense's suggestion that this ailment cannot be adequately treated by the BOP.

██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

The BOP is fully capable of handling this medical treatment going forward, which negates any basis for a health-based reduction under Section 3553(a). *See United States* v. *Lelonde*, 509 F.3d 750, 770 (6th Cir. 2007) (approving the district court's "ask[ing] the federal marshal as well as the probation officer about [the defendant's] ability to receive adequate medical care while in custody" in upholding the imposition of the maximum sentence recommended by the Guidelines).  As described in the letter provided by Barbara Sullivan,

---

[21] ████████████████████████████████████████████████████

████████████████████████████████████████████████████

Health Systems Administrator for the BOP, which is attached hereto as Exhibit I, all BOP institutions are fully accredited by the Joint Commission on Accreditation for Health Care Organizations, which sets the medical, surgical and psychiatric standards for hospitals nationwide.  *See* Exh. I. at 2.  El-Hanafi will be evaluated prior to designation to ensure that he is placed in an institution that is equipped to handle the level of medical services he requires, ranging from designation to a medical referral facility that can provide in-patient care to seriously ill inmates, to general population facilities that provide care via internal Health Services Departments and outpatient referral programs.  *Id.* at 2-3.  Having reviewed documentation regarding El-Hanafi's medical condition, Ms. Sullivan opined that the BOP would be capable of providing appropriate care to address his medical needs.  *Id.* at 4. Accordingly, there is no indication that the treatment El-Hanafi claims he will require --- which, according to El-Hanafi, entails "lifelong treatment with anticoagulant medication, along with rest and elevation of the leg when it is painful and swollen, and compression with properly-fitted stockings," Deft. Br. at 10, ████████████████████████████ ████████████ --- cannot be provided by the BOP.  Nor does it make sense that the BOP presumably would be able to provide adequate treatment for the remainder of the abbreviated sentence sought by the defense, but not for the entirety of the 20-year sentence recommended under the Guidelines.

But most importantly, El-Hanafi's medical condition and his treatment while in BOP custody in no way detract from the exceedingly seriousness of his offense of providing material support to al Qaeda --- which is far and away the most compelling and significant factor in this case under Section 3553(a), and calls for a 20-year sentence.  *See, e.g.*, *United States* v. *Fishman*, 631 F. Supp. 2d 399, 405 (S.D.N.Y. 2009) (declining to take into account the defendant's bipolar

disorder under Section 3553(a), because the defendant made "no claim of a causal relationship

between his proffered illness and his crime," and therefore the illness "will have no effect on the

Court's ultimate sentence"); *see also United States* v. *Morales*, 501 F. App'x 42, 43 (2d Cir.

2012) (emphasizing that the serious nature of the defendant's crime seriously lessened any

potential mitigation based on the defendant's health issues); *United States* v. *Brudi*, No. 12-4723-

cr, 2013 WL 5681647, at *1 (2d Cir. Oct. 21, 2013) (same).  The extraordinary gravity of El-

Hanafi's crime utterly dwarfs any sentencing consideration that he should receive based on his

medical condition or treatment by the BOP.[22]  El-Hanafi should not be loosed on society

prematurely because of his medical condition --- especially since, as Dr. McKinsey makes clear,

---

[22] In the somewhat analogous context of evaluating requests for downward departures based on conditions of confinement, courts have generally determined that the more serious the crime, the less compelling is any argument for a reduction in sentence based on conditions of confinement.  For instance, in *United States* v. *Torres-Teyer*, 322 F. Supp. 2d 359 (S.D.N.Y. 2004), Judge Lynch considered a defendant's application for a downward departure where the defendant had spent ten months in a foreign prison, which the defendant characterized as "an extraordinarily harsh environment filled with fear, danger, violence, rape and corruption."  *Id.* at 377.  Given the defendant's Guidelines range of approximately 20 years' imprisonment, Judge Lynch concluded that, "[a]bsent evidence of truly horrific conditions, subjection to substandard detention conditions for ten months does not warrant a meaningful departure from a twenty-year sentence."  *Id.*  Similarly, in *United States* v. *Carty*, 264 F.3d 191 (2d Cir. 2001), the Second Circuit held that "pre-sentence confinement conditions *may in appropriate cases* be a permissible basis for downward departures" under the Sentencing Guidelines.  *Id.* at 208 (emphasis added).  On remand in *Carty*, Judge Schwartz declined to depart downward --- citing, among other things, "the severity of [the defendant's] crimes."  *United States* v. *Carty*, 95 Cr. 973 (S.D.N.Y. Nov. 9, 2001), at 23-24 (attached as Exhibit J); *see also, e.g.*, *United States* v. *Naranjo-Ramirez*, No. 09-4343-cr, 402 Fed. Appx. 576, 2010 WL 4723301, at **2, 4 (2d Cir. 2010) (unpublished) ("noting that sentencing judges are "under no obligation to depart from the Guidelines on the basis of [a defendant's] allegedly harsh pre-sentence confinement conditions," so long as they are "consider[ed]") (emphasis in original).  Following *Carty*, "the courts have granted relief generally where the conditions in question are extreme to an exception degree and their severity falls upon the defendant in some highly unique or disproportionate manner." *United States* v. *Mateo*, 299 F. Supp. 2d 201, 211 (S.D.N.Y. 2004) (Marrero, J.); *accord, e.g.*, *United States* v. *Green*, 04 Cr. 424-14, 2006 WL 3478340, at *4 (S.D.N.Y. Dec. 1, 2006) (Sweet, J.).

that condition is treatable and carries minimal long-term impact, provided that El-Hanafi wears support stockings.  Exh. G at 4-5.

