UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA


      -against-                                  No. 10 Cr. 162 (KMW)


WESAM EL-HANAFI

              *Defendant.*

--------------------------------------------------------X




## REPLY MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF DEFENDANT WESAM EL-HANAFI


                             Sarah Kunstler
                             Rebecca Heinegg
                             *Attorneys for Wesam El-Hanafi*
                             315 Flatbush Avenue #103
                             Brooklyn, NY 11217

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

**UNITED STATES OF AMERICA**

      -against-                       No. 10 Cr. 162 (KMW)

**WESAM EL-HANAFI,**

               *Defendant.*

--------------------------------------------------------X

## REPLY MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF DEFENDANT WESAM EL-HANAFI

### PRELIMINARY STATEMENT

This reply memorandum is submitted to respond to the government's arguments for a maximum sentence and to urge this Court, given the suffering and permanent disability Mr. El-Hanafi has endured due to the delayed diagnosis of, and the substandard care he has received for, his                             to impose a sentence substantially below the Guidelines.

A rigorous review of Mr. El-Hanafi's medical records demonstrates: (1) that he began experiencing and complaining of symptoms consistent with         in late April or early May of 2010, immediately after a lengthy custodial flight from Dubai to the United States; (2) that for seventeen months, while these symptoms progressively worsened and while Mr. El-Hanafi

continued to desperately seek medical attention, the only treatment he received was over-the-counter pain medication; (3) that by the time his condition was diagnosed,

;  (4) that the care he has received since diagnosis has been sub-standard; and (5) that he is now

.

## BACKGROUND

On June 18, 2012, pursuant to a plea agreement, Mr. El-Hanafi pled guilty to an information charging him with providing material support to al Qaeda and conspiring to provide material support to al Qaeda, allocuting to his conduct. Under the terms of the plea agreement, the parties agreed that Mr. El-Hanafi's adjusted offense level is 37, that his Criminal History Category is VI, and that the advisory Guidelines range is 360 months to life. However, because the combined statutory maximum sentence for Counts One and Two is twenty years, the parties stipulated to an applicable Guidelines recommendation of twenty years' imprisonment.

On October 15, 2012, Probation issued its Presentence Investigation Report agreeing with the parties' calculation of the advisory Guidelines range as reflected in the plea agreement, and recommending a non-Guidelines sentence of thirteen years' imprisonment. In a two-page justification for this departure, Probation noted that the conviction is Mr. El-Hanafi's first offense, that he is a loving husband and father with three children and the sole breadwinner for his family. Probation also considered Mr. El-Hanafi's medical issues, as well as the fact that he was not promptly diagnosed or treated. Finally, Probation compared Mr. El-Hanafi to other

large-scale terrorist defendants, who were sentenced to terms of imprisonment ranging from twelve years to life. After looking at Mr. El-Hanafi's "actions, his personal circumstances, and his apparent intent", Probation determined that he was "more in line" with the defendants who received twelve-year sentences. (PSR, pp. 22-24.)

On June 17, 2013, counsel submitted a sentencing memorandum on behalf of Mr. El-Hanafi. As exhibits to the memorandum, counsel submitted a medical report prepared by Dr. Laura Chalfin, twenty-four letters of support from members of Mr. El-Hanafi's family, and a letter to the Court from Mr. El-Hanafi. Counsel requested a non-guidelines sentence of five years' imprisonment based on the following factors: (1) Mr. El-Hanafi's history and characteristics, including a childhood marked by poverty and physical abuse; (2) the many letters of support from family and friends who know Mr. El-Hanafi as an attentive, involved family member and someone who went out of his way to be there for his family when they needed him; (3) Mr. El Hanafi's strong acknowledgment, in his letter to the Court, of the enormity of his wrongdoing and the pain he inflicted on his family; (4)

; and (5) the misdiagnosis and delayed treatment of Mr. El-Hanafi's         , a condition that is now chronic and life-threatening.

