**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**----------------------------------------------------------X**

**UNITED STATES OF AMERICA**


        **-against-**
                                    **No. 10 Cr. 162 (KMW)**


**WESAM EL-HANAFI**

        *Defendant.*

**----------------------------------------------------------X**


## REPLY MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF DEFENDANT WESAM EL-HANAFI

Sarah Kunstler

Rebecca Heinegg

*Attorneys for Wesam El-Hanafi*

315 Flatbush Avenue #103

Brooklyn, NY 11217

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

                                                      **No. 10 Cr. 162 (KMW)**

        **-against-**

WESAM EL-HANAFI,

        *Defendant.*

-------------------------------------------------------X

## REPLY MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF DEFENDANT WESAM EL-HANAFI

### INTRODUCTION

We respectfully submit this memorandum in response to the government's submission dated September 10, 2014.  Nothing in this submission, or in any of our prior submissions, is intended to detract from Mr. El-Hanafi's acceptance of responsibility, his appreciation for the seriousness of the offense he has committed, or his unqualified remorse for his wrongdoing. However, the seriousness of Mr. El-Hanafi's offense is not the end point for the Court's consideration of an appropriate sentence in this case. Despite the government's fervent protestations,  Mr. El-Hanafi's medical condition, and the care he has received while in the custody of the Bureau of Prisons, are entirely appropriate considerations for this Court under 18 U.S.C. § 3553(a).

Title 18, United States Code, Section 3553(a) directs a sentencing court to impose a reasonable sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. This statutory mandate has taken on new meaning in light of the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 128 S.Ct. 586 (2007), and *Rita v. United States*, 551 U.S. 338 (2007), as well as the Second Circuit's decision in *United States v. Crosby*, 307 F.3d 103 (2d Cir. 2005), and its progeny.

In *Gall*, the United States Supreme Court held that while the Guidelines should be "the starting point and the initial benchmark" of a reasonable sentence, the sentencing judge "may not presume that the Guideline range is reasonable" and "must make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. At 587. The Supreme Court also "reject[ed] an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Id*. Thus, a sentencing court, after considering the advisory Guidelines, is now free to fashion a reasonable sentence that it deems appropriate based upon all of the sentencing factors set forth in 18 U.S.C. §3553(a).

## ARGUMENT

### I. MR. El-HANAFI'S CARE AND TREATMENT HAS FALLEN FAR BELOW ANY ACCEPTABLE STANDARD OF CARE

The Court now has reports from two experts who fundamentally disagree about the timing of the onset of Mr. El-Hanafi's ▮▮▮▮. It would be convenient for the government if Mr. El-Hanafi's ▮▮▮▮▮▮▮▮▮▮▮▮ "spontanteously" began 6-8 weeks prior to diagnosis, as its expert opines, and was not provoked by the 14-hour custodial flight that preceded the onset



of symptoms, as concluded by Dr. Weitz. The government's expert, Dr. McKinsey, ███████

██████, appears to base his conclusion solely on the appearance of the September 30, 2011

███████. In contrast, Dr. Weitz, a██████████████████████████████ ███████[1],

bases his opinion on Mr. El-Hanafi's ████████████████████████████████████

████████ going back to late April/early May of 2010, as well as the conclusions reached by

specialists at New York Downtown Hospital and The Brooklyn Hospital Center, who, unlike

either expert, have actually treated Mr. El-Hanafi and managed his care. Dr. Weitz's

supplemental report, dated September 19, 2014, is attached as Exhibit A to this memorandum

and incorporated by reference as if fully set forth herein.

