# LAW OFFICE OF SARAH KUNSTLER

315 FLATBUSH AVENUE #103 • BROOKLYN, NEW YORK 11217
(718) 783-3682 • FAX (347) 402-2014 • KUNSTLERLAW.NET

December 8, 2014

Honorable Kimba M. Wood
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

                                              Re:    *United States v. Wesam El-Hanafi*
                                                       10 Cr. 162 (KMW)

Dear Judge Wood,

On October 16, 2014, the parties met before Your Honor on what was to have been the date for Mr. El-Hanafi's sentencing to discuss a number of outstanding issues, including a hearing where the parties' medical experts would testify. That hearing is currently scheduled for January 7, 2014. The Court also set a schedule for two submissions; one addressing whether the Court could take into account whether the quality of medical care (or lack thereof) that Mr. El-Hanafi received while in BOP custody has contributed to a deterioration in his medical condition, and the other cataloguing the landscape of sentences received by other defendants under 18 U.S.C. § 2339B. We respectfully submit this letter to address the scope of the Court's consideration of Mr. El-Hanafi's medical condition and care under 18 U.S.C. § 3553(a). This letter also addresses the government's misstatement of the operative Guidelines range in its Sur-reply submission of September 10, 2014, which defense counsel failed to catch in our response to that submission.

Honorable Kimba M. Wood
December 8, 2014
Page 2 of 14

**I. The Scope of the Court's consideration of Mr. El-Hanafi's medical condition and care**

There is no question that a defendant's physical illness and infirmity merit consideration under the Guidelines. Under 18 U.S.C. § 3553(a), Mr. El-Hanafi's physical health is a part of his "history and characteristics," that the Court must consider in fashioning an individualized sentence that is "sufficient, but not greater than necessary" to comport with the goals of sentencing as articulated in the statute. *See* 18 U.S.C. § 3553(a) and (a)(1). Further, there is no question that Mr. El-Hanafi's medical condition, and the Bureau of Prison's ability to provide him with necessary care, are an integral part of the Court's calculus; a sentencing court is required to consider "the need for the sentence imposed ... to provide the defendant with …. medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Finally, the Sentencing Commission has recognized, under § 5H1.4, that there may be circumstances in which the physical condition of a defendant "may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.[1]

---

[1] We are not seeking a departure here, however it is worth noting that the 2010 amendments to the Federal Sentencing Guidelines enlarged the role of certain offender characteristics, including physical condition, in determining whether a departure is warranted. Amendment 739 elevated four offender characteristics from the "not ordinarily relevant" to the departure decision category to a new category. Age, mental and emotional conditions, physical condition or appearance, and military service now "may be relevant in determining whether a departure is warranted" if such conditions, "individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." §§ 5H1.1 (age), 5H1.3 (mental and emotional conditions), 5H1.4 (physical condition), and 5H1.11 (military service).

Honorable Kimba M. Wood
December 8, 2014
Page 3 of 14

However, with respect to the quality of medical treatment – or lack of medical treatment – that Mr. El-Hanafi received during the more than four and a half years that he has spent in the custody of the BOP, the parties disagree as to whether this is part of the scope of the court's consideration under 18 U.S.C. 3553(a).

In *United States v. Pepper*, 131 S.Ct. 1229 (2011), the Supreme Court acknowledged that it has "long recognized that sentencing judges 'exercise a wide discretion' in the types of evidence they may consider when imposing sentence and that highly relevant—if not essential— to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Id*. at 1235 (*citing Williams v. New York*, 337 U.S. 241, 246–247 (1949)). In *Pepper*, the Supreme Court held that given the broad discretion afforded courts in 18 USC § 3661 which provides that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct," and in 18 USC § 3553(a), which sets forth certain factors that sentencing courts must consider, including "the history and characteristics of the defendant," "[d]istrict courts post-*Booker* may consider evidence of a defendant's postsentencing rehabilitation at resentencing and such evidence may, in appropriate cases, support a downward variance from the advisory Guidelines range." *Id*. at 1249.

Under the same principle, the Court has broad discretion to consider a defendant's experience of pre-sentence incarceration. As will be addressed more fully below, the deficient medical care that Mr. El-Hanafi received is relevant under both 18 U.S.C. § 3661 and 18 U.S.C. §3553(a). Mr. El-Hanafi's medical care – or lack of medical care - is inextricable from the conditions of his confinement and is a part of his "history and circumstances" under 18 U.S.C. §

3553(a)(1). Further, the deficient care provided by the BOP is relevant under 18 U.S.C. § 3553(a)(2)(D), which requires an analysis of "the need for the sentence imposed….to provide the defendant with needed….medical care….in the most effective manner."

