F17eelh1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4             v.                           10 CR 162(KMW)

 5   WESAM EL-HANAFI,

 6                 Defendant.

 7   ------------------------------x

 8
                                           January 7, 2015
 9                                         10:17 a.m.

10
     Before:
11
                        HON. KIMBA M. WOOD,
12
                                           District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  JOHN P. CRONAN
17        MICHAEL LOCKARD
          Assistant United States Attorneys
18
     SARAH KUNSTLER
19   REBECCA HEINEGG
          Attorneys for Defendant
20

21

22

23

24

25
```

F17eelh1

1               (In open court)

2               THE DEPUTY CLERK:  Court calls the United States of

3     America vs. Wesam El-Hanafi.  Counsel, please state their

4     appearances.

5               MR. LOCKARD:  Good morning, your Honor.  Michael

6     Lockard and John Cronan for the government.

7               THE COURT:  Good morning.

8               MS. KUNSTLER:  Good morning, your Honor.  Sarah

9     Kunstler and Rebecca Heinegg for Mr. El-Hanafi.

10              THE COURT:  Good morning.

11              Good morning, Mr. El-Hanafi.

12              We are here to hear medical testimony from two

13    doctors.  Did counsel have a preference for the order in which

14    the doctors go?  I think they would normally be the defense

15    first?

16              MR. LOCKARD:  That's fine.  That's fine with the

17    government.

18              Your Honor, we've also discussed with defense counsel

19    not sequestering the witnesses so that each witness can hear

20    the other doctor's testimony.  And we think that's appropriate

21    in this case, if the Court is --

22              THE COURT:  That's very sensible.  Then we're ready

23    for the witness.

24              MS. KUNSTLER:  All right.  Your Honor, then the

25    defense calls Dr. Jeffrey Weitz.

F17eelh1

```
1    JEFFREY WEITZ,

2          called as a witness by the Defendant,

3          having been duly sworn, testified as follows:

4               THE COURT:  You may examine.

5               THE WITNESS:  Sorry?

6               THE COURT:  That's the judge's way of telling a lawyer

7    that she can get going with the questions.

8               THE WITNESS:  I'm sorry.  I can't hear you very well.

9               THE COURT:  Okay.  I'll speak louder.  What I said was

10   she may examine you now.

11              THE WITNESS:  Okay.  Thank you.

12              THE COURT:  Let's all speak loud, right into the mic.

13   Let me know if you can't hear anything.

14              MS. KUNSTLER:  Thank you, your Honor.

15              One thing I wanted to mention is that we've also

16   agreed with the government that we stipulate that these are

17   experts.  We may be asking them about their expertise, but

18   that's only with respect to this particular area and as it

19   relates to this case.

20              THE COURT:  Yes.  In other words, they are both

21   experts in?  You should state what they're experts in.