In sum, whether the BOP adequately handled El-Hanafi's medical condition in no way diminishes El-Hanafi's exceedingly serious criminal conduct of providing extensive support to al Qaeda, nor the overwhelming need for strong deterrence for terrorism offenses.[23]

### 2.    El-Hanafi's Alleged Offer To Cooperate Is Inaccurate and Irrelevant

In his submission, El-Hanafi claims that his genuine desire to atone for his crimes is evidenced in part by the fact that "he has been willing and prepared to meet and cooperate with the government."  Deft. Sent. Ltr. at 9.  Further, El-Hanafi claims that the only reason that meeting has not taken place is "because the individual the government was interested in died before a meeting could be arranged" and "not due to any unwillingness on Mr. El-Hanafi's part."  Deft. Sent. Ltr. at 10.  This is simply inaccurate.  To be clear, *El-Hanafi was never willing to cooperate with the Government*.

As El-Hanafi and his counsel are aware, cooperation would require that El-Hanafi not only confess to his charged crime, but also to fully disclose his own criminal history, the conduct of his co-conspirators and other associates, and be willing to testify as a Government witness.  In fact, El-Hanafi, through counsel, expressly refused to accept the full obligations of cooperation.  Rather, around the time of his guilty plea in this case, El-Hanafi, through counsel, informed the Government that he would be willing to provide a *limited* proffer to the Government only concerning his own conduct and particularly focusing on the covert methods of electronic

---

[23] Moreover, El-Hanafi has filed a civil lawsuit alleging that the BOP rendered subpar treatment.  *See El-Hanafi* v. *United States*, 13 Civ. 2072 (PAC) (S.D.N.Y.).  That lawsuit will provide El-Hanafi with an avenue to assert arguments concerning the standard of care rendered by the BOP and to pursue any appropriate relief.  *Cf.* Exh. G at 4 (Dr. McKinsey noting: "The medical treatment of Mr. El-Hanafi from the time of the diagnosis of the DVT to the present appears to be within the standard of care.").

communication that El-Hanafi taught his al Qaeda associates --- information that would likely have been stale and of limited value several years removed from El-Hanafi's interactions with Suffian and the Doctor.   Nonetheless, despite several attempts, even that highly limited meeting never occurred for three principal reasons: (1) vacillations in El-Hanafi's desire to have the meeting; (2) El-Hanafi's demand that the meeting be conducted with his co-defendant, which the Government refused; and, ultimately, (3) scheduling issues among counsel.

In essence, El-Hanafi made clear that he was unwilling to tell the Government certain details about his dealings with al Qaeda and about other individuals who also were supporting terrorism.   This selected withholding of information about a murderous and active terror group stands flatly at odds with El-Hanafi's insistence that he "understands the magnitude of his offense, and is deeply remorseful."   Deft. Sent. Ltr. at 10.   El-Hanafi swore an oath of allegiance to al Qaeda.   His continued loyalty to al Qaeda's secrets is entirely incompatible with El-Hanafi's suggestion that he has, now, rejected the group and reformed.

In sum, El-Hanafi's limited offer to meet with the Government --- which would have been conditioned on him not discussing all his criminal conduct and, in any event, in fact never occurred --- does not warrant favorable sentencing consideration in this case.

**IV. CONCLUSION**

For the reasons set forth above, the Court should sentence El-Hanafi at the statutory

maximum of twenty years' imprisonment, should order forfeiture in the amount of $70,000 for

which the defendants are jointly and severally liable, and should impose a fine.

Dated:          New York, New York
                December 11, 2013

                                        Respectfully submitted,
                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York


                              By:    ____/s/_____
                                        John P. Cronan
                                        Aimee Hector
                                        Assistant United States Attorneys
                                        Tel.:  (212) 637-2779/ -2203

**<u>Affirmation of Service</u>**

JOHN P. CRONAN, pursuant to Title 28, United States Code, Section 1746, hereby

declares under the penalty of perjury, that he is employed as an Assistant U.S. Attorney in the

Southern District of New York, and that, on December 11, 2013, he caused copies of The

Government's Sentencing Memorandum to be served via electronic notification, electronic mail,

and First Class mail on:

>       Elizabeth M. Fink
>       36 Plaza Street
>       Suite 1G
>       Brooklyn, NY 11238
>       Tel.: (718) 783-3682
>       Email: atticuslex@aol.com

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


Dated: New York, New York
        December 11, 2013


                        ___/s/_____
                        JOHN P. CRONAN
                        Assistant United States Attorney