On December 11, 2013, the government filed its sentencing submission. In this submission, the government asked the Court to sentence Mr. El-Hanafi to twenty years' imprisonment – the statutory maximum. The government, offering erroneous conclusions about Mr. El-Hanafi's health and making false assertions about his lack of remorse, argued that a maximum sentence was necessary.

## ARGUMENT

**1.  Mr. El-Hanafi fully and unconditionally accepts responsibility for his conduct.**

The government went to great lengths to point out the myriad ways in which defense counsel's sentencing memorandum purportedly revealed Mr. El-Hanafi's "remarkable lack of remorse and appreciation for his crime." (Gov't's Sentencing Memo. ("Gov't Memo.") at 32, ECF No. 153.) Mr. El-Hanafi respectfully disagrees with this mischaracterization of his mental state. He reiterates his full and unconditional acceptance of responsibility for his conduct. Nothing in defense counsel's prior submission or this reply memorandum is intended to detract from Mr. El-Hanafi's acceptance of responsibility or his unqualified remorse for his wrongdoing.

**2.  Mr. El-Hanafi                                        .**

3. **Mr. El-Hanafi's medical condition and the quality of the care he has received while in the custody of the Bureau of Prisons are important considerations for this Court under 18 U.S.C. 3553(a).**

The bulk of this submission addresses (1) Mr. El-Hanafi's medical condition, (2) the quality of care he has received while in government custody, (3) how that care (or lack of it) has impacted his illness, and (4) his medical needs going forward.[1]  The severity of Mr. El-Hanafi's condition, and the abysmal treatment that he has received in BOP custody does not take away from the seriousness of the crime he has committed. But it is nonetheless worthy of this Court's consideration under 18 U.S.C. § 3553(a).

a. **The Significance Of The Fourteen-Hour Flight From Dubai As A Precursor To Mr. El-Hanafi's Illness**

The government accuses Mr. El-Hanafi of "not being forthright" and worse, of "attempting to mislead the Court," in his non-existent contention that he was "shackled and not permitted to move during the April 2010 flight from the UAW." (Govt. Memo at p. 38.) Respectfully, the government distorts both the facts and counsel's argument.[2]

_____

[1] As the Court is aware, we have retained a second expert, Dr. Jeffrey Weitz, to review Mr. El-Hanafi's medical records and evaluate the conclusions reached by the government's expert. At this outset, we wish to be very clear that neither Dr. Weitz' report – nor this submission – addresses the causation of Mr. El-Hanafi's          .  We are not asking the Court to decide whether or not Mr. El-Hanafi's          was caused by agents of the government.  It is irrelevant. What is relevant is the incontrovertible fact that he has chronic, life-threatening          and the government has failed to treat him.

[2] As the government is fully aware, it has _never_ been counsel's position that Mr. El-Hanafi was shackled during the Dubai flight. As Ms. Fink states in her affidavit, "Mr. El-Hanafi never represented to me that he was shackled during the flight from Dubai. In numerous conversations

First, nowhere in counsel's prior submission does it state that Mr. El-Hanafi was shackled. Our argument is that Mr. El-Hanafi was immobilized and unable to move about the cabin freely during the flight. Mr. El-Hanafi was placed on a commercial flight, with government agents seated on all sides of him throughout the duration of the flight. At one point during the flight, Mr. El-Hanafi reached for a business card to show one of the agents, and was warned that if he made any more movements like that he would be handcuffed. As a result, it was Mr. El-Hanafi's understanding that he was to move as little as possible during the flight. Any suggestion that Mr. E- Hanafi was shackled during the flight was inadvertent, and Mr. El Hanafi has made no representations to that effect.[3]

The government's assertion that this "misrepresentation" demonstrates Mr. El-Hanafi's lack of remorse is therefore baseless. Rather, the government's lack of appreciation for the seriousness of Mr. El-Hanafi's condition, and their insistence, and the insistence of its medical expert, that the          was spontaneous, and occurred months after he first began experiencing documented symptoms, demonstrates the callous disregard with which the government approaches the serious medical condition and the life-threatening danger that El-Hanafi is in and will continue to be in so long as he is in BOP custody.