The significance of when Mr. El-Hanafi's ████ began is not about assigning blame for its

causation. What is relevant here, for the purposes of 18 U.S.C. §3553(a), is how many months

went by during which Mr. El-Hanafi suffered from progressively worsening symptoms and

received no diagnosis and no treatment. In the final analysis, this is not about competing medical

opinions – it is about incontrovertible facts. The Court need not pinpoint the exact moment that

Mr. El-Hanafi's ████ began in order to take into account his desperate efforts to obtain medical

care in the many months prior to his diagnosis, which are outlined in our July 25, 2014 Reply

Memorandum ("Def. Reply Br.") , and documented in the BOP Medical Records attached as

Exhibit 2 to that submission. (*See* Def. Reply Br. pp. 9-13, and Ex. 2, pp. 21-39.) As Dr. Weitz

notes in his supplemental report, by the time the ████████ was ordered on July 26, 2011,

---

[1]     *See* Dr. Weitz' CV, attached as Exhibit 3 to our July 25, 2014 submission.

Mr. El-Hanafi had a documented medical history detailing nearly 15 months of right leg pain going back to May 2010. Significantly, beginning on February 27, 2011, and for five months before the ultrasound was ordered, Mr. El-Hanafi made consistent complaints of ███████████████████████████████ ████████████████████████████████████. These are all symptoms consistent with ███████████████ and they should have prompted an ████████ at a much earlier date. However, the ultrasound was not done until September 30, 2011, two months after it was ordered, which is a medically unacceptable delay.

(Exhibit A, p. 1.) In fact, a differential diagnosis of ████████ was made on May 16, 2010 by Dr. Watson, the BOP doctor who examined Mr. El-Hanafi at FTC Oklahoma. (*See* Ex. 2 to Def. Reply Br., at 1.) Yet, despite this early initial diagnosis, and despite Mr. El-Hanafi's numerous efforts to obtain care over the next year and a half, the BOP failed to order a single diagnostic test. Incredibly, Mr. El-Hanafi's examination by Dr. Watson was also the last time he would be examined by a doctor for more than 15 months. According to BOP medical records, between Mr. El-Hanafi's examination by Dr. Watson on May 16, 2010, and July 26, 2011, when the first ultrasound was ordered by Dr. Bussanich at MCC, all of Mr. El-Hanafi's medical care was provided by medical personnel described as either Physician's Assistants ("PAs") or Mid-level Practitioners ("MLPs").[2] Perhaps, if Mr. El-Hanafi had been seen even once by a doctor during this period, he would have had the benefit of an earlier ████████. In any event, once Mr. El-Hanafi was finally examined by Dr. Bussanich, the possibility of ████ was immediately reconsidered.

---

[2]      We have not provided the Court with every BOP medical record between May 16, 2010 and July 26, 2011, but are happy to make this entire record available upon request.

Neither the government nor its expert can account for the BOP's failure to order an

█████████████████ until July of 2011, or the two month delay in the scheduling of that

ultrasound until September of 2011. Because of these failures, we are left with an extremely

delayed ████████, and no earlier diagnostic tools from which to chart the development of Mr.

El-Hanafi's ██████. That the government attempts to use this lack of diagnostic information to its

advantage, claiming that Mr. El-Hanafi's disease began at the precise moment of the first

████████, is galling, and underscores the pervasive indifference of BOP medical care, to which

Mr. El-Hanafi will remain hostage for the duration of his prison sentence. It also defies logic. As

Dr. Weitz notes, if Mr. El-Hanafi's ██████████████████ 6 to 8 weeks prior to the

September 30, 2011 ultrasound, ████████████████ after the ████████ was ordered in

July; a scenario that seems inconceivable given that Mr. El-Hanafi had symptoms going back

nearly 15 months." (Exhibit A, p. 1.)

Mr. El-Hanafi now has ██████████████████████ "a permanent condition for

which there is no cure and which is associated with a significant reduction in quality of life"

(Exhibit A, p. 5), and a condition which, if he had received timely diagnostic testing, he may

have avoided entirely. Because of this ████████, Mr. El-Hanafi ████████████████████

████████████████████████████████████████████████████

███████████████████ to alleviate these symptoms. Each day, he receives ████████████

████████████████████████████████████████████████████

█████████████████████. Mr. El-Hanafi suffers continual anxiety that a poorly executed

injection or a fight instigated by another inmate will cause ██████████████, or that there

Page 6 of 10

will be ██████████████████████████████████, either of which could kill him.[3]

Mr. El-Hanafi's present condition, and the evolution of his disease, are clearly a part of his "history and characteristics" that the Court must consider under 18 U.S.C. § 3553(a)(1) in fashioning the appropriate sentence. Mr. El-Hanafi's illness directly impacts the conditions of his confinement, the severity of his punishment, as well as the amount of deterrence associated with his imprisonment. Each day, week, month and year that Mr. El-Hanafi spends incarcerated is qualitatively different – and considerably more onerous – than the experience of a healthy inmate.