    **a. The quality of Mr. El-Hanafi's prior medical care is relevant under the broad language of 18 U.S.C. § 3661, which imposes "no limitation" on what the Court may consider.**

In *United States v. Pepper*, the Supreme Court looked to the broad language of 18 U.S.C. § 3661 as part of its justification for holding that a district court may consider evidence of a defendant's rehabilitation that took place during the years he spent incarcerated between his initial sentencing and his resentencing. The Supreme Court explained that § 3661 "does not provide any basis for the courts to invent a blanket prohibition against considering certain types of evidence at sentencing," and held that "[a] categorical bar on the consideration of postsentencing rehabilitation evidence would directly contravene Congress' expressed intent in § 3661."

The extensive evidence of Mr. El-Hanafi's efforts to secure medical treatment, and the inadequate treatment he received, despite those efforts, is clearly relevant to the selection of an appropriate sentence here. Most fundamentally, and as explained in further detail below, that evidence provides the most up-to-date picture of his "history and characteristics." § 3553(a)(1).

    **b. The quality of Mr. El-Hanafi's prior medical care is a part of his conditions of confinement under 18 U.S.C. § 3553(a)(1).**

"[P]re-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *U.S. v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *see also U.S. v. Francis*, 129 F.Supp.2d 612, 616-19 (S.D.N.Y. 2001) (granting downward departure to defendant

who spent thirteen and one-half months in a state facility where defendant was subjected to "substandard conditions"). A number of district courts in this Circuit have held that below Guidelines sentences are appropriate "where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner." *U.S. v. Mateo*, 299 F.Supp.2d 201, 208 (S.D.N.Y. 2004, Marrero, J.) (citing cases and granting downward departure to a defendant who was subjected to sexual harassment by a prison guard and the birth of a child without medical attention at the MDC); *U.S. v. Brooks*, 2008 WL 4693335 (E.D.N.Y. 2008, Sifton, J.) (reducing a defendant's sentence from 37 months to 30 months based on the defendant's confinement in the SHU for 10 months); *United States v. Francis*, 129 F.Supp.2d 612, 619 (S.D.N.Y. 2001, Patterson, J.) (departing downward based on defendant's thirteen and one-half month pretrial detention at a state facility where he suffered severe physical and psychological trauma "under qualitatively different conditions than those of pre-sentence detainees in federal facilities operated by the Bureau of Prisons"); *see also U.S. v. Salvador*, 2006 WL 2034637 at *4) (McKenna, J.).

In *Brooks*, the court considered the impact of extended solitary confinement on a defendant's mental health, and the mental deterioration that a defendant suffered during an extended period of solitary confinement. *See Brooks*, 2008 WL 4693335, at *4. And in *Mateo*, the district court specifically considered the lack of medical treatment afforded to the defendant by the BOP, detailing how she was denied care for over fifteen hours while giving birth. *See Mateo*, 299 F. Supp at 211-212. From these cases, it is clear that the Court can take the BOP's failure to provide adequate medical care into account under 3553(a).

Like the defendant in *Mateo*, who was denied medical attention during childbirth for over 15 hours, our client was denied medical attention for his DVT for over 17 months. Like the defendant in *Brooks*, whose incarceration in the SHU created conditions that were severe relative to the general population at the MDC, the failure of the BOP to treat Mr. El-Hanafi created severe conditions that made his experience of incarceration vastly more onerous that that of the average inmate. This is why it is important for the parties to be able to question their expert witnesses about whether the care Mr. El-Hanafi received was adequate, substandard, or non-existent; without this testimony, the Court lacks sufficient evidence to make a determination as to whether a lack of medical care created conditions of confinement that are "extreme to an exceptional degree" or whether the severity of these conditions fell upon him "in some highly unique or disproportionate manner." *Mateo*, 299 F.Supp at 208.

The government argues that this Court should not take their failure to provide medical care into account because it is impossible to determine with certainty whether Mr. El-Hanafi would have suffered less had he received treatment earlier. The government also contends that, according to their expert, Mr. El-Hanafi did not develop DVT until 6-8 weeks before the ultrasound was performed on September 30, 2011.[2] The government is attempting to use their failure to perform diagnostic testing on Mr. El-Hanafi to their benefit, arguing that because there were no tests performed prior to the ultrasound in September 2011, the lack of any earlier test results demonstrates that the clot did not develop earlier.