22              MS. KUNSTLER:  That they're -- well, they're both

23   experts in deep vein thrombosis or experts in hematology and

24   vascular surgery, and they have practices specialized in those

25   areas.  They're slightly different areas of expertise, but
```

F17eelh1

1    we'll be going over that.

2              THE COURT:   Okay.   Thank you.

3    DIRECT EXAMINATION

4    BY MS. KUNSTLER:

5    Q.   Good morning.

6    A.   Good morning.

7    Q.   Can you -- you've already stated your name.

8              Could you briefly summarize your educational

9    background for the Court.

10   A.   Yes.   I went to medical school at the University of Ottawa

11   and graduated in 1976.   And after clinical training in internal

12   medicine, hematology and medical oncology, I came to New York

13   City where I did my research training at Columbia University.

14   And I was on the faculty from 1983 to 1986.   And then I

15   returned to Canada, and I assumed my current position at

16   McMaster University.

17   Q.   And what is your current title and positions?

18   A.   Yes.   I'm a professor of medicine and biochemistry at

19   McMaster University.   I'm vice chair for research for the

20   department of medicine at McMaster University.   And I'm

21   executive director of the Thrombosis and Atherosclerosis

22   Research Institute, which is an institute that employs about

23   150 people and does research that spans the spectrum from basic

24   research to animal models to clinical trials and to knowledge

25   translation in the area of thrombosis or abnormal clotting in

F17eelh1                           Weitz - direct

1    veins and arteries.

2    Q.  And how many such institutes are there in the world?

3    A.  I'm sorry?

4    Q.  How many such institutes are there in the world, like the

5    institute?

6    A.  Oh, there aren't very many.  I think we're the only

7    institute like that in Canada.  There is one in the UK and

8    there are a couple in the United States.

9    Q.  And can you summarize your board certifications with

10   respect to your specialty in thrombosis.

11            THE COURT:  I have -- I have in front of me his entire

12   curriculum vitae.  If there is anything you wish to highlight,

13   you may, but I have reviewed the curriculum vitae.

14            MS. KUNSTLER:  That's fine, then, your Honor.

15   Q.  Can you tell us, what is deep vein thrombosis?

16   A.  So deep vein thrombosis refers to a blood clot in a vein

17   that's deep and somewhere in the body.  These usually occur in

18   the veins of a leg, but they can occur in the veins of the arm

19   or, more rarely, in pretty much any vein in the body.

20   Q.  And can you -- how many patients with DVT do you see in a

21   year?

22   A.  I don't know exactly how many I might see in a year, but in

23   a typical day on call -- and I'm on call about one day a

24   week -- I will see approximately 20 patients in that day who

25   have deep vein thrombosis or a complication thereof.  That's

F17eelh1                    Weitz - direct

1  just an approximation, so that's -- I see a lot of patients

2  with deep vein thrombosis.  That's what our area specializes in

3  at McMaster University.

4  Q.  So about 20 a week generally?

5  A.  Yeah, about at least 20 a week.

6  Q.  And how long have you been seeing patients or treating

7  patients with DVT, for how many years?

8  A.  Since the early 1980s.

9  Q.  And at what stage of the disease do you generally get these

10 patients?

11 A.  I see patients at all stages; from the time when they're

12 sent in with the possibility of deep vein thrombosis and they

13 require diagnostic testing, to patients who have established

14 diagnosis and are being asked questions about their management,

15 to patients who have complications or possible recurrence.  So

16 I see the whole gamut of patients.

17 Q.  And do you do clinical studies on patients with DVT?

18 A.  Yes.  I've been involved in many clinical studies in both

19 prevention, diagnosis, treatment and knowledge translation.

20 Q.  And have you written any peer-reviewed articles in the

21 field?

22 A.  I have.

23 Q.  Do you have an approximation of how many?

24 A.  I've written almost 400 peer-reviewed articles.

25 Q.  And how many would relate directly to the field of

F17eelh1                          Weitz - direct

1   thrombosis?

2   A.  Probably over 200.

3   Q.  Now, I am going to show you what's been marked as

4   Defendant's Exhibit A.  And I believe everyone has copies of

5   everything.

6           Now, have you seen that document before?

7   A.  Yes.

8   Q.  Have you seen the document before?

9   A.  Yes, of course I have.  Yes.

10  Q.  And what is it?

11  A.  This is a paper that was published last year on

12  post-thrombotic syndrome.  And this is a scientific statement

13  that was published in circulation, and is part of the American

14  Heart Association request for these types of statements.

15          THE COURT:  The exhibits I've been handed are not

16  marked, and there are many of them.  It might be helpful if

17  they were marked.

18          MS. HEINEGG:  They are marked on the back of the

19  exhibit, your Honor.

20          THE COURT:  Oh, I see.  It's not the usual spot, but

21  okay.

22          MS. KUNSTLER:  I apologize, your Honor.  It should be

23  the first exhibit in the pile.  It's an article entitled The

24  post-thrombotic Syndrome.

25          THE COURT:  I have it.

1           MS. KUNSTLER:  Okay.

2    BY MS. KUNSTLER:

3    Q.  Now, did you have a role in drafting that statement?

4    A.  I did.  As part of the writing committee for this paper, we

5    reviewed the literature on this topic, most of it coming within

6    the last few years.  We've prepared a draft.  We generated and

7    voted on the recommendations, and then the paper was submitted.

8    It went through both an external peer review process, which

9    required two rounds of corrections, and then an internal peer

10   review process by the American Heart Association itself before

11   it was published.  And I was involved in all stages along the

12   way.

13   Q.  Thank you.

14           MS. KUNSTLER:  Your Honor, I just wanted a point of

15   clarification.  I didn't know whether we're officially

16   admitting exhibits or whether it's less formal and we're just

17   identifying them as exhibits for identification purpose.

18           THE COURT:  Well, let's see.  To the extent that this

19   was authored in part or in whole by Dr. Weitz, I think it

20   should probably come in as an exhibit.

21           MS. KUNSTLER:  Okay.  I guess I'll ask, as we go

22   through, I'll ask about each of my exhibits.

23           THE COURT:  Okay.

24   BY MS. KUNSTLER:

25   Q.  Now, we met before to discuss the care and treatment of my

F17eelh1                        Weitz - direct

1    client?

2    A.  I met you for the first time yesterday.  We have talked on

3    the phone several times.

4    Q.  And are you being compensated for your time in connection

5    with this case?

6    A.  I am.

7    Q.  And can you tell me what your hourly rate is?

8    A.  It's $500 per hour.

9    Q.  And how many hours have you billed so far?

10   A.  I think I've billed for 40 hours thus far.

11   Q.  And have you been paid yet?

12   A.  No.

13   Q.  And are you being paid for your time here in New York?

14   A.  I am.

15   Q.  And how much are you being paid for that?

16   A.  $5,000 a day.

17   Q.  Now, is your rate here your standard rate that you charged

18   us in this case?

19   A.  No.  It's not my standard rate.  My standard rate is closer

20   to $1,000 a day.

21   Q.  You mean --

22   A.  An hour.  I'm sorry.

23   Q.  Thank you.

24           Now, from your training and experience, generally are

25   you familiar with the standards of care to which medical

F17eelh1                        Weitz - direct

1    practitioners are held regarding DVT treatment and diagnosis?

2    A.  I am.

3    Q.  And can you tell us whether that standard of care and

4    treatment is relatively uniform throughout North America?

5    A.  I would like to think that it is, yes.

6    Q.  And from your training and experience, are you generally

7    familiar with what is regarded as appropriate and reasonable

8    medical care for DVT diagnosis and treatment?

9    A.  I am.

10   Q.  Now, have you reviewed materials in connection with this

11   case?

12   A.  Yes.

13   Q.  Can you tell me what materials you've reviewed?

14   A.  I reviewed documents from the Bureau of Prisons, hospital

15   records, clinic notes, laboratory results, ultrasound reports,

16   Mr. El-Hanafi's request for medical care and Dr. McKinsey's

17   reports.

18   Q.  And in preparation you've also reviewed medical literature

19   generally about the condition?

20   A.  Yes.

21   Q.  And his treatment?

22   A.  And I did review the pertinent medical literature in

23   preparing my reports.

24   Q.  And you examined Mr. El-Hanafi?

25   A.  Yes.  I've had an opportunity to meet with him yesterday

1   and to examine him.

2   Q.  And what specifically were you asked to do?  What was your

3   role when you were retained for this case?

4   A.  Well, I was asked to look at the facts in this case from a

5   medical perspective and to give an opinion on what needs to be

6   done medically and going forward in the care of Mr. El-Hanafi.

7   And I was also asked to look at whether the standard of medical

8   care that he received was adequate.

9   Q.  And did you make those determinations?

10  A.  I'm sorry?

11  Q.  Did you do that?

12  A.  Yes.

13  Q.  And did you form an opinion about Mr. El-Hanafi's medical

14  condition and needs going forward?

15  A.  I did, yes.

16  Q.  And what determination did you make about that condition

17  and those needs?

18  A.  Well, Mr. El-Hanafi had deep vein thrombosis that was quite

19  extensive, and he now has what's called post-thrombotic

20  syndrome, which is a chronic syndrome going forward.  So he

21  needs management for that.  He also has risk factors for

22  recurrent thrombosis, which include heterozygous for this

23  congenital mutation, the factor five Leiden mutation, and he

24  has antiphospholipid syndrome.  And because of these risk

25  factors he requires long-term anticoagulation therapy.  He also

F17eelh1                           Weitz - direct

1    has hypertension that hasn't been particularly well controlled,

2    and he has the start of some renal insufficiency, some kidney

3    impairment that needs to be watched on a go-forward basis.  So

4    those are the conditions that we are dealing with right now.

5    Q.  And what is post-thrombotic syndrome?

6    A.  This is a sequel to deep vein thrombosis that occurs in up

7    to 50 percent of the people who have extensive deep vein

8    thrombosis.  And it is a syndrome that's characterized by pain,

9    swelling and discomfort in the limb that's worse with standing

10   and is relieved with leg elevation.

11   Q.  Now I am going to hand you what I've marked as Defense

12   Exhibit B, which is also 3500-JW27, and Defense Exhibit B1.

13              THE COURT:  Before you get to that, may I ask a

14   question that follows on your prior question.

15              MS. KUNSTLER:  Sure, certainly.

16              THE COURT:  You said that his syndrome -- how do you

17   spell that, post --

18              THE WITNESS:  Thrombotic.

19              THE COURT:  Thrombotic syndrome, causes him pain,

20   swelling and discomfort, which is relieved by elevation of his

21   leg and --

22              THE WITNESS:  I'm sorry.  I'm having trouble hearing

23   you.

24              THE COURT:  Oh, okay.  I'll talk louder.

25              You testified that he now has pain, swelling and

1    discomfort, and that that is relieved by leg elevation and is

2    exacerbated by standing.  How about recreational movement?

3    Does that exacerbate his pain and swelling and discomfort?

4          THE WITNESS:  Absolutely, your Honor.  And

5    Mr. El-Hanafi told me that in his time that he gets for

6    exercise, he's quite limited in what he can do.  So, for

7    example, if he tries to do even simple things, like squats, he

8    has difficulty.  And he's tried to jog, and he can't jog

9    without getting very severe pain.  So he's quite limited in his

10   physical ability.  And I recognize he doesn't have many

11   opportunities, but even those opportunities that he has now are

12   limited by the discomfort that he has in his leg.

13         THE COURT:  All right.  Go ahead.  Thank you.

14         MS. KUNSTLER:  Thank you, your Honor.

15   BY MS. KUNSTLER:

16   Q.  So I am going to hand you Defense Exhibit B and B1.  Do you

17   recognize those documents?  Do you recognize those documents?

18   A.  Yes.  This is kind of a score sheet for filling out the --

19   what's called the Villalta score for determining the severity,

20   the presence and severity of post-thrombotic syndrome.  And I

21   filled this in yesterday when I saw Mr. El-Hanafi during that

22   visit.  There's two components to this --

23         THE COURT:  I'm sorry to interrupt you, but just as a

24   matter of housekeeping, it's time to offer Defense Exhibit A.

25   Do you offer it?

F17eelh1                          Weitz - direct

1          MS. KUNSTLER:  You mean Defense Exhibit B and the

2     exhibit --

3          THE COURT:  Let's see.  It's Defense Exhibit A to the

4     hearing.

5          MS. KUNSTLER:  The first exhibit?

6          THE COURT:  Yes.

7          MS. KUNSTLER:  I offer Defense Exhibit A.

8          THE COURT:  Any objection?

9          MR. LOCKARD:  No, your Honor.

10          THE COURT:  Exhibit A is received without objection.

11          (Defendant's Exhibit A received in evidence)

12          THE COURT:  And you're moving now to Exhibit B?

13          MS. KUNSTLER:  Yes.  We have now Exhibit B and B1,

14     your Honor.

15          THE COURT:  Okay.

16     BY MS. KUNSTLER:

17     Q.  Dr. Weitz, you were describing what Exhibit B is.

18     A.  Sorry.  There are two parts to this Villalta scale.

19     There's a part that's filled out by the patient, where the

20     patient describes the presence and severity of certain

21     symptoms.  And there's a part that's filled out by the

22     clinician, where I record the presence and severity of the

23     signs, the obvious signs of post-thrombotic syndrome.  And when

24     I -- when we did this scoring system yesterday, the score came

25     out to be 24 in the right leg, which is indicative -- any score

1    over five is indicative of post-thrombotic syndrome, and a

2    score of over 15, or the presence of leg ulcers, which he does

3    not have, clinches a diagnosis of severe post-thrombotic

4    syndrome.

5          So based on the results of that score, I conclude, and

6    based on my physical examination and my discussion with

7    Mr. El-Hanafi, I conclude that he has severe post-thrombotic

8    syndrome as a sequel to his extensive deep vein thrombosis in

9    his right lower extremity.

10   Q.  Now, why did you choose the Villalta scale test?

11         THE COURT:  Could I interrupt one more time.  You said

12   "as a sequel to."  Do you mean as a result of?

13         THE WITNESS:  As a result of the deep vein thrombosis,

14   as a complication of the deep vein thrombosis, yes, your Honor.

15   Q.  Dr. Weitz, why did you choose the Villalta scale?

16   A.  The Villalta score is the score that we use in our clinic

17   for determining the presence and assessing the severity of

18   post-thrombotic syndrome.  And the reason we use it is because

19   it's the one that's recommended by the International Society On

20   Thrombosis and Hemostasis as the go-to score for determining

21   the presence and severity of post-thrombotic syndrome.  And

22   it's chosen because it's the best validated instrument to

23   assess the presence of this disorder and to score how severe it

24   is.  It's been used in many, many clinical trials, both for

25   diagnosis, for assessing the response to different maneuvers.

F17eelh1                        Weitz - direct

1    So it's a useful one because it combines both what the

2    physician sees, but also what the patient describes in terms of

3    the severity of symptoms.

4    Q.  Are there any drawbacks to this test?

5    A.  The only drawback to it -- and it's a drawback of any

6    instrument that we use in post-thrombotic syndrome -- is it

7    doesn't say for 100 percent that the symptoms and signs that

8    you're seeing are due to deep vein thrombosis.  But we know

9    that because of other indicators in the medical condition.

10          So another thing that we have to have seen is that the

11   patient had documented deep vein thrombosis in the past six

12   months or so, which is the case with Mr. El-Hanafi.

13   Q.  Now, what did you note -- other than coming up with a score

14   of 24 on that test, what objective notes did you make about the

15   condition to reach that score?  And if it's helpful to you, you

16   can show them to us on B1, which is the color.

17   A.  Right.  Well, we do use this color score sheet that just

18   gives us a visual gradation of how bad the swelling is, how

19   much increased pigmentation or darkening of the skin there is

20   and how much there is of the dilated veins in the foot or in

21   the leg and redness and so on.  So we use that to kind of give

22   us a visual guide to grade whether it's present or absent, and

23   then if it's present, to assess the severity of each of those

24   signs.

25   Q.  And what did you see when you examined Mr. El-Hanafi's leg?

A.   Well, from the part that I filled in here in terms of he

had moderate swelling, moderate increase in pigmentation,

particularly in the ankle and the foot region.  There was some

redness, particularly in the foot.  He's got some thickening of

the skin down in the foot and ankle region.  And he's quite

tender.  When you compress the calf, there's quite a bit of

tenderness there on compression.  So all told, I gave the

gradation either of mild to moderate and severe for the dilated

veins in the foot and ankle region.

        THE COURT:  I have a question with respect to

compression.  Given that he's quite tender when you compress an

area, are compression stockings warranted?

        THE WITNESS:  Yes.  Your Honor, compression stockings

provide graded compression of the leg to keep the swelling

down.  So what you do with these stockings is you buy them

first thing in the morning, before you've been up and walking

for any length of time, because you can imagine if he'd been up

and walking for a while, the leg is already swollen.  So you

put them on early in the morning, and it keeps the leg

compressed; because if you allow the leg to swell, then it gets

heavy and achy.

        And that's when you start getting the pain when you

press on it.  It just feels like a swollen limb.  You can

imagine if you have a swollen ankle, it feels tight and it

hurts when you press on it.  So you're just keeping it from

1     getting swollen as you start doing your daily activities.

2               THE COURT:  Have you found in your practice that some

3     individuals' sizes don't conform to the sizes of compression

4     stockings; in other words, what -- the amount of compression

5     they need or the size they need is between two different sizes?

6               THE WITNESS:  Right.  Yes, your Honor.  The way that

7     we measure the legs -- and we can pick different sizes of

8     stockings, but these are made out of an elastic material, a

9     stretchy, elastic material.  And you can get stockings that

10    apply different degrees of compression, from rather mild

11    compression to quite heavy compression.  And you can imagine if

12    you think of the stockings that you might wear, some are

13    heavier hose than others.  So the heavier they are, the more

14    they compress.  And right now, Mr. El-Hanafi is using 20- to

15    30-millimeter stockings.  They're -- from what I saw yesterday,

16    they're a little bit on the loose side, because he was able to

17    take them off and put them on without much difficulty.  And

18    typically these things are not that easy to put on, because you

19    really want them to put some compression on there.

20              But it's important that the stockings be the right

21    size.  If they're too big and they just fall down, they're not

22    going to do any good.  But he is getting some symptomatic

23    relief, which is fortunate, that he is getting some symptomatic

24    relief with application of those stockings.  So that is a good

25    thing.  And he needs to continue to use them.

1          THE COURT:  In your view could he benefit from

2    stockings that are a little tighter?

3          THE WITNESS:  Sorry, would he benefit?

4          THE COURT:  Would he benefit from stockings that are a

5    little tighter?

6          THE WITNESS:  He might.  And things might get worse as

7    time goes on, because this can be a somewhat progressive

8    condition, and he might require heavier compression stockings.

9    But it's important that they be assessed every six months or

10   so, because they also, as you wash them, they lose their

11   stretchiness.  So they have to be replaced every six months or

12   so.  And he might be -- require remeasuring to make sure

13   they're the right size.

14   BY MS. KUNSTLER:

15   Q.  Dr. Weitz, this kind of brings me to a question.  I just

16   wanted to make sure we're clear.  When Mr. El-Hanafi came down

17   for his examination with you, he was wearing the stockings --

18   A.  Yes.

19   Q.  -- on his leg?

20   A.  He was.  But I had to take them off so that I could examine

21   his leg and his foot.  And we left them off throughout the

22   course of my examination, which was about two hours long.

23   Q.  And also, to confirm, in your opinion the stocking has made

24   his symptoms better, has alleviated his --

25   A.  Sorry?

1    Q.  The stockings have alleviated the symptoms of his

2    condition?

3    A.  When we discussed it, he told me that they were helping;

4    that if he didn't have the stockings on, then he really had a

5    lot more pain; and that without the stockings, after he's been

6    up for about an hour, or certainly two hours, he is in terrible

7    pain and has to lie down and elevate his leg.

8    Q.  So would it be fair to say that without the stockings his

9    score on the Villalta exam would have been even higher in the

10   severe category than it was during your examination?

11   A.  It's possible that there would have been more in the way of

12   swelling.

13            MS. KUNSTLER:  Your Honor, I'm going to offer

14   Exhibits B and B1.

15            THE COURT:  Any objection?

16            MR. LOCKARD:  No, your Honor.

17            THE COURT:  Defense Exhibits B and B1 are received

18   without objection.

19            (Defendant's Exhibits B and B1 received in evidence)

20   BY MS. KUNSTLER:

21   Q.  Now, Dr. Weitz, I have what I've marked as Exhibits C1

22   through C8, which are photographs that you took during your

23   examination.  Now, I understand that these might not be -- we

24   might not discuss them exactly in the order I numbered them,

25   but perhaps you can take a look at them and tell us what they

F17eelh1                         Weitz - direct

1    are and what they show.  And if you want to refer to them by

2    number, you'll see my numbers handwritten on the front.

3    A.  Okay.

4              THE COURT:  I don't think mine have numbers.

5              MS. KUNSTLER:  Your numbers, your Honor, I believe are

6    on the back.  And I apologize.

7              THE COURT:  Okay.  At the break I'll explain how to

8    put the stickers on.  Okay.

9              Let's move right along.  We're looking at Defense C1.

10   BY MS. KUNSTLER:

11   Q.  Well, Dr. Weitz, if that's not the first one, if you

12   want -- I believe -- well, that's fine.  You can go through

13   them in order.

14   A.  It might just be easier to go through them in the order,

15   although they're showing different things.  The lighting in

16   these examination rooms is not very good, so I apologize for

17   the photography skills.

18             But C1 and C2 are pictures of the abdomen of

19   Mr. El-Hanafi.  And what they show is the areas of bruising

20   that are the result of the subcutaneous injections of the

21   Lovenox, the low molecular weight heparin that he's getting as

22   an anticoagulant to treat his deep vein thrombosis.  So this is

23   given as an injection under the skin once a day.

24             And you can see with daily injections he's got quite a

25   bit of bruising on the anterior abdominal wall.  And you can

1    even see the little pin points there, which -- where the sites

2    where the needle -- more recent needle injections were done.

3              THE COURT:  Do these injections necessarily have to be

4    made in the same place, or could they be spread over a wider

5    area and perhaps cause less bruising?

6              THE WITNESS:  They can be spread around the abdominal

7    wall or the thighs.  Mr. El-Hanafi doesn't have a lot of meat

8    on his thighs, so he would prefer to use the abdominal wall.

9    You can spread them out, but it isn't unusual when you've been

10   on the low molecular weight heparin injections every day for

11   months to get bruising at the injection sites.

12             But occasionally serious bleeding can occur.  As you

13   can imagine, you have something untoward happen here, and you

14   can get serious bleeds into the abdominal wall when you inject

15   this anticoagulant.  Fortunately, he has not had anything like

16   that so far.

17   Q.  And why is serious bleeding a particular concern in

18   Mr. El-Hanafi's case?

19   A.  I'm sorry?

20   Q.  Why is serious bleeding a particular concern in

21   Mr. El-Hanafi's case?

22   A.  Well, with anyone who's on an anticoagulant in therapeutic

23   doses, in doses that you need to treat a condition as opposed

24   to the low doses that we use to prevent a condition, when you

25   give an anticoagulant to treat a chronic condition, you

F17eelh1                          Weitz - direct

1    increase the risk of bleeding.  It's just -- I mean, it's not

2    surprising that when you're on an anticoagulant long term, that

3    you have a higher risk of bleeding.  And that bleeding can be

4    serious bleeding.  It can be bleeding into the brain or it can

5    be bleeding into another critical organ site, and it can be

6    fatal in some cases.  So long-term anticoagulation is not to be

7    taken lightly.  And we don't do it unless we have to do it.  In

8    Mr. El-Hanafi's case, we have to do it because, as I said, he

9    had this extensive deep vein thrombosis, and he has risk

10   factors for recurrence.  And he may or may not have had

11   recurrent deep vein thrombosis in the course since its

12   diagnosis.

13   Q.  Now, does Mr. El-Hanafi have any other conditions that

14   would contribute to the risk of bleeding, other than the

15   fact --

16   A.  Yes.  He does.  He has hypertension or high blood pressure.

17   And if you don't control the blood pressure, that also

18   increases your risk of bleeding.  You can imagine that high

19   blood pressure is a risk factor for stroke.  And if you are on

20   an anticoagulant, you have an even higher risk of having a

21   hemorrhagic stroke, a stroke with blood in the brain.  And so

22   you have to -- whenever you have a patient on long-term

23   anticoagulation therapy, it's really important that you

24   carefully manage the blood pressure to keep it under control,

25   to lower that risk of bleeding.  And also, of course, you want

1     to keep the blood pressure under control to reduce the

2     long-term consequences of high blood pressure, which include

3     renal impairment, which he's already showing signs of.

4     Q.  Doctor, can you go through the rest of your photographs

5     with us?

6                 THE COURT:  I'm sorry.  I have a follow-up question.

7                 MS. KUNSTLER:  Sure.

8                 THE COURT:  There is medication that can reduce one's

9     high blood pressure.

10                THE WITNESS:  Yes.

11                THE COURT:  Is he taking such medication?

12                THE WITNESS:  He is, your Honor.  He's on a medication

13    to reduce his -- to reduce his blood pressure.  I'm not really

14    sure whether the dose has been titrated, but when I measured

15    his blood pressure yesterday, his diastolic pressure was still

16    a little bit elevated.  And I --

17                THE COURT:  How high was it?

18                THE WITNESS:  I think it was 94 or 95 millimeters of

19    mercury yesterday.  I wrote it down but I don't remember

20    exactly.  But I noticed in the recent records he's had

21    diastolic pressures over 100, just over 100 millimeters, which

22    is way too high for a young man like Mr. El-Hanafi.  So it

23    really does need to be controlled.

24                He is getting evidence of early renal impairment.  I

25    know that he has the okay to see a nephrologist, a kidney

1    doctor, at some point, which I think is a good idea.  But he

2    needs to have his blood pressure better controlled.

3              MS. KUNSTLER:  Your Honor, my next set of exhibits

4    have to do with the blood pressure measurements that Dr. Weitz

5    made and recent blood pressure measurements by the BOP.

6              THE COURT:  Okay.  Are you offering Exhibits C1 and

7    C2?

8              MS. KUNSTLER:  Yes, your Honor.  If it's more helpful

9    to go to the blood pressure and back to the photographs, I can

10   bring these exhibits up, which are Defendant's Exhibit D and

11   D1.

12             THE WITNESS:  Yes.  Exhibit D is from my examination

13   yesterday, and his blood pressure sitting in his right arm was

14   135 over 92.  So that's still not where it should be.

15             And Exhibit D1 gives some blood pressure recordings.

16   And I notice in November 19, 2014, the blood pressure in the

17   right arm was 130 over 96, and October 15th of 2014, the

18   pressure was -- on the right arm was 150 over 101, and in

19   the -- at different time, it was also 180 over 107.  So that's

20   high, your Honor.  And it's higher than we'd like it to be.

21             THE COURT:  How low should it be?

22             THE WITNESS:  His diastolic should be at least under

23   90.  It should be in the 80s at least.  So we want to get it

24   down, because he is at risk for more damage to the kidneys and

25   also at risk for bleeding.

1          THE COURT:  Now, you're saying he's already showing

2     signs of early renal impairment.  Can you say conclusively that

3     that's due to the high blood pressure not being controlled?

4          THE WITNESS:  I can't -- all I know is that the

5     creatinine is elevated.  That's a blood test that tells how

6     well the kidneys are functioning.  What the cause of that is, I

7     can't be sure.  But one potential cause of that is the high

8     blood pressure.

9          Another possible contributor might be the

10    antiphospholipid syndrome that he has that's in association

11    with the deep vein thrombosis, because antiphospholipid

12    syndrome can be on occasion associated with clotting in some of

13    the small vessels, including those in the kidney, and can

14    contribute to renal impairment.  So these are things that I'm

15    hoping that the nephrologist, that the kidney doctor, will

16    address when he or she sees Mr. El-Hanafi in the next little

17    while.

18         THE COURT:  How would one address the antiphospholipid

19    syndrome?

20         THE WITNESS:  Again, at this point it's really just a

21    matter of monitoring whether these tests, these abnormal tests,

22    stay positive over time, and to see whether he has any evidence

23    of more systemic disease that could be involving the kidneys,

24    could be involving the brain even.  Right now he doesn't.  On

25    talking to him or examining him, he doesn't have that.  But

1    it's something that needs to be watched on a go-forward basis.

2              THE COURT:  Is there anything that can be done to

3    delay or impede its contribution to harming him?

4              THE WITNESS:  Not for the antiphospholipid syndrome

5    per se, except that he needs to remain on anticoagulation to

6    reduce the risk of recurrent thrombosis and to reduce the risk

7    of clotting anywhere outside the leg as well.  And he needs to

8    have his blood pressure well managed to make sure that that's

9    not a contributing factor, either to the risk of bleeding from

10   the blood thinning therapy, the anticoagulant therapy or for

11   the progression of the renal impairment.

12             THE COURT:  Okay.  Let me get back to housekeeping for

13   a minute.

14             The defense has offered Exhibit C1 and C2.  Do you

15   want to offer also 3 through 8?

16             MS. KUNSTLER:  We haven't discussed them, but we're

17   happy to offer them at this time.

18             MR. LOCKARD:  No objections.

19             THE COURT:  All right.  There's no objections, so I

20   will enter defense Exhibits C1 through 8 without objection.

21             (Defendant's Exhibits C1 through 8 received in

22   evidence)

23             THE COURT:  Now, Exhibit D and D1, are you ready to

24   offer them?

25             MS. KUNSTLER:  I am, your Honor.  Just for clarity,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F17eelh1                         Weitz - direct

1    I'd like to.

2    BY MS. KUNSTLER:

3    Q.  What is Exhibit D, Dr. Weitz, and what is Exhibit D1?  Can

4    you tell us what Exhibit D is and what Exhibit D1 is?  I know

5    you --

6    A.  Exhibit D is just a sheet with some of my writing, a few

7    notes that I jotted down when I saw Mr. El-Hanafi yesterday.

8              Exhibit D1 is a record from the Bureau of Prisons,

9    which is a list of the blood pressure measurements that were

10   made and pulse measurements that were made at various -- on

11   various dates.

12   Q.  And given your blood pressure results and the blood

13   pressure results that you have from the Bureau of Prisons,

14   would you classify this as poorly controlled blood pressure or

15   that that's what the status of his blood pressure is right now,

16   poorly controlled hypertension?

17   A.  It's inadequately controlled hypertension at this point,

18   yes.

19             THE COURT:  What could adequately control his

20   hypertension?

21             THE WITNESS:  What is?

22             THE COURT:  What could adequately control his

23   hypertension?

24             THE WITNESS:  Just medication, your Honor.

25             THE COURT:  More medication?

F17eelh1                        Weitz - direct

1          THE WITNESS:  More medication, maybe a changing of the

2    dose, maybe even adding an additional medication.  Sometimes we

3    use a stepped approach.  But I don't know really whether his

4    dose of his antihypertensive, his blood pressure lowering

5    medication, whether it's been altered or changed.  I really

6    don't know.

7    BY MS. KUNSTLER:

8    Q.  And you mentioned the early signs of renal failure.  Did

9    you use any kind of measurement to determine that it was an

10   early stage failure, or a mild failure?

11   A.  The way we look at -- the way I look at it is to calculate

12   a creatinine clearance to see how well the kidneys are

13   functioning.  So in addition to just looking at the creatinine

14   level, you can use various formulas to calculate the creatinine

15   clearance.  And the one we tend to use is the so-called

16   Cockcroft-Gault formula --

17          THE COURT:  Could you spell that.

18          THE WITNESS:  C-O-C-K, then C-R-O-F-T, then another

19   word is Gault, G-A-U-L-T.

20   A.  And this is just a formula that takes into account the

21   person's creatinine, their age, their weight and the sex,

22   whether they're male or female.  Then you make a calculation.

23   And I did a calculation of -- based on his creatinine

24   clearance, and he comes out with mild impairment.

25          But he's very -- a young man and his -- you can have

1    an exponential drop in renal function.  So it's something that

2    we still need to watch very closely on a go-forward basis to

3    make sure that it doesn't continue to decline.

4              MS. KUNSTLER:  Your Honor, I apologize.  I think I may

5    have missed offering Exhibits D and D1.  I offer Exhibits D and

6    D1.

7              MR. LOCKARD:  No objection.

8              THE COURT:  Defense Exhibits D and D1 are received

9    without objection.

10             (Defendant's Exhibits D and D1 received in evidence)

11             THE COURT:  I'd like to ask the doctor to simply tell

12   us in plain English what is written on Defense Exhibit D.

13             THE WITNESS:  On Exhibit?

14             THE COURT:  I take it you measured his left calf and

15   his right calf.

16             THE WITNESS:  So I measured the circumference of the

17   left and right calf 10 centimeters below a bony landmark so

18   it's at the same distance in both calves.  And I measured the

19   right calf as two centimeters larger in circumference than the

20   left.  Underneath that I recorded the type of stocking that he

21   has.  Right now he's got Jobst stockings; that's the

22   manufacturer of those elastic compression stockings.  And

23   they're engineered to apply 20 to 30 millimeters of mercury

24   pressure.  So that's the -- how stretchy or how tight they are.

25             And then on the right side of the page I got his

F17eelh1                      Weitz - direct

1    oxygen saturation.  We can use a little machine that you put on

2    the finger there to measure the oxygen saturation in the blood

3    on room air, which was 98 percent.  His heart rate was 75 and

4    his blood pressure in the right arm, sitting, was 135 over

5    92 millimeters of mercury.

6              THE COURT:  Okay.

7    BY MS. KUNSTLER:

8    Q.  Now, Dr. Weitz, you reviewed Dr. McKinsey's most recent

9    report dated December 19, 2014?

10   A.  I'm sorry?

11   Q.  You reviewed Dr. Weitz's most recent report dated

12   December 19 -- sorry, Dr. McKinsey's most recent report?

13   A.  Yes.

14   Q.  And how were your findings different from his?  And if it's

15   helpful, I can bring the report up to you, but --

16   A.  No, I think that -- I mean, I use the Villalta scoring

17   system to assess the presence and severity of the

18   post-thrombotic syndrome.  And I did measure a difference in

19   circumference between the two calves.  And I think Dr. McKinsey

20   did not find a difference in circumference between the two

21   legs.

22             MS. KUNSTLER:  Just one moment, your Honor.

23             THE COURT:  Yes, take your time.  (Pause)

24   Q.  Do you have an opinion or any thoughts as to why you

25   reached a different result?

1   A.  I can't be sure.  I know Mr. El-Hanafi told me that when

2   Dr. McKinsey made the measurements, he had been lying on the

3   examining table.  When I made the measurements, he had been

4   sitting for some time with his stockings off.  And then I also

5   had measured them when he was standing.

6   Q.  Thank you.

7            Now, we discussed the severity of the PTS, the

8   post-thrombotic syndrome, and you did discuss somewhat the

9   severity of his disability, his ability to perform normal

10  tasks.  Are there any other -- I think you went through running

11  and walking or doing exercises.  Are there any other tasks that

12  he's limited in performing, based on his level of disability?

13  A.  Well, he tells me that unless he's wearing the stockings,

14  he really can't do much after standing or being up.  He can

15  just -- even just regular activities for an hour or two, he's

16  really unable to continue.  With the stockings, he's able to do

17  more without that discomfort.  But even with the stockings he's

18  still limited in what he can do, for simple exercises like, as

19  I said, squatting or trying to jog are still impossible for

20  him.

21  Q.  Now, we've gone through --

22            THE COURT:  I'm sorry to interrupt.

23            Can he do upper body exercises?

24            THE WITNESS:  He should be.  I didn't ask him that,

25  but he should be able to do upper body exercises without any

F17eelh1                         Weitz - direct

1    problem, yes.

2    Q.   And what about sitting or sitting in one place for any

3    length of time?  Is that --

4    A.   In most people with post-thrombotic syndrome, sitting --

5    walking is good because when you're walking, you keep the

6    muscles in your calves contracting.  But sitting with your legs

7    dangling, that's a problem, or just standing is a problem.  And

8    so if you're going to sit for extended lengths of time, leg

9    elevation is important.

10   Q.   Now, we've gone through -- you've discussed hypertension.

11   You've discussed risk factors.  You've discussed renal

12   impairment and the dangers of bleeding on the stomach injection

13   site, or just bleeding generally.  I'm wondering, is there

14   anything perhaps -- I'm wondering if it's useful for -- are

15   there any medical needs that we haven't addressed?  Or perhaps

16   it would be good to do a summary of the medical needs, rather

17   than kind of copy them haphazard so we have them in one place

18   together.

19   A.   Well, I guess the important things on a go-forward basis

20   are that for management of the post-thrombotic syndrome, he

21   needs to have properly fitted compression stockings.  And he

22   needs to be in an environment where he can elevate his legs and

23   he's not kept immobilized for any length of time.

24          He will require long-term anticoagulation therapy to

25   prevent recurrent deep vein thrombosis.  And this poses a risk

1   of bleeding.  So he should be in an environment where that risk

2   of bleeding is minimized.  And if he does have -- fell and hit

3   his head or was in a fight and had blunt trauma to the chest or

4   something, there's a risk of internal bleeding.  And so he

5   needs to be in an environment where he can be as supervised as

6   possible and where he can get rapid medical attention, should

7   that occur.

8           He needs monitoring of his high blood pressure to make

9   sure it's controlled and it stays where it should be.  And he's

10  going to have to have an assessment by the nephrologist to

11  assess why his renal function is declining, and to certainly

12  address the high blood pressure and maybe look for other

13  potential causes.

14          And he needs to be followed from the antiphospholipid

15  syndrome, just in terms of to make sure there's no evidence of

16  systemic progress of thrombosis that goes beyond clotting in

17  the deep veins of the leg.

18  Q.  And what are his needs in terms of exercise or -- his needs

19  in terms of exercise or ability to move around?

20  A.  Exercise is good for patients with post-thrombotic

21  syndrome.  I mean, the main thing is using the compression

22  stockings, but even, you know, walking programs can be helpful

23  and are worth a try in some of these people.  Some people can

24  do them better than others.  And it's something that could be

25  considered.  Clearly he can't jog, but maybe he could get

F17eelh1                            Weitz - direct

1    exercise through some sort of walking.

2    Q.  Now, why is ankle shackling a danger for him?

3    A.  Well, ankle shackling is a danger because it restricts the

4    movement.  And you could imagine that if you have a condition

5    that's causing you to get pain and swelling without -- an

6    inability to elevate your leg, that's going to exacerbate the

7    symptoms.  And shackling for long -- immobilization of an

8    extremity for long periods of time can be precipitant for

9    clotting as well.

10            THE COURT:  Let me ask you a question.  I don't know

11   if this is possible, but if he were transferred, and if the

12   marshals wanted him shackled, could he be transferred lying

13   down?

14            THE WITNESS:  I mean, that would probably help his

15   symptoms, yes, if he were transferred lying down.  I gather

16   what they're using now, instead of metal shackles, they're

17   using kind of a flexi-plastic, which is probably better than

18   the tight, metal shackles.  So at least that's an improvement.

19   But even just being allowed to elevate the leg would be a help,

20   your Honor.

21            THE COURT:  When you say "elevate," would lying prone

22   constitute elevation?

23            THE WITNESS:  It would, but it wouldn't even have to

24   be that much.  It could just be -- like if you could imagine

25   putting your leg on a footstool, even that would be a help.

1    But just having your leg straight down like we are sitting now

2    could be -- could be problematic for a long period of time in

3    someone with post-thrombotic syndrome.

4    BY MS. KUNSTLER:

5    Q.  Is there anything else that could be done to minimize the

6    risk while Mr. El-Hanafi was shackled, other than elevating the

7    leg?

8    A.  I mean, if you really had to do it is to release it

9    periodically and let him exercise the leg and move around a

10   bit.  Always a good thing in anyone who is shackled.  They

11   shouldn't be shackled for any extended period of time.

12        THE COURT:  How would you define "extended period of

13   time"?  How would you define "extended"?

14        THE WITNESS:  Well, I think anything beyond about four

15   hours is an extended period of time.  And for someone with

16   post-thrombotic syndrome, even an hour can be torture if you

17   can't move your leg.

18        MS. KUNSTLER:  One moment, your Honor.  (Pause)

19        I'm going to move on now to diagnosis and treatment

20   generally and what's optimal treatment.

21   Q.  Are there specific guidelines regarding the timing for

22   diagnosis and early treatment?

23   A.  Yes, there are guideline documents.  The one that -- the

24   ones that I tend to use are those of the American College of

25   Chest Physicians.

1    Q.  I realize we didn't -- before I do that, are there any

2    other photos among the C exhibits that you want to highlight in

3    terms of what you saw on --

4    A.  Yes.  We have Exhibit C3 to C8 that we didn't discuss.

5             And C3 and C4 show the foot and ankle.  And you can

6    see, especially on C4, you can see the discoloration around the

7    ankle, that brown discoloration.  And you can see these dilated

8    veins in the foot.

9             And you can also see on C3 that that's his right foot

10   but the left foot doesn't have those problems.  It's the right

11   foot, the right leg, that was involved with the deep vein

12   thrombosis.

13            C5 shows the other side of the foot, where you can

14   again see the dilated veins on the top of the skin, what we

15   call the superficial veins.  When you get blockage of the deep

16   veins, and then you start getting dilatation of the superficial

17   veins.

18            C6, Mr. El-Hanafi has -- is pointing to -- it's hard

19   to see it there, but to a dilated superficial vein that's just

20   at the side of his knee.  That's an area that's quite tender

21   for him.

22            And C7 shows a bit of dilation of one of the

23   superficial veins that runs on the inside of his right leg.

24            And the last one, C8, just shows the other leg, which

25   really looks pretty normal.

F17eelh1                        Weitz - direct

1           THE COURT:  Doctor, looking at Defense Exhibit C4.

2           THE WITNESS:  C4, yes.

3           THE COURT:  What is the cause of the brownish area?

4           THE WITNESS:  Yes.  This brown discoloration, your

5    Honor, it's caused by the seepage of red blood cells into the

6    tissues.  And then the macrophage is kind of the garbage

7    collector cells, if you will.  They engulf these red blood

8    cells.  And because of the iron inside the red blood cells, it

9    gives you that brown discoloration.

10          THE COURT:  Is that a danger for a patient?

11          THE WITNESS:  It's -- cosmetically it doesn't look

12   very good.  It just is a sign that there is enough pressure in

13   the veins that you're getting leakage of blood and fluid into

14   the tissues, and it's a sign that the severity of the

15   post-thrombotic syndrome is --

16          THE COURT:  It's a sign of severity?

17          THE WITNESS:  It's not a danger per se for having the

18   discoloration, but it's just an indicator that there's enough

19   swelling and extra evisceration that the blood is seeping out

20   into the tissues there to give you the red blood cell iron

21   accumulation in the tissue.  So it's an indicator of the

22   severity of the condition.  That's all.

23          THE COURT:  Thank you.  Would it lead to a deficiency

24   in iron in the patient's blood?

25          THE WITNESS:  No.  I mean, it's not bleeding enough to

1    cause -- it's a good question, but it's not bleeding enough to

2    cause iron deficiency.  But it does mean that there is some

3    seepage of blood and blood into the tissues.

4    BY MS. KUNSTLER:

5    Q.  Now, the darkening that the judge just asked you about, is

6    that hemosiderin?

7    A.  That's hemosiderin, yes.  You're right.

8    Q.  Now, did Dr. McKinsey find hemosiderin?

9    A.  I don't recall him mentioning that.

10   Q.  Now, we can return back to the guidelines we were

11   discussing, the guidelines related to the timing for diagnosis

12   and early treatment.

13           You mentioned the American College of Chest

14   Physicians?

15   A.  Yes.

16   Q.  Now, is there also something called a Wells score?

17   A.  I'm sorry?

18   Q.  A Wells score?

19   A.  Yeah.  The Wells score is a scoring system that's used to

20   assess the clinical likelihood of deep vein thrombosis.

21   There's also a Wells score for assessing the clinical, clinical

22   likelihood of pulmonary embolism, when the clot breaks off from

23   the vein in the leg and travels to the lung.  But the Wells

24   score is used when we see patients to assess whether the -- a

25   deep vein thrombosis is moderately to highly likely or is

F17eelh1                              Weitz - direct

1    unlikely.  And we sometimes -- we often use it -- I use it in

2    my practice when I see a patient where I'm suspecting the

3    possibility of deep vein thrombosis to assess how likely is it

4    that this patient has deep vein thrombosis.

5    Q.  So are these, the American College of Chest Physicians and

6    the Wells score, these are some of the main guidelines you

7    follow with regard to timing, with regard to diagnosis and

8    early treatment of deep vein thrombosis?

9    A.  Yes.  They -- the Wells score is something that we

10   incorporate in our algorithm, our approach to diagnosing

11   patients with suspected deep vein thrombosis.  And the

12   guidelines give a framework for the standard of care for

13   diagnosis and treatment of patients with deep vein thrombosis

14   or its complications.

15   Q.  And were you involved at all in the production of either

16   the American College of Chest Physicians guidelines or the

17   Wells score?

18   A.  Well, I was involved in the development of the Wells score.

19   Phil Wells, who developed that score, was one of our research

20   fellows.  And I'm on the -- some of the publications with him

21   that describe the score and have used it.

22          And as far as the guidelines go, I've been involved

23   with the American College of Chest Physicians guidelines on

24   antithrombotic therapy for quite a few years.  We update them

25   every about four years.  I am not an author on the guidelines

1    on the management of venous thromboembolism, but I was part of

2    the voting committee.  We did have a chance to vote on some of

3    the recommendations at the time when we discussed each of the

4    chapters that went into that guideline.  So we voted on areas

5    where there were bones of contention among the experts, as you

6    might expect.

7    Q.  Now, I'm handing you what's been marked as Defendant's

8    Exhibit E.  Can you tell me what this is?

9    A.  Yes.  This is the article, your Honor, and it's quite a

10   tome.  It's thick, and there's a lot of reading, which some of

11   my clinician colleagues complain about.  But it does give a

12   summary of the recommendations at the beginning.

13   Q.  Now, what do these guidelines tell us about early DVT

14   diagnosis and care?

15   A.  Well, the guidelines state that if you suspect deep vein

16   thrombosis, you should do appropriate diagnostic testing.  And

17   if there's going to be a delay in obtaining the diagnostic

18   test, as long as the patient isn't at high risk for bleeding,

19   you should cover the patient with anticoagulation therapy so

20   that they -- you're covering them for the worst-case scenario.

21   In the case of deep vein thrombosis, until you get the

22   diagnosis and rule it out, you're covering for the possibility

23   that they could develop a fatal pulmonary embolism while you're

24   waiting to make the diagnosis.  So you cover them with an

25   anticoagulant while you wait for the test, unless you can get

F17eelh1                          Weitz - direct

1    the test right away.

2              So if you're in a hospital setting, sometimes you can

3    get the test almost immediately.  But if you're in a clinic

4    setting or an outpatient setting, it can take a little time to

5    get the test done.  And then you cover the patient with an

6    anticoagulant while you're waiting.  And then if you rule in,

7    you've got him already on treatment, and if you rule it out,

8    you can stop the treatment.

9    Q.  Now, do the guidelines tell you how much time should pass

10   between when an ultrasound is ordered and when it's performed?

11   A.  They really don't speak to that.  The expectation is that

12   you'll get the diagnostic testing done as soon as possible.

13   Q.  So if somebody is at high -- is determined to be a high

14   risk for a DVT, what do the guidelines tell you to do in terms

15   of if an ultrasound can't be performed right away?

16   A.  They say that if you think the risk of DVT is high and you

17   can't get the test within four hours, then you should cover

18   them with anticoagulants until you can get the test.  So

19   sometimes it happens that the patient presents -- they always

20   present on a Friday evening of a long weekend, and you might

21   not be able to get the diagnostic test over the weekend.  So

22   what I would do in that case is I would cover the patient with

23   anticoagulants until I can get the test on the Monday or the

24   Tuesday.  So that might be the longest delay that I might see.

25             But normally, if they're during sort of business

F17eelh1                          Weitz - direct

1   hours, I can get the test done within an hour or so, where I
2   practice.  But it may not be like that everywhere.  So then you
3   cover the patients while we're waiting for the test, but you
4   shouldn't delay the test for more than a few days at most,
5   because you want to make a diagnosis and rule it in.  And if
6   they don't need to be on anticoagulant therapy, you can stop
7   it.  And if they do, you need to then assess, how long do they
8   have to be treated, and what sort of treatment are you going to
9   go for?  So it's important to get the test done as soon as you
10  can.
11  Q.  Now, you stated that if it's a suspicion of a high
12  likelihood, you treat with medication within four hours.  What
13  about moderate or -- there's three categories, right, and three
14  indications of what you should do.  Could you go over those
15  with us?
16  A.  So in moderate probability, you know, the guidelines say
17  you might wait for -- if you can get it within 12 hours, you
18  might not have to cover them.  So they're just giving a wider
19  time frame.  But I think if you can't get the test done within
20  a day or so, you should cover the patients.  You're better off
21  covering the patients with an anticoagulant, unless they're at
22  high risk for bleeding, because then you're covering for the
23  worst-case scenario:  That they have the disease, that the
24  disease extends and that the patient drops dead because of a
25  pulmonary embolism.

F17eelh1                          Weitz - direct

1             MS. KUNSTLER:  Your Honor, I'd like to offer Defense

2     Exhibit E.

3             MR. LOCKARD:  No objection.

4             THE COURT:  Defense Exhibit E is received without

5     objection.

6             (Defendant's Exhibit E received in evidence)

7             MS. KUNSTLER:  Thank you.

8     BY MS. KUNSTLER:

9     Q.  Now, in Mr. El-Hanafi's case, when was a DVT first

10    suspected?

11    A.  Did he --

12    Q.  When was it first suspected?

13    A.  The first -- the first ultrasound that was done that

14    detected it was at the end of September of 2000 -- I think it

15    was 2011.

16    Q.  Yes, that's accurate.  But when was the first mention of

17    the possibility of DVT in Mr. El-Hanafi's medical?

18    A.  So the first mention of the possibility of DVT was made, I

19    think, on May 16th by a Dr. Watson in Oklahoma, who noted that

20    he had pain, was complaining of pain in his leg.  And he or she

21    wrote that the differential diagnosis included early deep vein

22    thrombosis, Baker's cyst or other popliteal pathology.

23    Q.  Dr. Weitz, I'm going to hand you a binder of exhibits that

24    has a number of the exhibits that we're going to be discussing.

25    The first one is Defendant's Exhibit F.  Can you tell us what

F17eelh1                           Weitz - direct

1    that exhibit is.

2    A.  Yes.  The first one is differential -- it's Exhibit F,

3    which was dated on 5/16/10 and is signed by Dr. K. Watson from

4    Oklahoma City.  And in there, in terms of the assessment, the

5    doctor writes, early DVT, deep vein thrombosis versus Baker

6    cysts versus other popliteal problems.

7    Q.  Now, in your practice, after you make a differential

8    diagnosis such as this one, what are your next steps?

9    A.  Well, I think if I were considering those possibilities, I

10   would order an ultrasound, because an ultrasound will tell you

11   whether it's deep vein thrombosis, it will tell you whether

12   it's a Baker cyst, and it can look in the popliteal, which is

13   the area behind the knee, for other pathologies that might be a

14   cause of discomfort.

15   Q.  And how soon would you do that?

16   A.  I would do it as soon as possible; within, you know, hours

17   or a day or as soon as I could get it.

18   Q.  And what would you do if you weren't able to do it in a

19   timely fashion?

20   A.  Well, again, if I entertained the possibility of deep vein

21   thrombosis, as I said before, I would consider covering the

22   patient with anticoagulants until I can get the diagnosis made.

23           MS. KUNSTLER:  Your Honor, I would offer Defendant's

24   Exhibit F.

25           MR. LOCKARD:  No objection.

F17eelh1                          Weitz - direct

1           THE COURT:  Defense Exhibit F is received without

2     objection.

3           (Defendant's Exhibit F received in evidence)

4           MS. KUNSTLER:  Thank you, your Honor.

5     BY MS. KUNSTLER:

6     Q.  Now, I'd like you to turn in that binder to Defendant's

7     Exhibit G.

8     A.  Exhibit?

9     Q.  Exhibit G.

10    A.  I've got it, G.  That's dated 7/26/11?

11    Q.  Yes.  What's the date on that document?

12    A.  That's -- the encounter date that's stated here was

13    7/27/2011.

14    Q.  But the document, the document refers to what?  What does

15    the document refer to?

16    A.  The document refers to an encounter that Mr. El-Hanafi had

17    with a chief complaint of lower extremity pain.  And the

18    provider has seen the -- it looks like it's seen by a

19    physician's assistant, who documents that the inmate was seen

20    yesterday, due to chronic pain in right lower leg, attributes

21    the pain to foot cuffs being too tight about four months ago.

22    Recalls the officer loosening the cuffs during the trip for

23    comfort.  Has been seen in the past for sick calls re this and

24    states no treatment has worked; antibiotics, hot, cold

25    treatment, Naproxen, which is an antiinflammatory agent.  An

1    X-ray was done, which was negative.  Reports pain is in the

2    forefoot and calf and not able to discern if it's radiating

3    from a calf to the forefoot or vice versa.  Pain is now a 5,

4    which is just the level of pain on a scale.  However, it's a

5    10, which is the highest level, when he walks for a long

6    periods of time.

7    Q.  And what is ordered on that date or what -- well, is

8    Mr. El-Hanafi evaluated by a doctor on that date?

9    A.  Yes.  It sounds like, if I look at the next page of that

10   report, the clinical -- the clinical director was called in to

11   also examine the foot and the clinical director ordered an

12   ultrasound to be done.  And it says, the reason for the request

13   is ultrasound Doppler of right lower extremity due to pain of

14   four months.

15   Q.  Now, do you know how long after the date the ultrasound was

16   ordered it was actually performed?

17   A.  It was done about two months later.

18   Q.  Now, I know this may be hammering a nail I've already beat

19   to death a little bit, but under the guidelines we've

20   discussed, would you consider that an acceptable delay?

21   A.  I think that's an unacceptable delay.  I mean, a delay of

22   one, two, three days might be acceptable, but a delay of two

23   months is unacceptable.  And he was not given anticoagulants to

24   cover him for that two-month period.

25   Q.  Now, between those two exhibits I just gave you, Exhibit F

F17eelh1                    Weitz - direct

1    or -- we just discussed Exhibit F from 5/16/10 and Exhibit G

2    from 7/26/2011, between those dates, as far as you know, from

3    the records you've reviewed, was Mr. El-Hanafi examined by a

4    doctor at any point between those two dates?

5    A.   At least with all the records I received and reviewed, he

6    was not seen by a physician.  He was seen by various physician

7    assistants, but never examined by a physician, except by

8    Dr. Watson in Oklahoma in May, and then by the clinic director

9    in July of 2011.

10   Q.   And does the record that you have before you right now,

11   Exhibit G, does that record also consider the possibility

12   DVT -- I know it orders the ultrasound, but is DVT mentioned in

13   that report?

14   A.   I don't see that -- the possibility of DVT is mentioned.

15   Q.   If you turn to page -- do the words DVT appear in there?

16   If you turn to page one of the record.

17   A.   It says -- no.  It just says -- I don't see that it's

18   mentioned there.  There's no history of DVT, self or family,

19   but it doesn't --

20   Q.   I was just wondering if the words DVT appear.

21   A.   I think, though, that when you start ordering adult Doppler

22   ultrasound of the right lower extremity with pain in the leg

23   that's been going on for that long, and swelling, and calf

24   tenderness, that must be thinking of deep vein thrombosis.

25            THE COURT:  Could you pause just a moment.  I want to

F17eelh1                         Weitz - direct

1    check the transcript.

2              MS. KUNSTLER:  Sure.  (Pause)

3              THE COURT:  Thank you.  You may proceed.

4              MS. KUNSTLER:  Sure.

5    BY MS. KUNSTLER:

6    Q.  Do you see on the first page of that record, it says no

7    family history of DVT?

8    A.  (Nods head)

9    Q.  I'm sorry.  You have to speak your answer.

10   A.  Sorry?

11   Q.  Do you see on the first page of that record --

12   A.  Yeah, it --

13   Q.  -- it says no family history of DVT?

14   A.  Yes.

15   Q.  So in your opinion does that mean that in conjunction with

16   the fact that an ultrasound was ordered meant that --

17   A.  I think that's just in taking a history one --

18             MR. CRONAN:  Objection.  Speculation.

19             THE COURT:  Sustained.

20             MS. KUNSTLER:  Okay.

21   Q.  But your opinion is when the ultrasound is ordered

22   because --

23   A.  My opinion is that an ultrasound was ordered because the

24   patient has symptoms and signs in the right leg that have been

25   persistent for four months and have not responded to various

1    treatments.  And they're looking for something, and the

2    ultrasound is the way to diagnose deep vein thrombosis.

3            MR. CRONAN:  Objection, your Honor.  It may be a

4    matter of semantics, but I think the doctor can testify whether

5    he would have ordered the ultrasound but not why the ultrasound

6    was ordered.

7            THE COURT:  That's correct.  I'll accept that

8    correction to the transcript.

9            Go ahead.

10   Q.  Dr. Weitz, when a patient presented to you with these

11   symptoms, what would you have been considering and what would

12   you have ordered in order to diagnose -- what would have been

13   in your mind and what would you have ordered?

14   A.  I certainly would have considered the possibility of deep

15   vein thrombosis in the leg, with someone who has ongoing pain

16   and swelling in the lower extremity that hasn't responded to a

17   variety of different maneuvers.

18   Q.  Now, did you form an opinion whether the care Mr. El-Hanafi

19   received was the optimal treatment in this case?

20   A.  I have reached an opinion.  I think that he had the

21   possibility of deep vein thrombosis considered on two

22   occasions:  One very early on in the course, when Dr. Watson

23   raised the possibility of early deep vein thrombosis; and then

24   later in July, he comes in and he's got this persistent pain

25   and swelling in his right lower leg, to the point where he

1    can't -- he can't walk for any long period of time.  And the

2    ultrasound was ordered on 7/26, wasn't done until two months

3    later.  And when it was done, it shows extensive deep vein

4    thrombosis.

5    Q.  Now, what should have been done in this case?

6    A.  Well, I would say that when Dr. Watson saw the patient and

7    raised the possibility of early deep vein thrombosis, an

8    ultrasound should have been done there to settle on the

9    differential diagnosis that he or she raised.  And then when it

10   was ordered again, when an ultrasonic was finally ordered on

11   7/26, certainly there shouldn't have been a two-month delay

12   before getting that, after he's had progressive symptoms for

13   months that hasn't -- that haven't responded to all kinds of

14   different measures that they've tried.

15   Q.  And do you have an opinion on when Mr. El-Hanafi's DVT

16   started?

17   A.  I can't be 100 percent sure when it started, but he

18   certainly had symptoms that started after he came back from the

19   flight from Dubai in the end of April of 2010.  And the

20   possible diagnosis was entertained for the first time in May of

21   2010.  And then he had progressive symptoms.  So I think we're

22   looking at something that's been progressing for months.

23   Q.  Now, do you think it's reasonable to draw the conclusion

24   that Dr. McKinsey draws, which is that the DVT spontaneously

25   occurred six to eight weeks before it was diagnosed?

1    A.  Well, before the ultrasound is what he was -- I think

2    that's highly unlikely, because then the DVT would have started

3    after the ultrasound was ordered, and it would have post-dated

4    the beginning of the symptoms, which were certainly pretty bad

5    for several months before the ultrasound was ordered.

6    Q.  Now, do you have an opinion as to whether the lack of

7    earlier treatment was a contributing cause of Mr. El-Hanafi's

8    present condition?

9    A.  I think that it's more likely than not that the -- that had

10   the ultrasound been done earlier, the clot would have been less

11   extensive.  It wouldn't have been as big or extended right up

12   the leg into the thigh.  And the extent of thrombosis, the

13   extent of the DVT, is a predictor of the risk of

14   post-thrombotic syndrome.  So the larger the clot, the greater

15   the risk of post-thrombotic syndrome.

16              So if it had been possible to diagnose this earlier,

17   if they had done the ultrasound when the diagnosis was first

18   entertained, then it might have been localized in the calf and

19   he received treatment to prevent it from expanding, he might

20   not be suffering from post-thrombotic syndrome now.

21   Q.  Is it possible to prevent post-thrombotic syndrome?

22   A.  The things that we can do to reduce the risk are to

23   diagnose it -- well, primary prevention, that's not an issue

24   here, to -- but if you do diagnose, diagnose it as soon as

25   possible, so it's less extensive.  And then treat it for --

1    with the appropriate intensity and duration of anticoagulation.

2          And he had the ultrasound ordered on the 7/26 and

3    didn't get it for two months later.  So even if we thought that

4    it started on 7/26, not having treatment for two months means

5    you're not getting adequate treatment for at least two months.

6    So those are risk factors for post-thrombotic syndrome.

7          THE COURT:  I'd like to ask you a few questions

8    relating to what you've just testified to.

9          You say it's more likely than not that if the

10   ultrasound had been earlier, the clot would not be this large

11   as it is.  What more can you tell us about what your opinion is

12   based on and the likely size of the clot, when not treated?

13         THE WITNESS:  Your Honor, studies using X-rays of the

14   veins or using other scanning techniques show that most clots

15   start in the deep veins of the calf, and then they might just

16   resolve on their own.  But some of them will get bigger and

17   gradually work their way up the leg to go to the vein behind

18   the knee, into the thigh and higher.

19         The reason why we get concerned about the clots that

20   get bigger is because, one, they're more likely to break off

21   and travel to the lungs, which can lead to a fatal condition

22   known as pulmonary embolism.  And two is that once you start

23   getting to the veins behind the knee and into the thigh, and

24   the clot gets more extensive that way, you're blocking the

25   outflow of the blood from the leg.  You're kind of blocking the

1   plumbing, if you will.  And that causes the formation of

2   collaterals, the opening up of smaller vessels around to carry

3   the blood flow.  And that increases the risk of post-thrombotic

4   syndrome.

5           And so what I maintain is that we try and diagnose the

6   clots as early as we can and get them on treatment to prevent

7   them from getting bigger, one, to reduce the risk that they

8   have a pulmonary embolism; but, two, also to keep them as small

9   as possible, to reduce the risk of post-thrombotic syndrome.

10  Because once you develop post-thrombotic syndrome, there's

11  really -- we can control the symptoms, but there's nothing we

12  can do to get at the underlying cause.  And it's a chronic

13  condition that's going to be debilitating, reduces quality of

14  life.  It really isn't a very pleasant thing to have for the

15  rest of your life, particularly if you're at a young age, like

16  Mr. El-Hanafi.

17          THE COURT:  I understand that your -- the way you view

18  this question is what would you do --

19          THE WITNESS:  Yes.

20          THE COURT:   -- as reasonable care for a person.

21          One of the things that would be helpful to me to

22  understand or have some knowledge about is:  Is there any way

23  for you to be certain as to what got worse for Mr. El-Hanafi,

24  due to inadequate care -- or inadequate care, in your view?

25          THE WITNESS:  Well, what I think Mr. El-Hanafi is

F17eelh1                    Weitz - direct

1    stuck with, because of the delay in the diagnosis, is he's

2    stuck with quite severe post-thrombotic syndrome, which is

3    going to limit his quality of life.  And, again, I think if the

4    diagnosis had been made earlier, the clot would have been --

5    and treatment had been started earlier, the clot would have

6    been less extensive, and he might have had either no

7    post-thrombotic syndrome or perhaps less severe post-thrombotic

8    syndrome than he has now.

9             THE COURT:  As I understand your testimony, you are

10   weighing possibilities, and perhaps probabilities, but you lack

11   certainty as to whether any of his current condition was

12   worsened by inadequate care?

13            THE WITNESS:  I think that even a delay of -- even if

14   we said that his clot occurred in July 26, 2011 -- and that's

15   unlikely, because he already at that time had four months of

16   leg symptoms -- waiting another two months to make a diagnosis

17   is below the standard of care.  And that delay, even a

18   two-month delay, let alone six-month delay, if we say that his

19   symptoms started four months before and we even ignore that he

20   had symptoms even in 2010, even a six-month delay is even

21   worse.

22            THE COURT:  I understand your frame of reference with

23   respect to standard of care.

24            You now have the ability to see how impaired

25   Mr. El-Hanafi is, and I'm wondering, do you have any certainty

F17eelh1                          Weitz - direct

1    as to the extent to which his impairment is attributable to

2    lack of adequate medical care?

3              THE WITNESS:  Well, I think he has -- he has severe

4    post-thrombotic syndrome right now.  And I can't be 100 percent

5    sure that had he received the diagnosis sooner, he wouldn't

6    have post-thrombotic syndrome.  But I really do think that it's

7    more likely than not that had he had the diagnosis made sooner

8    and the treatment started sooner, he would have had -- he would

9    have now less severe post-thrombotic syndrome or no

10   post-thrombotic syndrome.

11             THE COURT:  Thank you.

12             MS. KUNSTLER:  Thank you, Doctor.

13             THE COURT:  We're getting close to when we should take

14   a morning break.  Is this a good time to break?

15             MS. KUNSTLER:  Yes, your Honor.

16             THE COURT:  All right.  Let me note that I believe

17   Dr. McKinsey is in the courtroom.  Thank you.  He is.  I think

18   it's perfectly appropriate for counsel to talk with the

19   witnesses, any witness who will talk to you, during a break.

20   And while you are questioning, while you're cross-examining, I

21   think it's appropriate for the doctor to stand next to the

22   cross-examiner to funnel questions that will make the testimony

23   more useful, the examination more useful.

24             All right.  Let's take a break until 12:05.  That's a

25   little more than 15 minutes.

F17eelh1                        Weitz - direct

1           (Recess)

2           MS. KUNSTLER:  I don't think I have yet offered

3    Defendant's Exhibit G, although --

4           THE COURT:  You did.  It's been entered.

5           MS. KUNSTLER:  Thank you.

6    BY MS. KUNSTLER:

7    Q.  Now, Dr. Weitz, Dr. McKinsey discounts Mr. El-Hanafi's

8    symptoms in the 17 months prior to his diagnosis.  Why do you

9    credit these symptoms?

10   A.  Why?

11   Q.  Why do you credit these symptoms?

12   A.  Why do I?

13   Q.  Credit them.  He discounts them.  Why would these symptoms

14   have made you consider diagnostic testing earlier?

15   A.  Well, he's got leg symptoms that -- going on and

16   progressing, not responding to different measures, including

17   analgesics, antiinflammatories, compresses, leg stretches, and

18   starting to get dilated superficial veins, more and more pain,

19   difficulty walking because of the pain, all of this progressing

20   over the course of several months.  I think you would begin to

21   think that you have to look for a different cause for those

22   symptoms.  And deep vein thrombosis would certainly be on my

23   differential diagnosis.

24   Q.  Now I'm going to hand back up to you this appendix of

25   exhibits.  If you could turn to what's been marked as

F17eelh1                          Weitz - direct

1    Defendant's Exhibit H.  And can you tell us what that document

2    is.

3    A.  This is an encounter on 5/24/2010.  The encounter was with

4    a physician's assistant, not with a physician.  And what

5    this -- the health problems noted there were pain in joint,

6    lower leg, current.  The status is listed as current.  And

7    medications were prescribed, which included aspirin and

8    ibuprofen, which is an antiinflammatory.  So both an analgesic,

9    aspirin, and an antiinflammatory agent, ibuprofen, were

10   prescribed for pain in joint and lower leg, it says.

11   Q.  Now, in Dr. McKinsey's December 2013 report he claims that

12   this record shows that Mr. El-Hanafi denies any painful -- any

13   current painful conditions.  Is this an inaccurate description

14   of this record or is it -- is Dr. McKinsey's description

15   accurate?

16   A.  It seems to be documented here that the patient was

17   complaining of pain in joint and lower leg.  And the

18   physician's assistant is ordering both an analgesic, aspirin,

19   and an antiinflammatory, ibuprofen.  So it's hard to believe

20   that there was nothing there that -- why would these

21   medications be prescribed, if there weren't pain?

22            MS. KUNSTLER:  Now I'd like to offer Exhibit H.

23            THE COURT:  Any objection?

24            MR. CRONAN:  No objection.

25            THE COURT:  Defense Exhibit H is received without

F17eelh1                          Weitz - direct

 1    objection.

 2              (Defendant's Exhibit H received in evidence)

 3    BY MS. KUNSTLER:

 4    Q.  Now, I'd like you to turn to what has been marked as

 5    Defendant's Exhibit I.

 6    A.  I?

 7    Q.  I, yes.

 8              Can you tell me what this record is?

 9    A.  This was an encounter on 7/16/2010.  Again, the encounter

10    appears to be with a physician's assistant.  And under review

11    of systems -- ROS stands for review of symptoms -- and

12    musculoskeletal general, there is documentation that there is

13    swelling.  Yes is noted there.

14    Q.  Now, in Dr. McKinsey's December 2013 report, he claims that

15    this record shows no evidence of lower extremity edema or

16    swelling noted.  Is Dr. McKinsey's description an accurate

17    description of this record?

18    A.  Well, there was some swelling, according to this document.

19    Exactly where, it doesn't say.

20              MS. KUNSTLER:  I'd like to offer Defendant's

21    Exhibit I.

22              THE COURT:  Any objection?

23              MR. CRONAN:  No objection, your Honor.

24              THE COURT:  Defense Exhibit I is received without

25    objection.

1          (Defendant's Exhibit I received in evidence)

2          THE COURT:  I'm told by my law clerk that Defense

3    Exhibit G has not been entered.  Is there any objection?

4          MR. CRONAN:  No, your Honor.

5          THE COURT:  Defense Exhibit G is received without

6    objection.

7          (Defendant's Exhibit G received in evidence)

8    BY MS. KUNSTLER:

9    Q.  Now, I'd like you to turn to page eight of Exhibit I.

10   A.  Exhibit I, page?

11   Q.  Page eight.  And can you read for us the comments on the

12   bottom of that page.

13   A.  Yes.  On page eight of that exhibit, which is dated

14   7/16/2010, the comments written at the bottom of that page, I

15   think it's right leg previously swollen since restraint was put

16   during inmate's transport from Oklahoma.

17         MS. KUNSTLER:  One moment, your Honor.

18         THE COURT:  Yes.  (Pause)

19   Q.  Now, in your opinion, Doctor, would it be reasonable or --

20   to connect the swelling mentioned here with the swelling

21   mentioned on the other page of this record?

22   A.  Yes.  Then again, on page ten of that exhibit, it also goes

23   on to say about pain in joint, lower leg, there's an indication

24   for, again, ibuprofen and aspirin.

25         MR. CRONAN:  Your Honor, may I just ask for

1    clarification that last question, I believe there was a

2    reference to swelling indicated in another part of the record.

3    And I'm not sure what that was a reference to.

4              MS. KUNSTLER:  Sure.  I can clarify that.

5              THE COURT:  You mentioned pages eight and ten.

6              MS. KUNSTLER:  Yes.

7    BY MS. KUNSTLER:

8    Q.  On page four of that report at the bottom of the page, is

9    swelling mentioned?

10             THE COURT:  It is.

11   Q.  Now I would like you to turn to what's been marked as

12   Defendant's Exhibit J.

13   A.  Exhibit J?

14   Q.  Yes.  Can you tell me what that is.

15   A.  And this is the 3/11/11 report where the chief complaint is

16   stated to be pain.  And it states here that the inmate

17   complains of pain and swelling on -- starting from the right

18   ankle going up the calf, and now goes up the back of the knee

19   and right thigh.  Refers that this condition started about 10

20   months, was cuffed in the ankle while being transported to

21   another jail.  Was given ibuprofen at that time, which worked

22   temporarily.

23   Q.  And what does the practitioner who evaluated him find?

24   A.  Swelling noted on right ankle.  Tenderness in the calf area

25   and popliteal area noted.  Prominent veins on the foot and

1   ankle area.  Full range of motion.

2   Q.  Now, what would be your next course of action, if you had a

3   patient who complained of those symptoms?

4   A.  Excuse me?

5   Q.  What would your next course of action be, if you had a

6   patient who complained of those symptoms and you made those

7   findings?

8   A.  Well, again, with pain and swelling in the ankle and calf

9   region and tenderness in the popliteal area, prominent

10  superficial veins, I would be worried about deep vein

11  thrombosis.  And I would have ordered an ultrasound.

12              MS. KUNSTLER:  Your Honor, I would like to offer

13  Defendant's Exhibit K.

14              THE COURT:  J?

15              MR. CRONAN:  No objection to J, your Honor.

16              MS. KUNSTLER:  I think I already offered J, but I will

17  offer J, if I didn't.  But I was just offering K, but I can

18  offer K and J.

19              THE COURT:  All right.  Does the government object to

20  Defense Exhibit K?

21              MR. CRONAN:  No, your Honor.

22              THE COURT:  All right.  Defense Exhibits J and K are

23  received without objection.

24              (Defendant's Exhibits J and K are received in

25  evidence)

F17eelh1                    Weitz - direct

1    BY MS. KUNSTLER:

2    Q.  Now, Dr. Weitz, can you turn to Defense Exhibit K?

3    A.  K?  Yes.  This exhibit is dated 3/30/11.  And the complaint

4    at that time was pain in right ankle along Achilles tendon

5    line.  No limitation of movement, but on exam under

6    musculoskeletal and ankle, foot, toes, it says, yes, edema,

7    swelling -- swelling and edema are the same thing -- and

8    ecchymosis, which is bruising or discoloration.

9    Q.  Now, again, in Dr. McKinsey's December 2013 report, he

10   states, the record shows no swelling.  Is this an accurate

11   description of the record?  Dr. McKinsey's report, he says the

12   record indicates no swelling.  Is that an accurate --

13   A.  Well, it says here that there's edema and swelling, but

14   they both mean swelling, so, yes, there's swelling.

15   Q.  Now, Dr. McKinsey date's Mr. El-Hanafi's DVT to six to

16   eight weeks before the September 2000 (sic) ultrasound, based

17   on the appearance of that ultrasound.  Is it possible to tell

18   from an ultrasound, from an initial ultrasound, when you have

19   no previous ultrasound for reference, when a clot started?

20   A.  I mean, in my experience with ultrasonography, it's

21   impossible to exactly date the onset of a clot from ultrasound

22   appearances.

23   Q.  So if you're looking at a new ultrasound, you can't say,

24   this clot is new, this clot is old, this clot's been here?

25   A.  Well, there are some appearances of an acute deep vein

1    thrombosis on ultrasound.  The vein might be dilated.  There

2    might be thrombus echogenic material that you can see that's

3    filling up the vein.  But that appearance can in some cases

4    persist for weeks or months.  And then it goes through a

5    progression to subacute conditions, where you start getting

6    some recanalization.  That means a channel is formed in the

7    blocked vein, and there starts to get some flow, but, again,

8    that appearance can persist for weeks or months and even be a

9    permanent situation in some cases.

10           So it's not an exact science where you can totally

11   date exactly when something started.  And I wish it were,

12   because it would make our job a lot easier.

13   Q.  So Dr. McKinsey disagrees with your opinion or your

14   conclusion -- your opinion that DVTs start in the calf.  He

15   says that DVTs start in any vein.  Is that accurate?

16   A.  Well, it is true that thrombosis can occur in any vein.

17   The most common veins to be involved are the veins of the

18   lower -- of the leg.  And most clots in the lower leg start in

19   the calf, and then they might just resolve or they might extend

20   into the more proximal lengths.  That's not 100 percent.

21   Sometimes clots can start in the thigh in certain conditions,

22   like pregnancy or something.  But in general, they start in the

23   calf and they progress and move up into behind the knee and

24   into the thigh.

25   Q.  Now, why is the location where they commonly start

F17eelh1                          Weitz - direct

1    important?

2    A.   Why are they?

3    Q.   Why is the location where they commonly start important?

4    A.   The only reason it's important is that, as we talked about

5    before, we try and make the diagnosis as soon as we can, so we

6    can initiate treatment.  And the goals of treatment are to

7    prevent the clot from extending, from getting bigger, because

8    if it gets bigger, there are two potential complications:  One

9    is that the bigger it is and the more extensive it is, the more

10   likely it is to break off, travel to the lungs, to produce a

11   pulmonary embolism, which can be fatal.  And the other reason

12   is that the more extensive it is, the more likely the patient

13   is to develop post-thrombotic syndrome and the more severe the

14   post-thrombotic syndrome is likely to be.

15            MS. KUNSTLER:  One moment, your Honor.

16   Q.   Now, I am handing you what's been marked as Defense Exhibit

17   L.  Can you tell me what this is.

18   A.   Yes.  This is labeled Exhibit L.  And this is an article

19   written by my friend and colleague, Clive Kearon, and describes

20   the natural history of venous thromboembolism.  It was

21   published in circulation in 2003.  And the first sentence of

22   the abstract of the paper, and of the introduction of the

23   paper, states that DVT usually starts in the calf veins from

24   where it may extend to the proximal veins and subsequently

25   break off -- break free to cause PE, or pulmonary embolism.

F17eelh1                         Weitz - direct

1              And then in the introduction, Dr. Kearon goes on to

2     give some of the fundamental references that document through

3     studies with X-rays of the veins, venography and other studies,

4     that that's indeed how they progress:  From starting in the

5     calf, usually, or sometimes in the valve cusps of the veins in

6     the calf, and then extending into the popliteal and more

7     proximal veins.  The popliteal vein is the vein behind the

8     knee.

9              MS. KUNSTLER:  Your Honor, I would like to offer

10    Defendant's Exhibit L.

11             MR. CRONAN:  No objection.

12             THE COURT:  Defense Exhibit L is received without

13    objection.

14             (Defendant's Exhibit L received in evidence)

15    BY MS. KUNSTLER:

16    Q.  Now, I would like to go back with you for a moment to

17    Defendant's Exhibit F, which is in the binder that you have.

18    A.  Exhibit F, yes.

19    Q.  And I'd also like to, with the government's indulgence,

20    like to hand up Government Exhibit 1, which is the record

21    that -- one page that -- two pages of records.  It has the

22    initial record that's the same as our Exhibit F and an

23    additional page.

24             Can you tell me what the -- well, actually, in

25    reviewing those records with you, in reviewing -- during the

F17eelh1                          Weitz - direct

1   break did you and I look at Government Exhibit 1 together?

2   A.  Yes.  Yes, I did.  So --

3   Q.  And what did we notice when we looked at Government

4   Exhibit 1 that we didn't notice previously?

5   A.  I do notice that on the -- on 5/16/2010 it looks like

6   the -- Mr. El-Hanafi was examined by an assistant, who then put

7   an assessment, early DVT versus Baker cyst versus other

8   popliteal problems, and then says in the plan, will consult

9   with Dr. Watson in the a.m.  And then on the subsequent page,

10  the -- a note dated 5/17/2010, that looks like is now signed by

11  Dr. Watson, says that -- it's hard to read the writing.

12  Doctors have terrible writing.  But some pain in the right

13  knee, possible Baker's cyst or transient bursitis.  Continue

14  aspirin and ibuprofen.

15          So that's where it sounds like the aspirin and

16  ibuprofen were continued at that point.  And I'm not sure

17  where -- talking about a follow-up examination, but that's what

18  the note says there.

19  Q.  So in looking at that record, it's your testimony that you

20  were incorrect earlier that it was Dr. Watson who made the DVT

21  differential diagnosis?

22  A.  Yes.  That's my -- that was my mistake.  It was the

23  physician's assistant who gave that differential diagnosis of

24  early deep vein thrombosis versus Baker's cyst versus other

25  popliteal pathology.  It sounds like Dr. Watson was falling on

1    the side of the possible Baker's cyst or bursitis.  I think,

2    again, the only way we can be sure would be to do an

3    ultrasound, which would have distinguished amongst all of those

4    possibilities.

5    Q.  And I guess my question is, looking at all of the records

6    in this case, the history of Mr. El-Hanafi's condition,

7    everything that you've examined, does this change anything

8    about your opinion in terms of the quality of care

9    Mr. El-Hanafi received or whether things should have been done

10   differently, or does your opinion remain the same?

11   A.  It really doesn't.  As I told you, I don't know exactly

12   when the deep vein thrombosis started, but certainly we have

13   documentation that at least in March of 2011 he was having pain

14   and swelling in the ankle and calf that wasn't responding to

15   analgesics, to aspirin or antiinflammatory agents, ibuprofen,

16   to compresses and so on.

17          It -- he continued to complain of that in July, and he

18   was examined again in July and found to have swelling in the

19   pain.  And that's when the ultrasound was ordered, and then it

20   was not done for two months.

21          So even if we said that it started in March of 2010,

22   we're still talking about four or five months of ongoing pain

23   and swelling until he gets the ultrasound ordered, and another

24   two months before the ultrasound is done and the DVT is

25   documented.  So it's still a delay.  So exactly when it

1   started, I can't say.  But it certainly was long-standing by

2   the time the ultrasound was ordered.  And there was still a

3   two-month delay before the ultrasound was done.

4          And if you're doing an ultrasound of the leg, you're

5   doing it to diagnose possible pathology.  Otherwise, we

6   shouldn't be wasting healthcare dollars to do a test.  So you

7   should be getting that test done promptly and looking for the

8   results.

9   Q.  Thank you.

10         Now, when you were reviewing Mr. El-Hanafi's medical

11  records, was this delay the delay two months between when the

12  ultrasound was ordered and when it was performed?  Did you note

13  frequent delays, or did you notice frequent delays at this time

14  throughout the medical records?

15  A.  In other people?

16  Q.  No, throughout Mr. El-Hanafi's medical records.

17  A.  I mean, yes, because we see at least in March, when he's

18  got symptoms and signs of leg pain and swelling, nothing is

19  done.  And then we go until July, when the ultrasound is

20  ordered with those same symptoms, and two months later it's

21  finally done.

22         MS. KUNSTLER:  One moment, your Honor.  (Pause)

23  Q.  Now, did you -- do you know what Mr. El-Hanafi has pled

24  guilty to?

25  A.  Do I know?

1   Q.  Do you know what Mr. El-Hanafi has pled guilty to?

2   A.  I do not.

3   Q.  Do you know anything about the crime or the offense in this

4   case or --

5   A.  I did look things up on the Internet about a month ago, but

6   I really don't know any of the details.

7   Q.  Did you know anything about the criminal case when you made

8   the decision to take this case on to be --

9   A.  I know nothing about it.

10   Q.  Did you know anything about it --

11   A.  No.

12   Q.   -- at the time you agreed to take this on?

13          Would it have made a difference, had you known more

14   about the offense or underlying crime in this case?

15   A.  No.  I'm looking at this case purely from the medical point

16   of view, to assess the problem that he has and what to do about

17   it going forward, and to assess the care that he received.

18   Q.  Now, have I shared any legal filings with you in this case,

19   any like legal argument or any legal, you know, documents

20   prepared by lawyers?

21   A.  I have not seen any such documents.

22   Q.  So I haven't provided you with anything that -- anything

23   from the government or from the defense in terms of legal

24   filings?

25   A.  No, you have not.

1          MS. KUNSTLER:  Can you hold on one moment?  (Pause)

2          Thank you.  No further questions.

3          THE COURT:  Thank you.  Is the government ready to

4   begin examination?

5          MR. CRONAN:  Yes, your Honor.

6          THE COURT:  All right.  I would suggest we go until

7   about 1:00 and then take an hour-and-15-minute break.

8          MR. CRONAN:  Sure.  Your Honor, I think I'll take the

9   Court up on your invitation to have Dr. McKinsey nearby.

10          THE COURT:  Very well.

11   CROSS EXAMINATION

12   BY MR. CRONAN:

13   Q.  Good afternoon, Doctor.

14   A.  Good afternoon.

15   Q.  Now, Doctor, would it be fair to say that DVTs are not

16   uncommon in people?

17   A.  Overall in the general population, one to three out of a

18   thousand people will develop DVT.

19   Q.  You yourself see about 20 patients a day when you're on

20   call who have DVTs?

21   A.  Well, remember that I have what you call referral bias,

22   because I work in a thrombosis clinic.  So the patients that

23   are referred to me are patients with either suspected DVT or

24   pulmonary embolism or thrombosis in some other site or patients

25   who have that we're following.  And likewise, on patients I see

F17eelh1                         Weitz - cross

1    in the hospital are patients who either have it or are

2    suspected to have thrombosis.

3    Q.  And you see people, obviously, who have post-thrombotic

4    syndrome as well?

5    A.  I do, yes.

6    Q.  People who have thrombosis or DVTs can live normal lives,

7    is that right?

8    A.  Yes, they can.  And there is different flavors to deep vein

9    thrombosis.  There are clots that occur in association with

10   transient risk factors, like surgery, for example.  And those

11   patients do very well after a short course of treatment.  And

12   then there are people like Mr. El-Hanafi, who develop DVT with

13   more uncertain risk factors but also have risk factors for

14   recurrent DVT.  And that becomes a more chronic condition.  And

15   then you're stuck with chronic issues that have to be dealt

16   with.

17   Q.  But even people who face the risk of chronic recurrence of

18   DVTs still can live normal lives with appropriate treatment,

19   isn't that right?

20   A.  They can live normal lives.  The thing that can limit the

21   quality of their life are the long-term consequences, such as

22   post-thrombotic syndrome.  So post-thrombotic syndrome,

23   especially in the severe form, like Mr. El-Hanafi has, can

24   severely decrease the quality of life and can impair your

25   ability to enjoy a normal life.

1    Q.  You would consider Mr. El-Hanafi to be on the severe end of

2    post-thrombotic syndrome?

3    A.  Yes, he's -- in my opinion, he's on the severe end of

4    post-thrombotic syndrome, based on my examination of him, the

5    things that he told me about what he can do and what he can't

6    do and the Villalta score assessment.

7    Q.  Things that he told you that he can and cannot do, that is

8    by definition based subjectively on what Mr. El-Hanafi told

9    you, is that right?

10   A.  Yes, they are -- the Villalta score looks at a combination

11   of things that he tells me --

12   Q.  So that's subjective as well, and we'll talk more about

13   that.

14            THE COURT:  Don't interrupt.

15   A.  That's subjective about what he says.  And also objective

16   of what I see in his leg.  So it's a combination of both of

17   those.

18   Q.  One thing you saw in his legs was a measurement of the size

19   of his calf, I believe, is that right?

20   A.  That's -- that's one thing that I looked at, yes.

21   Q.  And you looked at that because that's an indicator as to

22   the severity of the DVTs that Mr. El-Hanafi suffers, and the

23   post-thrombotic syndrome that he suffers from?

24   A.  The extent of swelling is one indicator, yes.

25   Q.  And in Mr. El-Hanafi's case, there's barely any difference

F17eelh1                         Weitz - cross

1    between his left calf and his right calf, isn't that right?

2    A.   In my book a two-centimeter difference is not barely any

3    difference.

4    Q.   Talking about two centimeters, which is less than an inch,

5    is that right?

6    A.   Two centimeters, but, still, it's a difference in size that

7    is in my book a significant indicator of post-thrombotic

8    syndrome.  And when I -- it's only one indicator on the scale.

9    And, sure, he could have had more difference, but that's after

10   he's wearing the stocking for most of the day, and he just took

11   it off for about an hour before I saw him.  So that's at its

12   best.  I'm sure that if I had looked at him at the end of the

13   day without a stocking, it would be worse.  And two centimeters

14   is still two centimeters.  That's a significant difference.

15   Q.   I'm sure you've seen patients with far, far worse, Doctor,

16   is that right?

17   A.   There are patients who have worse swelling, correct.  But,

18   still, as I look at all the criteria on the Villalta score, he

19   fits for what is by definition severe PTS.

20   Q.   Have you seen patients, for example, where one leg might be

21   almost twice the circumference of the other leg?

22   A.   I have seen the whole gamut of things in my practice.

23   Q.   So for that type of patient, you'd be looking at a

24   difference of about 30 to 40 centimeters, isn't that right?

25   A.   No, not that much.  You might be looking at a difference of

F17eelh1                         Weitz - cross

1    five centimeters or six centimeters, not 30 centimeters.

2    Q.  You've seen patients whose condition required invasive

3    surgery, is that right?

4    A.  With all due respect to Dr. McKinsey, the number of

5    patients that I sent for surgery for post-thrombotic syndrome

6    is small.  Unfortunately, there's -- the sorts of surgeries

7    that can be done to help that condition are somewhat limited.

8    But I do see patients who develop ulcers.  Fortunately

9    Mr. El-Hanafi does not have any ulcers, because those can be

10   difficult to heal.  But he is susceptible to venous ulceration.

11   Q.  His condition, Mr. El-Hanafi's condition right now, is not

12   so serious that you would recommend any sort of aggressive or

13   invasive surgery, would you?

14   A.  I don't recommend surgery for very many patients, no matter

15   how serious the post-thrombotic syndrome is.  I might recommend

16   some measures to heal ulcers.  Right now his condition, in my

17   opinion, is that of severe post-thrombotic syndrome.

18   Q.  You mentioned the reporting that Mr. El-Hanafi gave to you

19   regarding his condition, and then one of the things you

20   mentioned was that he said he's unable to run or jog.  Is that

21   right?

22   A.  He told me in the examination yesterday and in our

23   discussion, he told me that if he's trying to exercise and

24   tries to do deep knee bends or tries to jog, he cannot do those

25   without a lot of pain and discomfort.

F17eelh1                        Weitz - cross

1   Q.   Is there testing to determine an individual's ability to

2   run or jog with a condition?

3   A.   I'm not aware of any objective test to really do that,

4   because it would be limited by discomfort.  And he clearly --

5   clearly he's telling us that he has discomfort if he tries to

6   do those things.

7   Q.   Now, you recommend treatment for Mr. El-Hanafi's condition

8   going forward, whether in prison or out of prison, is that

9   right?

10  A.   I'm not sure what you mean by "treatment."

11  Q.   Sure.  Well, you recommend anticoagulation therapy,

12  correct?

13  A.   I recommend anticoagulation treatment, yes.

14  Q.   I believe you mentioned in one of your reports -- I'm going

15  to likely mispronounce this word, but Rivaroxaban treatment?

16  A.   I raised that as a potential option for Mr. El-Hanafi to

17  try and get away from the daily injections that he's currently

18  getting with the Lovenox, that low molecular weight heparin.

19  I'm a little bit worried about Rivaroxaban, because there's not

20  a lot of data about its use in patients with antiphospholipid

21  syndrome.  I am aware of studies that are ongoing, and I know

22  the results of some of those studies, but they haven't yet been

23  published.  I think it might be an option for him in the future

24  to get him away from the needles.  That's all I was thinking.

25            You can see the pictures we saw this morning of the

F17eelh1                          Weitz - cross

 1    bruising of his abdominal wall.  It's not very comfortable for

 2    anyone to be on injections every day for the rest of their

 3    life.  So it would be nice to be able to offer him something in

 4    the way of a pill, instead of an injection.

 5    Q.  And there would be oral options for Mr. El-Hanafi from --

 6    A.  Well, we don't have -- there could be oral options.  We

 7    don't -- he was on Warfarin, Coumadin at one point, but there

 8    was difficulty controlling the level of anticoagulation.  I

 9    don't think it's a great option for someone in the prison

10    setting.  And so I was exploring other potential options, how

11    good they would be for him.  I don't really know.  We need more

12    data.

13    Q.  And the injections, those are injections right beneath the

14    surface of the skin, is that right?

15    A.  These are given under the skin, yes.

16    Q.  Obviously it's not desirable, but a lot of people,

17    unfortunately, have to inject themselves because of medical

18    conditions, isn't that right?

19    A.  Well, yes.  I mean, a lot of people have to inject

20    medications under the skin.  For example, let's think about a

21    diabetic who might inject insulin.  But insulin isn't an

22    anticoagulant.  So you're injecting an anticoagulant under the

23    skin, which increases the risk of bleeding at the injection

24    site.  And of course you have a systemic, a whole body

25    anticoagulant effect, which increases the risk of bleeding.

1              THE COURT:  Could I interject for a moment.

2              You said that the injections increase the risk of

3    bleeding at the site.  If the injection is done properly and is

4    simply subcutaneous, does that, nonetheless -- is that

5    accompanied by a higher risk of bleeding at the site?

6              THE WITNESS:  So, your Honor, if the local -- if the

7    injection is done correctly, properly, with great care, the

8    risk of local bleeding is reduced.  But you can imagine that

9    you're giving the anticoagulant, and it gets into the

10   bloodstream, and now you've anticoagulated the blood.  If you

11   have trauma, even blunt trauma to your chest, you hit your

12   head, you're going to be more prone to internal bleeding

13   because you have your blood anticoagulate.

14             THE COURT:  I understand that.

15             THE WITNESS:  But the local bleeding, yes, the risk is

16   reduced if it's done carefully and properly.

17             THE COURT:  Now, we have seen photographs of

18   Mr. El-Hanafi's chest or abdomen that show bruising.  Is that

19   in your view the result of improper injection?

20             THE WITNESS:  You know, that's a good question.

21   The -- I think you can minimize the bruising.  And if you feel

22   his abdomen -- I couldn't really get that in the pictures, but

23   there are lumps there which are at the injection sites.  You

24   can minimize the bruising and minimize the formation of those

25   lumps, which are really just bruises under the skin, by more

F17eelh1                        Weitz - cross

1    attention to the injection technique to make sure that there's

2    pressure put onto the site after the needle is taken out.  All

3    of those measures can reduce it.  I have patients who are on

4    injectable anticoagulants like Mr. El-Hanafi for,

5    unfortunately, months or years.  And sometimes the abdomens

6    look like his.  Sometimes they look almost spotless.  So

7    technique is important.

8              THE COURT:  Thank you.

9    BY MR. CRONAN:

10   Q.  And the medication he's injecting into himself now is

11   Lovenox, isn't that right?

12   A.  That's the medication that he's on right now, is

13   Enoxaparin, or Lovenox.

14   Q.  And for an individual who has -- who is injecting himself

15   with Lovenox, what is the reported rate of internal bleeding?

16   A.  You know, we don't have a good record of that because there

17   aren't a lot of people on long-term Lovenox injections.  The

18   sorts of patients that we keep on long-term low molecular

19   weight heparin, such as Lovenox, they're usually people who

20   have, in the case of venous thrombosis, usually people who have

21   venous thrombosis in the setting of cancer.  And those patients

22   have a risk of major bleeding of about 5 percent per year.

23             I would think that because Mr. El-Hanafi doesn't have

24   underlying cancer, his risk of major bleeding is going to be

25   lower than that.  I would say that we mostly quote rates of

F17eelh1                    Weitz - cross

1    about 3 percent per year in patients who have long-term

2    anticoagulant therapy with either Lovenox or Warfarin.  Because

3    he's younger, that rate may be as low as 2 percent per year.

4              THE COURT:  If you could pause just a moment.  Thank

5    you.

6    Q.  And Mr. El-Hanafi doesn't have a history of bleeding that

7    you're aware of?

8    A.  No.  There's no particular history of bleeding.

9    Q.  And Lovenox is not a medication that's used rarely, is that

10   right?

11   A.  That?

12   Q.  That is uncommon.  It's a common medication?

13   A.  Yes, it's commonly used, most commonly used for prevention

14   of venous thromboembolism in low doses, in prophylactic doses

15   or low doses.  It's less commonly used for long-term treatment,

16   as I said, except in patients with cancer, or in his case,

17   because I guess the Warfarin wasn't a good option for him.

18   Q.  Well, it's frequently used, for example, for patients who

19   are pregnant, is that right?

20   A.  Yes, it could be used for treatment, for prevention or

21   treatment of venous thromboembolism in women who are pregnant.

22   Q.  And you have not ruled out whether or not Mr. El-Hanafi

23   could switch to oral medication in the future, have you?

24   A.  Well, he's been tried on Warfarin and not done well on

25   that.  And he was briefly on Rivaroxaban or Xarelto, and it's

F17eelh1                        Weitz - cross

1    unclear whether or not he had a recurrence on that.  So I think

2    with those two bits of history, I'm not sure that I would be in

3    a rush right now to switch him to an oral option.

4    Q.  And whichever course of treatment he ends up pursuing, he

5    ends up receiving, that would be the same course of treatment

6    whether he's in a prison environment, in a federal medical

7    facility or at liberty?

8    A.  Yes, you're right.  Whatever treatment is decided upon, he

9    would require that whether he's in the prison environment or

10   out in the community.  But I think in the prison environment,

11   there are other risk factors for bleeding that wouldn't exist

12   in the community environment.  I think the prison environment,

13   first of all, there is the possibility of fighting and getting

14   involved in altercations that might be associated with injuries

15   that could lead to serious bleeding.  And, of course, if a

16   bleeding -- if a bleed does occur -- and a bleed could occur

17   with uncontrolled hypertension; his blood pressure isn't being

18   controlled -- puts you at risk for stroke, for hemorrhagic

19   stroke, and you're on a blood thinner, an anticoagulant, that

20   increases your risk.

21         So the prison environment is certainly a less safe

22   environment for someone who's chronically anticoagulated than a

23   community environment, where you can avoid those sorts of

24   altercations, where you can seek rapid medical attention.  We

25   saw that getting an ultrasound took two months.  I'm not sure

F17eelh1                    Weitz - cross

1    how long it would take to get other forms of medical care in a

2    prison setting.  So I'm not sure that that's the best setting

3    to be on long-term anticoagulation.

4    Q.  You reviewed a lot of his prison medical records --

5    A.  Yes, I have.

6    Q.  -- going back to May 2010, is that right?

7    A.  Yes.

8    Q.  In those four-and-a-half, more than four-and-a-half years

9    of records, have you seen any indication that he had a physical

10   altercation at the Metropolitan Correctional Center?

11   A.  I haven't seen any of that so far, no.

12   Q.  And people get in fights outside of prison, too, right?

13   A.  Even?

14   Q.  People get into physical fights outside of prison?

15   A.  I'm sure they do, but I would guess that it's a lot more

16   common in prison than outside of prison.

17   Q.  Car wrecks are more common outside of prison than in

18   prison?  Car accidents are more common outside of prison than

19   in prison?

20   A.  I would think that car accidents are more likely outside

21   than inside.

22   Q.  Knife cuts could happen inside of prison or outside of

23   prison?

24   A.  Correct.

25   Q.  Now, Doctor, I want to talk to you a little bit about

F17eelh1                         Weitz - cross

1  Mr. El-Hanafi's blood pressure.  Do you have Defense Exhibit D1

2  in front of you?

3  A.  I don't.  I don't think so, no.  Yes.  Okay.  I've got it

4  now.

5  Q.  Do you see around midway through the first page there,

6  there's a list of blood pressure tests that are done on

7  October 15, 2014, four of them on that day, and then

8  November 19, 2014?

9  A.  I see the ones -- yeah, I see one on the 19th and four on

10  the 15th.

11  Q.  People often have elevated blood pressure when they see a

12  doctor than when they normally do; would that be fair to say?

13  A.  Yes.  There is what we call white coat syndrome, where the

14  doctor walks in with a white coat and the blood pressure goes

15  up.  And we see that from -- that the blood pressure is done,

16  say, on the 10/15.  They varied from diastolics of a high of

17  107 to a low of 96.  But even 96 is still elevated.

18  Q.  And what about on November 19th, about a month later, when

19  the blood pressure was at 80, the diastolic was at 89?

20  A.  That's right.

21  Q.  Where would you place that blood pressure on the scale of

22  high, moderate to low blood pressure?

23  A.  That's moderately -- that's increased.  It's higher than it

24  should be in a young man of Mr. El-Hanafi's age, but certainly

25  not as worrisome as a diastolic pressure that's in the high 90s

1   or over 100.  All I'm saying is the target for him should be

2   lower than it would be if you had hypertension, because he's on

3   a chronic anticoagulation therapy.  We want to keep it as low

4   as possible to lower his risk of bleeding.

5   Q.  Now, the high blood pressure, though, is not a consequence

6   of the deep vein thrombosis, is it?

7   A.  It -- it likely isn't, but it's possible that the

8   antiphospholipid syndrome could be contributing to the kidney

9   impairment, his renal function, and that kidney impairment in

10  turn could cause the hypertension.  So sometimes it's difficult

11  to know what's the chicken and what's the egg.  Those two are

12  possibly related.  But with antiphospholipid syndrome, there

13  can be thrombosis in blood vessels in the kidneys, which can

14  then cause hypertension and can cause impairment in renal

15  function.

16  Q.  Now, the antiphospholipid syndrome, that also is not caused

17  by a DVT, is that right?

18  A.  No, it's the other way around.  The antiphospholipid

19  syndrome probably contributed to the development of the DVT and

20  certainly puts him at risk for recurrent DVT, if he were to

21  stop anticoagulation therapy.

22  Q.  And that syndrome, the antiphospholipid syndrome, is

23  someone born with that?

24  A.  No.  It's an acquired -- that means we gain it.  And it's

25  an acquired abnormality.  It can occur early on in life.  It

1    can be secondary to diseases, such as Lupus or rheumatoid

2    arthritis, or can occur in the absence of those disorders, like

3    in Mr. El-Hanafi's case.  So he has what we call primary,

4    where -- because it's not secondary to some disease, primary

5    antiphospholipid syndrome.

6    Q.  Now, you mentioned a bit about possible renal impairment

7    that Mr. El-Hanafi may be developing.  Is that a consequence of

8    having a DVT?

9    A.  Not -- not so much of having the DVT, but, again, as I

10   said, it could be contributed to the -- to by the

11   antiphospholipid syndrome, which is -- could be contributing to

12   the DVT.  So that's the way that they can be interconnected.

13   Q.  And I believe you testified Mr. El-Hanafi is scheduled to

14   see a nephrologist for the renal issue?

15   A.  I don't know -- and I guess he's got the clearance to see a

16   nephrologist, but the way things work in the prison system,

17   from what I've seen, that might take several months.

18   Q.  And obviously there's medication for elevated blood

19   pressure, right, and there's medication for a renal condition,

20   if he does have one?

21   A.  I'm not sure that there would be specific medication for

22   the renal condition, but certainly one of the key parts will be

23   to control the blood pressure.  And I would hope that the

24   nephrologist will be looking for any other potential causes and

25   put him on medications that will do perhaps a little better job

F17eelh1                          Weitz - cross

1   of managing his blood pressure.

2   Q.  And could that medication be taken in conjunction with the

3   anticoagulation medication?

4   A.  Yes.  Yes.

5   Q.  Now, Mr. El-Hanafi had a genetic predisposition to

6   developing DVTs, isn't that right?

7   A.  He has a hereditary biochemical disorder called factor five

8   Leiden.  You can carry two genes for that, one from mom and one

9   from dad or just one.  He has just one, so he's what we call

10  heterozygous for that mutation.  Factor five Leiden is a weak

11  risk factor for deep vein thrombosis or pulmonary embolism.  It

12  increases the risk about twofold, but it is definitely a risk

13  factor.

14  Q.  And how much does his antiphospholipid syndrome increase

15  the risk factor for DVTs?

16  A.  Yeah.  The antiphospholipid syndrome is a much more serious

17  risk factor for recurrence.  And that's going to increase your

18  risk probably in the range of 15 to 20 fold.

19          So just to put that into perspective for you, if a

20  person had a DVT after surgery and required anticoagulation,

21  whether or not they had the anti -- whether or not they had the

22  factor five Leiden mutation would not influence my decision on

23  how long to treat them.  And if Mr. El-Hanafi had just that

24  abnormality, that wouldn't be a determinant on its own of how

25  long to treat him.  But the antiphospholipid syndrome is much

F17eelh1                          Weitz - cross

1    more of a risk factor for recurrence than the factor five

2    Leiden mutation.

3    Q.   And Mr. El-Hanafi is in good physical shape, is that right?

4    A.   Is in good?

5    Q.   Otherwise.

6    A.   He's in -- I mean, he's young and appears to be pretty

7    healthy, aside from his antiphospholipid syndrome and his

8    hypertension.  He could use a little more physical toning.

9         No offense, Mr. El-Hanafi.

10        But it's difficult for him to do that because he

11   can't -- he's trying to exercise, but he's restricted because

12   of his post-thrombotic syndrome.  He can't jog comfortably,

13   even doing knee exercises, as your Honor pointed out.  He could

14   do more upper body strengthening exercises, but cardiovascular

15   stuff will be difficult for him.

16   Q.   What about four-and-a-half, five years ago, when he was in

17   his early, mid30s?

18   A.   What about?

19   Q.   Four-and-a-half, five years ago, when he was in his early

20   or mid30s, without any indication of -- would someone in their

21   mid30s in good health, not overweight, absent some other

22   abnormality, be likely to develop a DVT on a longer plane

23   flight?

24   A.   On a -- without an anti -- you're just saying what's their

25   likelihood?

F17eelh1                          Weitz - cross

1    Q.   The likelihood of someone in their early to mid30s

2    developing a DVT on an airplane flight that is, say, 12 hours.

3    A.   You know, we hear a lot about DVT and long flights, but if

4    you think about how many people travel long distances, it's not

5    that common.  But it does occur.  And the ones we hear about

6    are the people who are well known personalities, like Serena

7    Williams, who developed a DVT on the -- after an even shorter

8    flight.

9    Q.   And is the likelihood of developing a DVT on a flight

10   reduced if the person is able to get up during the flight, such

11   as to go to the bathroom or move around?

12   A.   Absolutely.  It's reduced.  We have what we call -- often

13   the DVT associated with long flights is called economy class

14   syndrome, because people in economy class are stuffed in the

15   corner and they can't clamor over their seat mates to get up or

16   go to the bathroom or walk around.  And you can imagine that if

17   you're in restraints, or if you're surrounded by two bulky

18   guards, you're not going to be able to move your legs and

19   exercise and reduce your risk of deep vein thrombosis.  And

20   every booklet you have in the seat pocket of your airplane

21   tells you about doing exercises with your legs, but nobody ever

22   does them, except for me.

23             MR. CRONAN:  Your Honor, do you want me to keep going.

24             THE COURT:  We can keep going for, say, another 20

25   minutes.

F17eelh1                         Weitz - cross

1   Q.  Let me ask you a little bit about the symptoms of the deep

2   vein thrombosis.  What are some of the symptoms, some of the

3   main symptoms of a deep vein thrombosis?

4   A.  Well, typically people will have pain and swelling.  If

5   it's in the leg, they'll have pain or swelling in the leg.  It

6   often starts with swelling in the ankle that might proceed to

7   involve the calf.  They can have warmth of the skin.  They can

8   have dilatation of the superficial veins.  They can have

9   discoloration of the skin.  It can be red or it can sometimes

10  be bluish in color.  And the area tends to be tender to touch.

11  And they can have difficulty walking with pain when they try

12  and walk.  Those are some of the typical symptoms and signs.

13  Q.  Now, musculoskeletal pain in and of itself, do you consider

14  that to be an indicator of deep vein thrombosis?

15  A.  No.  When we have a person with -- who presents with leg

16  pain, we have to do a differential diagnosis.  And in the

17  differential diagnosis there might be included, might be

18  musculoskeletal causes of the leg symptoms.  It could be the

19  Baker's cyst.  If a Baker's cyst ruptures and cyst of the

20  synovial fluid travels down the leg, it can cause pain or

21  swelling.  So there's lots of things to consider in the

22  differential diagnosis of someone who presents with leg pain.

23      But someone who has pain and swelling in the leg

24  that's getting progressively worse and not responding to

25  analgesics, antiinflammatories, stretching, compressing, etc.,

F17eelh1                              Weitz - cross

 1   I think you have to start thinking about other pathologies.

 2   And I certainly would have DVT in my differential diagnosis.

 3   Q.   What about pain in a joint area?  Is that an indicator of a

 4   DVT?

 5   A.   If the pain is really localized to the joint only, there's

 6   no swelling in the calf or the ankle and you can reproduce the

 7   pain completely by just moving that one particular joint, that

 8   would make my likelihood of deep vein thrombosis -- it would

 9   certainly go lower on the list.

10   Q.   Now, on direct examination you spoke a bit about some

11   Bureau of Prisons records for a medical visit that

12   Mr. El-Hanafi had on May 16, 2010.  Do you remember that?

13   A.   May 16, yeah.

14   Q.   I believe it's Exhibit F or Government Exhibit 1?

15   A.   F, I've got it here.  Yes.

16            MR. CRONAN:  Your Honor, on direct we admitted

17   Exhibit F.  Exhibit GX1 is two pages of that exhibit.  We would

18   just more for both pages to be offered.

19            THE COURT:  All right.  As Exhibit 1?

20            MR. CRONAN:  Yes, your Honor.

21            THE COURT:  I take it no objection?

22            MS. KUNSTLER:  No objection, your Honor.

23            THE COURT:  Government Exhibit 1 is received without

24   objection.

25            (Government's Exhibit 1 received in evidence)