_____

with the government, I repeated that he had not been shackled during the flight, and described in detail what had happened – that agents sat next to him, that they let him go to the bathroom, and allowed him to pray – but that other than that he was not permitted to move." (Ex. 1)

[3] In her report, submitted as an exhibit to our first sentencing memorandum, Dr. Laura Chalfin made reference to Mr. El-Hanafi's flight in shackles. This statement was made in error, and was not based on any representations made by Mr. El-Hanafi, as Dr. Chalfin never spoke to Mr. El-Hanafi directly.

Further, that Mr. El-Hanafi may have been "permitted to leave his seat with an escort to use the bathroom" (Maxwell Declaration, Gov't Ex. H.) does not mean that he had the same freedom of movement as other passengers.  It is also worth noting that a long flight, even one in which a person is not in custody, increases the risk of          . According to the World Health Organization,

> The findings of the epidemiological studies indicate that the risk of
>                      is increased 2- to 3-fold after long-haul flights (more than 4 h)
> and also with other forms of travel involving prolonged seated immobility. The
> risk increases with the duration of travel and with multiple flights within a short
> period.[4]

To counteract this risk, the website for the Centers for Disease Control ("CDC") promotes the guidelines issues by the American College of Chest Physicians in recommending that long-distance air travelers engage in "calf muscle exercises", "frequent ambulation", and "aisle seating when feasible" to decrease the risk of          . As discussed in more detail below, the fact that Mr. El-Hanafi travelled on a fourteen-hour flight—in custody and with restrictions on his ability to move—immediately before first developing symptoms is a strong indicator of when his          first developed.

Further, since Mr. El Hanafi's initial sentencing submission in June 2013, counsel has learned that Mr. Hanafi was subjected to two additional periods of prolonged immobility – this time while in full restraints[5] – in the weeks after the fourteen-hour flight. From May 10 to May 11, 2010, Mr. El Hanafi spent thirteen to fourteen hours in full restraints as he was transferred

---

[4] Available online at:
[5] With both his wrists and ankles cuffed and connected to a belly chain.

from Virginia to Oklahoma (four hours in a transfer pen waiting to board a bus, five hours on a bus, which included the drive to the airport and additional time spent waiting to board a plane, and then four to five hours on the flight from Virginia to Oklahoma). As mentioned in the attached report by Dr. Weitz, this "additional period of immobility . . . may have exacerbated his condition." Mr. El Hanafi was again transported in full restraints during his transport from Oklahoma to New York on or about May 24, 2010, which took approximately eleven hours and included a custodial flight.

    **a.  The Sequence Of Events Leading To Mr. El-Hanafi's          Diagnosis**

    As discussed above, Mr. El Hanafi first began experiencing          immediately after the fourteen-hour flight from Dubai to Virginia on April 30, 2010. A "chronological care record" entry from the Federal Transfer Center in Oklahoma City dated May 16, 2010, notes that Mr. El-Hanafi reported                                                  On that date, after an examination, a BOP doctor found that there was

. (*See* Selected BOP Medical Records, Ex. 2, at 1.)

    Mr. El-Hanafi arrived at the MCC in New York on or about May 24, 2010. Despite continued treatment with

. (Ex. 2, at 6, 13, 17 and 19.)

Page 8 of 33

For seven months, Mr. El-Hanafi's complaints were ignored. As he took medication to treat the pain, the condition worsened. Finally, on February 27, 2011, the condition was so dire that Mr. El-Hanafi felt compelled to take affirmative steps to get medical attention. On that date, he submitted two "cop-outs"[6] to the administration making it clear that the condition had become significantly worse. One of the cop-outs stated:

(*Id.* at 21.) The second cop-out conveyed substantially the same information.

In response to the two cop-outs, MCC staff scheduled Mr. El-Hanafi for two sick calls with MCC's Health Services. (*Id.* at 22.) At a sick call on March 11, 2011, Mr. El-Hanafi told BOP medical staff that

(*Id.* at 23-25.) Health Services noted

" (*Id.*)

(*Id.*)

More time passed. At a sick call on March 30, 2011, Mr. El-Hanafi again complained of

. (*Id.* at 26-28.) Health Services noted

---

[6] "Cop-out" is the colloquial name for an "Inmate Request to Staff" form (Form BP-A0148).