Further, under 18 U.S.C. § 3553(a)(2)(D), the Court must also consider, among other considerations, "the need for the sentence imposed…to provide the defendant with needed… medical care…in the most effective manner." Given the quality of care he has received so far, there is every reason to expect that Mr. El-Hanafi will continue to receive delayed and substandard treatment for the duration of his incarceration. Even since his September 2011 diagnosis, Mr. El-Hanafi's appointments with specialists are routinely postponed or rescheduled. As a prisoner, he has no choice of doctor or hospital and no hope of any continuity of care. When he is taken to the hospital for follow-up with a specialist, there is apparently no way to make sure that he will be seen by a doctor who has previously treated him, or one who has access to his full medical history. And while both experts agree that ██████████████████████

---

[3]      Mr. El-Hanafi's anxiety is well-founded; ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████. (See Exhibit A, p. 5.)

████████████████████████████████████████████████ Mr. El-Hanafi experiences on

a daily basis, as of this writing, ██████████████████████████ have never been provided

to him.[4] Dr. Weitz is particularly struck by this failure, writing that ████████████████

██████, the simplest and least expensive measure of care, and a measure that Dr. McKinsey

strenuously supports, has proven impossible." (Exhibit A, p. 5.) Were he not incarcerated, there

is no question that Mr. El-Hanafi would have had access to better medical care.

We respectfully ask this Court to take these facts into account when determining a

sentence that is "sufficient, but not greater than necessary" to achieve the purposes of 18 U.S.C.

§3553(a).

## CONCLUSION

Wesam El-Hanafi will be sentenced by this Court on October 16, 2014 for a very serious

offense. Mr. El-Hanafi is deeply remorseful and ashamed for what he has done, and takes full

responsibility for his actions. Nothing in any of our submissions is offered as an excuse for or as

an attempt to mitigate his crimes, but rather, as an aid to the Court in determining the appropriate

sentence, after a consideration of the factors outlined in 18 U.S.C. §3553(a). In addition to being

a person who has pled guilty to an enormously serious crime, Mr. El-Hanafi is a person who

suffers from ████████████████████████, for which he has received substandard

---

[4] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████

care while in the custody of the Bureau of Prisons.[5] He is also a person who is unwavering in his commitment to his family, and who, despite his incarceration, and the difficulties he has encountered receiving adequate treatment and managing his disease in the prison setting, has succeeded in maintaining and building his relationships with his wife and children and playing an essential role in their lives.[6]

For the reasons outlined above, and in our prior submissions to the Court, we respectfully submit that a non-guidelines sentence substantially below the statutory maximum is warranted based on Mr. El-Hanafi's history and characteristics, and that such a sentence is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

---

[5]   At the time of his sentence, Mr. El-Hanafi will have spent almost four and a half years in harsh pretrial confinement, the majority of which has been spent at MCC.

[6]   Attached, for the Court's review, is a new letter of support Mr. El-Hanafi's wife, Nashwa Sedki, which provides a window into the depth of Mr. El-Hanafi's relationship with his family. (Letter from Nashwa Sedki, dated September 19, 2014, attached as Exhibit B.)

Dated:  Brooklyn, New York

September 26, 2014

Respectfully submitted,

Sarah Kunstler

Rebecca Heinegg

*Attorneys for Wesam El-Hanafi*

315 Flatbush Avenue #103

Brooklyn, NY 11217

(718) 783-3682

sarah@kunstlerlaw.net

cc:    AUSA John Cronan, AUSA Aimee Hector

Dawn Doino, USPO

Wesam El Hanafi