---

[2] The government does not explain why, if a DVT first developed in early-to-mid-August, an ultrasound was ordered in late July.

As Dr. Jeffrey Weitz explains,

> Patients with suspected DVT should undergo diagnostic testing as soon as possible; the delay should be no more than 24 to 48 hours. If testing cannot be performed within 12 hours in someone with a high likelihood of DVT, current guidelines recommend that treatment with anticoagulation be started to prevent clot extension and fatal pulmonary embolism while waiting for the test to be done, provided that the risk of bleeding is low (Kearon et al. Chest. 2012; 141 (2 Suppl) e19S-94S). Such therapy can then be stopped if the diagnostic test comes back as negative.

(Exhibit A, Letter from Dr. Jeffrey Weitz, December 8, 2014.)

On May 16, 2010, Dr. K. Watson at the Federal Transfer Center in Oklahoma City recorded a differential diagnosis of DVT for Mr. El-Hanafi. (*See* Exhibit B.) However, even though a doctor examined Mr. El-Hanafi and suspected DVT, no ultrasound was performed until more than 16 months later. This failure to perform any testing whatsoever was a severe departure from an acceptable standard of care. Allowing the government to use their initial failure to provide adequate medical care to justify their prolonged further failure to provide care defies logic. It is akin to allowing one party to a lawsuit to destroy evidence and then use the lack of evidence as the basis for an inference against the opposing party. The government also has no explanation for why Mr. El-Hanafi's repeated, documented pleas for medical care to address the pain and swelling in his leg did not prompt any response from the BOP. (*See* Exhibit B to Defendant's Submission dated July 25, 2014.)

Moreover, even if the government's timeline was correct, and Mr. El-Hanafi first developed DVT symptoms in July of 2011, it was still over two months before he received an ultrasound—over 30 times the longest acceptable delay in responding to a possible DVT. Dr. Weitz contends that "it is more likely than not that the delay in diagnosis of DVT and initiation

of treatment contributed to the [post-thrombotic syndrome] from which Mr. El-Hanafi now suffers… Had he undergone testing sooner, it is very likely that his DVT would have been less extensive and his risk of development of PTS would have been lower." (Exhibit A.)

The government has characterized this delay in appropriate care as a "treatment choice" that should not be second-guessed by the court. However, doing no diagnostic testing after a doctor has recorded a suspicion of DVT cannot credibly be described as a "treatment choice." It is simply a failure of treatment. Nor can the two-month delay between the eventual ordering of the ultrasound and its actual performance be explained as anything other than negligence.

The government has also argued that "the extraordinary gravity of Mr. El-Hanafi's crime utterly dwarfs any sentencing consideration that he should receive based on his medical condition or treatment by the BOP." (*Government's submission of December 11, 2013*, p. 41.) In support of its argument, the government, in a footnote, cites to four cases, including *Carty*, in which district courts declined to depart downward due to allegedly harsh pre-trial confinement, and on the basis of these cases, asserts that "courts have generally determined that the more serious the crime, the less compelling is any argument for a reduction in sentence based on conditions of confinement." (*Id*. at fn 22.)  The cases that the government cites do not support this contention, and the government's argument runs counter to the individualized nature of sentencing mandated by federal law. *See e.g., Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to

consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").[3]

For example, the government cites to *United States v. Torres-Teyer*, 322 F. Supp. 2d 359 (S.D.N.Y. 2004), a case in which a defendant had spent 10 months in a foreign prison, which the defendant characterized as "an extraordinarily harsh environment filled with fear, danger, violence, rape, and corruption." *Id.* at 377. While the court in that matter declined to depart downward based on the conditions of confinement, the court's reasoning was based on the lack of evidentiary support for the defendant's assertions, not on the seriousness of the defendant's crime. *Id*. In fact, the court in *Torres-Teyer* noted that conditions of confinement <u>can</u> be a permissible basis for downward departures, but found that "the record furnishes no basis to conclude that [the defendant] suffered from such conditions while detained in Belize." *Id.* at 378.