```
 1    BY MR. CRONAN:
 2    Q.  Do you have that exhibit in front of you, Doctor?
 3    A.  Yes, I do have it here.
 4    Q.  I believe, as you mentioned on direct, the notation for
 5    May 16, 2010, was by a physician's assistant, is that right?
 6    A.  That's what it looks like here.  I can't read the
 7    signature, but the last line there says consult with Dr. Watson
 8    in the a.m.  So I assume that it's a physician assistant, but I
 9    can't be 100 percent sure.
10    Q.  And I believe, if you look to the first notation on
11    May 13th, there's a mention of an E-B-A-R-B-Y, comma, PA.  Do
12    you see that, in type?  Maybe five lines down?
13    A.  Oh, yeah.  Okay.  Yeah.  Yes.  Okay.  I've got a circle
14    around that, so, yeah, I see that.  So that's a physician's
15    assistant.
16    Q.  Now, the notation for May 16, 2010, mentions pain in the
17    back of the knee, is that right?
18    A.  Pain in the back of the knee?
19    Q.  For that notation, maybe?
20    A.  Then in the calf.  There is more pain in the back of the
21    knee than in the calf.  Doesn't say that there isn't pain in
22    the calf.  It just says that there's more pain in the back of
23    the knee.
24    Q.  More pain in the back of the knee?
25    A.  Than in the calf.
```

F17eelh1                          Weitz - cross

1    Q.   It mentions pulsive, or good, I believe, or pulses -- yeah,

2    pulses are all good.  Do you see that, the next line after pain

3    in the calf?

4    A.   Yeah.  Pulses are all good.  Yeah.

5    Q.   What is -- and do you know -- do you have an understanding

6    of what that means?

7    A.   Yes.  I would guess that that physician's assistant

8    measured the pulses in -- presumably in the groin and in the

9    feet, and perhaps in the popliteal area, to make sure that the

10   arterial supply to the leg is good.

11   Q.   That --

12   A.   Doesn't help at all for veins.

13   Q.   And is there any mention of swelling in this notation?

14   A.   I don't see any mention of swelling in this examination.

15   Just the pain that's worse in the back of the knee than in the

16   calf.

17   Q.   And is there any mention of discoloration of the skin in

18   this notation?

19   A.   I don't see any mention of that.

20   Q.   What about tenderness?  Do you see any mention of

21   tenderness?

22   A.   Again, it just says pain in the back of the knee is worse

23   than in the calf.  I don't know whether that's pain, but the

24   patient describes the tenderness that the physician is

25   eliciting.

1   Q.  Would it be fair to say that there's no indication in this

2   note that Mr. El-Hanafi was presenting as a high risk or

3   likelihood of DVT?

4   A.  The physician's assistant put in the differential diagnosis

5   under assessment early DVT versus Baker's cyst versus other

6   popliteal problems.  So the physician assistant was thinking

7   about those three things, and the first thing that he or she

8   put down was early DVT.

9   Q.  Well, I appreciate that, Doctor.  I'm asking you as an

10  expert in this area, if you were presented with someone who

11  complained of pain in the back of his knee more so and then

12  less so in the calf, no swelling, no discoloration of the skin

13  and no tenderness, would you have assessed that individual,

14  that patient, to be presenting a high likelihood of having DVT?

15  A.  It's difficult to say without having examined the patient

16  at that time to actually see it for myself.  But certainly the

17  physician's assistant had that in the differential diagnosis.

18  Q.  If someone comes in to you -- we can put aside what's

19  written in this notation.  If someone comes in to you and

20  complains of pain in the back of their knee, less pain in the

21  calf, and no indications of swelling, tenderness or skin

22  discoloration, do you refer that person for an ultrasound to

23  determine if they have DVT?

24  A.  It's impossible for me to say without a little bit more

25  information, but I certainly would agree that it might not be

F17eelh1                      Weitz – cross

1    the highest probability for DVT at that time.

2    Q.   Would it be fair to say that every time a patient comes in

3    to you and complains of leg pain, you don't refer that patient

4    for an ultrasound?

5    A.   I see a lot of patients with leg pain, because that's what

6    I do.  What I do is I do a Wells score to determine the pretest

7    clinical probability, and there isn't enough information here

8    for me to really determine what the Wells score might be.

9    Q.   Doctor, do you have Defense Exhibit I in front of you?

10   It's a July 16, 2010, report from the Bureau of Prisons.

11   A.   I've got it here, yes.

12   Q.   Now, on page four on direct examination, I believe you

13   mentioned that swelling was indicated, on the bottom of page

14   four?

15   A.   On the bottom of page four, under musculoskeletal general,

16   it said swelling, and then in parentheses it says, yes.

17   Q.   Is there any indication of where there was swelling?

18   A.   On page eight of that same document, it says right leg

19   previously swollen since restraint was put during inmate's

20   transport from Oklahoma.  And on page ten of that report, it

21   says, pain in joint lower leg, and it talks about the

22   prescription of the ibuprofen and the aspirin.  So if we --

23   there's pain in the leg, there's swelling, and it appears to be

24   in that leg.

25   Q.   Now, the comment you just referred to, right leg previously

F17eelh1                        Weitz - cross

1    swollen since restraints were put during inmate's transport

2    from Oklahoma, do you know whether that was a report --

3    information reported by Mr. El-Hanafi or if that was an

4    observation by the treating physician?

5    A.   I don't -- I don't know.  I can't tell.  It's -- I don't

6    know.  It sounds like it's written by the physician assistant,

7    but I don't know where that's coming from.  But the indication

8    for the analgesics and the inflammatories for pain and joint

9    and lower leg and -- I don't know whether that came from

10   Mr. El-Hanafi or came from what the --

11   Q.   The prescription?

12   A.     -- person observed.

13   Q.   The prescriptions are for pain in joint, not swelling,

14   right?

15   A.   Well, of course the analgesics and antiinflammatories won't

16   do anything for swelling, but they will help to relieve pain.

17   But they do talk about swelling both in that musculoskeletal,

18   which is -- and in that other comment.

19   Q.   And in that comment it says, right leg previously swollen,

20   is that right?

21   A.   Well, previously swollen since restraint was put on.  So

22   that sentence makes me think that it was previously swollen and

23   it's been swollen since that restraint was put on after

24   transport.  But it's certainly open for interpretation.

25   Q.   Well, the medical term for swelling is -- can be edema,

F17eelh1                    Weitz - cross

1    E-D-E-M-A, is that right?

2    A.  That's -- that's a medical term, but I see doctors write

3    swelling or edema, yeah.

4    Q.  Edema means swelling, though, right?

5    A.  Edema means swelling.

6    Q.  On page eight, maybe about ten lines above the comment,

7    right leg previously swollen, isn't it reported on the record

8    here that there's no edema in the right lower extremity or in

9    the left lower extremity?

10   A.  It just says that the right leg previously swollen since

11   the restraint.  We have -- swelling under musculoskeletal is

12   yes, and review of symptoms.  So I'm assuming that there's

13   swelling now.

14   Q.  Well, on page eight, do you see where it says extremities,

15   colon, about midway down the page?

16   A.  Yeah.

17   Q.  And then the third and fourth line?

18   A.  It says -- yeah, it says none there.

19   Q.  For edema in the right extremity or in the left extremity?

20   A.  Yep.

21   Q.  Do you have Exhibit 3?

22   A.  I'm sorry?

23   Q.  I'm sorry.  Do you have Exhibit J, rather, in front of you?

24   That's a March 11, 2011, report?

25   A.  March?  I'm sorry.  I don't know what you're --

1   Q.  Defense Exhibit J, it's a dated March 11, 2011.

2   A.  Yes, all right.  I've got that.

3   Q.  Now, here there's a report of swelling, is that right?

4   A.  Yes.

5   Q.  Mr. El-Hanafi reported swelling from the right ankle to the

6   calf, is that right?

7   A.  That's what it says.

8   Q.  Now, page two of this report contains the results of an

9   examination, is that right?

10  A.  That's what it appears to be, yes, under musculoskeletal.

11  Q.  And that would be an objective examination as opposed to

12  subjective reporting from patient?

13  A.  Yeah.  From the symptoms that the patient is describing,

14  this looks like it's part of the physical examination, yes.

15  Q.  And noted swelling noted on the right ankle, right?

16  A.  So swelling noted on right ankle, tenderness of calf area

17  and popliteal area, noted prominent veins on the foot and ankle

18  areas and full range of motion.  Sorry.

19  Q.  Now, there is no indication of swelling in the calf over

20  here, is that right?

21  A.  There's swelling in the ankle and tenderness in the calf

22  and popliteal.

23  Q.  And swelling in an ankle could be caused by a variety of

24  things apart from a deep vein thrombosis, is that right?

25  A.  Swelling in the ankle could be caused by a variety of

F17eelh1                         Weitz - cross

things, but the tenderness in the calf and the popliteal area
suggests that it's not just something localized to the ankle.
Q.  Standing all day, for example, could cause swelling in that
area?
A.  Sorry?
Q.  Standing all day could cause swelling in the area?
A.  It -- it might, but it wouldn't cause the tenderness in the
calf.  It wouldn't cause the prominent veins on the foot and
the ankle.
Q.  And if swelling was caused by DVT, wouldn't more than just
an ankle be swollen?
A.  If you start with a calf DVT, so the clot is localized to
the calf, it's not at all uncommon to start to have the
swelling that first involves the ankle and then extends to
involve over time, would extend to involve the calf, but the
tenderness that's in the calf area and the popliteal area.  And
that swelling would certainly make me worry about the
possibility of DVT.
Q.  Would a DVT result in the entire foot being swollen as
opposed to just the ankle?
A.  It might be, or it could just be that you see puffiness in
the ankle, and that there is swelling in the foot.  It's hard
to know.  I wouldn't say that the level of detail in any of
these notes is very extensive, and would not pad -- if my
medical students gave me notes like that or my residents, I

F17eelh1                          Weitz - cross

1   would probably hand them back to them.

2   Q.   Would a local injury, such as an injury to an Achilles

3   tendon, would that be consistent with the symptoms that are

4   reported here?

5   A.   Again, an Achilles tendon problem might give you localized

6   ankle pain and tenderness along the Achilles ankle, but it

7   wouldn't give you popliteal pain.  It's unlikely to give you

8   even swelling.  It's possible it could, but, again, Achilles

9   tears are really difficult.  You can't move your foot.  I don't

10  know.

11          THE COURT:  This might be a good stopping point.

12          MR. CRONAN:  Yes, your Honor.

13          THE COURT:  It's now 1:30.  Let's resume at 2:45.

14  Thank you.

15          (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

100

F17eelh1                              Weitz – cross

1

2                                AFTERNOON SESSION

3                                    2:49 p.m.

4            THE COURT:  I'd like to ask counsel, roughly how much

5    longer do you expect to be?

6            MR. CRONAN:  Your Honor, I do not have much longer.

7    To be conservative, I would say 20 to 30 minutes, hopefully

8    less than that.

9            THE COURT:  Okay.  I'm not meaning to rush you, but I

10   have read the documents myself.

11           MR. CRONAN:  And we definitely want to finish today,

12   given our doctor's schedule.

13           THE COURT:  I'm sure.  I'm sure you do.

14           Okay.  We are then ready to resume.

15           MR. CRONAN:  Yes.

16           THE COURT:  Could you come forward, please.

17           MR. CRONAN:  I apologize.  Mr. Lockard will be joining

18   the table midway through this.

19           THE COURT:  Dr. Weitz, I remind you that you're still

20   under oath.

21   BY MR. CRONAN:

22   Q.  Doctor, do you still have exhibits in front of you?

23   A.  Sorry?

24   Q.  Are there exhibits still in front of you?

25   A.  Are there?

F17eelh1                    Weitz – cross

1    Q.  Exhibits, the documents.

2    A.  Yes.  Some.  I've got some here.  Which one are you looking

3    for?

4    Q.  Exhibit J.

5    A.  I've got Exhibit J here.

6    Q.  Now, we were talking about Exhibit J before we broke.  I've

7    got a couple of other questions.

8            With respect to the notation on page two regarding

9    swelling on the right ankle, when you see swelling secondary to

10   a DVT, swelling that results from a DVT, what causes that

11   swelling?

12   A.  Typically the swelling is caused by obstruction of flow out

13   of the leg.  It can be partial obstruction or complete

14   obstruction of flow, but some obstruction for blood flow out of

15   the leg.

16   Q.  Blood backs up?

17   A.  In a way, yeah, blood backs up.

18   Q.  Then it drains outside of the vein, would that be accurate?

19   A.  It can.  And of course if you elevate the leg in early deep

20   vein thrombosis, the drainage is helped.  So at the beginning,

21   the elevation might improve things.

22   Q.  And if the leg is not elevated, in what direction would the

23   drainage go, up or down?

24   A.  Well, obviously the gravity makes things go down.  So

25   you're going to get the most accumulation of the swelling in

F17eelh1                          Weitz - cross

1    the ankle and foot, and it's going to be worse if you're

2    standing and walking, as is the pain.

3    Q.  If there is a DVT in the ankle that causes swelling,

4    wouldn't swelling, therefore, go down to the foot area?

5    A.  It might, but it doesn't always go down into the foot, no.

6    Q.  Go to the next exhibit, Exhibit K --

7    A.  Yes.

8    Q.  -- which is a March 30, 2011, report.  Do you see that?

9    A.  I've got it.

10   Q.  Now, at the bottom of the first page there is an indication

11   under musculoskeletal, ankle, foot, toes, indicating swelling

12   and ecchymosis?

13   A.  Ecchymosis.

14   Q.  Ecchymosis means bruising, right?

15   A.  Bruising, yes, or discoloration.  It's hard to know.

16   Typically ecchymosis means bruising, but it could be -- mean

17   some discoloration.  I don't know.

18   Q.  With a DVT, do you get ecchymosis?

19   A.  You don't tend to get ecchymosis bruising, but you can get

20   discoloration, which to some could look like bruising.  And I

21   think we saw earlier this morning pictures of the ankle where

22   there's discoloration.  And that could be in some people's eyes

23   seen as ecchymosis, when really it's that hemosiderin

24   definition that we talked about.  But somebody might call that

25   ecchymosis.

F17eelh1                        Weitz - cross

1   Q.  Can you get ecchymosis with a sprained Achilles tendon?

2   A.  I suppose not a sprain so much as if you had a tear to the

3   Achilles tendon or a partial tear, you might get some bleeding

4   in that area.  I'm sure you could get -- but you'd have a lot

5   of bruising, not -- I think that would be a little bit

6   different, because if you really have damage to your Achilles

7   tendon, you have difficulty flexing your foot.

8   Q.  Let's go to the next record, which I believe is Exhibit --

9   I think it will be out of order alphabetically, but Exhibit G,

10  which is the July 27, 2011.

11  A.  Yes.

12  Q.  And I believe you testified about this one on direct

13  examination?

14  A.  That's correct.

15  Q.  And I believe you testified you had ordered an ultrasound

16  based on what you saw in this record, is that correct?

17  A.  Yes, an ultrasound was -- was ordered at this date.  And I

18  think that I would have ordered an ultrasound as well with

19  someone who had chronic pain in the right lower leg that was

20  going on for months and that didn't respond for -- to a variety

21  of nonspecific treatments.

22  Q.  Now, this report indicates -- does not indicate any

23  swelling, does it?

24  A.  No.  There's no mention here of any swelling in the actual

25  report.

F17eelh1                           Weitz - cross