(*Id.*) He was diagnosed with

. (*Id.*)

     A year had now passed and the     he contracted on the flight to the U.S. had still not been diagnosed let alone treated. On May 25, 2011, Mr. El-Hanafi begged the MCC's medical staff to alleviate his suffering. In another cop-out, he wrote:

(*Id.* at 29.) In response, MCC staff scheduled Mr. El-Hanafi for a sick call for June 8, 2011. (*Id.*) No sick call took place; one month after submitting the May 25, 2011 cop-out, Mr. El-Hanafi was still awaiting medical care. On June 23, 2011, he submitted another cop-out. He wrote:

 (*Id.* at 30.) In response, MCC staff scheduled him for a sick call for June 29, 2011. (*Id.*) When again no sick call took place, Mr. El-Hanafi filled out two "Sick Call Request and Medication" forms on June 29, 2011 and June 30, 2011. (*Id.* at 31-32.) In response, MCC staff scheduled him for a sick call for July 6, 2011. (*Id.*) On July 4, 2011, Mr. El-Hanafi wrote an email to the Associate Warden of Operations. (*Id.* at 33.) In his email, Mr. El-Hanafi asked for assistance, and explained his situation as follows:

(*Id.*) In the same email, Mr. El-Hanafi documented five separate verbal requests for medical treatment, in addition to the written cop-outs and sick call requests outlined above.

On July 6, 2011, more than three months after his last sick call appointment, and six weeks after his cop-out on May 25, 2011, which was followed by two sick call requests, one email to the Associate Warden of Operations, and five verbal requests for medical attention, Mr. El-Hanafi was finally seen by Health Services. According to a BOP "Clinical Encounter" report, Mr. El-Hanafi reported

. (*Id.* at 34-36.)  On July 13, 2011, Health Services approved a referral for an outside consultation with

. There is nothing to support that this consultation ever took place. (*Id.* at 37.)

Mr. El-Hanafi, believing that he was scheduled for a follow-up with Health Services on July 13, 2011, waiting all day but was never seen. On July 14, 2011, Mr. El-Hanafi wrote an email to Health Services:

---

[7] The record states "since I was arrested in Virginia."

(*Id.* at 38.) Three days later, on July 17, 2011, Mr. El-Hanafi sent a follow-up email to Health

Services asking, "Can you or someone from your department assist with this medical request?"

(*Id.*) The next day, July 18, 2011, Mr. El-Hanafi submitted a cop-out requesting medical

attention. He wrote:

(*Id.* at 39.) On July 26, 2011, twelve days after his July 14, 2011 email to Health Services, and

after two emails and a cop-out, Mr. El-Hanafi was finally seen by Health Services (*Id.* at 40-43.).

On this date, after fourteen months[8] of Mr. El-Hanafi's complaints of

, Health Services finally ordered

. (*Id.*) This was the second time the possibility of       was

mentioned in Mr. El-Hanafi's BOP medical records—the first being t

posited over a year earlier on May 16, 2010 in Oklahoma. (*Id.* at 1.)

---

[8] A BOP medical record from this date erroneously reports that Mr. El-Hanafi
                              when in fact it had been over 14 months.

ordered on July 26, 2011 was approved three weeks later on August 16, 2011. (*Id.* at 44.) On August 19, 2011, Mr. El-Hanafi, who may not have been aware of the approval and had not received medical attention since July 26, 2011, wrote an email to Health Services about                          that he was told he would receive. He wrote, "Please schedule me for the proper testing as the medical condition is still the same." (*Id.* at 38.) On September 15, 2011, Mr. El-Hanafi saw Health Services for a follow-up appointment. Medical staff noted recent                          . (*Id.* at 45-48.)  And on September 30, 2011,[9] over nine weeks after it was ordered, and seventeen months after the onset of his symptoms, Mr. El-Hanafi was finally taken to New York Downtown Hospital for an

. (Ex.2, pp. 50-52.) [10]

---

[9] One week earlier on September 23, 2011, BOP staff attempted to transfer Mr. El-Hanafi to New York Downtown Hospital for                          . In agony, Mr. El-Hanafi refused the transport because the U.S. Marshals Service insisted on ankle cuffs, which aggravated his already debilitating condition. (Id. at 49.)