Likewise, *United States v. Naranjo-Ramirez*, No. 09-4343-cr, 402 Fed. Appx. 576, 2010 WL 4723301 (2d Cir. 2010) (unpublished), also cited by the government, stands only for the unremarkable proposition that a sentencing court is entitled to considerable deference in its sentencing decisions. *See, e.g.*, *United States v. Guzman*, 282 F.3d 177, 182, (2d Cir. 2002); *United States v. Khalil*, 214 F.3d 111, 124 (2d Cir. 2000); *United States v. Karro*, 257 F.3d 112, 120 (2d Cir. 2001); *United States v. Napoli*, 54 F.3d 63, 66 (2d Cir. 1995). In *Naranjo-Ramirez*, the Second Circuit upheld a district court's sentence where the court had declined to depart downwards based on alleged conditions of confinement without an explicit discussion of such. In other words, the district court had made an individualized determination that the Circuit court did

---

[3] This is even more the case now post *Booker* and its progeny.

Honorable Kimba M. Wood
December 8, 2014
Page 10 of 14

not disturb, as there were no procedural errors made. While the government may prefer that the Court ignore all the other 3553(a) factors, the rule remains that in a sentencing proceeding, a district court "must make an individualized assessment based on the facts presented." *Gall v. United States*, 128 S.Ct. 586, 587 (2007). Much as the government may wish it to be so, there is no terrorism exception to 18 U.S.C. 3553(a).

Further, the severity of Mr. El-Hanafi's crime is already taken into account by the Guidelines; because of the terrorism enhancement, he is placed in Criminal History Category VI, when under ordinary circumstances he would be in Category I. We recognize that Mr. El-Hanafi's crime is extremely serious and that a significant term of incarceration is warranted. Nothing in this submission – or in any prior submission by defense counsel – is intended to minimize the seriousness of Mr. El-Hanafi's offense. However, the seriousness of the crime does not obviate the need for the Court to consider whether the BOP's failure to provide him with medical care made his conditions of confinement harsher than that of other inmates.

Between May 16, 2010, when a doctor first considered DVT as a possible diagnosis, and July 26, 2011, when an ultrasound was finally ordered, Mr. El-Hanafi was not once examined by a medical doctor and no diagnostic testing was done. Instead, less qualified practitioners prescribed painkillers, and instructed Mr. El-Hanafi to stretch, exercise, elevate his leg, and apply compresses. Acutely aware of his own physical deterioration, Mr. El-Hanafi made frequent complaints and actively sought out medical care. (*See* Exhibit B to Defendant's Submission dated July 25, 2014.) The failure of the BOP to provide Mr. El-Hanafi with appropriate medical care contributed to the agony, anxiety and permanent physical disability that Mr. El-Hanafi has

suffered, and created conditions of confinement that are both extreme to an exceptional degree and considerably more onerous that those faced by the average pre-trial detainee.

> c. **The quality of Mr. El-Hanafi's prior medical care is relevant to the court's determination of the need for the sentence imposed under 18 U.S.C. § 3553(a)(2)(D).**

The BOP's failure to provide Mr. El-Hanafi with adequate or appropriate medical care should also be considered in the context of 18 U.S.C. § 3553(a)(2)(D), which includes "the need for the sentence imposed….to provide the defendant with needed….medical care….in the most effective manner" among the factors to be considered in imposing a sentence.

As an exhibit to its December 11, 2013 submission, the government included a letter from Barbara Sullivan, a Health Systems Administrator with the BOP's Northeast Regional Office. Ms. Sullivan opined that "the BOP will be able to provide appropriate care for Mr. El-Hanafi." (Exhibit I to the Government's sentencing submission of December 11, 2013.) This letter offers nothing more than a boilerplate assertion of the BOP's capabilities. *See e.g.*, *U.S. v. Martin*, 363 F.3d 25, 50 (1st Cir. 2004) ("Something more than mere boilerplate language is necessary to assure the court that the BOP can adequately care for Martin given his substantial history of medical difficulty."); *U.S. v. Gee*, 226 F.3d 885, 902 (7th Cir. 2000) (determination that downward departure for defendant's physical condition was not an abuse of discretion, where district court made decision after considering medical records and the testimony of treating physicians and where letter in which the BOP indicated that it could adequately tend to defendant was merely a form letter trumpeting its ability to handle medical conditions of all kinds); *U.S. v. Willis*, 322 F.Supp.2d 76, 84  (D. Mass. 2004) ("I have never had a case before me in which the Bureau of Prisons suggested that it did *not* have the capacity to care for a defendant.") (emphasis

supplied). *See also* Natalie Hinton, Comment, *Curing the BOP Plague with Booker: Addressing Inadequate Medical Treatment in the Bureau of Prisons*, 41 J. Marshall L. Rev. 219, 2349 (2007) (noting "recent rejection of generalized [BOP] letters" touting ability to "treat a wide variety of medical illnesses") (footnote and citations omitted).