```
1    Q.  And it mentions -- in fact, it mentions -- what does
2    pitting edema mean?
3    A.  That means swelling that if you press on it, it leaves an
4    indentation.
5    Q.  And this report mentions no pitting edema, is that right?
6    A.  That's correct.
7    Q.  And also no calf tenderness, calf redness, warmth or edema?
8    A.  That's what it says.
9    Q.  So there's no calf swelling indicated in this report?
10   A.  Not that's recorded, no.  They do talk about the pain.
11   Q.  And this report I believe notes also that Mr. El-Hanafi is
12   able to walk on his heels and toes without difficulty, do you
13   see that?  The line under no calf, redness, warmth or edema?
14   A.  Yes.  That's true.  It also says, though, on the previous
15   page that he reports that he has pain in the forefoot and calf,
16   and it reaches a level of 10, which is the highest level of
17   intensity when he walks for long periods of time.  So just
18   standing on your heels is not walking for a long period of
19   time.
20   Q.  Well, if someone is suffering from a DVT in their ankle or
21   in their calf, would they be able to walk on their toes or
22   their heels?
23   A.  It's very variable, depending on the patient.
24   Q.  And this report also notes no history of family or personal
25   DVT, right?
```

1   A.  I'm not sure that it's this report.

2   Q.  On page one, at the end of --

3   A.  That's right.  No history of DVT, self or family.  So no

4   prior history.

5   Q.  Now, Mr. El-Hanafi's hypercoagulability preceded his

6   arrest, is that right?  His arrest -- preceded May 2010?

7   A.  Well, we know that his factor five Leiden mutation is

8   hereditary, so he would have been born with that.  We don't

9   know the onset of the antiphospholipid syndrome because that

10  wasn't tested for until after he was diagnosed with the deep

11  vein thrombosis.  So the onset of that one, I don't know

12  exactly.

13  Q.  Is there a direct test for antiphospholipid syndrome?

14  A.  Is there a, I'm sorry?

15  Q.  Direct test for whether or not someone has antiphospholipid

16  syndrome?

17  A.  It's not just one test.  It's a constellation of findings

18  to make that diagnosis.  You have to have evidence of

19  thrombosis, of clotting, which he has, and you have to have

20  some positive blood tests, that Lupus anticoagulant test and

21  anticardiolipin antibody and some other test to show the

22  antiphospholipid antibodies that are positive on tests done at

23  least three months apart.

24  Q.  You would agree, though, it's not within the standard of

25  care to test a patient as a matter of course for factor five

F17eelh1                          Weitz - cross

1    Leiden mutation?

2    A.   I wish that you were right.   Unfortunately, I see a lot of

3    patients that get tested for factor five Leiden and for

4    antiphospholipid antibody as a matter of course when they

5    present with a venous thrombosis with DVT, particularly someone

6    who presents at a young age.   And my definition of "young" gets

7    pushed further and further, but I would say that someone who

8    has their first episode of DVT when they're in their 30s,

9    that's a young age.   It's not at all unusual for those sorts of

10   patients to have thrombo -- what we call thrombophilia testing,

11   which includes the factor five Leiden and anticardiolipin

12   antibodies and more specific tests.

13   Q.   I should be more specific.   For a patient who has not yet

14   revealed the presence of a DVT --

15   A.   No.

16   Q.   -- is it normal to test for a factor five Leiden?

17   A.   You wouldn't do that unless they have the DVT.

18   Q.   Now, DVTs progress through stages, is that right?

19   A.   DVT -- I don't think I understand.

20   Q.   Let me ask that better.   A DVT starts with being fresh or

21   acute, right?

22   A.   I think you're confusing what an ultrasound examination

23   might show versus what a patient with DVT presents with.   So a

24   patient with DVT has DVT, we treat it, and the reason we treat

25   it is we want to prevent it from getting bigger.   We want to

F17eelh1                        Weitz - cross

1    lower the risk of having a pulmonary embolism, and in some

2    cases the DVT resolves, the ultrasound shows complete

3    restoration of flow.  In other cases it doesn't resolve.

4    Q.  So the thrombus, the blood clot starts as being acute, is

5    that right?

6    A.  Well, anybody who comes in with symptoms of pain and

7    swelling in their leg, that -- and you diagnose a DVT, yes,

8    we'd say that's an acute DVT.

9    Q.  It then progresses to subacute and --

10   A.  We don't -- I don't use that terminology because it's not

11   helpful for me.

12   Q.  Well, it progresses eventually to the point of being

13   chronic, is that right?

14   A.  Again, it's not a helpful diagnosis because it really --

15   the only thing that's helpful for me in assessing a patient

16   with DVT is, have I given them adequate treatment for their

17   DVT, which means the duration of anticoagulation where I assess

18   at different intervals whether -- what's their risk of

19   recurrence if I stop anticoagulation versus their risk of

20   bleeding if I continue.  And I make decisions.  I don't -- I

21   don't use this acute, subacute, chronic.  They're not helpful

22   definitions for me.

23   Q.  Well, Doctor, when a thrombus is in the vein --

24   A.  Yes.

25   Q.  -- as it progresses, it matures and becomes incorporated

F17eelh1                         Weitz - cross

1    in the vein, almost like it becomes part of the wall of the

2    vein, isn't that right?

3    A.   That can happen in some cases.  It doesn't happen in all

4    cases.  Some clots remain totally occlusive for months.  Some

5    clots totally resolve over weeks or months and they disappear.

6    Others, yes, go through that progression that you've just

7    mentioned, where they come -- become adherent to the wall of

8    the vein.  And you recanalize.  You get some flow.

9    Q.   And when it becomes adhering to the wall of the vein, is

10   that sometimes called a mural thrombosis?

11   A.   Sometimes that can be called on the wall, like a mural,

12   yes.

13   Q.   And when that happens, that DVT no longer runs a risk of

14   breaking off and going into the lungs, isn't that right?

15   A.   I think that the risk is lower, but there's also still,

16   with that clot, that residual clot in the vein, that has been

17   associated with an increased risk of recurrence.

18   Q.   Have you ever seen a mural thrombosis break off and go to

19   the lungs?

20   A.   You know, the thing is that I don't do repeated ultrasounds

21   every few months in my patients unless it's going to change my

22   course of treatment.  So, I mean, it's much less likely, I

23   agree, that if you've got -- find it adherent and it stays the

24   same, the chance of it breaking off is lower.  But those

25   patients are also at risk for getting recurrent thrombosis on

F17eelh1                          Weitz - cross

1    top of that, which can break off and embolize.

2    Q.   Understood.  They're at the risk of a new thrombosis.  I'm

3    focused on the one that's embedded on to the vein.

4    A.   It's less likely to embolize at that point, I agree.

5    Q.   Now, have you reviewed a recent ultrasound for

6    Mr. El-Hanafi?

7    A.   Have I?

8    Q.   Reviewed a recent ultrasound?

9    A.   How recent?

10   Q.   Well, what's the most recent you've reviewed?

11   A.   I can't remember the exact date on the most recent one.

12   Q.   In the most recent one you reviewed, what was the nature of

13   his DVT condition?

14   A.   Well, it's more of the appearance of some flow around the

15   clot.  So it's more the appearance of that mural thrombus with

16   residual abnormalities in the vein.  And as I said, residual

17   abnormalities in the vein have been associated in some studies

18   with a high risk of recurrence.

19   Q.   Now, Doctor, you testified on direct about the Villalta

20   scale that you administered at the jail yesterday, do you

21   remember that?

22   A.   Yes.

23   Q.   And this assessment, if I understand correctly, is two

24   parts:  The first part is the patient's reporting, and the

25   second is your observations; is that accurate?

F17eelh1                         Weitz - cross

1    A.  That's correct.

2    Q.  And the patient reports his or her level of discomfort,

3    pain that he is experiencing at that point, is that accurate?

4    A.  Yes.  It's discomfort, itching, pain, right, pins and

5    needles sensation.

6    Q.  Leg heaviness?

7    A.  Sorry?

8    Q.  Leg heaviness, something else.  And all those are

9    subjective reports, right?

10   A.  They -- they are subjective measures, and the way the scale

11   tries to adjust for this subjectivity is to use a sliding scale

12   of severity, much like we've talked about, with these pain

13   measurements that go from zero to ten, you try and assess them.

14   Here, it's zero to three.

15   Q.  But even so, what one person considers pain level ten,

16   another might consider pain level seven?

17             THE COURT:  I think I've taken that point.  Thank you.

18   Q.  And Mr. El-Hanafi's reporting for those five factors

19   resulted in 13 out of 15, is that right?

20   A.  Yes.  I think that's what I said.

21   Q.  Three severe and two moderate?

22   A.  Right.

23   Q.  And that score alone, in your view, would have resulted in

24   a rating of severe post-thrombotic syndrome?

25   A.  That score would have, but so would the score that I got on

F17eelh1                    Weitz - cross

1   the objective findings.  That alone would have also put it in

2   the severe category.

3   Q.  Wouldn't you consider the ability for someone to exaggerate

4   pain or discomfort to be a drawback for this test?

5   A.  It's certainly a possibility, but the issue is that the

6   subjective symptoms that people have with swelling of the leg

7   vary from person to person.  Some people have these big legs

8   that we talked about before, and yet they don't complain of

9   much in the way of symptomatology.  Others have less swelling

10  and they have very severe symptoms.

11  Q.  Normally a person who meets with you doesn't have an

12  incentive to lie about the level of pain or discomfort they're

13  in, isn't that right?

14  A.  Normally?

15  Q.  Normally someone, a patient who meets with you, would not

16  have an incentive to lie about the pain or discomfort he or she

17  is in, isn't that right?

18  A.  I would hope that that's the case.

19  Q.  They want to get the right treatment?

20  A.  That's right.  But I think the way the Villalta score gets

21  around that is that you've combined the subjective with the

22  objective.  And in Mr. El-Hanafi's case, the objective that I

23  had also was enough to make a diagnosis of PTS, post-thrombotic

24  syndrome, that is severe.

25  Q.  Let's talk about the objective then, Doctor.  Do you have

F17eelh1                          Weitz - cross

1    Exhibit B1 in front of you?

2    A.  D?

3    Q.  That is the color diagram of the visual guide for the

4    assessment.

5    A.  No, I don't have it anymore.  I did.  Thank you.

6    Q.  And here there are photographs of legs with descriptions

7    that reflect whether the condition which I named -- swelling,

8    redness, etc. -- is not existent, mild, moderate or severe?

9    A.  That's correct.

10             MR. CRONAN:  Your Honor, would you like an extra copy.

11             THE COURT:  I have it.  Thank you.

12   Q.  Now, Exhibit B, do you have that?  That is your assessment

13   of the Villalta scale.

14   A.  No, I don't think I have that anymore.

15             MR. CRONAN:  May I, your Honor.

16             THE COURT:  Yes.

17   A.  Thank you.

18   Q.  If I could direct you, Doctor, to page two.

19   A.  Yes.

20   Q.  And on page two, this is the report of your assessment of

21   the six factors that you assessed, is that right?

22   A.  Right.

23   Q.  By the way, the last factor, pain during calf compression,

24   that's another subjective factor, right?

25   A.  Yes and no.  You're eliciting pain by squeezing, and you

F17eelh1                      Weitz - cross

1    can see on the patient's face whether you are eliciting pain.

2    So that's objective.  And that's not the last -- the last

3    factor is whether an ulcer is present, yes or no.  So that's

4    the second last one, yes.

5    Q.  Oh, I see what you're saying, Doctor.  But the pain, you're

6    still relying on what the patient tells you --

7    A.  No.  You're squeezing, and you can look at the patient's

8    face.  And when I squeezed Mr. El-Hanafi's calf, he winced and

9    drew his leg away.  That, to me, is evidence of quite moderate

10   discomfort with that maneuver.

11        THE COURT:  Mr. Cronan, I have the point concerning

12   what's subjective and what's objective.

13        MR. CRONAN:  I'm moving on, your Honor, but to another

14   question on the analysis done by the doctor.

15   Q.  If we can look at edema on the top.  And again, that is

16   swelling, right, Doctor?

17   A.  Yes.

18   Q.  And you indicated that the edema --

19   A.  Was moderate.

20   Q.  Was moderate.

21        Now, on Exhibit B1, there's a picture of a moderate

22   edema, along with the description, noticeable swelling and loss

23   of bony landmarks, moderate pitting with pressure over ankle or

24   shin.  Do you see that?

25   A.  I do.

F17eelh1                          Weitz - cross

1    Q.   Handing you what is in evidence as Exhibit C3.  What is

2    Exhibit C3?

3    A.   Right.  So what you can't see on the picture, though, but

4    when I pressed --

5    Q.   I'm sorry, Doctor.  My question is:  What was Exhibit C3?

6    A.   This is -- it doesn't have a number -- here it is on the

7    back.  C3 is a picture of his foot and lower part of the leg.

8    What you --

9    Q.   A picture you took yesterday?

10   A.   A picture taken yesterday, yes.  But what you can't see is

11   that when you press on the skin and you made an indentation,

12   and you could elicit that indentation all the way up the -- to

13   the midpart of his shin.  And we had a two-centimeter

14   difference in the circumference of the calf.  So that's edema.

15   Q.   Do we see noticeable swelling in that photograph of the

16   ankle?

17   A.   It's difficult to see it, but there is some puffiness

18   around his ankle.

19   Q.   Do we see loss of bony landmarks?

20   A.   There's some loss of the medial malleolus, below the medial

21   malleolus.

22   Q.   What time of day yesterday did you administer this test?

23   A.   Sorry?

24   Q.   What time of day yesterday did you administer this test?

25   A.   I can't remember exactly what time I finally got in there,

F17eelh1                          Weitz - cross

1    but it was around 1:30 in the afternoon.

2    Q.  Now, you directed that Mr. El-Hanafi should not wear

3    support stockings earlier that day, didn't you?

4    A.  I just said that I would like to see his symptoms at their

5    worst, and so that would be easiest if they were off.  I often

6    tell patients that I see in my clinic not to wear their support

7    stockings on the day that I examine them, because it's very

8    difficult for them at times to get them on and off.  And it

9    takes time away from my examination.  And I also like to see

10   just how bad things are.

11   Q.  The purpose of your evaluation was to figure out the

12   condition that Mr. El-Hanafi was in, correct?

13   A.  That's correct.

14   Q.  Not the worst possible condition that he could be in.

15   A.  Well, I think that --

16           THE COURT:  I think this is --

17   A.  -- seeing the reality of the condition is seeing what

18   happens when you're not wearing the stockings, as well as what

19   happens when you are wearing the stockings.

20           THE COURT:  I think this is fairly obvious and getting

21   argumentative.

22           MR. CRONAN:  I apologize, your Honor.  I think it goes

23   to the subjective and objective results.

24           THE COURT:  Which is the point that I've taken well.

25           MR. CRONAN:  Your Honor, if I just may clarify, if he

F17eelh1                          Weitz - cross

1   was told not to wear support stockings and the doctor testifies

2   support stockings alleviate pain discomfort and swelling, I

3   think it goes directly to reliability of this test.

4              THE COURT:  I don't disagree with anything that you're

5   saying.  I'm not sure it goes to the reliability, but it goes

6   to how comfortable he is, how well he is with the stockings on

7   as opposed to with them off.

8   BY MR. CRONAN:

9   Q.  Your recommendation going forward is Mr. El-Hanafi should

10  wear support stockings, is that right?

11  A.  Absolutely, yes.

12  Q.  And if he failed to wear support stockings yesterday, could

13  that have caused a two-centimeter increase in the circumference

14  of his calf?

15  A.  Let's just be clear:  He did wear his support stockings

16  yesterday.  He came with them on when I saw them, and he told

17  me that he had been wearing them up until I had him take them

18  off, when I started my examination and my questioning.  So he

19  was wearing his stockings yesterday when he first came in to

20  the room.

21  Q.  And, Doctor, lastly, just to be clear, the most recent

22  ultrasound you observed for Mr. El-Hanafi did not reveal any

23  free-flowing blood clots or any blood clots that appeared

24  likely to break off at any point in the near future?

25  A.  He does not -- that's right, he doesn't have any

1  free-floating blood clots in there.  He has evidence of

2  recanalized deep vein thrombosis with persistent abnormalities

3  in the veins.

4          MR. CRONAN:  Nothing else, your Honor.

5          THE COURT:  Thank you.

6          MS. KUNSTLER:  Your Honor, I have very few questions.

7          THE COURT:  Very good.

8  REDIRECT EXAMINATION

9  BY MS. KUNSTLER:

10  Q.  Dr. Weitz, do you still have Government Exhibit 1 in front

11  of you?

12  A.  I can't hear you.

13  Q.  Do you still have Government Exhibit 1 in front of you?

14  A.  1?

15  Q.  It's all right.  The government has provided me with a

16  copy.

17  A.  I'm not sure what I've got.

18  Q.  Here's a copy.

19  A.  Okay, that one.  Yes.

20  Q.  Now, you can recall the government asked you a number of

21  questions about that exhibit, correct?

22  A.  Yes.

23  Q.  And they asked you a number of questions about those

24  symptoms, the symptoms listed on the first page of that exhibit

25  and what those symptoms would lead you to suspect or consider.

1    My question is, really, if you have a patient with these

2    symptoms as listed on page one of the government's exhibit, and

3    you knew that patient had just been on a long flight, would

4    that raise your clinical suspicion even further?

5    A.   Yes.  I think that, again, as we discussed earlier today,

6    long-haul flights are a risk factor for deep vein thrombosis.

7    And even first-year medical students know that.  And if the

8    patient gave me a history of being on a long flight and came in

9    with symptoms that are pain in the back of the knee and in the

10   calf, and they had the history of a long flight, it would make

11   me think of deep vein thrombosis.  And clearly the physician

12   assistant here also thought of that, because he or she puts

13   early DVT as the first item on the list.

14   Q.   Now, what if that patient not only had -- if you knew that

15   patient had been recently on a long flight, but what if you

16   also knew that that patient had had a second prolonged period

17   of immobility, as is the case here?

18   A.   Well, the longer the period of immobility, the greater the

19   risk of deep vein thrombosis.  So your index of suspicion

20   should increase.

21   Q.   And when I refer to a second period of prolonged

22   immobility, do you know what period I'm -- or what I'm

23   referring to?

24   A.   Yes, I do.  Mr. El-Hanafi had a long flight from Dubai

25   to -- I think it was to Virginia, and then he had another

F17eelh1                    Weitz - redirect

1   episode where he was transported from Virginia to Oklahoma

2   through both a plane and truck or some sort of vehicle ride and

3   lots of waiting in between.  And I believe at that second

4   transport period he was fully shackled.

5   Q.  Now, let's turn to the differential diagnosis on -- still

6   on that same first page of Government Exhibit 1.  The

7   differential diagnosis -- you've repeated it enough.  It's DVT

8   versus Baker's cyst versus other popliteal problem, right?

9   Now, what is done to confirm diagnosis of a Baker's cyst?

10  A.  Well, if you want to confirm the diagnosis, typically you

11  would do an ultrasound to show there is a Baker's cyst.

12  Q.  And what is done to confirm a diagnosis of another

13  popliteal problem?

14  A.  Again, an ultrasound would help you evaluate what's going

15  on in the area of the knee, the popliteal area.

16  Q.  If you turn to page two of that exhibit, what are the two

17  conditions -- what are the conditions that Dr. Watson is

18  postulating in his differential diagnosis on the second page?

19  A.  Well, Dr.  --

20  Q.  His or her, sorry.  I don't know whether Dr. Watson is a

21  male or female.

22  A.  Dr. Watson is saying possible Baker's cyst or transient --

23  I think it's transient bursitis.

24  Q.  What is done to confirm a diagnosis of transient bursitis?

25  A.  Again, the Baker's cyst is a blister, if you will, on

F17eelh1                     Weitz - redirect

1   the -- on that synovial fluid, which is the bursa there before

2   the knee.  So both Baker's cyst and bursitis could be diagnosed

3   with ultrasound.  Certainly the Baker's cyst could be.

4   Q.  Now, from all of the medical records you've seen, does it

5   appear that Mr. El-Hanafi received any further diagnosis or

6   treatment for any of these possibilities?

7   A.  No, not until July, when the ultrasound was ordered.

8              MS. KUNSTLER:  Thank you.  No further questions.

9              MR. CRONAN:  Nothing, your Honor.

10             THE COURT:  Thank you very much, Doctor.  Please step

11   down.

12             (Witness excused)

13             THE COURT:  Would you like him to leave the exhibits

14   at the witness stand?

15             MS. KUNSTLER:  I believe some of them are mine, some

16   of them are the government's.

17             THE COURT:  Why don't I ask the doctor to bring them

18   down to both of you.

19             Whenever you're ready.

20             MR. LOCKARD:  The government calls Dr. James McKinsey.

21             THE COURT:  Yes.

22                         - - - - -

23

24

25

F17eelh1                        Weitz - redirect

1      JAMES F. MCKINSEY,

2            called as a witness by the Government,

3            having been duly sworn, testified as follows:

4      DIRECT EXAMINATION

5      BY MR. LOCKARD:

6      Q.  What is your profession, sir?

7      A.  I'm a vascular surgeon.

8      Q.  And where do you work, Dr. McKinsey?

9      A.  I'm at Mount Sinai Hospital.

10     Q.  What's your position there?

11     A.  I'm vice chairman of surgery and the systems chief for

12     complex aortic intervention for the entire Mount Sinai system.

13     Q.  And if you can look at the black three-ring binder that's

14     in front of you, we've assembled some exhibits there.  If you

15     can turn to Exhibit 34, which should be the last of those

16     exhibits.  We did not for convenience sake organize them in the

17     right order, but they are just there in front of you.

18            Is that your CV?

19     A.  It is.

20            MR. LOCKARD:  The government offers Exhibit 34.

21            THE COURT:  Any objection?

22            MS. KUNSTLER:  No objection.

23            THE COURT:  Government Exhibit 34 is received without

24     objection.

25            (Government's Exhibit 34 received in evidence)

F17eelh1                        McKinsey - direct

1    BY MR. LOCKARD:

2    Q.  So your education and qualifications and current position

3    obviously are reflected in this CV.  So just very briefly,

4    could you describe what your current practice is.

5    A.  As a vascular surgeon I treat all forms of vascular disease

6    with exception of that involving the heart.  And the

7    intracranial brain, both venous and arterial.

8    Q.  Does that include the treatment of thrombosis?

9    A.  Yes, it does.

10   Q.  You said that you were the vice chairman of the department?

11   A.  Department of surgery at Roosevelt, yes.

12   Q.  Does that include supervisory responsibilities in that

13   department?

14   A.  Yes, it does.

15   Q.  And have you also taught in the field of medicine?

16   A.  Yes.  I've taught at University of Chicago.  Most recently

17   I was at Columbia University for 12 years as the chief of

18   vascular surgery there, and also the director of the vascular

19   fellowship.  So I had many educational responsibilities, as

20   well as administrative responsibilities.

21   Q.  And have you also published articles in your field of

22   expertise as reflected in your CV?

23   A.  Yes, I have.

24   Q.  Now, you're in the surgical department.  Do you have

25   patients where you manage or diagnose deep vein thrombosis?

F17eelh1                        McKinsey - direct

1   A.  Yes, I do.

2   Q.  And are those typically surgical or nonsurgical patients?

3   A.  Most of them are actually nonsurgical.  Some of them we

4   will intervene upon, either as a way of treating a relatively

5   acute DVT.  Rarely I have to operate on chronic DVTs with

6   significant symptoms.  And then also for replacing filter

7   devices and things like that in respect to a DVT.

8   Q.  And you've been retained as a medical expert in this case,

9   correct?

10  A.  Yes, I have.

11  Q.  And that's by the United States?

12  A.  That's by the United States.

13  Q.  And what is your rate at which you're compensated for this?

14  A.  $400 an hour.

15  Q.  And approximately how much have you billed or been paid so

16  far?

17  A.  I believe it's around $12,000.

18  Q.  And you also have a separate fee for your appearance in

19  court today?

20  A.  Yes, I do.

21  Q.  What is that fee?

22  A.  That's $4,000 a day.

23  Q.  Have you previously served as an expert witness in other

24  cases?

25  A.  Yes, I have.

F17eelh1                          McKinsey - direct

1   Q.  Have those been civil or criminal cases?

2   A.  Civil.

3   Q.  And if you can now turn to Exhibits 31, 32 and 33 in that

4   binder.

5   A.  I'm at Exhibit 31.

6   Q.  If you could just look briefly at each one so that you are

7   familiar with what it is.

8           Are those reports that you've prepared in connection

9   with your expert services in this case?

10  A.  Yes, they are.

11  Q.  So let's look first at Exhibit 33.

12          MR. LOCKARD:  At this time the government offers

13  Government Exhibit 31, 32 and 33.

14          THE COURT:  Any objection?

15          MS. HEINEGG:  No objection.

16          THE COURT:  Government Exhibits 31, 32 and 33 are

17  received without objection.

18          (Government's Exhibits 31, 32 and 33 received in

19  evidence)

20          MR. LOCKARD:  So for identification and the record,

21  Government Exhibit 33 is a letter dated December 19, 2014, from

22  Dr. McKinsey.

23  BY MR. LOCKARD:

24  Q.  Dr. McKinsey, what does your December 19, 2014, report

25  generally relate to?

F17eelh1                         McKinsey - direct

1    A.  It was per the request that I actually evaluate

2    Mr. El-Hanafi.  I performed a physical exam and an ultrasonic

3    evaluation.  And my findings are carried out in this -- covered

4    in this report.

5    Q.  Now, in connection with that exam did you -- I believe you

6    said you also performed an ultrasound?

7    A.  I did, in conjunction with my radiology technologist.

8    Q.  If you could look at Government Exhibit 11, that should

9    also be in that binder.  And, in fact, there's a loose copy on

10   the shelf in front of you.

11   A.  I have it.

12   Q.  Does Exhibit 11 include pages from the ultrasonic

13   evaluation of Mr. El-Hanafi on that day?

14   A.  Yes.  We actually printed out every image to make sure we

15   had the full picture.

16   Q.  And if you could look at Exhibits 22 through 28 that are

17   also in that binder.

18   A.  It starts here at 21.

19   Q.  Thank you for that correction, Exhibits 21 through 28.

20           Are those photographs that were taken of

21   Mr. El-Hanafi's lower extremities during your exam?

22   A.  Yes, it was.

23           MR. LOCKARD:  The government also offers Exhibits 11

24   and 22 through 28.

25           THE COURT:  Not 21?

F17eelh1                          McKinsey - direct

1                MR. LOCKARD:  21 through 28, thank you, your Honor.

2                THE COURT:  Any objection?  Do you wish to object?

3                MS. HEINEGG:  No objection, your Honor.

4                THE COURT:  Government Exhibits 11 and 21 through 28

5        are received without objection.

6                (Government's Exhibits 11 and 21 through 28 received

7        in evidence)

8        BY MR. LOCKARD:

9        Q.  Dr. McKinsey, can you please just walk us through the

10       evaluation that you performed of Mr. El-Hanafi on that date,

11       plus steps you took, and we'll clarify those things as you go

12       along.

13       A.  Originally he came to the office.  First he was seen by my

14       PA, as I was unfortunately detained in the operating room.  And

15       she did her initial evaluation.  We started an ultrasound

16       evaluation.  I was able to then come back up to the office and

17       then completed the evaluation, physical examination, mainly

18       looking at his umbilicus, belly button down to his foot.  We

19       did listen to his lungs and this type of thing.  And then after

20       doing the exam, especially looking for the changes in his leg,

21       with both supine and then dependent, meaning lying down and

22       then hanging down.  And then we reperformed the ultrasound

23       evaluation so I could see the images in realtime as they were

24       being obtained.

25       Q.  Now, in connection with your physical exam did you also

F17eelh1                         McKinsey - direct

1  take a history of Mr. El-Hanafi?

2  A.  I briefly discussed where he was, what had been going on.

3  I summarized the history I'd gotten from reviewing his records

4  already.  Had some discussion with him regarding how he was

5  doing, what was going on.  He stated that, you know, he didn't

6  have a period of time where he had not been wearing his

7  stockings.  And since he'd been wearing his stockings, he said

8  he was able to be more active and able to do more.  And he was

9  doing well while he was wearing his stockings.

10          THE COURT:  Doctor, I'll ask you to slow down a bit

11  for the court reporter.

12          THE WITNESS:  I'm sorry.

13  A.  So after that, and then asking any issue of family history

14  of DVT, etc., I then proceeded to examine the patient.

15  Q.  And in your conversation with Mr. El-Hanafi about how he

16  was doing with the stockings, did he report to you any

17  limitations on his activities or daily activities that he was

18  suffering at that time?

19  A.  No.  Actually, his comment was he was doing well, as long

20  as he was wearing the stockings.

21  Q.  Did Mr. El-Hanafi report to you his subjective experience

22  of pain that he was suffering?

23  A.  He originally reported he had pain mainly in the area of

24  the ankle and then radiating up.  And he pointed to his calf,

25  but then he also pointed to an area at the right lateral aspect

F17eelh1                            McKinsey - direct