[10]  According to the defense's medical expert, Dr. Jeffrey Weitz, whose expert report is attached as Exhibit 3:

**b.  Expert Opinions On The Cause And Duration Of Mr. El-Hanafi's**

The government retained Dr. James McKinsey, a vascular surgeon, to refute counsel's claims of delayed diagnosis and substandard medical care. In his report dated December 2, 2013, Dr. McKinsey concluded that Mr. El-Hanafi's       "probably spontaneously occurred in the summer of 2011," shortly before it was diagnosed. (*See* Gov't Memo. Ex. G, at 3.) As one can glean from Dr. McKinsey's choice of words, his conclusion was one of a range of possibilities and was little more than an assertion based on probability estimates and opinion. First, Dr. McKinsey opined that

(*Id.* at 2.) Next, Dr. McKinsey viewed

(*Id.* at 3.) Finally, Dr. McKinsey perceived in the

. (*Id.*)

The defense's medical expert, Dr. Jeffrey Weitz, also viewed Mr. El-Hanafi's charts, including the same images that Dr. McKinsey viewed. Dr. Weitz is a leading authority in the field of              A professor in the Departments of Medicine and Biochemistry and

.

(Ex. 3 at 1-2.)

Biomedical Studies at McMaster University in Ontario, Canada, Dr. Weitz holds the Tier 1

Canada Research Chair in Thrombosis and the Heart and Stroke Foundation/J.F. Mustard Chair

in Cardiovascular Research, and is the Executive Director of the Thrombosis and Atherosclerosis

Research Institute.[11] We asked Dr. Weitz to (1) assess the conclusions reached by Dr. McKinsey;

(2) evaluate the care Mr. El-Hanafi has received; and (3) detail the care Mr. El-Hanafi will need

going forward.

      After reviewing Mr. El-Hanafi's medical records from the Bureau of Prisons, New York

Downtown Hospital, and Brooklyn Medical Center, Dr. Weitz concluded that

n his expert opinion, "the

triggering event was more likely than not to be the long flight" from Dubai to the United States

(Ex. 3, at 6.) His reasons are as follows:

---

[11] Dr. Weitz's CV is attached as Exhibit 4.

(*Id.* at 5.)

Dr. McKinsey's conclusion that the

is at odds with the diagnostic findings outlined in the October

4, 2011 discharge summary from New York Downtown Hospital. Those records describe

.

(Ex. 2, at 51.)  Dr. Weitz concurred with the diagnosis made by Mr. El-Hanafi's treating

physicians at New York Downtown that the

With respect to Dr. McKinsey's conclusion that

(Ex. 3, at 5.)

In response to Dr. McKinsey's contention that a

(*Id.* at 5.) [12]  Accordingly, "it is not surprising that

the first symptoms were localized to                        (*Id.*) Dr. Weitz also noted that "the

hospital records from the New York Downtown Hospital and from the Brooklyn Hospital

(*Id.*) Ultimately, El-Hanafi's

_____

12

should have been diagnosed long before it was. As Dr. Weitz asserted, the "

(*Id.*)

**d. Expert Opinions On Whether Mr. El-Hanafi's         Could Have Been Mitigated**

According to Dr. McKinsey, in addition to

(Gov't Memo. Ex. G, at 3.)

As Dr. Weitz explained in his report, while

(Ex. 3, at 6.) In support of his opinion,

(*See* Susan R. Kahn et.