The question here is not whether appropriate medical care is theoretically available, but whether Mr. El-Hanafi realistically has any likelihood of receiving it. In this regard, the quality of care that Mr. El-Hanafi has received during more than four years in BOP custody is a far better indicator of the quality of care that he can expect to receive going forward than a generalized letter from the BOP. However, in order to determine whether the BOP has provided Mr. El-Hanafi with substandard care, the Court must look backward, to the care that Mr. El-Hanafi has in fact received, and not just prospectively to the quality of care that the BOP maintains he can expect.

    d. **Conclusion**

It is clear that a deficiency in medical care suffered by Mr. El-Hanafi falls within both the scope of the factors which the Court is required to consider under 3553(a), and the broad range of factors that a court is permitted to consider. It is of course up to the Court, after hearing from the defense and government experts, to determine how much weight to give this information, but there is no legal basis for restricting the breadth of information that this Court may consider in the first instance.

  **II. The government's Sur-Reply misconstrues the operative Guidelines range**

The government, in its "Sur-Reply Sentencing Memorandum" dated September 10, 2014, has misconstrued the operative Guidelines range in this case. In its Sur-Reply, the government

argued that "El-Hanafi's medical condition does not warrant a sentence below twenty years' imprisonment—a term that already is well below what the Guidelines suggest." Contrary to the government' representation, a sentence of 240 months is a Guidelines sentence, not a below-Guidelines sentence, and to treat it as anything other than a Guidelines sentence would be reversible error. *See U.S. v. Dorvee*, 616 F.3d 174 (2d Cir. 2010).

In *Dorvee*, the defendant pled guilty to one count of distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). The initial Guidelines calculation was 262 to 327 months. However, because the statutory maximum was 240 months, the actual Guidelines was 240 months, pursuant to U.S.S.G. § 5G1.1(a). In sentencing the defendant, the district court mistakenly treated 262 to 327 months as the starting point for any variance. The court then sentenced the defendant to 233 months, representing the statutory maximum minus credit for time served, which it deemed a sentence "relatively far below the guideline". *Dorvee*, 616 F.3d at 181. On review, the Second Circuit held that the district court plainly erred in failing to apply the correct sentencing guidelines, explaining its decision as follows:

> The district court's miscalculation of the Guidelines sentencing range carried serious consequences for the defendant. It appears that the district court believed it was imposing a non-Guidelines sentence when, in fact, it selected a sentence conforming exactly to the Guidelines. If the district court intended to grant the defendant a sentence "relatively far below the guideline," Dorvee did not receive the benefit of such an intention. This situation illustrates why we require district courts to accurately calculate the Guidelines sentence before considering the § 3553(a) factors. The Guidelines range (or, in this case, the Guidelines direction to apply the statutory maximum) represents the Sentencing Commission's considered opinion about what the sentence should be in an ordinary case, and therefore serves as the district court's starting point in selecting a sentence. The § 3553(a) factors, in turn, provide the sentencing judge with a set of criteria for potential variances, based on the nature and circumstances of the offense and the history

Honorable Kimba M. Wood
December 8, 2014
Page 14 of 14

and characteristics of the defendant. If the district court miscalculates the typical sentence at the outset, it cannot properly account for atypical factors and we, in turn, cannot be sure that the court has adequately considered the § 3553(a) factors. That is what happened here, and constitutes procedural error.

*Id*. at 181-182 (citations omitted).

In this case, as in *Dorvee*, the statutory maximum is also the Guidelines range. This is correctly stated by Probation in ¶ 95 of the PSR, which concludes, pursuant to U.S.S.G. § 5G1.2, that "the Guideline term of imprisonment is 240 months." (PSR ¶ 95.)  Therefore, the government's argument that a sentence of 240 months – the statutory maximum – is "well below what the Guidelines suggest" is inaccurate. In this case, the benchmark and starting point for the Court's consideration of §3553(a) factors is the statutory maximum of 240 months.

Thank you for your kind consideration of this letter.

Respectfully submitted,

Sarah Kunstler
Rebecca Heinegg
*Attorneys for Wesam El-Hanafi*

CC: AUSA Aimee Hector, AUSA John Cronan, AUSA Michael Lockard

Wesam El-Hanafi