```
1    of his knee, pointed to a vein that was probably about two
2    centimeters, three centimeters in length of some dilatation of
3    his vein.  Then he described that the pain would go up the
4    inside of his leg, and he took his hand and ran it from the
5    ankle up along the inside of his leg to his knee and up to the
6    thigh, saying this was the distribution of his pain that he had
7    been having.
8    Q.  Did he talk about any other particular pain; for example,
9    nighttime pain?
10   A.  He did comment that he was also getting pain at night,
11   especially when he would bend his knee while lying down.
12   Q.  Now, before we move on to the rest of your exam --
13            THE COURT:  Slow down just a bit.
14   Q.  I'd like to break down those various reports of pain and
15   talk about each of them, in particular the significance of that
16   type of pain with respect to being typical symptom of DVT or of
17   post-thrombotic syndrome or not being a classic symptom of a
18   DVT or post-thrombotic syndrome.
19   A.  Well, his symptoms were mainly that of pain around the area
20   of the ankle, which really is very much not in what we see with
21   a deep vein thrombosis.  Certainly he -- the pain in an
22   isolated vein really doesn't go with a DVT.  We all have little
23   areas of enlarged vein.  But I did not see a feeding vein into
24   that or a draining vein.  So it was more an isolated segment.
25            The pain that he reported mainly when he took his hand
```

F17eelh1                          McKinsey – direct

1    and went from the ankle up along the inside of his leg by his

2    knee and up to the thigh was in the distribution of his

3    superficial vein, but certainly not what you would see with

4    someone with a deep vein thrombosis.  Generally someone with a

5    deep vein thrombosis, because of the obstruction of the vein,

6    you'll see generalized swelling below that level of

7    obstruction.  And they complain of a circumferential pain,

8    rather than a localized pain, on one side of the leg or the

9    other.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    F170elh2                    McKinsey - direct
```

2   Q.  And can you just explain what you mean, what is the

3   difference between a localized pain and circumferential pain?

4   A.  If I were to take a finger and point to one part of my

5   body, that would be a focal area of pain, because you say it

6   hurts right here.

7           But when someone has a deep vein thrombosis, the

8   entire extremity swells, at least in some cases.  And their

9   pain is more of a global, generalized pain involving that

10  entire area of the leg.  So they say their leg is heavy.  They

11  feel fullness in their leg.  But they generally do not point to

12  one point and say it hurts right here.

13  Q.  Why does deep vein thrombosis sometimes cause pain.  What

14  is happening that hurts?

15  A.  Well, it really depends.  There is two types of thrombosis.

16  One is a superficial thrombosis in the vein outside of the

17  fascial compartment of the muscles.  So that is really in the

18  fat tissue, right underneath the skin.  That is veins we all

19  see when -- and they are harvested for surgery.  And you can

20  get what we call a superficial thrombophlebitis, which means

21  that there is a clot that forms in the greater saphenous vein,

22  most commonly.  That will lead to a significant amount of

23  tenderness, warmth, and inflammatory responses ongoing.  And

24  that is sort of an example of how the body will respond to a

25  clot.

1          If you develop a deep vein thrombosis, what will

2     happen is a clot will form, and in many cases, patients don't

3     know it.  They are totally asymptomatic.  Because pathways

4     around that area of clot, or past that area of clot because it

5     is not completely blocking, are adequate and venous return to

6     the heart is fine.  In those cases where they either don't have

7     adequate collateralization, meaning alternate pathways, or

8     there is a significant obstruction, then the blood below that

9     level of the clot will actually become -- the veins become

10    engorged.  With that engorgement, there are stretch receptors

11    within the veins, as well as going down into the musculature in

12    the compartment, all that can cause pain.  The inflammatory

13    response of the vein that interacts with a clot can cause pain.

14    And, also, what can happen, is that as you have that

15    obstruction, the musculature in the veins within that become

16    engorged and embodied.  The problem with that is that, and this

17    is why you can see more of a systemic response, or a

18    generalized response, is that the muscular compartments are all

19    contained within the fascial components.  So that in the lower

20    leg, you actually have four fascial components.

21         The fascia of the compartments are actually very rigid

22    and don't really expand.  It's like a leather.  So if the

23    muscle becomes engorged and swollen, and veins become

24    congested, within that deep compartment, then they could have

25    pain as that muscle starts expanding.  And worse case, it can

1    expand to the point that you actually can have nerve injury and

2    start having numbness and tingling of the foot.  So it's a

3    congestion that leads to swelling, as well as inflammatory

4    response in the area of the clot.

5    Q.  And when there is swelling from a deep vein thrombosis, I

6    think you said that comes from when there is an occlusion in

7    the vein, and there are inadequate pathways around that

8    occlusion; is that right?

9    A.  To put it in lay terms, something we're all very familiar

10   here in New York, is if for some reason there is an accident

11   along one of the interstates, things back up behind it.  And,

12   generally, they'll back up until there is a place where we can

13   get an off ramp to go and get around that area of blockage.

14   And the same thing happens in the veins, as well as in the

15   arteries.  If there is an area that develops a clot, if there

16   is not adequate areas for the veins, venous blood to go around

17   that clot, then it becomes engorged.  And you get what we call

18   venous hypertension or high pressure within the venous system.

19   That's because the arterial system is still pumping blood down

20   to the foot, but it comes back in, it goes through the

21   capillaries, then it is trying to go back to the heart, it's

22   still being pushed by the blood coming in behind it.  It's kind

23   of like a block at an escalator, people keep piling up behind

24   it, piling up behind it.  So you get the vein becoming

25   engorged, because you have the pressure from the blood coming

1    from the artery and no place for it to go.

2          So you can see if you have a significant clot without

3    alternate pathways, that's when the extremity becomes

4    congested.

5    Q.  To pick up on your traffic jam analogy, if there is a wreck

6    up on 125th Street, would you see the traffic jam down on Canal

7    Street, or would you see it up where the wreck is?

8    A.  You generally see it -- and we have all experienced this.

9    If you have a wreck and you happen to be in front of that

10   wreck, you actually have smooth sailing, because everything is

11   backed up behind it.  So, generally, you'll see the effect of

12   that in an area that goes distal, in this case, or towards the

13   foot.

14   Q.  In other words, does the swelling ever skip where the

15   actual obstruction is, and start somewhere further down the

16   extremity?

17   A.  Swelling will generally start below the level of the

18   obstruction.  It doesn't necessarily have a skip zone, but it

19   will start at the level of obstruction, or the point where you

20   don't have adequate collateralization to go around that area.

21   Q.  Now, does Mr. El-Hanafi currently have an occlusive deep

22   vein thrombosis, based on your exam?

23   A.  He has a partially occlusive deep vein thrombosis.

24   Q.  So the swelling he has right now, is that the result of a.

25   DVT, or is that part of a post-thrombotic syndrome?

1    A.   The answer is yes to both.

2         He does have a DVT that, with a DVT, it will affect

3    the vein valves.  The vein valves are like locks, as you take

4    water from a lake of different altitudes.  So when the pressure

5    is greater below the vein valve, as if when you are standing,

6    whatever, the blood will then go back towards the heart.  When

7    the pressure gets greater above the vein valve than below, then

8    the valves close.  So that's the natural way we do it.  So when

9    you are walking, and moving, and your calf contracts, it is

10   literally like pushing toothpaste out of a toothpaste tube,

11   will push blood back towards the heart, the vein valves close

12   and the muscles relax, and that prevents the reflux going back.

13   That's called a cap pump mechanism.

14        What we see with patients with DVT, is that those vein

15   valves become nonfunctional.  Even if you dissolve a clot, most

16   of the time those vein valves still are nonfunctional.  So now

17   you have the blood, because it is not being actively pumped,

18   actually going backwards down because of that increased

19   pressure, and that leads to venous hypertension.

20   Q.   Did you make an objective assessment of the amount of

21   swelling in Mr. El-Hanafi's right leg, below the thigh?

22   A.   Right.  Again, to try to be objective about it, we came in,

23   he was not wearing his stockings that day.  He had been

24   sitting.  But when I came in, he was lying down, but he was in

25   a sitting position when I came in to see him.  I had him lay

1    down and actually I made measurements using the bottom aspect

2    of the kneecap as a landmark, and measured down 20 and

3    30 centimeters but I actually measured circumferentially around

4    the legs, on both sides.

5    Q.   And what did you find?

6    A.   Basically, there was no difference between the

7    circumference of each leg compared to the other.

8    Q.   And that's when he is in the laying down position?

9    A.   He was supining, yes.

10   Q.   Did you also examine Mr. El-Hanafi when his legs were

11   hanging?

12   A.   Yes.

13   Q.   What did you observe?

14   A.   He had some venous engorgement of both legs.  You could see

15   the veins becoming more engorged on both the left and the right

16   in the superficial veins, as well as the small cosmetic

17   telangiectasias, more on the right foot than the left.  There

18   was in fact a slight small area of hemosiderin deposition at

19   the area of the ankle on the inside.

20             THE COURT:  Spell that.

21   A.   H-E-M-E-R-C-E-R-D-I-N.  Actually it's hemo --

22   Q.   Okay.  And you talked, I think we heard a little bit about

23   hemosiderin deposition from Dr. Weitz.  Just remind us, is that

24   the leakage of blood into the surrounding tissue and then the

25   breakdown of the red blood cells?

1    A.  It is a very localized area.  We talked, you know, what

2    happens, is there is a natural communication between the

3    superficial veins and the deep veins of the leg.  And there is

4    generally four levels that we have of these perforators or

5    communication between the veins.

6        What happens when someone has venous hypertension, the

7    venous blood pools.  And because gravity, the further down away

8    from the heart it goes, when you are standing up, just like

9    when you are going into a pool, the deeper you go, the greater

10   the pressure.  So the distal, or most far from the heart

11   connection of perforators are called Cockett, C-O-C-K-E-T-T

12   perforators.  And what happens is, with increased pressure

13   within the vein, blood flow actually reverses and overcomes the

14   valves in those perforators, and then will pool from the deep

15   system into the superficial system.

16       Again, these lowest perforators are at the level of

17   the ankle.  So we'll see changes when the blood leaks out from

18   the vein because of this increased pressure, at the level of

19   the median lateral ankle, medialis.  And so those are some of

20   the very focal areas you see, and something you see fairly

21   early on.

22       THE COURT:  Slower.

23   A.  These are very well-defined areas that we see early on in

24   patients that have the post-thrombotic syndrome, or venous

25   hypertension in general.  You don't have to have a clot to have

1    these changes.  Lawyers, surgeons, teachers will also get these

2    type of changes with prolonged periods of standing.

3    Q.  I think it would be helpful to walk through your physical

4    exam using the photographs.  Before we do, I have just a couple

5    of preliminary questions about the exam itself.

6         Did you use a Wells scale in you're evaluation?

7    A.  No, I did not.

8    Q.  Are you familiar with what a Wells scale is?

9    A.  Yes, I am.

10   Q.  And why didn't you use a Wells scale?

11   A.  Generally, if you are trying to say is a patient at

12   increased risk of having a DVT.  I had guilty knowledge,

13   because this was what the whole evaluation was about.  So I

14   didn't see it necessary to test to see if he had a high

15   probability of DVT when I knew, in fact, he had a history of

16   DVT.

17   Q.  Did you use a Villalta scale?

18   A.  No.  Mine was more a direct evaluation.  Because my concern

19   with the Villalta scale is, as was pointed out in depth is it

20   is a very subjective, rather than objective tool.  It can be

21   used in research in trying to help quantify large groups of

22   patients, but it really does not help me on a day-to-day basis

23   of how I'm going to manage patients differently.

24   Q.  Does the outcome of a Villalta scale -- does the outcome or

25   a patient's score on Villalta scale, is that something that

1    would, in your general practice, affect your treatment

2    recommendations one way or another?

3    A.  Well, unfortunately, and was alluded to earlier, I wish we

4    had better therapy.  But regardless, if they come in and they

5    are a 5 or a 24, the treatment is the same.  And that is

6    generally support stockings and leg elevation, if they had

7    periods of swelling.  And, generally, at night, telling them to

8    elevate the legs on a pillow or two.

9           THE COURT:  I know I am becoming repetitive, but it's

10   very important for you to slow down so that we'll have a full

11   record here.  Both of you should slow down.

12          MR. LOCKARD:  Yes, your Honor.

13   Q.  So let's now take a look at the photographs from your

14   examination.  If you could turn to government exhibit 21.

15   A.  Yes, sir.

16   Q.  This is a picture of his left lower extremity in the

17   dependent position.  Obviously, you see the floor right below

18   his foot.  You can see an engorged vein, which is the greater

19   saphenous vein going on to the foot.  And you see small

20   telangiectasias or small cosmetic veins that are enlarged

21   there, as well as even a vein going on the top part of his

22   foot, about half way between his ankle and his toes.

23          You also note a kind of reddish-blue discoloration of

24   his toes, and some brownish discoloration at the level of the

25   toes, and even going on to the foot itself.

1    Q.  Doctor, you may have the only color copy of that --

2             THE COURT:  That's all right, I can look over his

3    shoulder, it's okay.

4    Q.  The left foot was not an extremity that suffered a DVT?

5    A.  That's correct.

6    Q.  What do you see, again, on exhibit 22.

7    A.  Twenty-two is just the outside or the lateral aspect of his

8    left foot.  And, again, you see some mildly engorged veins, as

9    well as brownish discoloration and some reddish-blue

10   discoloration of his toes.  And, again, coming down towards the

11   ankle area, a little bit of discoloration there also.

12            THE COURT:  Do you have any idea of what caused that

13   discoloration?

14            THE WITNESS:  This is him.  I means, you know, we all

15   have anything from being exposed to fungus, to just your normal

16   distribution of color pigments in your skin.  Certainly, I saw

17   no evidence that he had venous hypertension on the left leg.

18   But what we are seeing is some of the changes that we all put a

19   lot of stock in, even on his good leg.  So the discoloration,

20   the engorged veins, the more enlarged small capillary veins.

21   So this just may be the way he is.

22            You know, obviously, we all know people that have

23   varicose veins.  And they don't necessarily have had a DVT.

24   But prolonged periods of standing, genetics, whatever, can lead

25   patients to develop some increased pressure in their lower

1    extremities in their veins.

2    Q.  And exhibit 23, is that a photograph, again, of the left

3    foot in the laying-down position?

4    A.  That's in the supine position, so you'll notice, now, with

5    the leg elevated, you will see some drainage, but still

6    persistent veins on the top part of his foot.  And that

7    bluish-red discoloration has somewhat decreased, if not

8    completely gone away.  And you'll still see some of that color

9    change around the level of his ankle.

10    Q.  Now, let's look at exhibit 24.  On exhibit 24, are we still

11    on the left?

12    A.  Yes.

13    Q.  And what do you see -- what do you see of relevance in the

14    photograph?

15    A.  Well, again, now, this is with the leg elevated.  So it is

16    not having the effect of gravity as much.  But we're still

17    seeing these high or darkly-colored what we call

18    hyperpigmented veins, somewhat small, on his left foot.  And

19    even going up onto the level of his ankle.  So if you look at

20    the Villalta score, this would actually be a moderate to

21    severe, most likely, classification for his veins, just based

22    on this.  And that's his good leg.

23    Q.  Look at exhibit 25.

24    A.  This is his right leg on the outside or lateral view.  And

25    we're again seeing similar patterns where we see the engorged

1  veins going down onto the top of his foot.  The pigment

2  patterns we saw that were not dissimilar from the left foot.

3  And you can see some areas where you see those cosmetic veins

4  that are a little bit more darkly colored or hyper pigmented.

5      You also see the reddish-blue discoloration of his

6  toes.  Again, this is something more likely normal for him.

7  Q.  And then maybe we can just go a little bit more quickly

8  through 26, 27, and 28.

9  A.  Well, 26 is the inside of the same leg, the right leg, in

10  the dependent position.  You see a mild engorged vein, very

11  similar to what we saw on the left leg.  And perhaps a little

12  bit more of the small cosmetic telangiectasia or enlarged veins

13  on the inside of his foot, and heel.

14      We then look, as we elevate the leg, you see that

15  bluish discoloration disappear.  Again, because gravity is no

16  longer helping pool some of the blood in his foot.  And you see

17  the smaller veins that we mentioned.  And you see that the

18  greater saphenous vein now is starting to collapse some, and is

19  not markedly engorged.

20      And then, finally, on exhibit 28, it is the outside or

21  lateral view of the foot again, but up in the supine position.

22  And the findings are pretty much as we have described before;

23  decreased redness and blueness, decreased pooling of the veins,

24  and the same kind of splotchy type of pigmentation going on on

25  the top of his foot, down onto his toes, not hemosiderin

1    deposition.

2              THE COURT:  You said not, what?

3              THE WITNESS:  Not hemosiderin.  It's not the

4    breakdown products of red blood cells pooling after they have

5    leaked out of the vein.  This is something else that he has.

6    Q.  Now, let's look at the ultrasound.

7              THE COURT:  Exhibit?

8    Q.  Which is exhibit 11.

9    A.  I have the loose copy.

10   Q.  Now, what were your basic conclusions, based on your review

11   of the ultrasound?

12   A.  This is where I really wanted to evaluate using duplex

13   ultrasonography to evaluate the presence or absence of a DVT or

14   clot within the vein, as well as the flow patterns one can see

15   in relationship to position bearing down what we call a

16   valsalva to see how much reversal of flow are going the wrong

17   way in the vein could actually occur.  And we did mainly

18   obviously concentrating on the right lower extremity.

19   Q.  And what portion of the right lower extremity, or right

20   leg, what portion of the leg did you examine with the

21   ultrasound.

22   A.  Basically, we went from the iliac arteries -- now, this was

23   done again by my tech, with my observations went over it.  The

24   iliac arteries are the ones that are going into the pelvis that

25   drain the legs, going back to the big vein in the center called

1    the vena cava.  And we assessed those.  And we went, from

2    there, all of the way down, looking at both the deep veins as

3    well as the superficial femoral vein, or greater saphenous

4    vein, and going down.