Page 17 of 33

al., "Compression stockings to prevent post-thrombotic syndrome: a randomised placebo-

controlled trial," 383 *Lancet* 880-88 (2014), attached as Ex. 5.). "Therefore," Dr. Weitz

continued,

(Ex. 3, at 6.) Dr. Weitz' opinion was shared by

(Ex. 2, at 87.)

Further, as outlined below, Dr. McKinsey's assessment that Mr. El-Hanafi was

.

---
13

**e. Whether Mr. El-Hanafi Was "Intermittently Non-Compliant With Taking His Medication"**

---

14

.

16

.

**f. Expert Opinions on Whether the Medical Treatment that Mr. El-Hanafi Received Was Within the Standard of Care**

The government's expert, Dr. McKinsey, concluded that the treatment Mr. El-Hanafi

received for            "appears to be within the standard of care." (Gov't Memo. Ex. G, at 4.) Dr.

Weitz disagreed, based on

Mr. El-Hanafi's numerous requests for medical attention during the seventeen months

prior to the         diagnosis are outlined above and documented in the attached medical records.

As Dr. Weitz explained in his report,

underscore some of the difficulties inherent in attempting to treat a chronic and potentially life-threatening medical condition in the prison context. As there is no one hospital, no one treating physician or set of ongoing specialists managing Mr. El-Hanafi's condition, and has he has frequently missed regularly scheduled appointments and experienced delays in treatment, it is impossible to maintain any continuity of care.

.

"

On May 14, 2014, counsel phoned to Adam Johnson, supervisory attorney for the MCC, and shared the information received from Dr. Weitz about the importance of

. Counsel also followed up by email, stating as follows:

On June 13, 2014, after a follow-up email from counsel inquiring                        , Mr. Johnson replied that

.” (*Id.* at 6.)  On July 16, 2014, two months after counsel's

email, Mr. El-Hanafi was taken to

. (*Id.* at 7-9.) On July 18, 2014,

Health Services generated a request for a consult with a

**g.  Expert Opinions on the Long-Term Impact of Mr. El-Hanafi's**

Perhaps most crucially, Dr. Weitz disagreed with Dr. McKinsey on the course of

treatment required and the long-term impact of his            .

reached

”

_____

In addition to extended anticoagulation, Dr. Weitz made the following recommendations:

- 

## 4. The Appropriate Sentence

### a. A fuller understanding of Mr. El-Hanafi's condition and the inadequate treatment he has received underscores why a significantly reduced non-Guidelines sentence is appropriate herein.

The government, in its December 2013 sentencing submission, argued that the BOP "is fully capable of handling Mr. El-Hanafi's medical condition going forward" and attached a letter from Barbara Sullivan, the Health Services Administrator for the BOP, confirming her belief that "the BOP will be able to provide appropriate care to Mr. El-Hanafi." (Gov't Memo. Ex. I.) While it is common for the government to uphold the honor of the BOP's medical staff, both government studies and press reports have chronicled the inability of the BOP to provide adequate medical care for inmates. *See, e.g*., Daniel S. Murphy, "Aspirin Ain't Gonna Help the Kind of Pain I'm In: Health Care in the Federal Bureau of Prisons," in *Convict Criminology* 247 (Jeffrey Ian Ross, et al., eds. 2003); Bureau Of Prisons Health Care: Inmates' Access To Health

Care Is Limited By Lack Of Clinical Staff, House of Representatives Judiciary Committee,

Subcommittee on Property and Judicial Administration, GAO/HEHS-94-36 (Feb. 10, 1994). The

fact is that the BOP has focused on cutting health care costs in federal prisons, and its cost-

cutting measures have led to grossly inadequate medical care for federal prisoners with serious

illnesses. *See, e.g.*, U.S. Gov't Accountability Office, GAO/T-GGD-00-112, *Containing Health

Care Costs for an Increasing Inmate Population* (2000); Off. of the Inspector Gen'l, *The Federal

Bureau of Prison's Efforts to Manage Inmate Health Care* (Feb. 2008).

The substandard medical care provided by BOP facilities in general is consistent with Mr.