5    Q.  How far down did you go?

6    A.  We went down until it was mid calf, going onto the foot.

7    Q.  And what did you find?

8    A.  Basically, what we found was, on the right, the common

9    femoral vein, which is the one -- or the iliac vein in the

10   abdomen was patent without any evidence of obstruction.  The

11   common femoral vein --

12   Q.  If I could interrupt.  When you say it is "patent," what

13   does that mean in lay terms?

14   A.  That means there is no obstruction within, so it is wide

15   open.  Venous blood is travelling through it without any clot,

16   any external compression.  It is normal.

17   Q.  Okay.

18   A.  We then go to the groin.  And we look at the common femoral

19   vein.  And it is widely open, patent, without evidence of

20   obstruction.  And it compresses very easily with simple

21   pressure.  And that's one of the tests we use.  When we are

22   looking to see is there something filling the lumen of the

23   vein, that may be very early where it won't show up on

24   ultrasound, what we'll actually do is take the probe and push

25   and see can that vein wall collapse or not.  If there is only

1    blood in it, without clot, then it will collapse right down and

2    almost wink at you type of a picture.

3            If there is clot in the vein, even -- and very early

4    clot, you really don't see as well with ultrasound, just

5    because it doesn't have the echo shadows that can occur for

6    ultrasonic waves to bounce off of.  You will actually see where

7    it won't collapse down, it will actually move with compression.

8    So we saw that the veins in the groin and the common femoral

9    vein were open without evidence of any blockage within them.

10           The most other -- one of the things we look at very

11   carefully is the profunda femoral vein.  That vein actually

12   drains the thigh.  And so it's one of the alternate pathways

13   for collateral branches that we talked about before.

14   Interestingly, as a surgeon, I can actually go in and remove

15   the superficial femoral vein, or what we now call the femoral

16   vein, and use it as a bypass for a larger organ or whatever I

17   need to reconstitute.  And patients generally have very little

18   symptoms, as long as the profunda femoral vein is open.

19           So that is one of the dominant things we use to

20   determine, do they have an adequate pathway for collateral

21   vessels to the drain and the like.

22           And his profunda vein was wide open.

23           THE COURT:  Remember to slow down.

24   BY MR. LOCKARD:

25   Q.  I'll back up to where we started this discussion.  Maybe if

1    I can spell iliac.

2    A.   I-L-I-A-C.

3    Q.   Femoral.

4    A.   F-E-M-O-R-A-L.

5    Q.   Profunda.

6    A.   P-R-O-F-U-N-D-A.   I'm not going to spell superficial.

7    Q.   I think that's -- I think that catches us up.

8    A.   So the profunda femoral vein is widely patent, open.

9    P-A-T-E-N-T -- open.

10          And then, as we look further down, I start seeing an

11   area that shows both the artery in the vein and there's good

12   flow going in the appropriate directions.   But, then, when you

13   get into the area in the upper-more part of the thigh, away

14   from the groin, probably about 4 or 6 inches below the groin

15   crease, we start seeing some thickening of the vein wall.   And

16   this is what we would call a chronic, or the chronic changes of

17   a vein due to a previous DVT.   And so, here, I'm seeing that --

18   and this is really showing that the vein still has flow going

19   through it, but the wall has thickened, because most likely

20   from a previous blood clot being in that area.   And that is in

21   the proximal, probably 4 to 6 inches from the groin.

22          We follow that down, going towards the knee.   And we

23   see that pattern persists, and that there is still flow going

24   through the femoral vein, but there is that thickening

25   throughout the vein wall itself.   This is very well organized.

1    I see it very nicely.  You can see the echo shadows now coming

2    through it.  That gives me an indication that this is an older

3    area of clot.

4    Q.  And is the vein that you are talking about now, is that the

5    vein where, based on your review of prior ultrasounds, is that

6    the vein where his DVT was?

7    A.  Well his DVT was in the femoral vein.  And then, also, in

8    the earlier studies in the popliteal, and even going into just

9    below the knee in the proximal tibial veins.  But we're now

10   looking up in the more mid thigh area.  So that it is worse

11   than it has been described before, but as we proceed down,

12   there were some changes I saw that were different than previous

13   studies I reviewed.

14   Q.  And approximately how much blood flow is getting through

15   that vein during your ultrasound?

16   A.  What we did was, this was actually taking the ultrasonic

17   probe and looking along the length of the vein.  We then turned

18   the ultrasonic probe 90 degrees, so now we are looking just as

19   if you took a cut through a loaf of bread.  You can now see it

20   on end.  And we saw about 50 percent of the lumen was still

21   open.  And the other 50 percent had these chronic changes of

22   previous deep vein thrombosis.

23   Q.  You are very careful about calling it chronic changes

24   associated with a prior DVT.  Why do you call it that, instead

25   of calling it a chronic DVT?

1    A.  Chronic DVT is really a term we're not using as much

2    anymore.  I think, basically, it is now it is really showing

3    that the vein has changed and, actually, the clot has become

4    integral into the vein itself, so it's not going to move, it is

5    not going to break free.  It is actually well incorporated into

6    the anatomy of the vein.

7            Again, as a surgeon, I have had the advantage over

8    most of my colleagues that are not surgeons, where I have

9    actually been able to operate and see fresh clot, and then

10   operate on veins that have had chronic clot, or even subacute,

11   something within comes to mind, eight weeks beforehand had a

12   DVT.  And what you find is, when you open the vein or artery

13   that has an acute clot, it looks, forgive the expression, like

14   jelly.  Or currant jelly, it is sometimes described.  Where it

15   is just kind of squishy.  Again, grape jelly is very

16   consistent, but easily movable, and you can just kind of

17   squeeze it like a paste in your fingers.

18           As you get into maturation process, as the clot

19   organizes, the particles within the clot, the fiber and

20   everything starts cross-linking and becoming more organized.

21   It then becomes more incorporated into the vein wall itself.

22   And having operated on these, where if they had been there for

23   a month, two months, what you many times will find is you can't

24   cut them out of the vein.  You have to remove the vein itself.

25   And it becomes very adherent and organized.  As it gets into

```
 1    the very chronic phases, that is again where it becomes
 2    fibrotic, meaning that it is really not like a jelly at all,
 3    and very, very different in appearance than what we see with
 4    acute blood clot.
 5    Q.   Okay.
 6    A.   So moving along again, we see that as we get down to the
 7    area just above the knee, we see that the vein is now open
 8    again.  And so where we had seen clot in some of the earlier
 9    ultrasound, I now see that there is flow that has returned back
10    into that area, or recanalize, as we call it.  And that goes
11    down through the popliteal.  And we really didn't see any clot
12    in the tibial veins, as we went further down.
13    Q.   Now, Dr. McKinsey, approximately how many patients have you
14    managed with thrombosis or post-thrombotic syndrome?
15    A.   I would say, conservatively, five, six hundred.
16    Q.   Okay.  And in your experience, how severe are the symptoms
17    of Mr. El-Hanafi's post-thrombotic syndrome at this time?
18    A.   Mild, at best.  I have seen patients that have come in that
19    have had need for urgent operation because they were going to
20    loose their leg if I didn't fix their blood clot.  That's a
21    very severe form, what we call phlegmasia cerulea dolens, or
22    phlegmasa alba dolens.  Then you can come into patients that
23    come in with ulceration.  And, as Dr. Weitz indicated, that is
24    a severe form of the post-thrombotic syndrome.  But you see
25    that, it's fairly common.  They come in with breakdown.
```

1    Because of that leakage of blood, and I should point out that

2    it really becomes a fibrotic environment, because of the body's

3    response to the chemicals that are released as the red blood

4    cells are being broken down by white blood cells or

5    macrophages.  Then we end up with that creating or having an

6    ulcer that forms.

7            Another significant portion of the population comes in

8    with significant leg swelling.  And I have had, just recently,

9    I have had a patient --

10           THE COURT:  I don't know how to slow you down, so

11   after each sentence, pause.

12           THE WITNESS:  Yes, ma'am.

13           I have had a patient -- just recently had one fly in

14   because of the significant swelling, where his leg was double

15   the size of his unaffected leg.  The issue really becomes how

16   to manage them, and how do they respond with it.

17           Acutely, we will generally make sure that we have an

18   idea of the extent of the blood clot, and then work to compress

19   the leg with support stockings to try and prevent that swelling

20   that can occur.  And, also, similar to a girdle, if you will,

21   the compression stockings help prevent that pooling increased

22   venous pressure in the leg from standing and exercise.

23           By having that girdle, if you will, or the support

24   stocking, that allows our patients to get up, be more active,

25   and do things without that significant swelling that can occur.

1   Q.   Do you have any other recommendations for Mr. El-Hanafi's

2   ongoing care and management?

3   A.   I think, you know, certainly he has the underlying

4   hypercoagulable state that was nicely outlined earlier today.

5   That is something that is not related to his DVT.  That is what

6   has happened to him, either because of genetics, or because of,

7   it could be nephritis.  We have already heard that he has some

8   reason renal issues.  That could help cause the

9   antiphospholipid-type syndrome.

10  Q.   Pause on that phrase for a second.  Antiphospholipid

11  syndrome; a-n-t-i-p-h-o-s-p-h-o-l-i-p-i-d?

12  A.   Uh-huh.

13         So, basically, as we are trying to, you know, this

14  patient does have an underlying hypercoagulable state.  The

15  other issue is that he had a DVT.  With that, he was treated

16  with anticoagulation.  And while on anticoagulation, he had

17  another DVT.  And in my mind, that is, especially in

18  conjunction with the other information we just mentioned, for

19  him to be on, most likely life-long anticoagulation, or at

20  least until investigators were able to come out and find what

21  is the best treatment for these patients that have the

22  antiphospholipid syndrome.

23         So with adequate, appropriate anticoagulation, either

24  orally or subcutaneously, and support stockings, and generally

25  just to the level of the knee, he should be able to be active

1    and lead a normal life.

2    Q.  If you had a patient that presented similarly to Mr.

3    El-Hanafi, would you recommend any life-style restrictions to

4    that patient?

5    A.  Really, no.  I mean I think what I generally will tell them

6    is put the stocking on first thing in the morning, wear it all

7    day long, take it off before they go to bed.  And then sleep

8    with their leg elevated on a pillow or two, just to help with

9    the passage of drainage of blood through their leg, and see how

10   they do.  And with that, I don't restrict their activity.  They

11   are able to walk, run, do whatever they want to do and,

12   generally, they do it quite well.

13           And he actually said that, with his stocking, he was

14   doing well.

15   Q.  Now, let's turn to away from the exam that you performed in

16   your office a few weeks ago, and talk about deeper back into

17   Mr. El-Hanafi's medical history.

18           Have you also reviewed other medical records, of his,

19   in connection with your engagement in this case?

20   A.  I was able to review the prison records as were made

21   available to me, as well as the comments from Dr. Weitz.

22   Q.  Have you also reviewed the records from outside hospitals

23   that have also treated Mr. El-Hanafi?

24   A.  Yes.  As part of his time, he did have outside studies done

25   in the hospital vascular laboratories.  I was able to review

1    those notes and, also, able to review the actual ultrasounds

2    that were obtained from either in the hospital or from the

3    offices.

4    Q.  I would like to try and read your overall impressions from

5    that review before we attack specific records that are in

6    there.

7              Overall, in your review of Mr. El-Hanafi's medical

8    records, have you seen, in that history, reports of pain,

9    and/or discoloration, and/or swelling in his right leg over the

10   course of those records?

11   A.  Throughout the course of the records, I saw several

12   descriptions of pain, mainly in the area of the ankle.  It

13   seems like that has been his major issue of the focal pain

14   comes from there, potentially involving the Achilles tendon,

15   and then starting to radiate more up into the inside of his

16   leg, and then going up to his thigh.

17             And it seems to be somewhat episodic which, again, it

18   was a deep vein thrombosis.  You would expect it to be

19   constant, and it would not be focal pain in a joint, such as a

20   knee or an ankle.

21             You generally would have people describing more pain

22   in the nonjoint areas, calf and thigh, because that's the ones

23   that are able to swell more, because you have the soft tissue,

24   as well as the musculature in that area that is able to swell.

25   Obviously tendons, bones, capsular spaces, as well.

1    Q.  Based on your review of those reports, do you have an

2    opinion of when the DVT in Mr. El-Hanafi's right thigh most

3    likely formed?

4    A.  Well, based on the ultrasound that we had available to us

5    from September of 2011, there were changes within that, based

6    on the ultrasonic images, that made me feel it was not fresh,

7    but certainly one that was in that four-to-eight week period as

8    it was starting to organize to become more the chronic changes

9    that we see with chronic DVT.  And with that -- we saw that.

10   And then, interestingly, I saw those changes in September.  And

11   that was also reported by the independent review of the

12   hospital.  And then when I compared it to the later

13   examinations going out into December, I saw that that clot had,

14   in fact, changed.  So that made me feel like it was not

15   something that may have had an extended period there, and had

16   stayed the same, but was in the normal progression that we see,

17   day in and day out, as clots go from more acute or fresh to

18   become more incorporated into the vein itself.

19   Q.  Okay.  And so that conclusion is based not only on your

20   general experience with the progression of a DVT, but also on

21   the changes that you saw in Mr. El-Hanafi's DVT in ultrasounds

22   taken over time?

23   A.  What I saw was, in the ultrasound back in September, that

24   looked like it was, again, fairly within that eight-week

25   period.  It then became more chronic.  And we actually saw

1    areas that may have recanalized that had initially clots that

2    went away.  There is a normal balance within the bloodstream

3    between factors that try and make clot, and factors that try

4    and break down clot.  And that is the body's way to try and

5    control this whole hemostasis or coagulation cascade.

6          We saw that some of the more clots around the level of

7    the knee actually dissolved completely.  We saw that the clot

8    that was in the thigh actually was originally totally

9    occlusive, then became partially occlusive.  So something had

10   happened.

11         Now I can't tell you that this is the -- I can say a

12   six-month old clot versus a two-year old clot.

13         What I can tell you is when I see a clot that is in

14   that first two-month window, with these changes, it is still

15   fairly subacute.  And then as it progresses in the time frame

16   you would expect to become more chronic in appearance, that

17   fits with the normal progression we see for clots.

18         So I would date, at least the clot that I saw as of

19   the September 2011 ultrasound, to be somewhere within two

20   months of that time period.

21   Q.  Without being able to place precisely where in that

22   two-month window it might have formed.

23   A.  We don't have that availability.  I can just say it is

24   probably within that two-month's time frame.

25   Q.  Why don't we look at government exhibits one through eight,

1  which should be in the binder in front of you.

2  A.  I'm at exhibit 1.

3  Q.  Okay.  Which I believe has already been admitted into

4  evidence at this hearing.

5          Is that one of the medical records you reviewed for

6  this defendant -- I'm sorry, is that one of the medical records

7  that you reviewed in connection with this case?

8  A.  Yes, it was.

9  Q.  Okay.  Now, I just want to talk very briefly about a

10 portion of the May 16th, 2010 report.  Or notes, rather.

11 A.  Okay.

12 Q.  Which is about midway through that May 16th, 2010 note,

13 where it appears that the person who performed this

14 examination, or took these notes, is talking about possible

15 causes of the pain that is being reported by the patient.

16          Do you see that?

17 A.  Yes, I do.

18 Q.  Okay.  And is that something you have heard described today

19 as a differential diagnosis?

20 A.  We had extensive conversation regarding the early DVT

21 versus Baker's cyst, versus other popliteal problems.  One that

22 was not mentioned before is that, in their examination, it was

23 mainly stressed the pain was in the back of the knee.  Again,

24 an area not one would see with a DVT.  And even went on to

25 further explain that that comparison between the two calfs were

1    very similar, at least for temperature and -- they feel the
2    same.
3    Q.  Based on your review of this report, or these notes, at
4    this time, looking at these notes, do these notes suggest to
5    you that DVT is a likely cause of the symptoms being reported?
6    A.  No, they say the patient had been exercising, doing
7    push-ups.  Pain is in an area of a joint.  None of that would
8    make me think of a DVT, especially without seeing any
9    difference in size.

10           She commented the size of the calfs were -- basically
11   feel the same, which would make me think that he really didn't
12   have significant calf swelling at that time, but isolated knee
13   pain.
14   Q.  These notes were taken after the patient was on an
15   international flight.  And there was a little bit of discussion
16   about Economy Class Syndrome.  Just what's your experience with
17   that phenomenon?
18   A.  It is a great catch phrase you see on TV and everything
19   else.  But it really has not been shown to make a difference,
20   i.e. if you are sitting in coach versus you are sitting in
21   first class, the actual incidence of deep vein thrombosis is
22   the same.  I was actually attending a meeting where they
23   presented on this.  And there was no difference between economy
24   class and business and first.  It is just being on a long
25   flight.

1   Q.  Not necessarily being squished up against a window in

2   economy?

3   A.  No.  We all kind of believe that, but it really hasn't

4   borne out to be true.

5   Q.  So there has also been some discussion of the defendant's

6   transportation, within the United States, wearing leg shackles?

7   A.  Correct.

8   Q.  In your experience, would cuffs or another restriction that

9   is too tight on an ankle, is that a factor relating to the

10  appearance of the DVT?

11  A.  No.  I mean if you are constrained, even tightly

12  constrained at the ankle, that may lead to foot swelling.  Just

13  like if you have a pair of exercise pants that draw together at

14  the bottom of your foot, and they swell below it.  It may lead

15  to local pain at the level of the ankle or the Achilles tendon,

16  depending on where it was shackled and what part of the --

17  unfortunately, or fortunately, I'm not an expert on shackles.

18  But, you know, if there is a point where there is a point of

19  irritation, that can lead to pain.  But it is not going to lead

20  to a blood clot, especially one that is above the level of any

21  constraint from the shackles themselves.  You would have to

22  have something -- if it's constraining around like that, you

23  would have swelling below, you are not going to have it above.

24  Q.  We also talked a little bit earlier about Baker's cyst.

25  Can you remind us, again, generally, what is a Baker's cyst and

1    what kind of effects or symptoms does it have?

2    A.  Most of incidental findings, meaning that we did another

3    study and, oh, look, there's a Baker's cyst.  They can cause

4    pain.  Generally, the ones that are intervened upon.  And it's

5    basically an outpouching from the capsule of the knee joint

6    going into the space behind the knee.  They can be small, or

7    become fairly large.  They are, generally, I agree with Dr.

8    Weitz, they are generally detected by ultrasound.  But there is

9    a difference.  You have to order, at least in the United

10   States, you order an ultrasound to rule out Baker's cyst, they

11   are not going to do a venous ultrasound.  They are just going

12   to do the test that you asked them to do.

13   Q.  In other words, if you order an ultrasound to rule out or

14   diagnose a Baker's cyst, you wouldn't be able to use that

15   ultrasound, you wouldn't see a DVT in that ultrasound.

16   A.  The techs may not look.  That's the difference, is that --

17   they are very much directed towards -- and, unfortunately, this

18   is, again, life in the United States.  They only get credit

19   and, hence, the institution gets paid for, if you have an

20   indication for the study.  And so if you are saying knee pain,

21   rule out Baker's cyst, they are going to look for a Baker's

22   cyst.  If they try and comment on the venous system and

23   everything else, that is not part of the evaluation for Baker's

24   cyst, and the diagnoses of rule out pathology, is no longer

25   accepted.

1          THE COURT:  Could you explain what that means, the

2     last part?

3          THE WITNESS:  Okay.  In the current reimbursement

4     model we have, if I come in, I would like to say rule out DVT

5     or rule out -- we get sent to our lab, rule out vascular

6     pathology.  In other words, cast a net and see what you catch.

7          Right now, for a laboratory to be paid for by the

8     government, a study, you actually have to have an indication,

9     not rule out.  So evaluation of leg swelling.  Evaluation for

10    Baker's cyst.  Then you can do an ultrasound for it and the

11    hospital will actually get reimbursed.

12         So we now get notes from our radiologists saying you

13    need to give us a more detailed reason why we're doing it,

14    rather than rule out.

15         THE COURT:  Okay, thank you.

16    Q.  The process of elimination isn't good enough, in other

17    words.

18    A.  I think there is a role for screening.  Unfortunately, it

19    is just not reimbursed.

20    Q.  So let's look, now, at government exhibit 2, which for the

21    record is a report relating to an encounter on May 25, 2010 for

22    Mr. El-Hanafi.

23    A.  Okay.

24    Q.  Have you reviewed that report?

25    A.  Yes, I did.

```
1    Q.  And what about the symptoms that are reported in this

2    report, how do those, in your mind, indicate DVT, not indicate

3    DVT?

4    A.  Their comment is mainly related to pain in the joint, as we

5    go through this.  And it does not really comment, per se, on a

6    history of leg swelling, or significant venous engorgement, or

7    enlargement, anything along that line.  So their main point is,

8    again, looking for an indication or pain in the joint itself.

9    And they are treating it appropriately, if they felt it was

10   pain in the joint, with a nonsteroidal antiinflammatory

11   ibuprofen.  They also felt he had a history of sprain or strain

12   in the neck, which has resolved.

13          Are there other specific points you want me to comment

14   on -- I'm sorry.

15   Q.  Certainly.  If you look at government exhibit 3.  And,

16   again, this is, for the record, the July 16th, 2010 encounter

17   date with Mr. El-Hanafi.

18          Is this another one of the records that you reviewed

19   in connection with this matter?

20   A.  Yes, it is.  Basically, they are saying he appeared

21   somewhat anxious.  But, then, as they come through the

22   examination --

23          Just -- I want to make sure.

24          -- they basically say that he has swelling under

25   musculoskeletal, but no other real comment, except for
```

1    swelling.  Don't give a location for it.

2           Generally, when you think of musculoskeletal, you

3    think of joint issues, not muscles, per se.  And, then, when

4    you come down on the actual physical exam, they note:  No

5    evidence of lower extremity edema on the right, and no evidence

6    of low extremity edema on the left.

7           So again, they are not seeing any swelling of either

8    lower extremity on their assessment there.  And they also note

9    full range of motion for both the left and right leg.

10   Q.  What about varicosities or calf tenderness?

11   A.  Calf tenderness.  So they note, on their physical exam,

12   this is their findings, that they have no tenderness in his

13   calf.

14   Q.  And what about with respect to varicosities in the lower

15   extremities?

16   A.  They note no varicosities consistent with increased

17   pressure in the veins.

18   Q.  In other words, DVT can cause varicosities, and they didn't

19   see any in this exam, right?

20   A.  Certainly deep vein thrombosis may cause varicosities.  It

21   doesn't necessarily do, but its absence doesn't support the

22   diagnose of a DVT.

23   Q.  Let's look, now, to what's been marked as government

24   exhibit 4.  Is this another one of the records that you

25   reviewed?

1    A.  Yes.  This is from 3/11/2011.  And subjectively, meaning

2    what he was complaining of, he was complaining of pain and

3    swelling starting from the ankle again, going up into the calf

4    and now up into the back of the knee and into the right thigh.

5    He does say this started about 10 months ago.  And relates it

6    to the cuff of the ankle again, potentially local trauma in

7    that area.

8            As we move through, they note that he has swelling of

9    the right ankle on page two of three.  And they do note some

10   tenderness in the calf area and popliteal area.  And some

11   increased veins on the foot.  But he has full range of motion.

12   Their feeling is that he has knee pain in the lower leg, and,

13   again, treat him with nonsteroidals.

14   Q.  In your view, which of these, if any, symptoms are

15   consistent with DVT diagnosis or not indicative of DVT?

16   A.  Well, again, it is pain starting from a joint, an ankle.

17   And that's not where you are going to see the swelling and

18   increased venous pressure that really leads to the

19   post-thrombotic syndrome.  So it is unlikely that pain from DVT

20   is going to start at the ankle.

21           THE COURT:  One part of your testimony has been

22   confusing me.  In the records where they read:  "Pain in joint,

23   lower leg," you leave out lower leg.  Is that significant?

24           THE WITNESS:  No.  I was assuming they meant that was

25   which joint, identifying a location of the body.  But it

certainly adds nothing, or excludes anything by saying lower

leg.

Q.  So, for example, if the indication for:  "Pain in joint,

lower leg," referred back to, under musculoskeletal, where it

says: "Swelling noted on right ankle, tenderness in the calf

area and popliteal area," does that affect you're evaluation of

these symptoms?

A.  I think, again, we are trying to evaluate over a period of

time.  And as I mentioned before, DVT symptoms, generally, are

not episodic, where they come and go.  They should be constant.

So where we are seeing more musculoskeletal pain where you have

irritation in the joint space and things like that, that can be

more episodic.

        Judge, your point, also, when I was interpreting it,

it was my interpretation was that if I was thinking pain in

joint and lower leg, I would have made that distinction versus

pain and joint, comma, lower leg.  I was interpreting that

meaning a defining region, rather than duality.

Q.  Identifying the joint --

        THE COURT:  I guess I think of the lower leg as

encompassing more than a joint.

        THE WITNESS:  I agree, where I was seeing that as

saying rather than a joint somewhere else, they were saying a

joint, comma, lower leg.

        THE COURT:  Located in the lower leg.

1           THE WITNESS:  Right.  What happens with these reports,

2     having had to deal with electronic medical records, it I all by

3     pull down.  And so you have a section that says lower leg.

4     Then you can say pain.  So then it will print out:  Pain,

5     comma, lower leg.  Or swelling, comma, lower leg.  So you have

6     areas that you work through as you are using electronic medical

7     records that are kind of pre-scripted for you.

8           And so that's the way I see this written is the

9     computer kind of filling in the blanks and, also, why you see

10    we have so many pages, because these are all computer generated

11    by pull-down, click, click, click.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          THE WITNESS:  Before you there is also now mandated by

3     the government, who do this type of thing, so it's not

4     something you need to be -- it's the penal system.

5          And if you look on page two of three on 3/11/2011, the

6     way I was interpreting it, you see if they have foot and ankle

7     areas, they put and in there, meaning they're seen as two areas

8     they're discussing, rather than a region of the body that would

9     have been under pull down.

10         THE COURT:  One second.  If you take a look at page

11    two of three in this exhibit, in the middle of the page, it

12    says, indication of, comma, knee, comma, pain in joint, comma,

13    lower leg.  Now, presumably those are not all precisely the

14    same thing.  They're different things separated by a comma.  So

15    your assumption that if a comma separates something, something

16    else, it doesn't mean it's something in addition, I'm confused.

17         THE WITNESS:  It's working -- and I haven't seen their

18    electronic medical records, so I am making an assumption here.

19    But generally what you'll do is you'll come through and it will

20    say symptoms, and you have little bunch of bubbles, and you

21    click knee, pain in joint, lower leg, and you can click, click,

22    click.

23         THE COURT:  So we don't know one way or the other?

24         THE WITNESS:  Yes, ma'am.  But generally, when I've

25    seen it, there's an "and" if they're talking about two areas.

1    But I agree, it seems a little unusual.  Say I don't know of

2    anywhere a knee would be separate than the lower leg.  But if

3    you look at the next line down, it says right ankle, pains and

4    swelling.  So they make a distinction when they're talking

5    about the two.

6              THE COURT:  I see.

7    BY MR. LOCKARD:

8    Q.  So besides the medication that was prescribed as a result

9    of this, the cephalexin capsule, C-E-P-H-A-L-E-X-I-N, and the

10   Naproxen tablet, what other medical action was recommended or

11   prescribed from this visit?

12   A.  They recommended a -- getting a plain X-ray, two views of

13   the ankle.  Specific reason for evaluation of ankle, pain and

14   swelling.

15   Q.  And does that request for an ankle X-ray as opposed to a

16   knee or some other X-ray indicate to you that the focus of the

17   complaint was on the ankle?

18   A.  Certainly, when you order an ankle X-ray, you're only going

19   to generally get the ankle area.  So I'd assume that was the

20   area of focus and concern, and also my interpretation of

21   continuing to seeing comments regarding the ankle.

22   Q.  And if you look at Exhibit 5, which is a report of an

23   encounter dated March 30, 2011 -- so several weeks later --

24   what, if anything, did you see in this report as it relates to

25   being indicative of DVT or not indicative of a DVT?

1    A.  Well, two things is the chief complaint is orthopedic and

2    rheumatologic.  It's not DVT.  So they're still working on the

3    assumption that his symptoms are most likely driving them to an

4    evaluation of a joint space or a bony issue.

5         They do -- pain is somewhat ill-defined as cramping,

6    aching and dull, but is separated by upward slashes, very

7    different than what we saw, which is commas.  They do note that

8    the Achilles tendon itself has no limitation of movement but is

9    very tense.  It's a very tense tendon.  And calf has -- I

10   assume this is musculoskeletal spasm.  So they're, again,

11   focusing on the ankle, the tendon attached to the -- to help

12   stabilize the ankle.  Then it's an insertion point, meaning

13   when it hooks up to the muscle in the calf.

14        So this, again, goes to some concern that something is

15   going on at the level of his ankle, his symptoms are being

16   attributed to the ankle region and the surrounding areas,

17   meaning the musculature coming up.

18        We then go to a point where they say there is

19   ecchymosis -- I believe this is the visit -- muscle aches,

20   stiffness, but not -- they don't notice swelling per se.  At

21   the bottom of the page, page one of two, under examination,

22   which is where the medical provider is actually examining, and

23   again, it's the ankle, foot and toes.  Specifically commenting

24   on that region of the body, saying that there is swelling in

25   the area of the ankle, foot and toes, edema, swelling -- again,

F17eelh3                    McKinsey - direct

1  redundancy, because we both -- we've ascertained that's the

2  same.  And ecchymosis, which, again, is bruising.

3         You will not generally get ecchymosis in the ankle,

4  foot and toes from a DVT.  If you've had some trauma, injury to

5  the Achilles tendon, bruise, bump, that's what you're going to

6  get your ecchymosis from.  So the physical findings there,

7  again, go along with -- they're concerned that something is

8  really going on with his right ankle joint.

9  Q.  Is a musculoskeletal spasm in the calf area, is that an

10  indicator of DVT?

11  A.  No.  It really is not.  Charlie horse may be one way we can

12  describe it also in layman's terms.  The pain is generally more

13  of a constant stretch type of thing.  It's not a spasmodic type

14  of pain.

15  Q.  In fact, if we can look at Government Exhibit 6, which is a

16  sick call request dated June 29, 2011.

17  A.  Yes.

18  Q.  Is this one of the records that you reviewed in connection

19  with this engagement?

20  A.  Yes, we did.  I had to review it when I initially received

21  the records.

22  Q.  Now, does this appear to be the patient's own description

23  of the need for medical attention?

24  A.  This is -- the first component of it is generally what the

25  patient is complaining of.  And then the subjective component,

1   where he'll come in and -- the patient will come in and say,

2   This is why I'm here.  And so what is the problem?  And it

3   says, pain and swelling of right -- pain and swelling and right

4   foot, not calf.  Can only walk on my toes due to extreme pain

5   in the ankle area.  Not calf, not knee, not thigh.  Need to see

6   doctor as soon as possible, ASAP.  Painkillers and ice not

7   working.  Pain increased last night.

8   Q.  And if you look down in the -- towards the bottom third of

9   the page, is there a description, another description of where

10  the pain was located?

11  A.  Again, they had to ask, where's the pain?  He describes it,

12  right calf down again into the foot.

13  Q.  Now --

14  A.  Now, it's interesting that he says that he can walk on his

15  toes.

16  Q.  What does that say to you about --

17  A.  Well, as we described earlier, if you've got an issue with

18  a venous hypertension, a DVT, blood clot, that generally leads

19  to engorgement and swelling in the facile compartments, the

20  deep -- you have the four different compartments in the leg.

21  Q.  And then in lay terms, where are those four compartments?

22  A.  Well, you have two in the back, one in the -- on the front

23  and one on the side.

24  Q.  Where are they in relation to your calf muscle?

25  A.  Well, the two in the back are the superficial and deep

1    posterior compartments, and then you'll have an anterior

2    compartment, meaning the top, and a lateral compartment,

3    meaning the side.

4    Q.   In other words, am I hearing you correctly that the calf

5    muscle -- the calf muscle is in some of those compartments that

6    you described?

7    A.   Well, all the muscles that work the ankle and the foot are

8    in those compartments.  You have opposing -- it's like a pulley

9    system, where the muscles in the back will help, you know,

10   bring the leg up, bend the knee and then work at the ankle

11   level.  The ones on the top help bring the foot up.  The ones

12   in the back bring the foot down.  The reason for that

13   teleologically, the reason for the compartments is to

14   compartmentalize the function.  So you have several muscles

15   doing similar actions.  You put them in the same space, and

16   then you bind them together with an outer wrapping that's

17   nonexpansile, that sort of focus the function of those muscles.

18   Unfortunately, because of that outer covering, when the -- if

19   you have backing up of venous blood, again, being pushed

20   forward by the arterial system, goes through the capillaries

21   and comes back in the veins and can't go anywhere, you have

22   congestion.  And those muscles become swollen and tender.

23        And so if you go up on your toes, as we all know, your

24   calves tense.  And so if the muscle is being engorged and

25   becoming tender, the last thing you're going to want to do is

F17eelh3                        McKinsey - direct

1    make the muscles tense and put more pressure on them.  So,

2    again, it goes to if he's going up on his toes and able to

3    walk, then I'd be more concerned, is there something going on

4    locally at the heel level, where he doesn't want to put

5    pressure on that heel?  Not my field of expertise to define

6    ankle issues per se, but it certainly goes against a

7    significant clot that's causing engorgement and swelling of the

8    muscles as you're suddenly going to tense a muscle to walk.

9    Q.  I believe if we turn to Government Exhibit 7, which will be

10   the next one, which for clarity of the record is a report of an

11   encounter on July 6, 2011.

12          Again, is this one of the records you reviewed in

13   connection with this matter?

14   A.  Yes, I did.

15   Q.  And on July 6th, about a week after that June 29th sick

16   call request, what is the complaint that's being relayed in the

17   subjective portion of the report?

18   A.  He again comes in, chief complaint of orthopedic and

19   rheumatologic issues and complaints of pain.  My right foot

20   bottom hurts for the last two months, since two months ago.  I

21   have had no injury to cause that.  This is from the tight

22   cuffs.  The ankle still hurts.  He does note his right leg is

23   swollen since I was arrested in Virginia due to the tight cuff.

24   I was X-rayed two months ago here.

25   Q.  Now, can you sort of break down what's being reported there

F17eelh3                         McKinsey - direct

1   in terms of things that might be indicative of DVT and things

2   that are not indicative of DVT?