El-Hanafi's treatment in particular. Over the past four years in BOP custody, Mr. El-Hanafi has

never received medical care that meets any acceptable standard. The seventeen-month delay in

diagnosis has left Mr. El-Hanafi

As Mr. El-Hanafi wrote in one of his many pleas for care prior

to diagnosis,

> I have asked many times to go downstairs as an emergency but have been denied
> every time. The individuals who deny my requests are either security guards who
> are not qualified to make an assessment on what is and what is not an emergency
> or the most they do is call a nurse over the phone who denies over the phone
> without seeing my condition.

(Ex. 2, at 33.)

Time and time again, the urgency of Mr. El-Hanafi's medical needs has been left to the judgment of BOP correctional staff lacking the medical training required to make these determinations. If the care Mr. El-Hanafi has received over the past four years is a fair measure of the treatment he can expect going forward, he has good reason to worry that should such an emergency arise, he will receive delayed care and may suffer further injury or even death as a result.

Mr. El-Hanafi knows that his experience is hardly unique. This past spring, Mr. El-Hanafi watched helplessly as his cellmate suffered

the man lay screaming on the floor of the locked cell the two men shared. A corrections officer informed Mr. El-Hanafi's cellmate that there was no medical staff available during the night shift and, even if it was a life or death situation, there was simply not enough staff to take him to the hospital. And as this Court is aware, these delays are not limited to pre-trial facilities but are inherent in the federal prison system, where medical care, by definition, can never be the BOP's first priority.[18]

**b.  Probation's recommendation of 13 years is based upon a survey of other defendants convicted of terrorism in district courts**

The Probation Office has recommended that Mr. El-Hanafi be sentenced to 156 months imprisonment. (PSR at 22.) Probation reached this conclusion in part based on a survey of

---

[18] In

sentences of other defendants convicted of terrorism-related charges, some of whom received sentences of twelve years' incarceration and some of whom were sentenced to life. Probation stated that Mr. El-Hanafi "as shown by his actions, his personal circumstances and his apparent intent," was more in line with the former group. (PSR at 23.)

The government strongly disagrees with this conclusion and notes that the information from government witnesses, including their report that Mr. El-Hanafi directed Hasanoff to surveil the New York stock exchange, was not available to Probation at the time of the recommendation. But there is no reason to assume that this information would have changed Probation's calculus. A review of some recent sentences shows that even taking into consideration this newly reported conduct, Mr. El-Hanafi's conduct is comparable to defendants who received far less than even Probation's recommended 156 months.

Here are a few examples. The defendant in *United States v. Warsame*, No. 04 Cr. 29 (D. Minn. 2009), admitted that he attended an al-Qaeda training camp in Afghanistan, was trained in the use of AK-47 rifles, Uzis and other weapons, as well as training in tactics and navigation, fought for the Taliban and was exposed to heavy fighting. He admitted to sending approximately $2,000 (Canadian) to one of his former training camp commanders and exchanged e-mail messages with and provided information to several individuals associated with al-Qaeda. He was sentenced to 92 months for conspiracy to provide material support and resources to a designated foreign terrorist organization, although the government had asked for 150 months.

In *United States v. Mohamed Ibrahim Ahmed*, 10 Cr. 131 (PKC) (S.D.N.Y. 2013), the defendant traveled to Somalia to receive "jihad" training in weapons and explosives at an al

Shabaab camp and contributed a total of 3,000 Euros to al Shabaab, a designated foreign terrorist organization. He was sentenced to 111 months incarceration.

In *United States v. Jamal Yousef*, 08 Cr. 1213 (JFK) (S.D.N.Y. 2012), the defendant, who had a history of trafficking in drugs, weapons, and fake travel documents, conspired to provide an arsenal of military-grade weapons to the designated foreign terrorist organization FARC in exchange for a large shipment of cocaine. He was given a below-Guidelines sentence of twelve years imprisonment.

In *United States v. Yusuf*, 10 Cr. 4551 (S.D. Cal. 2012) the defendant, who recruited and encouraged other Americans to engage in jihad on behalf of al-Shabaab and to "kill infidels everywhere" was sentenced to eight years.