3   A.   Again, he's complaining of pain on the bottom of his foot.

4   Generally you're not going to have that pain associated with a

5   deep vein thrombosis.  And that's more a local phenomena,

6   pressure phenomena.  Whether it was from the -- an injury to

7   his ankle or Achilles tendon region, I don't know.  Again, if

8   the tight cuffs surround his ankle, that certainly could have

9   irritated his ankle joint and the Achilles tendon region.  But

10  certainly it's not -- you can't say that a tight cuff around

11  the ankle is going to lead to a DVT above it, since venous flow

12  is going away from that area, rather than towards it.

13  Q.   And if we look down to the exam portion under

14  musculoskeletal, in the ankle, foot and toes area, what's the

15  first observation of that exam?

16  A.   First normal bony landmarks so he doesn't have significant

17  swelling in the foot that would cause you not to be able to see

18  his ankle morphology and the bones in his ankle and foot.  He

19  has normal range of motion, again, going against any type of

20  inability to move his calf.  They do, in the ankle, foot and

21  toes region note swelling edema and tenderness.  And this,

22  again, is some of the problem with the electronic medical

23  record.  Then they also say it's decreased range of motion.  I

24  would assume that since they -- as the last thing they said

25  trauma.  This is a negative statement, but one would assume if

F17eelh3                         McKinsey - direct

1   they mentioned the trauma, they would at least try and

2   elucidate it further.

3   Q.   And then --

4   A.   They comment, normal exam, full range of motion, nontender

5   on palpation.  So, again, everything that goes along with

6   something that is really not a significant finding, especially

7   with exception of some ankle or foot pain.

8   Q.   And now let's go to Government Exhibit 8, which to

9   identify, for the record, is a report of a, quote/unquote,

10  encounter on July 27, 2011.

11          Again, is this one of the records that you reviewed in

12  connection with this matter?

13  A.   Yes, it is.

14  Q.   And what is your view of the symptoms that are being

15  reported and being found on examination in this encounter as it

16  relates to indicative or not indicative of DVT?

17  A.   He's, again, seen with chief complaint of lower extremity

18  pain.  He attributes it to the tight ankle cuffs or foot cuffs

19  as ascribed here.  Been seen in sick call before.  Nothing

20  really that would give me further -- pain is in the forefoot

21  and calf, but not able to discern if it's radiating from calf

22  to forefoot or vice versa.  Originally said the pain is five.

23  It was ten before, when he walks for long periods of time.

24  More of a self-reported type of history there.  They noticed

25  some mild -- on their physical examination, under

1   musculoskeletal, they noticed that there's some mild

2   reddish-blue coloring in comparison to the left but no edema

3   or -- there's mild tenderness in the aforementioned area.  I'm

4   assuming to the ankle.  No calf tenderness is noted.  No calf

5   redness is noted.  There's no warmth or edema and there's full

6   range of motion.  He was able to walk on his heels and toes

7   without difficulty.  As per our previous discussion, I have

8   some concern on -- that would not -- that would make me feel

9   less likely for him to have a DVT.  There appears to be

10   adequate palpable pulses down in his foot.  And the rest of his

11   exam is really unremarkable.  He has no popliteal tenderness at

12   this point in time.  And he has normal strength and normal gait

13   under examination.

14   Q.  And what's your evaluation of whether this report indicates

15   to you that DVT is a likely source of these or a less likely

16   source of these symptoms?

17   A.  This sounds like we -- we're going to check everything out,

18   but I don't have a high clinical suspicion that this is

19   actually the case.

20           THE COURT:  We've gone for quite a while without a

21   break.  Maybe we should take a ten-minute break.

22           And let me ask counsel during the break to talk to one

23   another and give me a feeling for whether we'll need to reserve

24   time tomorrow morning.  Thank you.  So we'll be on a ten-minute

25   break until a few minutes to 5:00.

1          (Recess)

2          THE COURT:  When Mr. El-Hanafi comes in I'll be asking

3     you for your estimates.

4          Counsel, can you give me your estimates of how much

5     longer you think you'll be?

6          MR. LOCKARD:  Your Honor, I estimate about 20 minutes.

7          THE COURT:  And on cross?

8          MS. HEINEGG:  Half an hour to 40 minutes.

9          THE COURT:  All right.  The court reporter is fine

10    with one more hour.  So without speaking too fast, we'll

11    continue.

12         I'd like to preview what is one of my main questions

13    for each doctor, and that is:  What extent, if any, do you

14    differ with one another as to, one, how much pain the defendant

15    has been in to date, due to his physical state, without any

16    attention to what caused it, just what he has experienced; and

17    secondly, looking to the future, what you expect his pain to

18    be, and what care do you think he needs?

19         MS. KUNSTLER:  Your Honor, should we have Dr. Weitz

20    come back on the stand to address that question?

21         THE COURT:  If he'd like to.  I think it might be

22    helpful to elicit this right away from Dr. McKinsey, then you

23    can see if Dr. Weitz disagrees.

24         Do you have my questions in mind, or do you want them

25    one by one?

1          THE WITNESS:  Probably better if I take them one by

2     one so I can give you a full answer, answer your questions

3     fully.

4          THE COURT:  Do you have any way of estimating the

5     degree of pain that Mr. El-Hanafi has experienced due to his

6     medical problems in the past four years?

7          THE WITNESS:  I think obviously pain is a very

8     subjective type of situation.  And we have many people that can

9     have severe pain, and many people that feel they're having

10    severe pain that haven't had a real opportunity to feel pain.

11    So one of the things I always use is if you've had a kidney

12    stone, if you've ever had labor, how does this pain compare to

13    that?  Unfortunately, we can't use that here.

14         THE COURT:  Or root canals.  Go ahead.

15         THE WITNESS:  But I think from what you've seen in my

16    interactions with him and the description here, his pain has

17    mainly been described to the area of the ankle.  I don't see a

18    significant sign of change -- this is where Dr. Weitz and I

19    will most likely disagree most strongly -- in the ramifications

20    of his deep vein thrombosis, meaning that he has minimal

21    swelling.  He has minimal changes in his feet.  He does not

22    have pitting edema.  I don't see significant varicoceles.  And

23    by his own statements, when he's compliant with his support

24    stockings, this was not -- he wasn't noncompliant, but when he

25    is able to wear his support stockings, he actually does fairly

F17eelh3                    McKinsey - direct

1    well, by his comment to me.

2           So I think if he has -- he has limitations moving

3    forward will be that he should wear the stockings from when he

4    gets up in the morning until when he goes to bed at night, and

5    then elevate his leg on a pillow or two at night without

6    wearing his stockings.  He needs to have his stockings changed

7    whenever they're easy to get on.  They are size specific, so

8    you just don't say, I'll go up on the gradations.  Many times

9    you don't really need to go over 15 to 20 millimeters of

10   pressure, but they have to fit.

11          And so the function of them, they are mildly elastic,

12   but the main thing is they're compressive.  And that kind of

13   helps prevent the fluid from pooling in his leg.  So if he's

14   able to get them on a regular basis, have them well fitting,

15   then that really will allow him to do his activities.  So he is

16   going to be restricted by the need to wear stockings to try and

17   prevent any long-term sequelae from his clot.

18          Having been someone seeing a lot of these patients

19   having to have major surgery, bypasses or skin grafts, I see

20   him nowhere near needing anything in that regard.  So in my

21   examination, as well as descriptions, I would worry about a

22   musculoskeletal issue of the ankle and the need for stockings.

23          I think the other issue is that of anticoagulation.

24          One other thing, just observing him through the course

25   of today, he's been sitting here for hours and I haven't seen

F17eelh3                      McKinsey - direct

1    him fidgeting, acting, wincing as if he's in pain.  It's just a

2    pure observational statement.

3            The anticoagulation, yes, I agree 100 percent with

4    Dr. Weitz.  He needs to be anticoagulated, and he needs to for

5    life.

6            THE COURT:  Now, how about the renal malfunction?

7            THE WITNESS:  Totally unrelated to the DVT, with the

8    exception that it may be -- and, again, I'm going to defer to

9    Dr. Weitz -- is that if he does, in fact, have the

10   antiphospholipid syndrome -- and I have to give credit, we have

11   one of the world's experts on it so I'll defer to him on

12   that -- but if he does have that, then that may be causing some

13   of the renal function, or the renal dysfunction may have caused

14   the antiphospholipid syndrome.  Certainly nephritis, meaning

15   irritations or itchiness from the kidney, autoimmune disease,

16   Lupus, things like that can cause the antiphospholipid

17   syndrome.  Because of that, we all know that people with the

18   antiphospholipid syndrome are much more likely -- I believe

19   Dr. Weitz said 40 times, I don't disagree with that -- likely

20   to form the DVT.  And that not only can be a DVT, meaning

21   venous issue, but it also can be an arterial issue.  They can

22   have renal failure.  They could have dialysis.  They can have

23   stroke.  They can have kidney failure.  They can have death

24   because of the antiphospholipid syndrome.  Not something

25   because of his incarceration or the DVT, but because of

1    something else going on that is autoimmune regulated more than

2    likely.

3            He also had another factor, meaning that factor five

4    Leiden heterozygous minimal impact, actually.  If he was

5    homozygous, I'd be much more concerned, but I think with the

6    two factors that Dr. Weitz has brought forward, as well as the

7    recurrent DVT, meaning while on anticoagulating, having another

8    DVT, I would certainly say he is definitely hypercoagulable and

9    should be anticoagulated until science gets smart enough to

10   figure out what else we could do with him.  But that's,

11   unfortunately, the -- and that's why I had some problem with

12   some of the other scales of measures.

13           What we see is all in the matter we -- no matter what

14   permutation we go through, the final answer is the same:

15   Anticoagulate him and put him in the support stocking.  And

16   that's really where I think he'll do very well with it.  I've

17   seen patients with much, much worse symptoms than he has that

18   actually do well, once we get them in stockings and, if

19   necessary, anticoagulation.

20           THE COURT:  Is the renal incompetence, to the extent

21   there is any -- I'm not sure whether that's going to progress

22   or not.  Do you have any idea whether it will?

23           THE WITNESS:  Well, I think it's mild, at worst.  And

24   I haven't gone through -- and, again, that's something I would

25   more go to a nephrologist, who I understand he's going to be

1    seeing.  But it's certainly not related to anticoagulation.

2    It's not related to the DVT.  So --

3              THE COURT:  But it could be related to the high blood

4    pressure?

5              THE WITNESS:  It depends.  I mean, I think -- I hate

6    to bring up another idea, but, you know, one thing we see in

7    the extremes of age is that there happens to be -- and, again

8    I'm a vascular surgeon so I'm going to go to my specialty.  If

9    there's a potential blockage in the kidney artery, it can lead

10   to elevation, especially on that bottom number, the diastolic

11   number.  So I think an ultrasound may be warranted in the

12   workup of this to make sure he doesn't have an issue that may

13   be obstructing blood flow to the kidney, because the kidney is

14   one of our major sensors for blood pressure, our blood pressure

15   regulation.

16             It's also a very selfish organ, meaning that if the

17   kidney senses a low blood pressure, because there's a blockage

18   in the kidney artery going to it, it thinks the whole body is

19   seeing a low blood pressure so it releases a chemical that

20   actually raises blood pressure, especially in a young

21   individual, that bottom number.

22             Is it a long shot?  Yes.  It's kind of like ordering

23   an ultrasound because nothing else is out there, but it's

24   certainly, as I start working up someone for hypertension,

25   something I would consider, just to make sure I can rule it

F17eelh3                        McKinsey - direct

1    out.

2              The other, you know, and probably more likely -- and

3    this would go to Dr. Weitz.  I'll defer to his comments on

4    it -- is that, does he have some type of nephrotic syndrome

5    that really is totally unrelated to anything else, except for

6    his genetic makeup or exposure?  Things, again, we don't know

7    yet, but by having a nephrotic syndrome, that certainly can

8    lead him to develop this, you know, antiphospholipid syndrome,

9    which then makes him hypercoagulable.

10             So in some regards, you know, if we wouldn't have had

11   this DVT, he potentially could have presented with a

12   life-threatening, catastrophic event that we really couldn't

13   have rescued him from.  So I think he definitely needs to be

14   anticoagulated, and until we have a better answer, keep him on

15   anticoagulation, whether via pill or subcutaneous injection.

16   That's up to the doctors that are taking care of him.

17             THE COURT:  All right.  And with respect to the pain

18   he's likely to suffer in the future, you said that's largely

19   subjective?

20             THE WITNESS:  But I saw him walking around.  I see his

21   leg.  By 25 years' experience, you know, patients that have

22   this minor level of disease with appropriate treatment, with

23   stockings, do very well.  They can walk --

24             THE COURT:  Do you mean they're not in pain?

25             THE WITNESS:  With -- generally not, no.

1          THE COURT:  Okay.  Now, I don't mean to cut you off at

2     all, but I think at this point it would be useful for me to let

3     Ms. Kunstler confer with Dr. Weitz to see if he has a different

4     view on these matters.

5          MS. KUNSTLER:  Thank you.

6          THE COURT:  And if he does, I'd hear him right now.

7     We'd take him out of turn.

8          MR. LOCKARD:  Yes, your Honor.

9          (Pause)

10         MS. KUNSTLER:  Your Honor, I think we should allow

11    Dr. Weitz a moment -- I think there are some areas of agreement

12    but some areas of disagreement, and I think Dr. Weitz could

13    probably get through it.

14         THE COURT:  If he's ready to testify, I'll ask

15    Dr. McKinsey to briefly step down.  Thank you.

16         (Witness stood down)

17         THE COURT:  And if you wish, you may sit with counsel

18    so you can consider what questions they might wish to ask.  You

19    can leave everything there.  Thank you.

20         Dr. Weitz, I remind you that you're still under oath.

21    Thank you.

22         You may examine.

23         MS. KUNSTLER:  Your Honor, I didn't know first

24    examining or whether you were asking Dr. Weitz the same

25    questions but the first question you posed your Honor is:  Do

1    you have any way of estimating the degree of pain that

2    Mr. El-Hanafi has experienced over the past four years?

3     JEFFREY WEITZ, resumed.

4    REDIRECT EXAMINATION

5    BY MS. KUNSTLER:

6    Q.  You heard Dr. McKinsey's answer to that question, based on

7    his analysis of the symptomology.  How is your analysis of the

8    pain over the past four years different?

9    A.  Well, in the records that I examined going back to

10   essentially after his flight from Dubai on April the 30th,

11   2010, to the time of diagnosis of the deep vein thrombosis,

12   that's a period of approximately 17 months.  And during that 17

13   months, Mr. El-Hanafi had repeated requests for medical

14   attention related to symptoms in his right leg.  It was always

15   the right leg, and they included pain in the ankle, pain in the

16   calf, swelling.

17          And repeatedly these symptoms were more or less

18   ignored.  He went through a variety of sort of symptomatic

19   measures with aspirin, an antiinflammatory, ibuprofen, with leg

20   stretches, with heat or compresses.  Nothing worked.  So for 17

21   months, he went undiagnosed with the cause of this persistent

22   progressive leg pain.

23          Now we know that, based on the ultrasound that was

24   finally performed after that seven-month period, that he

25   definitely had deep vein thrombosis.  I don't think there's any

F17eelh3                        Weitz - redirect

1   question about that.  We could argue about when it started.

2   Clearly when it was ordered in July, not done until September,

3   they must have been thinking about deep vein thrombosis,

4   because they did an ultrasound looking at the veins.  We heard

5   already about payment schedules and how you have to identify

6   what you want the ultrasound to look at.  So he had deep vein

7   thrombosis that went back at least until July, but his symptoms

8   went back for months before that.  So, again, I would venture

9   to say that he's gone for months without diagnosis.

10           He now has DVT.  We have heard all about the issues

11  about his post-thrombotic syndrome and his antiphospholipid

12  syndrome, his need for chronic anticoagulation, the

13  hypertension and the impairment in renal function, all of which

14  require more attention.  I think he's suffered quite a bit from

15  this condition.

16  Q.  Thank you.  And I believe with the questions about the

17  renal system, you were -- you're in agreement with

18  Dr. McKinsey?

19  A.  I think all of these are possibilities that need to be

20  explored, so I would hope that he has access to the

21  nephrologist, the kidney doctor, in a reasonable length of

22  time.

23  Q.  And with respect to future pain, I don't know how it was at

24  largely -- all you know is what Mr. El-Hanafi subjectively told

25  you and your experience on the Villalta scale.  Is there

F17eelh3                        Weitz - redirect

1    anything beyond that deals with current pain, which is both

2    subjective and objective assessments of pain on that test?

3    A.   Right.  Both on my subjective and objective test assessment

4    using the Villalta score, he has severe post-thrombotic

5    syndrome.  Fortunately, I think, as Dr. McKinsey indicated,

6    he's getting a pretty good response with the compression

7    stockings.  That's wonderful for now, that he does that.  It

8    helps.

9         But even with the stockings, he's still very limited

10   in what he can do.  He can't do the squats.  He can't do any

11   jogging.  He's a young man, and he would like to be able to do

12   these activities just to keep fit.  And he's limited in what he

13   can do to keep cardiovascular fitness up.  Yes, he could do

14   upper body strength exercise, but that doesn't help a lot for

15   your general cardiovascular fitness.

16        MS. KUNSTLER:  Is there anything else, your Honor?  I

17   was trying to cover your questions.

18        THE COURT:  No.  I think what I should do now is let

19   each of you cross-examine one another's expert.  So the

20   government could go to cross on this very limited area, and

21   then you could cross Dr. --

22        MS. KUNSTLER:  I would suspend cross on --

23        THE COURT:  Do you have any cross?

24        MR. CRONAN:  I don't have any questions.

25        THE COURT:  Okay.  Please step down.

F17eelh3                    Weitz - redirect

1              (Witness excused)

2        JAMES F. MCKINSEY, resumed.

3    DIRECT EXAMINATION (continued)

4    BY MR. LOCKARD:

5    Q.  Dr. McKinsey, I would like to just clarify one thing that's

6    at least not clear to me, and possibly not clear in the record

7    either.  When we talked about renal impairment, have you seen

8    renal impairment in your review of Mr. El-Hanafi's records?

9    A.  Nothing that really looked like it.  It was something that

10   drew my attention for a second, but, again, that was not my

11   focus of the review.  You can lose one full kidney and have a

12   creatinine that's nearly norm at 1 to 1.2 creatinine, someone

13   donates one or removed one for cancer.

14   Q.  So is the elevated creatinine levels that Dr. Weitz

15   testified about an indication they should be monitored as

16   opposed to an actual impairment or failure of function at this

17   point, or what's your view on that issue?

18   A.  It definitely is a monitoring situation.  I think it would

19   be worthwhile to do renal duplex, just to make sure he doesn't

20   have something like fibromuscular dysplasia, which is something

21   that can occur in younger individuals.  Again, vascular surgeon

22   thinking of vascular issues.  But I don't think there's

23   anything that -- at most, it may be salt restriction, dietary

24   restrictions for protein.  These are things that are easily

25   managed wherever he may be.

F17eelh3                        McKinsey - direct

1    Q.  I'd also like to ask another question about the support

2    stockings.  If an individual presents with pain and swelling

3    from a musculoskeletal issue in addition to post-thrombotic

4    syndrome, what, if any, effect would the compression stockings

5    have on the musculoskeletal issue?

6    A.  Actually, it should help improve it, depending on what the

7    issue may be.  Obviously it's not going to help a fracture,

8    which we've had an X-ray that shows he does not have.  But if

9    there's a ligamentous issue or a tendon issue, compression

10   has -- we see with our athletes and everything else, they come

11   in, they wrap their legs and they feel better.  So compression

12   has many things to help blunt the inflammatory response and

13   help prevent the swelling that can occur in joint spaces also.

14   Q.  And then I'm going to move to the September 2011

15   ultrasound, which I think we've addressed, but I just want to

16   make sure it's clear in the record.

17          Based on your review of the DVT in the September 2011

18   ultrasound, could that DVT that you saw in that ultrasound have

19   occurred in April or May of 2010, 16 or 17 months prior?

20   A.  That's very unlikely.  Again, by the nature of the natural

21   healing of a blood clot, you can say that if you saw it look

22   more like a longer duration, you say, did I miss it, but when

23   you see those changes that really kind of go along with a

24   fresher clot, that then matures over the next two months to

25   become more of a well established clot, well organized clot,

1    that tells me that that really was something that that specific

2    clot that we were looking at had probably been there only for a

3    couple months, at best.

4    Q.  Given that Mr. El-Hanafi is an individual who has been

5    discussed at length as a predisposition to clotting, could he

6    have had other clots in the past that did not appear on the

7    ultrasound?

8    A.  Certainly.  We've seen that.  We've seen where he had clots

9    in his popliteal vein that were well documented in the

10   ultrasound, but yet the ultrasound that we did, I personally

11   reviewed and was there as it was being done, did not show it.

12   So because he is predisposed for making clot, we may see that

13   he is making it and then breaking it down.  And this is a

14   repetitive cycle that many times would have gone undiagnosed.

15   Again, as I said, people actually removed, myself included, the

16   femoral vein for other reasons in patients are relatively

17   asymptomatic.  So by any of this blocking and slowly blocking,

18   as long as it doesn't impinge on the profunda femoral vein,

19   then many people do very well.  And so I think this is

20   something where he could have -- you know, this has been going

21   on for some time.  We don't know.

22   Q.  In circumstances where you are able to identify a DVT in

23   its early stages, what types of interventions are available?

24   A.  Well, it really depends on the symptoms that are associated

25   with it.  If someone comes in that has mild swelling -- in my

1   practice someone who, with two centimeters of swelling at most,

2   is someone I would classify as mild swelling.  When I see them

3   doubling the size of their leg, come in very tense, the skin

4   looking like an overripe tomato, that's something I consider a

5   severe occlusion in DVT.

6           With that, in the earlier phases, yes, I can go in and

7   put a catheter in there and try and dissolve the clot with a

8   blood clot dissolving medicine.  The term has been used several

9   times today, that Coumadin, Lovenox, Xarelto are blood

10  thinners.  That's actually wrong.  They are -- they are

11  anticoagulants.  They don't change the viscosity of the blood

12  at all.  They don't thin it like a thin paint, but it actually

13  just prevents a clot from forming.  So if you come in and then

14  you use a different agent, which we call a thrombolytic agent,

15  it will actually activate the thrombolytic system to actually

16  break down a clot that's already formed.  Heparin, Coumadin,

17  help prevent clot from forming, but it doesn't affect the

18  existing clot that's there.  The body may, just like water

19  running over limestone and being activated by the natural

20  fibrinolytic system will enhance that and come in and use an

21  agent -- it's called TPA, tissue plasminogen activators.  The

22  most common -- I've used urokinase, which is a similar agent,

23  but now mainly we use TPA.  And if I have someone that comes in

24  that has severe symptoms, especially if they've got more than

25  iliac veins, which can help block off, and then by being in the

F17eelh3                          McKinsey - direct

1    vein up in the abdomen, it is now preventing drainage from that

2    important profunda femoral vein, that becomes more of an issue.

3              So early on I can go in and place a catheter and then

4    give the -- a clot dissolving medicine that slowly allows the

5    clot to dissolve, if it's within that first four-week time

6    period pushing it up to eight weeks, but you have to use a lot

7    more of the drug.

8              But that comes at a cost and a risk.  And I don't mean

9    a financial cost.  If I have someone that has a clot in their

10   thigh, I would need to see a significant amount of swelling to

11   make me want to do that.  It's an uncomfortable procedure.  I

12   actually have to bring them in, put them on their belly, access

13   the vein behind the knee or lower and run a catheter up there,

14   and they have to lay in that position as we give the blood clot

15   dissolving medicine.

16             The real concern I have in using it if they're not

17   severely symptomatic is there's risks to using blood clot

18   dissolving medicine, or TPA.  And that includes intracranial

19   bleeds and GI bleeds.  And I've actually had a patient have an

20   intracranial bleed and actually die from the use of TPA.  So

21   it's something I take very seriously.  I've never had someone

22   have a GI bleed from Lovenox, unless they've had a previous

23   history of multiple GI bleeds, and certainly not a bleed into

24   their brain.  But when you go into much more active clot

25   dissolving medicine, you have to be very careful when you

F17eelh3                    McKinsey - direct

1    decide to use it, and only use it in those patients where you

2    think the risk of not using it is greater than the risk of

3    using it.  And so then you'd be more likely to go in to try and

4    use it judiciously but to try and dissolve the clot.

5            Now, the real issue that goes with that -- I'm sure

6    Dr. Weitz and I would agree -- is that even if you go in and

7    dissolve the clot, you're still having risk of developed the

8    post-thrombotic syndrome.  So just because you made the clot go

9    away doesn't mean that you're not going to develop the symptom,

10   because those vein valves can be injured.  And then if they

11   allow the blood to go in the wrong direction, you still can end

12   up with venous hypertension.  It may be better.  We're still

13   trying to investigate that.  But that's been an ongoing work

14   for many decades, trying to figure out what's right to do for

15   that.  So more higher up into the abdomen, I'm more likely to

16   do it, especially if their symptoms are severe.  Going down

17   into the thigh, I am less likely to do it, only if they have

18   very severe symptoms.

19           And as I mentioned earlier, I have actually operated

20   early on in the patients that had severe symptoms.  And that

21   was where I removed fresh clot and actually found it was

22   someone who came in that had a previous older clot that was

23   probably in the range of about six to eight weeks in duration

24   and then had a new clot that formed on it and became profoundly

25   symptomatic.  I was able to remove the fresh clot fairly

F17eelh3                        McKinsey - direct

easily, and just with a special catheter we pull through that

moves the clot out.  But when I actually, directly looking at

the older clot that was there, it was really incorporated into

the vein wall itself.  And there's no way of getting it out

without actually just removing the vein in that section.

Q.  Is there any way to predict with any degree of reasonable

certainty if anticoagulation had been started earlier, whether

or how much it would have affected the degree to which the clot

became occlusive or how severe the DVT itself was?

A.  Well, I think we've seen the natural history of this in

this limited -- forgive me for saying case study, because what

we've seen is he originally presented with a clot, and it was

totally occlusive.  It then dissolved, and some of it broke up,

and he had a partially occluded clot, thrombus.  We then later

found they had a new clot that was totally occluded that,

again, opened up again, and right now it's open again.

        So I think that, you know, we're seeing the natural

ebb and flow of these type of things as we look at the

coagulation cascade.  And by having him on anticoagulation, I

think we've got a baseline, but certainly it's still an active

process.  And that's why, again, I think he needs long-term

anticoagulation in something that's reliable.  Coumadin, I

think, is one that we all have problems managing, just because

it's -- can be affected by many things; liver function, what

you ate the day before, this type of thing.  So it becomes much

1    more of a challenging medication to manage.  And we actually

2    have to bring patients in sometimes once a week, once every

3    other week, until we get them on a stable dose.

4         Using things such as Lovenox, Xarelto, which we've

5    also mentioned, are things that we can now give that don't

6    require continuing monitoring, and more importantly, are more

7    consistent interaction.  So I think there are opportunities we

8    have to continue this.  But if we would have started it before

9    he ever got on the plane, would it have made a difference?  I

10   really don't think so.

11        I think his real problem -- and, again, this is an

12   opinion, but his real problem, as was pointed out by Dr. Weitz,

13   is this underlying hypercoagulable state of having a factor

14   five Leiden heterozygous, but more importantly, having an

15   antiphospholipid syndrome.

16   Q.  I'd like to just briefly address standard care before we

17   conclude.  In your review of Mr. El-Hanafi's medical records,

18   in your opinion, did it fall below acceptable standard of care

19   not to have diagnosed the likelihood of a DVT prior to the

20   review of the ultrasound results in September of 2011?

21   A.  Can you state that one more time again for me?  I'm sorry.

22   Can we read it back?

23   Q.  In your opinion is it below acceptable standards of medical

24   care for his DVT not to have been diagnosed until the results

25   of the September 2011 ultrasound?

F17eelh3                          McKinsey - direct

1    A.  Well, it's my opinion that the main DVT that was documented

2    in September was really, at most, four to eight weeks in its

3    presence, that acute totally occlusive thrombus, or subacute.

4    So I think it's not that far out of the range of -- especially

5    with the symptoms we saw.  I mean, if he came in with a

6    massively swollen leg, where you could see that you can't -- I

7    mean, I see them when they come in:  You can't see their knee,

8    you can't see their ankle, their foot is as big as a pumpkin

9    type of thing; figuratively, but there's no doubt that they've

10   got something going on.  He never really presented with those

11   symptoms.

12        So I could certainly understand if you talk about

13   standard of care, and that's kinds of how we, I guess, sort of

14   define this.  I don't see that there's a significant violation

15   of the standard of care, based on the findings that he had.

16   There is some, you know, should I do this, should I rule it

17   out, but he certainly was not profoundly symptomatic, and he

18   certainly did not appear to be at significant risk.

19        Now, can I say it's ideal that you don't get an

20   ultrasound for several months?  Obviously not.  And I think if

21   there was a very high clinical suspicion, and if you look at to

22   note where they ordered it, they kind of went through

23   everything else that was more musculoskeletal, and also as an

24   afterthought they said, let's get an ultrasound.  So in the

25   flavor of their note, they really didn't have DVT high on their

F17eelh3                          McKinsey - direct

1    list, because the symptoms weren't classic for DVT.  So, would

2    I like to have seen an ultrasound earlier?  Yes.  But

3    interestingly, if my theory is right, based on the ultrasonic

4    finding there, if he would have gotten an ultrasound two months

5    before it, that may have actually preceded the formation of his

6    clot and it may have been normal.

7                   (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F170ELH4                        McKinsey – direct

1    Q.  Based on your review of the medical records relating to Mr.

2    El-Hanafi's care after the DVT was identified, in your opinion,

3    does that care comply with acceptable medical standards?

4    A.  I think it did.  I mean I think they had some issues,

5    obviously, of trying to balance his anticoagulation.  We saw

6    evidence where his protime went very high, and then came low.

7    So he was obviously trying to get coordinated with that, at

8    which point I think, in a very appropriate decision, the

9    physicians there said this is just not working, we can't make

10   sure that he is gonna get an appropriate level of

11   anticoagulation, for whatever reason.  Whether it is dietary

12   intake, his metabolism, his liver, whatever.  They said they

13   can't do it.  And that's when changed it to an alternative

14   medication, which I think is a thoughtful and a right thing to

15   do.  He had certainly been seen.  He has had the stockings.

16   There was some question of whether the stockings were needed or

17   not.  And I think, at that point, he probably didn't have the

18   stockings as readily available to him.  We had that discussion

19   earlier.  Once he got back to having the stockings at a regular

20   basis, by his voice and by my exam, he is doing very well with

21   it.  So I think that to say that there is a true deviation from

22   the standard of care, I would say no.  If he came in and had,

23   frankly, 10, 15 centimeters swollen leg and they did nothing

24   about it, I would be more concerned, which was not the case and

25   never documented.

1          MR. LOCKARD:  If I could have just one moment, your

2     Honor.

3          THE COURT:  Yes.  And, as a matter of housekeeping,

4     the government has not offered exhibits 2 through 8 yet.

5          MR. LOCKARD:  That is correct, your Honor.  And at

6     this time, we offer exhibits 2 through 8.

7          THE COURT:  Any objection?

8          MS.KUNSTLER:  No objection, your Honor.

9          THE COURT:  All right.  Government exhibits 2 through

10    8 are received without objection.

11          (Government's Exhibits 2-8 received in evidence)

12          THE COURT:  All right.  Anything?  Yes, go ahead.

13          MS.KUNSTLER:  We may be pushing a little up against

14    6:00.  It is somewhat later than we anticipated.

15          THE COURT:  I know.  I took time with my own

16    questioning.

17          Go ahead.

18    CROSS-EXAMINATION

19    BY MS. HEINEGG:

20    Q.  Good evening, Dr. McKinsey.

21          Your current position is the Vice Chairman at the

22    Department of Vascular Surgery; is that right?

23    A.  No.  I'm the Vice Chairman at the Department of Surgery.

24    And I'm the Systems Chief for Complex Aortic Interventions for

25    the entire section of surgery throughout the Mt. Sinai system.

F170ELH4                          McKinsey - cross

1    Q.   And that's a new position?

2    A.   Yes, ma'am.

3    Q.   Doctor, have you participated in any clinical studies of

4    deep vein thrombosis?

5    A.   Specifically, no.

6    Q.   Are you currently participating in any clinical studies of

7    deep vein thrombosis?

8    A.   No.

9    Q.   Have you published any peer-reviewed articles on deep vein

10   thrombosis?

11   A.   Not specifically, no.

12   Q.   Approximately how many patients do you see in a year?

13   A.   I would say in the range of 500 to 600.

14   Q.   And approximately how many of those patients are DVT

15   patients?

16   A.   I would say 10 to 15 percent.

17   Q.   You said it was about 23 a year; is that right?

18   A.   It would -- I would say I have seen between 500 and 600

19   patients with DVT, and sequelae thereof, in my career.

20   Q.   Okay.

21   A.   I tend to see -- excuse me.  But I tend to see, also, the

22   more complicated cases, as when I was the Chief of Vascular at

23   Columbia.  And then, here, I would be seeing the ones that came

24   in with significant problems and issues, not the more mundane.

25   I actually recruited --

F170ELH4                          McKinsey - cross

1    Q.  So it would be fair to say that, as a surgeon, you don't

2    normally treat a DVT with surgery, unless it is a pretty

3    serious one, or there is complications; is that fair to say?

4    A.  Depends.  If you define surgery as a scalpel, that's true.

5    If you find intervention, which I also do, and that's a

6    majority of my practice, that is much more common.

7    Q.  So you tend to get these more severe cases?

8    A.  Yes, ma'am.

9    Q.  Typically, at what point in the correction of an illness do

10   you see patients who have DVT?

11   A.  We'll see them from initial presentation to long-term

12   management.  As vascular surgeons, we see patients and follow

13   up, and I continue to follow them along.

14   Q.  Are you, generally, a doctor who orders the first

15   ultrasound?

16   A.  Sometimes I am.  Sometimes they come in with an ultrasound

17   already.

18   Q.  And just briefly, you mentioned that the economy class

19   syndrome is something of a misnomer, that you are no more

20   likely to get a DVT in economy than in first class.  But

21   meaning that the risk is the long-period immobility on the

22   flight, right, not --

23   A.  That's correct.

24   Q.  But you would say that it's the long period of immobility,

25   and not what class of -- not whether you are in economy or

F170ELH4                         McKinsey - cross

1   first class that is the risk factor for developing a DVT?

2   A.  Well, the connotation was that economy class you were more

3   likely to be less mobile.  You are also more likely not to stay

4   as well hydrated, because you don't want to have to get up and

5   crawl over the other two people next to you to go to the

6   bathroom or walk up and down.  So that was the bias.  And many

7   of us kind of grew up with that of saying, that was the economy

8   class syndrome.  But, again, it was many years ago now, but

9   certainly that was presented that, if you come in, and whether

10  you are flying coach, or whether you are flying business or

11  first class, your incidences of DVT is greater, whether you

12  have that much mobility or not.  So there is a lot more factors

13  that come into it.