In contrast, the twenty-year sentence advocated by the government is closer to the sentences imposed on defendants who had concrete plans to kill civilians. For example, in *United States v. Viktor Bout*, 08 Cr. 365 (SAS) (S.D.N.Y. 2012), the defendant was convicted after trial of conspiracy to kill U.S. nationals, conspiracy to kill officers and employees of the U.S., conspiracy to acquire and use anti-aircraft missiles, and harboring or concealing terrorists (material support conspiracy). He was sentenced to twenty-five years imprisonment.

In *United States v. Manssor Arbabsiar*, 11 Cr. 897 (JFK) (S.D.N.Y. 2013), the defendant pleaded guilty to committing and conspiring to commit murder-for-hire and to conspiring to commit an act of terrorism transcending national boundaries against the United States. The defendant was involved in a plot with members of the Iranian military to assassinate the Saudi Arabian Ambassador to the United States in Washington, D.C.  The defendant admitted, among

other things, that he had agreed with officials in the Iranian military to cause the assassination of

the Ambassador while the Ambassador was in the United States, that he had agreed to pay $1.5

million to an individual in order to murder the Ambassador, and that he had arranged for

$100,000 to be wired to that individual as a down payment for the murder. He was also

sentenced to 300 months (twenty-five years) imprisonment. We respectfully submit that

sentences in this range are not appropriate for Mr. El-Hanafi.

This Court has a responsibility "to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct." 18 U.S.C.

§ 3553(a)(6). The United States Sentencing Commission reports that the average sentence

imposed for providing material support to designated foreign terrorist organizations or for

terrorist purposes is 111 months. (*See* U.S. Sentencing Comm., *Quick Facts: Offenses Involving*

*National Defense* (2012)).[19] Mr. El-Hanafi's conduct is not so drastically different from other

defendants convicted of providing material support for terrorism as to warrant the twenty year

sentence requested by the government.

## <u>CONCLUSION</u>

Wesam El-Hanafi has pled guilty to crime that is beyond serious, and he takes full

responsibility for his appalling choices. As he wrote in his letter to the Court,

> I've learned many lessons over my time in prison. I inflicted so much pain on the
> people I love most and they have shown me nothing but love and support. I feel
> ashamed by my actions and by the ideology I embraced. An ideology that slowly
> took away my sense of reason and replaced it with blind following. My actions

---

[19] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_National_Defense.pdf.

> are so embarrassing to me that I cannot bear to even mention them to anyone and
> I'm at a loss at how at some point in my life I supported these actions and beliefs.

(*See* El-Hanafi Sentencing Memo. Ex. B, ECF No. 133) (Letter from Wesam El-Hanafi to Hon.

Kimba M. Wood.)   He recognizes that living in the United States has been a privilege, that he

has enjoyed opportunities for education and advancement, and lived in relative comfort and

safety, in stark contract with "the dangers and injustices that my relatives back home and many

others in the world face every day." (*Id.*)  Despite the suffering that Mr. El-Hanafi has endured,


, he is nonetheless grateful for his arrest in this case. Mr. El-Hanafi's incarceration has given

him the opportunity to reflect on his choices, to repair and strengthen his relationships with

family, and to change the course of his life.

      Mr. El-Hanafi knows that he will never be able to change the past, and that he must live

with the horror of his actions for the rest of his life. He is committed to living each day making

up for the wrong he has done.

      For the reasons outlined above and in our prior submission, we respectfully ask this Court

to impose a significantly reduced non-guidelines sentence due to the suffering and harm endured

by the defendant.

Dated: Brooklyn, New York
       July 25, 2014

Respectfully submitted,

Sarah Kunstler
Rebecca Heinegg
*Attorneys for Wesam El-Hanafi*
315 Flatbush Avenue #103
Brooklyn, NY 11217
(718) 783-3682

cc:     AUSA John Cronan, AUSA Aimee Hector
        Dawn Doino, USPO
        Wesam El Hanafi