14  Q.  Again, flying is a risk factor.

15  A.  Yes, ma'am.

16  Q.  Is that because it is a prolonged period of relative

17  immobility?

18  A.  Well, as I just said, we were not able to -- you would

19  think that would be the case, if you could say the person in

20  the window seat in coach was the one always getting the DVT.

21  But whether you are in business or first class, you still have

22  a greater opportunity to walk around.  And, certainly, you're

23  much more mobile, and you still have increased incidence, so

24  there is many things we don't know yet.

25  Q.  When you provide care for a DVT patient, are there

F170ELH4                         McKinsey - cross

1   particular guidelines that you follow?

2   A.  In regards to anticoagulation and to management, and to --

3   I guess I need more specifics regarding your question.

4   Q.  Well, are you familiar with the American College of Chest

5   Physicians Guidelines for treating DVT?

6   A.  Yes, ma'am.

7   Q.  Would you agree that those guidelines are fairly

8   authoritative?

9   A.  No.  They are opinions.

10  Q.  Okay.  Are they opinions that you agree with?

11  A.  Some I do, and some I don't.  The art of medicine is you

12  have to be able to analyze each patient and figure out what is

13  the best for them.  And that's where experience comes in.

14  Q.  Are there other guidelines that are different opinions that

15  you prefer?

16  A.  No.  I mean I think each one of them, it is more the direct

17  assessment of the patient.  And someone coming in -- many of

18  these guidelines try to make it protocol driven, or cookbook.

19  And that's not what you can do.  You can come in and see how

20  severe their symptoms are, do I need to do lytic therapy or do

21  I not need to do lytic therapy.  These are all questions that

22  you really have to individualize to the patient.  They are

23  meant as guidelines, they are not authoritative.

24  Q.  In your practice, when you order an ultrasound for

25  suspected DVT, how soon do you expect that ultrasound to take

F170ELH4                          McKinsey - cross

1    place?

2    A.  Well, I'm spoiled, I have the ultrasonic lab right there.

3    So I will see it during the time of the visit, if possible, or

4    if unless they already had one already.

5    Q.  Well, so what's the outside time frame that would be

6    acceptable.  Would a day's wait be acceptable?

7    A.  I think we can go into that.  And I think that, certainly,

8    you would like to get it in a timely fashion.  And it depends

9    on how significant a suspicion you have that they have a DVT.

10   Q.  Okay.  And, well, the ACCP guidelines addresses that to an

11   extent in terms of what kind of treatment a person with a

12   suspected DVT should get; isn't that right?

13   A.  It does, when you truly have significant symptoms, yes.

14   Q.  Well, there is a range, right.  There is a range from mild

15   to high, and with a different range of treatment for each set

16   of suspected symptoms?

17   A.  Right.  What we were doing is that we would actually --

18   depending on, you know, since I ran the vascular lab for many

19   years at Columbia, we would come in and say do we think the

20   patient has significant symptoms.  And we would actually go

21   assess the patient and put our own judgment of how quickly we

22   need to get an ultrasound based on the physical finding.  I

23   agree with the guidelines, if you have a high clinical

24   suspicion.

25   Q.  Also the guidelines say if you have a high clinical

F170ELH4                          McKinsey - cross

1    suspicion or a person who is at high risk, that you should

2    begin anticoagulation therapy if you can't get that ultrasound

3    within four hours, right?

4    A.   I agree with that.  If you have a high clinical suspicion.

5    Q.   And if there is a moderate risk person, that you should

6    begin anticoagulation treatment if you can't get that

7    ultrasound within 24 hours?

8    A.   That's where judgment comes in.  More, it depends on what

9    day of the week it is, and what the symptoms are.

10   Q.   That is what the guidelines say, right?

11   A.   Again, in the guidelines; yes, ma'am.

12   Q.   And the ACCP guidelines say that that person with a low

13   risk, they should be treated with anticoagulation therapy if

14   you can't get that ultrasound within 48 hours, right.

15   A.   I can't quote the guidelines verbatim, whether it 48, 72, I

16   can't quote.  Again, I don't have to deal with that, because I

17   have my own lab.

18   Q.   So if you had a patient who you had evaluated as at risk

19   for DVT, and you ordered an ultrasound, what is the outside

20   time frame that you would consider acceptable?

21   A.   Again, depends on my suspicion and everything else.  I

22   would say a week.  Just giving a number.

23   Q.   Okay.  So outside of a week would be unacceptable, an

24   unacceptable amount of time to wait.  What if you had to wait a

25   month?

F170ELH4                          McKinsey - cross

1    A.  Again, depends on the symptoms of the patient.

2    Q.  Would a month be acceptable?

3    A.  It all depends on the clinical symptoms.

4    Q.  So there are situations in which it would be acceptable to

5    wait a month to get an ultrasound after you had ordered the

6    ultrasound for a person who you suspected had a DVT?

7    A.  I think it would be desirable to get it in within that time

8    frame, but I can't say what should or should not be done.

9         Again, someone presenting with ankle pain, and then

10   the whole work-up is musculoskeletal, it is just as common

11   as --

12   Q.  Oh, we'll get to that in a minute.

13        You testified that you believe Mr. El-Hanafi first

14   developed a DVT six to eight weeks before the ultrasound on

15   September 30, correct?

16   A.  I said that that DVT, which I saw, then, would be

17   consistent with one that formed within six to eight weeks.

18   Q.  So you based that date on your reading the of ultrasound

19   that was taken on September 30, 2011?

20   A.  Yes, ma'am.

21   Q.  And it was based on your viewing of that, of the clot,

22   because of the subacute nature of the clot?

23   A.  Yes, ma'am.

24   Q.  So it's your opinion that a DVT takes six to eight weeks to

25   progress from acute to subacute?

F170ELH4                        McKinsey - cross

1   A.  It can.  That's variable.  And, again, I say this is not an

2   exact science.  But we can see changes that make it not the

3   chronic changes you associate with DVT in the vein wall.  So if

4   I see something that has that characteristic, I can say it has

5   probably occurred somewhere between the last four to eight

6   weeks.  Can I say it was two weeks versus six weeks?  No, I

7   cannot.

8   Q.  So are you saying that a DVT progresses from acute to

9   subacute at the same rate in every single person?

10  A.  Of course not.

11  Q.  So there are people for whom their DVT could progress from

12  acute to subacute at a completely different rate?

13  A.  Within that.  That's why I gave a range of four to eight

14  weeks.

15  Q.  Six to eight weeks.  So there is no person who has a DVT in

16  which that clot could progress from acute to subacute in

17  outside of eight weeks?

18  A.  Obviously you never say never, never say always.  But

19  general clinical presentation --

20  Q.  You have no --

21          THE COURT:  You're interrupting him.

22          THE WITNESS:  Yeah.

23  A.  The general clinical presentation of this.  And it is

24  supported by when they got a subsequent ultrasound six to eight

25  weeks later, it had changed.  So there was a progression where

F170ELH4                        McKinsey - cross

1    it was not something that I think your hypothesizing, that you

2    could have a subacute change that could last for years.  Well,

3    we saw it at one point in time.  We looked another point in

4    time, that is about six weeks later and it's changed.  So, yes,

5    I do feel that there was a natural progression there that goes

6    along with the clinical course I have seen for 25 years of

7    experience.

8    Q.  And you also testified that that blood has mechanisms that

9    clot and unclot that are working against each other all of the

10   time, right?

11   A.  They are hopefully balanced.  I wouldn't say working

12   against each other.  Dr. Weitz can comment more on that, I'm

13   sure.

14   Q.  And wouldn't that seem to suggest that clots are not

15   necessarily following a static orderly progression?

16   A.  There is -- if you say that you are looking at how the

17   average clot changes, it follows a natural progression.  And

18   just like you say nothing is authoritative, this is the general

19   thing we see.

20           Now, you can have a clot, as we did see in this case,

21   that's been there for a while.  And, eventually, it dissolves.

22   So that, like water running over limestone, it can eventually

23   break down.  But that change of a clot organizing, not

24   dissolving but organizing, is fairly consistent.  Now --

25   Q.  Is there --

F170ELH4                          McKinsey - cross

1    A.  -- again, after about eight weeks, that no longer gives me

2    ability to kind of date it, so I can't tell you is it six

3    months old or two years old.  But, in the acute phase, and

4    having operated on, seen clots and everything else, I am fairly

5    comfortable with that statement.

6    Q.  So is this progression, from acute to subacute, that almost

7    always happens in six to eight weeks, is that established and

8    documented in medical literature?

9    A.  It's been something that we have discussed as working

10   through the vascular lab is a common thing that we have seen

11   and documented through multiple, multiple ultrasounds; yes.

12   Q.  I'm sorry, but my question is are there medical literature

13   publications that address this timeline?

14   A.  I have not seen a specific -- I mean this is something from

15   my training, in the nineties on, that we have always discussed,

16   we have seen, and I have documented and confirmed by clinical

17   experience.

18   Q.  Okay.  So this is what you have seen in your own personal

19   experience, not necessarily something that has been established

20   in clinical studies?

21   A.  It's something that I have seen in being director, or

22   active, or fellow in at least three different institutions,

23   commonly discussed throughout the vascular community.

24        I think that you can easily come in and say these are

25   the changes that you see.  And you can go back into the lab and

F170ELH4                        McKinsey - cross

1   you can certainly say the natural changes you see within the

2   vein, and the clot that forms within the vein.

3   A.  But the real problem being is that you can't go in and

4   operate on patients, take the clot out and examine it, and then

5   really try and do some type of dating for it.  Because, A, you

6   generally can't remove it.  And, B, it's very detrimental to

7   the patient.

8   Q.  So let's turn to this exam that you conducted in December

9   on Mr. El-Hanafi.  Where did you conduct this exam?

10  A.  In our office.

11  Q.  In your office?

12  A.  Yes, ma'am.

13  Q.  At Mt. Sinai?

14  A.  At Mt. Sinai Roosevelt.

15  Q.  So was it conducted the way a normal doctor's visit

16  happens, in that your assistant went in first, and then you

17  went in later to complete the examination?

18  A.  Yes.  Again, because I was originally planning to see him

19  immediately upon his arrival, but unfortunately I was tied up

20  in the operating room.  He did not travel lightly, obviously.

21  And so we had him come in.  I had my PA start with an initial

22  assessment.  She reported back to me what her assessment was.

23  And then I said I'll be right up.  And, actually, within a few

24  minutes I was able to go up and see the patient.  The

25  ultrasound, they had done some of it, I reviewed --

1   Q.  Stop.  And I'll continue on.

2           So but you didn't actually see Mr. El-Hanafi arrive.

3   He had already seen your physician's assistant.  So you didn't

4   actually see whether he had his stockings on and the

5   physician's assistant had to take them off?

6   A.  I did not, no.  I was told he did not have his stockings on

7   that day.

8   Q.  By the physician's assistant or by somebody else?

9   A.  I think by him, but I am not certain.  I know that was the

10  information given to me.

11  Q.  But you can't remember by whom?

12  A.  I can't remember off the top of my head.

13  Q.  What questions did you ask Mr. El-Hanafi?

14  A.  Basically, I asked him about his symptoms, where his pain

15  was, what his activity level was, how he responded with the

16  wearing of the stockings.  He responded back appropriately.  I

17  said I had reviewed some of his history, and I went over some

18  of that.  And then asked for certain signs.  Did he have any

19  veins that he saw that had become large.  And he pointed out to

20  the one vein on the right aspect of his knee.  I asked if he

21  had any on his anterior abdominal wall, meaning his belly area,

22  thinking of alternate pathways being formed.  And he said no.

23  And so we then asked how he had been doing with the stockings.

24  He reported that since he had gotten to the point where he was

25  getting it more consistently, he had been doing well.

F170ELH4                        McKinsey - cross

```
 1   Q.  You didn't ask him any questions about how well he could
 2   perform certain activities?
 3   A.  I think I asked him about walking around.  I didn't know
 4   what the level of activity was with his incarceration.
 5   Q.  Okay.  But so you didn't ask him whether he was able to go
 6   jogging?
 7   A.  I did not ask him, specifically, whether he would go
 8   jogging.  I guess I had the misconceived concept that they
 9   really don't do that.
10   Q.  So you prepared three reports --
11   A.  Yes.
12   Q.  -- in preparation for this case.  And you have gone over a
13   number of those records that you reviewed.  Have you reviewed
14   the government's legal filings in this case?
15   A.  I have not.
16   Q.  You have --
17   A.  I have not.
18           THE COURT:  He said no.
19   Q.  But you have reviewed some of the defense's filings in this
20   case.
21   A.  The main thing I have reviewed was the records, the
22   hospital records.  And then the ultrasonic evaluation.  I think
23   if you are referring, and this may by my own lack of knowledge
24   base, I think there was a report.  I can't remember, did you do
25   a report summarizing my thoughts.
```

1          MR. CRONIN:  I could clarify, your Honor, if you want.

2    If my memory is correct, I believe we sent the doctor a

3    redacted version of the defense brief, redacting everything

4    other than the medical analysis and discussion.  I am not sure

5    if we told the doctor what that was.

6          We may have, I just don't remember.

7    BY MS. HEINEGG:

8    Q.  So is that what you are referring to in your September 26,

9    2014 when you said you reviewed your response to Mr.

10   El-Hanafi's attorneys to the Court?

11   A.  Yes.  They did send me a copy of the report.

12   Q.  But you reviewed only the medical portions of that

13   document?

14   A.  The report that he -- that was attributed to him, I

15   reviewed.

16   Q.  But it says you reviewed the report of the doctor, and the

17   response of Mr. El-Hanafi's attorneys for the Court?

18   A.  I don't remember everything specific about that, I'm sorry.

19   I mean the main thing I was focusing on was his clinical

20   condition, report from your expert.  And then, really, focusing

21   on the ultrasonic evaluation and how his symptoms were

22   presented.

23          I think there was a -- I know I read -- now, I'm

24   vaguely remembering something that had a lot of things blacked

25   out.  But it was not something that was high on my list for

F170ELH4                         McKinsey - cross

1    review.  I apologize for not having more memory of it.

2    Q.  So can I have you look at the government's exhibit number

3    1.  This is the defense exhibit F, I believe.  I guess that is

4    still in front of you.

5    A.  Yes, ma'am.

6    Q.  And we have already discussed this, and this physician's

7    assistant notes, which are rather brief.

8         THE COURT:  May I interject?  We have been over this

9    particular exhibit a number of times.

10        MS.KUNSTLER:  I have --

11        THE COURT:  You may well have something new that you

12   want to bring out on it.  I'm concerned about the timing and

13   whether we need to reserve time for another day to continue.

14        So how much longer do you think you have?

15        MS. HEINEGG:  We could try to be done in 20 minutes,

16   your Honor, if that's --

17        THE COURT:  Why don't you try to be done in 10, and

18   we'll see where we are.

19        MS. HEINEGG:  I think 10 might be pushing it.

20        THE COURT:  Try questioning.

21   Q.  So turning to government exhibit number 1, would you agree,

22   actually without looking at this exhibit, would you agree,

23   generally, that the practitioner who actually examines the

24   patient is in the best position to evaluate that patient's

25   symptoms?

F170ELH4                         McKinsey - cross

1   A.  That is very dependent on time, what they have available to

2   them.

3   Q.  Let me clarify that.  Would you agree that the practitioner

4   who evaluates the patient's symptoms is in a better position to

5   assess that patient than a person who reads that person's

6   notes?

7   A.  Yes.

8   Q.  And so the practitioner who looked at Mr. El-Hanafi that

9   day made a differential diagnosis of a Baker's cyst -- or

10  rather early DVT, versus a Baker's cyst, versus another

11  popliteal problems; right?

12  A.  That's what it says there, yes.

13  Q.  And in your practice, if you had made this kind of

14  differential diagnoses, what would your next step be?

15  A.  As the physician?

16  Q.  As the physician.

17  A.  I would go back and asses the patient.  And by the

18  description of normal temperature between the two, and no calf

19  swelling between the two, and complaints of ankle pain, I would

20  not actively pursue a work-up of a DVT at that time.

21  Q.  Would an ultrasound help you differentiate between -- I'm

22  sorry -- and early DVT and a Baker's cyst?

23          THE COURT:  I think we know the answer to this.  I

24  think we have been over this ground.

25          MS. HEINEGG:  I'm sorry, I'll move on.

F170ELH4                        McKinsey - cross

1   Q.  I'm handing you what's been premarked defendant's exhibit

2   M.  Is this a document that you reviewed in preparation for

3   this case?

4   A.  I don't specifically remember it, since it was a

5   significant amount of material.  But I'm sure it was in there.

6   Q.  You believe -- you believe that you did?

7   A.  More than likely, yes.

8   Q.  Okay.  This document is a Request for Medical Attention for

9   Mr. El-Hanafi dated February 27th, 2011; correct?

10  A.  That's what the date on this is, yes.

11  Q.  And in the symptoms, he complains of in this request, are

12  several blood clots on my right foot, a swollen vein by my

13  right ankle, and two veins that run all of the way to the back

14  of my knees have become dark gray, almost black, and it's

15  extremely painful to walk.

16          If a person was presenting with these symptoms, how

17  soon would you recommend that that person see a doctor?

18  A.  Well, this actually describes more of a superficial

19  thrombophlebitis.  Because he is able to see the veins which

20  means it is in subcutaneous tissue.  He says he has a cyst in

21  his right leg, but then several clots on my right foot, which

22  is not part of -- the deep veins are not there.  And the

23  swollen vein on by my right ankle.  That is most likely a

24  nondeep vein, because he can see it.  And because deep veins

25  are not visible at the level of the ankle.  He says he has

F170ELH4                         McKinsey - cross

1    something all of the way up the back of his leg.  Again, that's

2    a visible vein, which means it's a superficial within the

3    subcutaneous tissue of the skin and not within the deep

4    compartments.

5    Q.  So how soon do you think this person should see a doctor?

6    A.  I really don't know the system that is allowed there.  This

7    sounds like a superficial thrombophlebitis, at worst.  And if

8    they have a medical system that a PA or something can see him

9    and say, yes, this is a superficial thrombophlebitis, or not,

10   it is not symptomatic of a DVT, no.

11   Q.  So if a person's superficial veins are dilated and dark

12   colored, would it be reasonable to think that there may be an

13   issue in the deep vein system?

14   A.  Generally.  I mean acutely coming on like this, this is

15   more likely a superficial venous problem.

16   Q.  What did you do mean "acutely coming on?"

17   A.  If he is coming in and saying I now have several blood

18   clots in my right foot, so it sounds as if there's been a

19   change, when someone says I now have, it means it's a change

20   from whatever he had before.  My interpretation.

21   Q.  If you can please look at, this is the government's exhibit

22   number four, March 11, 2011.  The second page of this medical

23   report, Under Health Problem Comments, it says:  Right ankle,

24   leg, and popliteal fossa pain.

25   A.  On page 2 of three?  On exhibit 4 page 2?

F170ELH4                          McKinsey - cross

1   Q.  Page 2, yes.

2   A.  Health problem comments, right ankle, leg, and popliteal

3   fossa pain.

4   Q.  So this is a description of pain that is not, it's not

5   specifically localized to the ankle; right?

6   A.  That's correct.

7         But DVT doesn't cause right ankle or fossa pain,

8   generally.

9   Q.  I'm handing you what's been marked defendant's exhibit N

10  for identification.

11        THE COURT:  You mean to offer defendant's exhibit, M,

12  as in Mary?

13        MS. HEINEGG:  I do, your Honor.

14        THE COURT:  And is there any objection?  M, as in

15  Mary.

16        MS. HEINEGG:  And I would now ask to move that into

17  evidence.

18        MR. LOCKARD:  No objection to M or N.

19        THE COURT:  Defendant's exhibit N and M are received

20  without objection.

21        (Defendant's Exhibits N, M received in evidence)

22  BY MS. HEINEGG:

23  Q.  And defendant's exhibit N is a request for medical

24  attention for Mr. El-Hanafi dated May 25th, 2011; correct?

25  A.  That's correct.

F170ELH4                          McKinsey - cross

1   Q.  And is this a document that you reviewed?

2   A.  I believe so.

3   Q.  And in this complaint, in this document, Mr. El-Hanafi is

4   complaining of swelled up right ankle, he's unable to stand or

5   walk for more than a few minutes.  This problem has been

6   recurring since my arrest one year ago in Virginia, correct?

7   A.  That's what it says; yes, ma'am.

8   Q.  But you don't believe that this is symptomatic of deep vein

9   thrombosis?

10  A.  No, ma'am, I do not.

11  Q.  Can you describe some of the symptoms of deep vein

12  thrombosis?

13  A.  Generally, it can be asymptomatic.  It can be -- meaning no

14  symptoms, whatsoever.  It can cause swelling, generally, below

15  the level of where the clot forms.  Those are the -- it can

16  cause some redness, tenderness.  The swelling is generally

17  circumferential, meaning around the entire aspect of the leg.

18  It is not going to be isolated.  If the ankle is involved,

19  generally the foot is involved.  So that if you have a

20  popliteal vein DVT, you may end up with circumferential calf

21  swelling, swelling extending down through the ankle and on to

22  the foot.  But you are not going to have isolated ankle

23  swelling, or ankle pain.  It tends to be not really involving

24  joints, because joints don't have the ability --

25  Q.  Mr. El-Hanafi, himself, has not actually said anything

F170ELH4                         McKinsey - cross

1   about joints, has he?

2   A.  Ankle is what I would consider to be a joint.

3   Q.  Right.  But he says ankle, foot, calf, and leg?

4   A.  Right ankle swelled up, I interpret meant the actual joint

5   at the ankle.

6   Q.  Okay.  So what would you consider this symptomatic of, if

7   you received this complaint from a patient?

8   A.  My concern would be some type of rheumatological or

9   orthopedic issue with the ankle itself, Achilles tendon.  These

10  are all things we have discussed before.  But, again, if he has

11  pain with walking but, you know, now it is more in the joint

12  space, with swelling of the joint, one thinks of a bursitis,

13  any type of thing that, you know, it's a minor sprain.  All of

14  these things can be in that differential.  DVTs wouldn't cause

15  isolated ankle swelling.

16  Q.  So with these concerns that you have, what course of

17  treatment would you take?

18  A.  I mean I would have someone from orthopedics or someone

19  that is more familiar with musculoskeletal issues evaluate him.

20  Q.  Do you know if that happened here?

21  A.  I think, eventually, he was scheduled to be seen by

22  orthopedics.  I don't, in the timeline, know if that happened

23  or not.  I was, again, looking at it from the vascular and

24  venous side.

25  Q.  You didn't review any records reflecting that Mr. El-Hanafi

1    was seen by a specialist?

2    A.  He was not specifically seen by an orthopedic surgeon, no.

3    But that would also depend on whether someone actually assessed

4    his wound -- or his ankle, how significant they thought it was.

5    Q.  If you could turn your attention to government exhibit 6.

6    And I believe you testified that you had reviewed this record.

7    A.  Yes, ma'am.

8    Q.  You testified that you reviewed this record, but it was not

9    mentioned in your report.

10   A.  Forgive me.  I did not mention every record that I reviewed

11   specifically.  I would not necessarily have called a sick call

12   request as a separate line item on it.  I think I would have

13   mistakenly, or not, included that as part of the medical

14   records while he was in the prison system.

15   Q.  And in this record, Mr. El-Hanafi's complaints are pain

16   from his right calf to his foot, pain and swelling; correct?

17   A.  His principle complaint is pain and swelling in the right

18   foot, can only walk on my toes due to extensive extreme pain in

19   the ankle area.  Need to see a doctor.

20   Q.  And if you look down to about two-thirds of the way down

21   the page, where it says where is the pain.  What does it say

22   there?

23   A.  Right calf, down the foot.

24   Q.  So this is not actually pain that is localized to his

25   ankle; correct?

1    A.  Well, when he came in, what is your problem, that's where

2    he described it, now --

3            THE COURT:  This is argument.  We know what the

4    document says.

5    BY MS. HEINEGG:

6    Q.  Turning to government exhibit 7, this is -- I'm sorry.

7    This one is July 6, 2011.

8    A.  That's correct.

9    Q.  And you didn't mention this in your report.  It was

10   actually, I think, only two of these approximately eight

11   records that were mentioned in your report.  Is there a reason

12   that you decided to include some and not others?

13   A.  I basically lumped many things together.  I would not say a

14   clinical encounter as something different than the health care

15   prison records.  I would go to the attorney's office and be

16   more -- they could give me an itemized list, but this was not

17   something I sat down and said point A, point B, point C.  That

18   was my error.

19           I apologize, Judge.

20           THE COURT:  Could you prioritize your questions at

21   this point?

22           MS. HEINEGG:  I'm almost to the end, your Honor.

23           THE COURT:  Okay.

24   BY MS. HEINEGG:

25   Q.  On this July 6,2011 date, Mr. El-Hanafi's complaints are

1    that his foot has been hurting for two months, his ankle still

2    hurts, his right leg has been swollen since he was arrested in

3    Virginia, correct?

4    A.  It says foot been hurting for two months, I have no injury

5    that caused this.  This is from the tight cuffs.  The ankle

6    still hurts.  My right leg is swollen since I was arrested in

7    Virginia.

8            THE COURT:  Again, we can all read the document and we

9    have read it before, so I think what you need to do is ask

10   questions to elicit information from the witness, rather than

11   read from the document.

12           MS. HEINEGG:  Okay.

13   Q.  Turning to defendant's exhibit G, which is government's

14   exhibit number eight, you have already testified that you did

15   not believe that there were any symptoms of DVT described in

16   this document; correct?

17   A.  Well, there is many symptoms that are described in this

18   document.  As you look at it in its entirety, I don't see a

19   consistent complaint that one would find that would make me

20   have a high suspicion of a deep vein thrombosis.  Because,

21   generally, the symptoms of deep vein thrombosis are constant,

22   especially until they are under compression.

23   Q.  But this is the date that the ultrasound was ordered,

24   correct.  It occurs on this record?

25   A.  Yes, that's correct.

F170ELH4                          McKinsey - cross

1    Q.  So that the physician doing the examination apparently saw

2    some indication, because as you testified earlier, you need to

3    have, you need to see an indication in order to run a test.

4    You can't just rule something out?

5            MR. LOCKARD:  Objection, speculative.

6            THE COURT:  Sustained.

7    BY MS. HEINEGG:

8    Q.  This is also approximately the date on which you testified

9    you believed that the DVT began, isn't it?

10   A.  I said it could have occurred between four and eight weeks

11   from the time of the ultrasound.  This puts it at the longest

12   distance from that time.

13   Q.  And if you know, did Mr. El-Hanafi file any further

14   follow-up requests for care after this date?

15   A.  I have not memorized each of his requests, chronologically,

16   I'm sorry.

17   Q.  So after the ultrasound was ordered, it occurred two months

18   later; correct?

19   A.  Yes, ma'am.

20   Q.  And I think you testified earlier that this clot-busting

21   technology, this clot-busting therapy that you were talking

22   about needs to happen while the clot is still fresh, right?

23   A.  In an appropriate patient, yes.  Generally, it is most

24   effective within two to four weeks.

25   Q.  So had it not taken two months from the time Mr.

F170ELH4                        McKinsey - cross

1    El-Hanafi's ultrasound was ordered, he would have had an

2    opportunity, he was deprived of this opportunity, because the

3    ultrasound took place two months later, rather than immediately

4    afterwards, around the time when you said the clot would be

5    fresh.

6    A.  Based on the clinical findings here, I would not have

7    offered him thrombolytic therapy because the risk would have

8    outseated the --

9    Q.  Is there any other therapy that a person can undergo to

10   prevent a DVT from developing further?

11   A.  Anticoagulation, as we have discussed.

12           MS. HEINEGG:  While Ms. Kunstler is looking, I want to

13   note two things.  We did not admit Dr. Weitz' CV today.  It is

14   already part of the record of this case.  It was submitted as

15   an exhibit.

16           THE COURT:  Yes.

17           MS.KUNSTLER:  We also did not admit his report.  I'm

18   assuming that those are part of what the judge will consider,

19   anything that is an exhibit in this case is part of what the

20   judge will consider, even if it wasn't admitted today?

21           THE COURT:  I expect to do so, unless there is an

22   objection.

23           MR. LOCKARD:  No, your Honor.

24           MS. HEINEGG:  At this point, I'm handing up what is

25   marked defendant's exhibit O for identification.

1    Q.  And this is another request for medical attention from Mr.

2    El-Hanafi dated 6/23/11, correct?

3    A.  That's correct.

4    Q.  And in which he complains of swelling in his right ankle,

5    foot, and calf area?

6    A.  Still had inflammation in the right ankle, foot, and calf.

7           MS. HEINEGG:  I would move exhibit O, defendant's

8    exhibit O into evidence.

9           MR. LOCKARD:  No objection.

10          THE COURT:  Defendant's exhibit O is received without

11   objection.

12          (Defendant's Exhibit O received in evidence)

13   Q.  Dr. McKinsey, do you know what charges Mr. El-Hanafi is

14   convicted of?

15   A.  All I know was basically from as Dr. Weitz.  I Googled it

16   after I agreed to review.  And buying watches, that's all I

17   got.

18   Q.  Buying watches?

19          THE COURT:  Yes, buying watches.  That was the

20   first --

21   A.  That's what the internet said.

22          THE COURT:  Those were the first news --

23   Q.  So you were aware of the general nature of the charges

24   against Mr. El-Hanafi?

25   A.  I guess I had a strong suspicion when I was contacted by

F170ELH4                           McKinsey – cross

1    the U.S. Attorney's Office for terrorism, and et cetera.  But I

2    did not, once I saw, out of curiosity I looked and saw, I did

3    not look any further.

4           MS. HEINEGG:  If I can just have one minute, I'll be

5    done in a moment.

6           THE COURT:  Yes, sure.

7    BY MS. HEINEGG:

8    Q.  So, Dr. McKinsey, based on the nature of the telephone call

9    that you got from the government, you made an assumption that

10   this was a case involving terrorism?

11   A.  I think in the initial phone call they just asked me if I

12   would review the records.  And then, after I agreed to review

13   them, then they divulged more and said he was being tried here.

14   And I saw the history of it as I went through it.

15   Q.  And just one more question.  We've gone through, at length,

16   a number of records dating from the end of, beginning from May

17   2010 to July of 2011.  In your first report, you wrote that on

18   July 27, 2011, the patient began complaining of pain and

19   swelling in the calf and forefoot.  Is there a reason why you

20   chose this date to set a beginning of pain?

21   A.  That was, when I looked at that record, that's when I was

22   going through and seeing what he was reporting at the different

23   times in the records I reviewed.

24          MS. HEINEGG:  Thank you.  I have nothing further.

25          MR. LOCKARD:  No redirect, your Honor.

1              THE COURT:  All right, thank you very much.

2              Doctor, you may step down.

3              (Witness excused)

4              THE COURT:  Is there any further testimony?

5              MR. LOCKARD:  Not from the government.

6              MS.KUNSTLER:  None from us, your Honor.

7              THE COURT:  Okay.  Well, I want to thank counsel for

8    your very careful preparation and examination.

9              I want to thank the doctors for your time and efforts.

10             Now, we don't have a date scheduled for sentencing, do

11   we?  We do.  What is the date for sentencing?

12             MR. LOCKARD:  January 20th, your Honor.

13             THE COURT:  Okay.  Do counsel anticipate any further

14   submissions, or do I have before me everything I need for

15   sentencing.

16             MR. LOCKARD:  I think the last thing that the

17   government is going to do is incorporate whatever additional

18   recommendations for prospective care and management that have

19   been made today, and discuss those with the BOP and see if we

20   can get the Court an additional or supplemental report from

21   them.

22             THE COURT:  All right.

23             MR. LOCKARD:  And we expect to be able to do that,

24   based on our discussion with the BOP counsel prior to this

25   hearing, we expect to be able to do that within a few days.

F170ELH4                        McKinsey - cross

1          THE COURT:  All right.  And I think I have already

2     made it clear that a BOP generalized statement that they can do

3     everything necessary, is not adequate.

4          MR. LOCKARD:  Yes, your Honor.  We intend to have them

5     address these specification recommendations.

6          THE COURT:  Okay.  Thank you very much.

7          MS.KUNSTLER:  Thank you, your Honor.  We will be --

8     there is a draft of it here, but we would like to prepare, or

9     have Dr. Weitz prepare a list of his recommendations in a

10    letter that we can provide the Court and, hopefully, also

11    provide the BOP.  And we may have a short comment on the letter

12    from the BOP, we don't know, we have not seen it yet.

13         THE COURT:  Very good.  Okay, thank you.  So we are

14    adjourned.

15         (Adjourned)

16

17

18

19

20

21

22

23

24

25

<pre>
 1                      INDEX OF EXAMINATION

 2   Examination of:                            Page

 3   JEFFREY WEITZ                              183

 4   Direct By Ms. Kunstler . . . . . . . . . . . . 4

 5   Cross By Mr. Cronan  . . . . . . . . . . . . .71

 6   Redirect By Ms. Kunstler . . . . . . . . . . 117

 7   JAMES F. MCKINSEY

 8   Direct By Mr. Lockard  . . . . . . . . . . . 121

 9   JEFFREY WEITZ  . . . . . . . . . . . . . . . 183

10   Redirect By Ms. Kunstler

11   JAMES F. MCKINSEY

12   Direct By Mr. Lockard  . . . . . . . . . . . 186

13   Cross By Ms. Heinegg . . . . . . . . . . . . 197

14                     GOVERNMENT EXHIBITS

15   Exhibit No.                            Received

16    1    . . . . . . . . . . . . . . . . . . .90

17    34    . . . . . . . . . . . . . . . . . . 121

18    31, 32 and 33   . . . . . . . . . . . . . 124

19    11 and 21 through 28  . . . . . . . . . . 126

20    2-8   . . . . . . . . . . . . . . . . . . 197

21                     DEFENDANT EXHIBITS

22   Exhibit No.                            Received

23    A   . . . . . . . . . . . . . . . . . . . .14

24    B and B1 . . . . . . . . . . . . . . . . .20

25    C1 through 8 . . . . . . . . . . . . . . .27
</pre>

```
 1   D and D1  . . . . . . . . . . . . . . . .30
 2   E     . . . . . . . . . . . . . . . . . . .44
 3   F     . . . . . . . . . . . . . . . . . . .46
 4   H   . . . . . . . . . . . . . . . . . . . .59
 5   I   . . . . . . . . . . . . . . . . . . . .60
 6   G   . . . . . . . . . . . . . . . . . . . .60
 7   J and K are   . . . . . . . . . . . . . . .62
 8   L   . . . . . . . . . . . . . . . . . . . .66
 9   N, M    . . . . . . . . . . . . . . . . . 216
10   O   . . . . . . . . . . . . . . . . . . . 224
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```