**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**---------------------------------------------------------X**

**UNITED STATES OF AMERICA**


       **-against-**                          **No. 10 Cr. 162 (KMW)**


**WESAM EL-HANAFI**

                 *Defendant.*

**---------------------------------------------------------X**



## REPLY MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF DEFENDANT WESAM EL-HANAFI



                          Sarah Kunstler
                          Rebecca Heinegg
                          *Attorneys for Wesam El-Hanafi*
                          315 Flatbush Avenue #103
                          Brooklyn, NY 11217

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

**UNITED STATES OF AMERICA**

      -against-                                    No. 10 Cr. 162 (KMW)

**WESAM EL-HANAFI,**

               *Defendant.*

--------------------------------------------------------X

## REPLY MEMORANDUM IN AID OF SENTENCING
## <u>ON BEHALF OF DEFENDANT WESAM EL-HANAFI</u>

### <u>PRELIMINARY STATEMENT</u>

This reply memorandum is submitted to respond to the government's arguments for a maximum sentence and to urge this Court, given the suffering and permanent disability Mr. El-Hanafi has endured due to the delayed diagnosis of, and the substandard care he has received for, his deep vein thrombosis ("DVT"), to impose a sentence substantially below the Guidelines.

A rigorous review of Mr. El-Hanafi's medical records demonstrates: (1) that he began experiencing and complaining of symptoms consistent with DVT in late April or early May of 2010, immediately after a lengthy custodial flight from Dubai to the United States; (2) that for seventeen months, while these symptoms progressively worsened and while Mr. El-Hanafi

continued to desperately seek medical attention, the only treatment he received was over-the-counter pain medication; (3) that by the time his condition was diagnosed, the clots were extensive, reaching from his calf to his groin;  (4) that the care he has received since diagnosis has been sub-standard; and (5) that he is now permanently debilitated, and cannot stand for more than a few minutes or walk more than several feet without excruciating pain, requiring lifelong anticoagulation and monitoring of his condition to avoid premature death.

## BACKGROUND

On June 18, 2012, pursuant to a plea agreement, Mr. El-Hanafi pled guilty to an information charging him with providing material support to al Qaeda and conspiring to provide material support to al Qaeda, allocuting to his conduct. Under the terms of the plea agreement, the parties agreed that Mr. El-Hanafi's adjusted offense level is 37, that his Criminal History Category is VI, and that the advisory Guidelines range is 360 months to life. However, because the combined statutory maximum sentence for Counts One and Two is twenty years, the parties stipulated to an applicable Guidelines recommendation of twenty years' imprisonment.

On October 15, 2012, Probation issued its Presentence Investigation Report agreeing with the parties' calculation of the advisory Guidelines range as reflected in the plea agreement, and recommending a non-Guidelines sentence of thirteen years' imprisonment. In a two-page justification for this departure, Probation noted that the conviction is Mr. El-Hanafi's first offense, that he is a loving husband and father with three children and the sole breadwinner for his family. Probation also considered Mr. El-Hanafi's medical issues, as well as the fact that he was not promptly diagnosed or treated. Finally, Probation compared Mr. El-Hanafi to other

large-scale terrorist defendants, who were sentenced to terms of imprisonment ranging from twelve years to life. After looking at Mr. El-Hanafi's "actions, his personal circumstances, and his apparent intent", Probation determined that he was "more in line" with the defendants who received twelve-year sentences. (PSR, pp. 22-24.)

On June 17, 2013, counsel submitted a sentencing memorandum on behalf of Mr. El-Hanafi. As exhibits to the memorandum, counsel submitted a medical report prepared by Dr. Laura Chalfin, twenty-four letters of support from members of Mr. El-Hanafi's family, and a letter to the Court from Mr. El-Hanafi. Counsel requested a non-guidelines sentence of five years' imprisonment based on the following factors: (1) Mr. El-Hanafi's history and characteristics, including a childhood marked by poverty and physical abuse; (2) the many letters of support from family and friends who know Mr. El-Hanafi as an attentive, involved family member and someone who went out of his way to be there for his family when they needed him; (3) Mr. El Hanafi's strong acknowledgment, in his letter to the Court, of the enormity of his wrongdoing and the pain he inflicted on his family; (4) ██████████████████████ ██████████; and (5) the misdiagnosis and delayed treatment of Mr. El-Hanafi's DVT, a condition that is now chronic and life-threatening.

On December 11, 2013, the government filed its sentencing submission. In this submission, the government asked the Court to sentence Mr. El-Hanafi to twenty years' imprisonment – the statutory maximum. The government, offering erroneous conclusions about Mr. El-Hanafi's health and making false assertions about his lack of remorse, argued that a maximum sentence was necessary.

## ARGUMENT

**1.   Mr. El-Hanafi fully and unconditionally accepts responsibility for his conduct.**

      The government went to great lengths to point out the myriad ways in which defense counsel's sentencing memorandum purportedly revealed Mr. El-Hanafi's "remarkable lack of remorse and appreciation for his crime." (Gov't's Sentencing Memo. ("Gov't Memo.") at 32, ECF No. 153.) Mr. El-Hanafi respectfully disagrees with this mischaracterization of his mental state. He reiterates his full and unconditional acceptance of responsibility for his conduct. Nothing in defense counsel's prior submission or this reply memorandum is intended to detract from Mr. El-Hanafi's acceptance of responsibility or his unqualified remorse for his wrongdoing.

**2.   Mr. El-Hanafi was** ███████████████████████████████**.**

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██

### 3. Mr. El-Hanafi's medical condition and the quality of the care he has received while in the custody of the Bureau of Prisons are important considerations for this Court under 18 U.S.C. 3553(a).

The bulk of this submission addresses (1) Mr. El-Hanafi's medical condition, (2) the quality of care he has received while in government custody, (3) how that care (or lack of it) has impacted his illness, and (4) his medical needs going forward.[1] The severity of Mr. El-Hanafi's condition, and the abysmal treatment that he has received in BOP custody does not take away from the seriousness of the crime he has committed. But it is nonetheless worthy of this Court's consideration under 18 U.S.C. § 3553(a).

### a. The Significance Of The Fourteen-Hour Flight From Dubai As A Precursor To Mr. El-Hanafi's Illness

The government accuses Mr. El-Hanafi of "not being forthright" and worse, of "attempting to mislead the Court," in his non-existent contention that he was "shackled and not permitted to move during the April 2010 flight from the UAW." (Govt. Memo at p. 38.) Respectfully, the government distorts both the facts and counsel's argument.[2]

---

[1] As the Court is aware, we have retained a second expert, Dr. Jeffrey Weitz, to review Mr. El-Hanafi's medical records and evaluate the conclusions reached by the government's expert. At this outset, we wish to be very clear that neither Dr. Weitz' report – nor this submission – addresses the causation of Mr. El-Hanafi's DVT. We are not asking the Court to decide whether or not Mr. El-Hanafi's DVT was caused by agents of the government. It is irrelevant. What is relevant is the incontrovertible fact that he has chronic, life-threatening DVT and the government has failed to treat him.

[2] As the government is fully aware, it has *never* been counsel's position that Mr. El-Hanafi was shackled during the Dubai flight. As Ms. Fink states in her affidavit, "Mr. El-Hanafi never represented to me that he was shackled during the flight from Dubai. In numerous conversations

First, nowhere in counsel's prior submission does it state that Mr. El-Hanafi was shackled. Our argument is that Mr. El-Hanafi was immobilized and unable to move about the cabin freely during the flight. Mr. El-Hanafi was placed on a commercial flight, with government agents seated on all sides of him throughout the duration of the flight. At one point during the flight, Mr. El-Hanafi reached for a business card to show one of the agents, and was warned that if he made any more movements like that he would be handcuffed. As a result, it was Mr. El-Hanafi's understanding that he was to move as little as possible during the flight. Any suggestion that Mr. E- Hanafi was shackled during the flight was inadvertent, and Mr. El Hanafi has made no representations to that effect.[3]

The government's assertion that this "misrepresentation" demonstrates Mr. El-Hanafi's lack of remorse is therefore baseless. Rather, the government's lack of appreciation for the seriousness of Mr. El-Hanafi's condition, and their insistence, and the insistence of its medical expert, that the DVT was spontaneous, and occurred months after he first began experiencing documented symptoms, demonstrates the callous disregard with which the government approaches the serious medical condition and the life-threatening danger that El-Hanafi is in and will continue to be in so long as he is in BOP custody.

---

with the government, I repeated that he had not been shackled during the flight, and described in detail what had happened – that agents sat next to him, that they let him go to the bathroom, and allowed him to pray – but that other than that he was not permitted to move." (Ex. 1)

[3] In her report, submitted as an exhibit to our first sentencing memorandum, Dr. Laura Chalfin made reference to Mr. El-Hanafi's flight in shackles. This statement was made in error, and was not based on any representations made by Mr. El-Hanafi, as Dr. Chalfin never spoke to Mr. El-Hanafi directly.

Further, that Mr. El-Hanafi may have been "permitted to leave his seat with an escort to use the bathroom" (Maxwell Declaration, Gov't Ex. H.) does not mean that he had the same freedom of movement as other passengers.  It is also worth noting that a long flight, even one in which a person is not in custody, increases the risk of DVT. According to the World Health Organization,

> The findings of the epidemiological studies indicate that the risk of venous thromboembolism is increased 2- to 3-fold after long-haul flights (more than 4 h) and also with other forms of travel involving prolonged seated immobility. The risk increases with the duration of travel and with multiple flights within a short period.[4]

To counteract this risk, the website for the Centers for Disease Control ("CDC") promotes the guidelines issues by the American College of Chest Physicians in recommending that long-distance air travelers engage in "calf muscle exercises", "frequent ambulation", and "aisle seating when feasible" to decrease the risk of DVT. As discussed in more detail below, the fact that Mr. El-Hanafi travelled on a fourteen-hour flight—in custody and with restrictions on his ability to move—immediately before first developing symptoms is a strong indicator of when his DVT first developed.

Further, since Mr. El Hanafi's initial sentencing submission in June 2013, counsel has learned that Mr. Hanafi was subjected to two additional periods of prolonged immobility – this time while in full restraints[5] – in the weeks after the fourteen-hour flight. From May 10 to May 11, 2010, Mr. El Hanafi spent thirteen to fourteen hours in full restraints as he was transferred

---

[4] Available online at: http://www.who.int/ith/mode_of_travel/DVT/en/
[5] With both his wrists and ankles cuffed and connected to a belly chain.

from Virginia to Oklahoma (four hours in a transfer pen waiting to board a bus, five hours on a

bus, which included the drive to the airport and additional time spent waiting to board a plane,

and then four to five hours on the flight from Virginia to Oklahoma). As mentioned in the

attached report by Dr. Weitz, this "additional period of immobility . . . may have exacerbated his

condition." Mr. El Hanafi was again transported in full restraints during his transport from

Oklahoma to New York on or about May 24, 2010, which took approximately eleven hours and

included a custodial flight.

   **a.  The Sequence Of Events Leading To Mr. El-Hanafi's DVT Diagnosis**

       As discussed above, Mr. El Hanafi first began experiencing calf pain immediately after

the fourteen-hour flight from Dubai to Virginia on April 30, 2010. A "chronological care record"

entry from the Federal Transfer Center in Oklahoma City dated May 16, 2010, notes that Mr. El-

Hanafi reported "no improvement in leg pain" that "started shortly after arriving here". On that

date, after an examination, a BOP doctor found that there was "more pain in the back of the right

knee than the calf" and provided a differential diagnosis (or alternative possible diagnoses) of

"early DVT vs. Baker's cyst vs. other popliteal problems." Mr. El-Hanafi's prescription for

Motrin (Ibuprofen) was increased from 400 to 600 milligrams, and his prescription for Aspirin

(325 milligrams) was renewed. (*See* Selected BOP Medical Records, Ex. 2, at 1.)

       Mr. El-Hanafi arrived at the MCC in New York on or about May 24, 2010. Despite

continued treatment with Ibuprofen and Aspirin, the pain in Mr. El-Hanafi's right leg continued,

and is documented in a "Health Screen" from May 24, 2010 and a "History & Physical" from

July 16, 2010, which also noted swelling. (Ex. 2, at 6, 13, 17 and 19.)

For seven months, Mr. El-Hanafi's complaints were ignored. As he took medication to treat the pain, the condition worsened. Finally, on February 27, 2011, the condition was so dire that Mr. El-Hanafi felt compelled to take affirmative steps to get medical attention. On that date, he submitted two "cop-outs"[6] to the administration making it clear that the condition had become significantly worse. One of the cop-outs stated:

> I was previously diagnosed with inflammation in the "cyst" in my right leg and this weekend my condition worsened. I now have several blood clots on my right foot, a swollen vein by my right ankle, and two veins that run all the way to the back of my knees have become dark grey and almost black. It is extremely painful to walk. Need to see doctor ASAP.

(*Id.* at 21.) The second cop-out conveyed substantially the same information.

In response to the two cop-outs, MCC staff scheduled Mr. El-Hanafi for two sick calls with MCC's Health Services. (*Id.* at 22.) At a sick call on March 11, 2011, Mr. El-Hanafi told BOP medical staff that the pain and swelling that had started at his right ankle had progressed to his knee and thigh. (*Id.* at 23-25.) Health Services noted "swelling" on Mr. El-Hanafi's right ankle; tenderness in the "calf and popliteal area" (back of the knee); and "prominent veins on the foot and ankle areas." (*Id.*)  Health Services ordered an X-ray and prescribed Alleve (naproxen) and Keflex (cephalexin), an antibiotic. (*Id.*)

More time passed. At a sick call on March 30, 2011, Mr. El-Hanafi again complained of right leg pain. (*Id.* at 26-28.) Health Services noted a tense tendon and calf, muscle spasms, as well as edema (swelling) and ecchymosis (skin discoloration caused by ruptured blood vessels).

---

[6] "Cop-out" is the colloquial name for an "Inmate Request to Staff" form (Form BP-A0148).

(*Id.*) He was diagnosed with a "sprain and strain of the Achilles tendon" and prescribed

naproxen, hot and cold compresses, and exercise. (*Id.*)

A year had now passed and the DVT he contracted on the flight to the U.S. had still not

been diagnosed let alone treated. On May 25, 2011, Mr. El-Hanafi begged the MCC's medical

staff to alleviate his suffering. In another cop-out, he wrote:

> Right ankle swelled up again and unable to stand or walk for more than a few
> minutes. Problem has been recurring since my arrest one year ago in Virginia.
> Took Ibuprofen, Naproxen, Aspirin, heat pad and ice but pain + swelling keep
> returning. Please assist ASAP.

(*Id.* at 29.) In response, MCC staff scheduled Mr. El-Hanafi for a sick call for June 8, 2011. (*Id.*)

No sick call took place; one month after submitting the May 25, 2011 cop-out, Mr. El-Hanafi

was still awaiting medical care. On June 23, 2011, he submitted another cop-out. He wrote:

> Still have inflammation in right ankle, foot, and calf area – pain when standing
> and finished all medicine that doctors gave me here for the past year. This is my
> fourth copout trying to make an appointment and still have not see (sic) a doctor
> in two months. Please assist ASAP.

(*Id.* at 30.) In response, MCC staff scheduled him for a sick call for June 29, 2011. (*Id.*)

When again no sick call took place, Mr. El-Hanafi filled out two "Sick Call Request and

Medication" forms on June 29, 2011 and June 30, 2011. (*Id.* at 31-32.) In response, MCC

staff scheduled him for a sick call for July 6, 2011. (*Id.*) On July 4, 2011, Mr. El-Hanafi

wrote an email to the Associate Warden of Operations. (*Id.* at 33.) In his email, Mr. El-

Hanafi asked for assistance, and explained his situation as follows:

> I have had swelling and pain in my right calf, and [ankle] since my arrest 14
> months ago and now it's in my right foot and unable to walk except on my toes.

The last 7 weeks it's gotten worse and I have done many cop-outs and sick calls but have not been able to see a doctor. I was put on the sick call list about one month ago but I came back late from a legal visit and the C.O. did not let me go down to medical. I have asked many times to go downstairs as an emergency but have been denied every time. The individuals who deny my requests are either security guards who are not qualified to make an assessment on what is and what is not an emergency or the most they do is call a nurse over the phone who denies over the phone without seeing my condition.

(*Id.*) In the same email, Mr. El-Hanafi documented five separate verbal requests for medical treatment, in addition to the written cop-outs and sick call requests outlined above.

On July 6, 2011, more than three months after his last sick call appointment, and six weeks after his cop-out on May 25, 2011, which was followed by two sick call requests, one email to the Associate Warden of Operations, and five verbal requests for medical attention, Mr. El-Hanafi was finally seen by Health Services. According to a BOP "Clinical Encounter" report, Mr. El-Hanafi reported that his right leg had been swollen since around the time he was first incarcerated in Virginia,[7] that the bottom of his right foot had been hurting for two months, and that he believed the injury may have been caused by tight cuffing. Mr. El-Hanafi was prescribed 600 milligrams of ibuprofen, and underwent an X-ray of his right leg, which was normal. (*Id.* at 34-36.) On July 13, 2011, Health Services approved a referral for an outside consultation with an orthopedist. There is nothing to support that this consultation ever took place. (*Id.* at 37.)

Mr. El-Hanafi, believing that he was scheduled for a follow-up with Health Services on July 13, 2011, waiting all day but was never seen. On July 14, 2011, Mr. El-Hanafi wrote an email to Health Services:

---

[7] The record states "since I was arrested in Virginia."

> I still have pain and swelling in my right foot and [ankle]. Dr. Evangelista saw me
> last week and gave me pain killers again (which I have taken on and off for the
> last 14 months). I did get an x-ray and was suppose[d] to see him again on 7/13
> but he did not put me on the call-out list. The pain killers are not working and I
> need to see a specialist. It's been over 14 months and the staff here does not know
> what I have or how to treat it. Please assist ASAP.

(*Id.* at 38.) Three days later, on July 17, 2011, Mr. El-Hanafi sent a follow-up email to Health

Services asking, "Can you or someone from your department assist with this medical request?"

(*Id.*) The next day, July 18, 2011, Mr. El-Hanafi submitted a cop-out requesting medical

attention. He wrote:

> I still have pain and swelling in right foot and [ankle]. Saw Dr. Evangelist about
> two weeks ago but condition is the same. Dr. Evangelista gave me pain killers
> again and x-ray. He said he would have results next day but I never heard from
> him since. Please let me know my condition and how to treat it. If you don't know
> then refer me to a specialist. This has been happening for over a year now.

(*Id.* at 39.) On July 26, 2011, twelve days after his July 14, 2011 email to Health Services, and

after two emails and a cop-out, Mr. El-Hanafi was finally seen by Health Services (*Id.* at 40-43.).

On this date, after fourteen months[8] of Mr. El-Hanafi's complaints of worsening right leg pain,

and attendant symptoms such as swelling, darkening of the veins, and difficulty standing and

walking, Health Services finally ordered an ultrasound, and asked Mr. El-Hanafi if he had a

personal or family history of DVT. (*Id.*) This was the second time the possibility of DVT was

mentioned in Mr. El-Hanafi's BOP medical records—the first being the differential diagnosis

posited over a year earlier on May 16, 2010 in Oklahoma. (*Id.* at 1.)

---

[8] A BOP medical record from this date erroneously reports that Mr. El-Hanafi has reported pain
in his right leg for 4 months, when in fact it had been over 14 months.

The ultrasound ordered on July 26, 2011 was approved three weeks later on August 16, 2011. (*Id.* at 44.) On August 19, 2011, Mr. El-Hanafi, who may not have been aware of the approval and had not received medical attention since July 26, 2011, wrote an email to Health Services about testing (the ultrasound) that he was told he would receive. He wrote, "Please schedule me for the proper testing as the medical condition is still the same." (*Id.* at 38.) On September 15, 2011, Mr. El-Hanafi saw Health Services for a follow-up appointment. Medical staff noted recent high blood pressure levels and chronic right foot pain. (*Id.* at 45-48.)  And on September 30, 2011,[9] over nine weeks after it was ordered, and seventeen months after the onset of his symptoms, Mr. El-Hanafi was finally taken to New York Downtown Hospital for an ultrasound which revealed that he had an "acute, totally occlusive DVT" of his right leg, extending from his calf to his groin. (Ex.2, pp. 50-52.) [10]

---

[9] One week earlier on September 23, 2011, BOP staff attempted to transfer Mr. El-Hanafi to New York Downtown Hospital for an ultrasound. In agony, Mr. El-Hanafi refused the transport because the U.S. Marshals Service insisted on ankle cuffs, which aggravated his already debilitating condition. (Id. at 49.)

[10]  According to the defense's medical expert, Dr. Jeffrey Weitz, whose expert report is attached as Exhibit 3:

> Deep vein thrombosis refers to clots in the deep veins; usually those of the leg. Typically, these clots start in the veins in the calf where they may or may not cause symptoms.  The clots can then extend to involve the vein behind the knee (popliteal vein) and the vein in the thigh (femoral vein).  With extension into these veins, two things happen. First, the clots are more likely to become symptomatic because they block outflow of blood from the leg.  The symptoms can include leg pain and swelling, discoloration of the skin and prominence of superficial veins. Second, clots that extend into the thigh can break off and travel to the lungs to produce a pulmonary embolism, which can be fatal.  It is also worthwhile pointing out that up to 50% of patients with deep-vein thrombosis develop post-thrombotic syndrome, which is severe in up to 10% of patients.  A

### b.  Expert Opinions On The Cause And Duration Of Mr. El-Hanafi's DVT

The government retained Dr. James McKinsey, a vascular surgeon, to refute counsel's claims of delayed diagnosis and substandard medical care. In his report dated December 2, 2013, Dr. McKinsey concluded that Mr. El-Hanafi's DVT "probably spontaneously occurred in the summer of 2011," shortly before it was diagnosed. (*See* Gov't Memo. Ex. G, at 3.) As one can glean from Dr. McKinsey's choice of words, his conclusion was one of a range of possibilities and was little more than an assertion based on probability estimates and opinion. First, Dr. McKinsey opined that "significant DVT will not present with isolated ankle pain as was the situation in this case." (*Id.* at 2.) Next, Dr. McKinsey viewed Mr. El-Hanafi's September 30, 2011, ultrasound that showed a blockage in his right leg. Dr. McKinsey considered the blockage to be a "subacute" clot and estimated that it likely began forming 2-8 weeks before the ultrasound. (*Id.* at 3.) Finally, Dr. McKinsey perceived in the ultrasound images taken from September through December of 2011 a "natural progression [in] the appearance of the DVT from subacute to chronic" over the course of those months. (*Id.*)

The defense's medical expert, Dr. Jeffrey Weitz, also viewed Mr. El-Hanafi's charts, including the same images that Dr. McKinsey viewed. Dr. Weitz is a leading authority in the field of thrombosis. A professor in the Departments of Medicine and Biochemistry and

chronic condition caused by damage to the valves in the veins with a resultant increase in venous pressure, the symptoms and signs of post-thrombotic syndrome include leg pain and swelling of the affected limb that are worse at the end of the day and are relieved with leg elevation.  In severe cases, skin changes and ulcers can develop.

(Ex. 3 at 1-2.)

Biomedical Studies at McMaster University in Ontario, Canada, Dr. Weitz holds the Tier 1

Canada Research Chair in Thrombosis and the Heart and Stroke Foundation/J.F. Mustard Chair

in Cardiovascular Research, and is the Executive Director of the Thrombosis and Atherosclerosis

Research Institute.[11] We asked Dr. Weitz to (1) assess the conclusions reached by Dr. McKinsey;

(2) evaluate the care Mr. El-Hanafi has received; and (3) detail the care Mr. El-Hanafi will need

going forward.

    After reviewing Mr. El-Hanafi's medical records from the Bureau of Prisons, New York

Downtown Hospital, and Brooklyn Medical Center, Dr. Weitz concluded that "Mr. El-Hanafi's

deep vein thrombosis started many months before the diagnosis." In his expert opinion, "the

triggering event was more likely than not to be the long flight" from Dubai to the United States

(Ex. 3, at 6.) His reasons are as follows:

> First, Mr. El-Hanafi began to complain of right leg pain immediately after the
> flight although his initial medical contact for this problem occurred about two
> weeks later. Second, the possibility of early deep vein thrombosis was first
> entertained on May 16, 2010. Third, between May 10 and May 11, 2010, Mr. El-
> Hanafi was transferred from Virginia to Oklahoma in full shackles; a trip that and
> took about 13 or 14 hours; four hours were spent in a transfer pen waiting to
> board a bus, five hours were spent on the bus ride to the airport and then waiting
> to board the plane, and then four to five hours were spent on the flight from
> Virginia to Oklahoma. Therefore, he had another period of immobility that may
> have exacerbated his condition. In support of this concept, from May, 2010 until
> July, 2011, Mr. El-Hanafi continued to complain of ankle swelling and calf pain
> that did not respond to analgesics, anti-inflammatory agents, warm compresses, or
> antibiotics. He was symptomatic enough to warrant x-rays of the ankle even
> though there was no history of trauma. Fourth, on July 26, 2011, the possibility of
> deep vein thrombosis was again considered and an ultrasound was ordered, but
> this test was not performed until September 30, 2011; over two months later.

---

[11] Dr. Weitz's CV is attached as Exhibit 4.

(*Id.* at 5.)

Dr. McKinsey's conclusion that the September 2011 ultrasound showed a "subacute" clot that likely began 2-8 weeks before is at odds with the diagnostic findings outlined in the October 4, 2011 discharge summary from New York Downtown Hospital. Those records describe an "acute, totally occlusive DVT" of Mr. El-Hanafi's right leg, extending from his calf to his groin. (Ex. 2, at 51.)  Dr. Weitz concurred with the diagnosis made by Mr. El-Hanafi's treating physicians at New York Downtown that the "September 2011 ultrasound showed totally occlusive thrombosis." With respect to Dr. McKinsey's conclusion that the clot formed 2-8 prior to diagnosis, Dr. Weitz stated that dating the clot's incidence "based on the ultrasound appearance is almost impossible." (Ex. 3, at 5.)

In response to Dr. McKinsey's contention that a "significant DVT will not present with isolated ankle pain," Dr. Weitz explained that "deep vein thrombosis often starts in the calf and then extends into the more proximal leg veins."(*Id.* at 5.) [12]  Accordingly, "it is not surprising that the first symptoms were localized to the ankle and the calf." (*Id.*) Dr. Weitz also noted that "the hospital records from the New York Downtown Hospital and from the Brooklyn Hospital all attribute the deep vein thrombosis to the long flight based on the temporal relationship with the symptoms. Therefore, the physicians involved in the primary care of this patient considered this deep vein thrombosis to be provoked by the long flight." (*Id.*) Ultimately, El-Hanafi's DVT

---

[12] In this regard, it is also worth noting that Mr. El-Hanafi's right ankle pain was <u>not</u> an isolated symptom. According to BOP medical records, Mr. El-Hanafi was experiencing swelling at least as early as July 16, 2010, and likely before. (*See* Ex. 2, at 10-20) (Record from July 16,  2010 indicating that a musculoskeletal exam was positive for swelling and stating that "righ[t] leg was previously swollen since restraint was put [on] during inmate's transport[t] from Oklahoma").

should have been diagnosed long before it was. As Dr. Weitz asserted, the "failure of the symptoms to respond to symptomatic measures such as analgesics, anti-inflammatory agents or antibiotics should have prompted the health professionals to consider something other than a muscle strain." (*Id*.)

### d. Expert Opinions On Whether Mr. El-Hanafi's DVT Could Have Been Mitigated By Use of Compression Stockings

According to Dr. McKinsey, in addition to anticoagulation treatment, "the main treatment to control the symptoms of a DVT is wearing of compression stockings to prevent the over-distention of the veins of the leg." (Gov't Memo. Ex. G, at 3.) Dr. McKinsey faulted Mr. El-Hanafi for failing to use the stockings that were supplied to him. (*Id.*) ("Stockings were supplied to the patient but it was reported that he was noncompliant with wearing of his support stockings or wearing them in the prescribed way.") According to the government's expert, failure to use compression stockings will "allow for the veins to become more distended and further injure the veins and result in more swelling." (*Id.* at 3-4.) The implication here is that Mr. El-Hanafi is to blame for the worsening of his DVT because he failed to use or improperly used the compression stockings provided to him.

As Dr. Weitz explained in his report, while "the use of compression stockings can help to control symptoms of the post thrombotic syndrome, there is no evidence that they influence the natural history of the disease." (Ex. 3, at 6.) In support of his opinion, Dr. Weitz cited to the results of a recent study published in *Lancet* "which showed that the early application of stockings in patients with deep vein thrombosis had no influence on the incidence of post-thrombotic syndrome compared with the application of sham stockings." (*See* Susan R. Kahn et.

al., "Compression stockings to prevent post-thrombotic syndrome: a randomised placebo-controlled trial," 383 *Lancet* 880-88 (2014), attached as Ex. 5.). "Therefore," Dr. Weitz continued, "it is my opinion that the use or non-use of compression stockings has no influence on the long-term outcome of deep vein thrombosis." (Ex. 3, at 6.) Dr. Weitz' opinion was shared by Dr. Huang, Mr. El-Hanafi's treating hematologist at New York Downtown Hospital, who told Mr. El-Hanafi that compression stockings were "purely cosmetic, would not prevent DVT and had no impact on his disease process after the clot had been established." (Ex. 2, at 87.)

Further, as outlined below, Dr. McKinsey's assessment that Mr. El-Hanafi was noncompliant with the use of compression stockings is not supported by the medical records. As discussed above, Mr. El-Hanafi was diagnosed with DVT on September 30, 2011, seventeen months after he first began experiencing symptoms. Almost three months after his diagnosis, on December 19, 2011, Dr. Wun, an attending physician in the General Surgery department at New York Downtown Hospital prescribed compression stockings, and stockings were ordered by Health Services at the MCC. (*Id.* at 62) ("Will order compression stockings – knee high 30-40mmHg.") On December 21, 2011, Mr. El-Hanafi was provided with generic knee high diabetic compression stockings that were not fitted for his leg. (*Id.* at 64.) On January 18, 2012, Dr. Webber, a cardiologist at New York Downtown noted that Mr. El-Hanafi was wearing calf compression stockings and recommended "full leg compression stockings to reduce residual swelling." (*Id.* at 68-70.) That same day, Health Services took measurements of Mr. El-Hanafi's leg and planned to order two pairs of thigh high jobst stockings. (*Id.* at 74.) Between January and March, Mr. El-Hanafi wrote at least four emails (on January 12, February 13, March 16, and

March 26, 2012 to Health Services asking when he would receive fitted, full leg compression stockings as the generic knee-high stockings were too tight and his swelling and pain was increasing. (*Id.* at 68, 76, 81-82.)

On April 20, 2012, nearly four months after stockings were first prescribed, Mr. El-Hanafi received two pairs of fitted jobst stockings. However, only one of those pairs was at the prescribed level of pressure (20-30 mmHg). (*Id.* at 83-87.) On August 6, 2013, Mr. El-Hanafi stopped wearing the stockings, after he was told by Dr. Huang that they were "purely cosmetic" and would not impact the progression of his DVT and after learning, from the report authored by Dr. Laura Chalfin, attached to defense counsel's prior sentencing submission, that improperly fitted stockings could increase the risk of thrombosis. (*Id.* at 91; *see also* report by Dr. Chalfin, attached as Ex. A to our Sentencing Submission dated June 17, 2013.)  By that time, the stockings no longer fit; a medical record dated May 21, 2013, three months before Mr. El-Hanafi stopped wearing the compression stockings, reflects that Mr. El-Hanafi was "requesting . . . new support hose since his current ones are losing their elasticity." (Ex. 2, at 88.) In fact, a record from September 3, 2013 suggests that the stockings Mr. El-Hanafi received may have *never* fit, stating that "the problem is his right leg measurements fall between two sizes." (*Id.* at 105.) On August 6, 2013 and again on September 3, 2013, Mr. El-Hanafi was re-measured and a new pair was ordered. However, no new compression stockings were ever received.[13] (*Id.* at 93-94, 103.)

---

[13] Upon information and belief, on July 15, 2014, when Mr. El-Hanafi last saw Dr. Bussanich from Health Services, he was told that Health Services would not be providing him with a new pair of stockings until they were prescribed by a vascular surgeon.

In summary, Mr. El-Hanafi wore compression stockings for 19 months. Between December 21, 2011, when Mr. El-Hanafi received his first pair of non-fitted knee-highs, and August 6, 2013, when he stopped wearing the "fitted" thigh-high stockings that were too large for him, there are only two records of non-compliance.[14]

### e. Whether Mr. El-Hanafi Was "Intermittently Non-Compliant With Taking His Medication"

In his report, Dr. McKinsey reported that Mr. El-Hanafi was "having difficulty regulating his INR[15] (low and high) with Coumadin and it was noted that Mr. El-Hanafi was intermittently non-complaint with taking his medication as prescribed." (Gov't Memo. Ex. G, at 3.)

Dr. Weitz reviewed the BOP medical records and hospital records and found "no indication" that Mr. El-Hanafi was non-compliant with his Coumadin prescription.[16] (Ex. 3, at 8.) While Dr. Weitz agreed that "the INR results on warfarin were erratic," he explained that this "is not an uncommon situation with warfarin" and cited a 2009 study that estimates that "up to

---

[14] On May 22, 2012, Health Services noted that Mr. El Hanafi was not wearing the stockings during a sick call and on February 26, 2013, Health Services noted that was wearing the stockings "loosely to the knee" because they caused pain and varicose veins when worn to the thigh. These records, as well as the many records in which Health Services notes that Mr. El-Hanafi was wearing the stockings as directed, are not included but available at the Court's request.

[15] INR, or "international normalized ratio", is a system established by the World Health Organization (WHO) and the International Committee on Thrombosis and Hemostasis for reporting the results of blood coagulation (clotting) times.

[16] According to BOP medical records, the only medication with which Mr. El-Hanafi was non-compliant was medication for his high blood pressure, which he refused because it was making him dizzy and giving him headaches. Health Services eventually prescribed a lower dose of the blood pressure medication and agreed only to administer a higher dose when a blood pressure reading indicated it was necessary. This alleviated the problem.

50% of patients in the community setting have an INR that is outside the therapeutic range." (*Id.*)

Dr. Weitz noted that "the situation is likely to be even worse in the prison setting where INR

monitoring is performed less frequently and where there is less control over dietary factors that

can influence the anticoagulant effects of warfarin." (*Id.*) Because a stable INR could not be

achieved on warfarin, Mr. El-Hanafi was switched to other anticoagulation medication. For a

time, he was prescribed rivaroxaban (Xarelto) and currently receives twice-daily injections of

enoxaparin (Lovenox) into his abdomen.

f. **Expert Opinions on Whether the Medical Treatment that Mr. El-Hanafi Received Was Within the Standard of Care**

The government's expert, Dr. McKinsey, concluded that the treatment Mr. El-Hanafi

received for his DVT "appears to be within the standard of care." (Gov't Memo. Ex. G, at 4.) Dr.

Weitz disagreed, based on (1) the 17-month delay in diagnosis after the onset of symptoms, "a

delay that likely contributed to his excessive deep vein thrombosis and placed him at higher risk

for post-thrombotic syndrome;" (2) several misdiagnoses of recurrent deep vein thrombosis,

which "prompted frequent unnecessary changes in his anticoagulant regimen, which placed him

at higher risk of bleeding"; and (3) the decision, in February 2014, to implant an IVC filter "for

no good reason . . . further increasing the risk of recurrent deep vein thrombosis." (Ex. 4, p. 8.)

Mr. El-Hanafi's numerous requests for medical attention during the seventeen months

prior to the DVT diagnosis are outlined above and documented in the attached medical records.

As Dr. Weitz explained in his report, "because deep vein thrombosis usually starts in the calf, it

is likely that, had he been diagnosed earlier, the deep vein thrombosis would have been less

extensive and his risk of developing post-thrombotic syndrome would have been lower." (Ex. 3, at 9.)

The misdiagnoses of recurrent DVT underscore some of the difficulties inherent in attempting to treat a chronic and potentially life-threatening medical condition in the prison context. As there is no one hospital, no one treating physician or set of ongoing specialists managing Mr. El-Hanafi's condition, and has he has frequently missed regularly scheduled appointments and experienced delays in treatment, it is impossible to maintain any continuity of care.  For example, on November 14, 2011, Health Services requested a cardiology appointment to determine whether or not Mr. El-Hanafi was a candidate for lifelong anticoagulation or whether the medication should be discontinued after six months. On November 17, 2011, the cardiology appointment was scheduled for November 28, 2011. Mr. El-Hanafi missed that appointment because there wasn't sufficient staff for an escort team to the hospital. While there is no indication in the records as to whether another cardiology appointment was scheduled, Mr. El-Hanafi was taken back to the hospital on December 2, 2011 and again on December 15, 2011, but the cardiologist was not there on either occasion. On January 18, 2012, over two months after the appointment was first scheduled, Mr. El-Hanafi was finally taken to the cardiologist so that critical questions about his care could finally be answered. And in August 2013, Mr. El-Hanafi complained of a new and worsening pain behind his right kneecap for three weeks before he was taken for an ultrasound, which led to a hospital admission.

The decision to surgically implant an unnecessary IVC filter in Mr. El-Hanafi is also deeply troubling. According to Dr. Weitz, "the only indication for a vena cava filter is in patients

who have contraindications to anticoagulation and are at high risk for pulmonary embolism. This was not the case for Mr. El-Hanafi because he was successfully treated with anticoagulants." (Ex. 3, at 7.) The unnecessary filter was inserted during Mr. El -Hanafi's February 2014 hospitalization at Brooklyn Hospital Center. (*See* Brooklyn Hospital Discharge Summary (Feb. 2014),  Hospital Discharge Summaries, attached as Exhibit 6, p. 12.) It has put him at higher risk for clotting, increasing "the risk of recurrent deep vein thrombosis by about two-fold". (Ex. 3, at 7.)  Further, while the filter is supposed to be temporary (or retrievable) it is unlikely that it can ever be removed. According to Dr. Weitz, retrievable filters should be removed "within a month of implantation because the longer they remain in place, the more rooted they become, which renders removal difficult or impossible." (*Id.* at 7)

On May 14, 2014, counsel phoned to Adam Johnson, supervisory attorney for the MCC, and shared the information received from Dr. Weitz about the importance of removing these filters early. Counsel also followed up by email, stating as follows:

> According to BOP medical records, this device is scheduled to be removed after 6 months (in August). However, the hem[a]tologist with whom we are consulting on Mr. El Hanafi's case recommends that it be removed much earlier. Apparently, the longer you leave a retrievable filter in place the less likely you are going to be able to retrieve it. According to our expert, studies of such filters in the United States show that more than 70% cannot be retrieved, and that retrieval becomes less and less possible the longer the filter is in. Ideally, a retrievable filter should be removed in 4-6 weeks. At this point, Mr. El-Hanafi's filter has been in place for 3 months. Additionally, our hematologist told me that the filters themselves increase the possibility of clotting by 200%.

(Recent Materials on the IVC Filter, attached as Ex. 8, p. 5.) On June 13, 2014, after a follow-up email from counsel inquiring about the filter, Mr. Johnson replied that "Medical staff indicate the

outside specialist removal is scheduled." (*Id.* at 6.)  On July 16, 2014, two months after counsel's

email, Mr. El-Hanafi was taken to Brooklyn Hospital where he was seen by an intern in the

Vascular Surgery Department who, upon information and belief, had no prior involvement with

Mr. El-Hanafi's care or the insertion of the filter. Without a recent ultrasound, the intern was

unable to remove the filter, and Mr. El-Hanafi was sent back to the MCC with the filter still in

place and instructed to return in two weeks for an ultrasound. (*Id.* at 7-9.) On July 18, 2014,

Health Services generated a request for a consult with a vascular surgeon for an ultrasound and

removal of the filter. (*Id.* at 10.) As of this writing, the unnecessary filter, which has increased

Mr. El-Hanafi's clotting risk by 200 percent, is still in place and may have in fact become

permanent.

### g.  Expert Opinions on the Long-Term Impact of Mr. El-Hanafi's DVT

Perhaps most crucially, Dr. Weitz disagreed with Dr. McKinsey on the course of

treatment required and the long-term impact of his DVT. In his report, Dr. McKinsey concluded

(1) that there is "no advantage to further anticoagulation" beyond six months after diagnosis; (2)

that the use of support stockings was "the only treatment required"; and (3) that if he is

compliant with the use of the stockings, he should have "minimal to no long term symptoms or

issues from his DVT." (Gov't Memo. Ex. G, at 4-5.)

According to Dr. Weitz, and contrary to the conclusion reached by Dr. McKinsey, Mr.

El-Hanafi "should be maintained on extended anticoagulation therapy because his risk of

recurrence is high should treatment be stopped." (Ex. 3, at 9.) Dr. Weitz' conclusion is based on

the fact that Mr. El Hanafi developed DVT in a "setting of a minimal provocation" (the long

flight) and, in addition to being heterozygous for the Factor V Leiden mutation (a hereditary disorder), has antiphospholipid antibody disorder, an acquired disorder "associated with a high risk of recurrence and one in which most experts recommend extended anticoagulation, particularly in patients with a lupus anticoagulant." (Ex. 3, at 6.)[17] Dr. Weitz estimated the risk of recurrence to be fifteen percent at one year and forty percent at five years, explained that the case-fatality rate is six percent, and concluded that "stopping anticoagulation could result in death." (Ex. 3, at 8.) His opinion is shared by Mr. El-Hanafi's treating physicians, who have determined that Mr. El-Hanafi "needs to be on lifelong anticoagulation." (Ex. 6, Brooklyn Hospital Discharge Summary from September 2, 2013.)

Further, Dr. Weitz disagreed with Dr. McKinsey's opinion that Mr. El-Hanafi's DVT carries minimal long-term impact. As Dr. Weitz explained:

> Mr. El-Hanafi has post-thrombotic syndrome; a chronic disorder associated with pain and swelling in the affected [area] that is caused by damage to the valves in the deep veins. Such damage results in reflux of blood because of the incompetents valves; a finding noted on Mr. El-Hanafi's recent ultrasound examinations. The incompetent valves also lead to venous hypertension which is the cause of the leg swelling and discomfort. Therefore, I disagree with the government expert who opines "there has been no description of signs of chronic venous hypertension" as a result of Mr. El-Hanafi's deep vein thrombosis. Finally, it is important to point out that there is no treatment for post-thrombotic syndrome. The best we can do is to control the symptoms with compression stockings.

(Ex. 3, at 7.)

---

[17] As addressed on page 4 of his report, Dr. Weitz determined that Mr. El-Hanafi has antiphospholipid disorder blood tests, which were "persistently positive" for anticardiolipin antibody, showed elevated levels of the $\beta$2-glycoprotein 1 IgG antibody, and indicated the presence of a lupus anticoagulant. (Ex. 3, at 4.) These tests are attached at Exhibit 7.

In addition to extended anticoagulation, Dr. Weitz made the following recommendations:

- "regular exercise of at least 1 hour twice per day," (*id.*);

- "use of properly fitted compression stockings," (*id.*), which as of the writing of this submission, have not been provided;

- avoidance of "the use of shackles during transportation," which aggravate his condition, (*id.*);

- housing Mr. El-Hanafi "in a setting where fighting is less likely to occur and where medical attention is available if needed," given the danger of grave internal bleeding while on blood thinners from blunt trauma to the head or chest; (*id.* at 8) and

- treatment with rivaroxaban, "which is likely to be better tolerated than twice daily subcutaneous injections of enoxaparin, which can place him at risk for serious bleeding into the abdominal wall," (*id.* at 9.)

**4.  The Appropriate Sentence**

**a.  A fuller understanding of Mr. El-Hanafi's condition and the inadequate treatment he has received underscores why a significantly reduced non-Guidelines sentence is appropriate herein.**

The government, in its December 2013 sentencing submission, argued that the BOP "is fully capable of handling Mr. El-Hanafi's medical condition going forward" and attached a letter from Barbara Sullivan, the Health Services Administrator for the BOP, confirming her belief that "the BOP will be able to provide appropriate care to Mr. El-Hanafi." (Gov't Memo. Ex. I.) While it is common for the government to uphold the honor of the BOP's medical staff, both government studies and press reports have chronicled the inability of the BOP to provide adequate medical care for inmates. *See, e.g.*, Daniel S. Murphy, "Aspirin Ain't Gonna Help the Kind of Pain I'm In: Health Care in the Federal Bureau of Prisons," in *Convict Criminology* 247 (Jeffrey Ian Ross, et al., eds. 2003); Bureau Of Prisons Health Care: Inmates' Access To Health

Care Is Limited By Lack Of Clinical Staff, House of Representatives Judiciary Committee, Subcommittee on Property and Judicial Administration, GAO/HEHS-94-36 (Feb. 10, 1994). The fact is that the BOP has focused on cutting health care costs in federal prisons, and its cost-cutting measures have led to grossly inadequate medical care for federal prisoners with serious illnesses. *See, e.g.*, U.S. Gov't Accountability Office, GAO/T-GGD-00-112, *Containing Health Care Costs for an Increasing Inmate Population* (2000); Off. of the Inspector Gen'l, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care* (Feb. 2008).

The substandard medical care provided by BOP facilities in general is consistent with Mr. El-Hanafi's treatment in particular. Over the past four years in BOP custody, Mr. El-Hanafi has never received medical care that meets any acceptable standard. The seventeen-month delay in diagnosis has left Mr. El-Hanafi severely debilitated and in constant pain with a chronic condition that he must endure for the rest of his life. Mr. El-Hanafi cannot stand or walk for more than a few minutes without experiencing unbearable pain. He lives in a state of constant anxiety, a waking nightmare, worrying that he will experience a recurrence of clotting or embolism, fall victim to violence which will lead to an internal hemorrhage, or otherwise find himself in need of immediate medical attention. As Mr. El-Hanafi wrote in one of his many pleas for care prior to diagnosis,

> I have asked many times to go downstairs as an emergency but have been denied every time. The individuals who deny my requests are either security guards who are not qualified to make an assessment on what is and what is not an emergency or the most they do is call a nurse over the phone who denies over the phone without seeing my condition.

(Ex. 2, at 33.)

Page 27 of 33

Time and time again, the urgency of Mr. El-Hanafi's medical needs has been left to the judgment of BOP correctional staff lacking the medical training required to make these determinations. If the care Mr. El-Hanafi has received over the past four years is a fair measure of the treatment he can expect going forward, he has good reason to worry that should such an emergency arise, he will receive delayed care and may suffer further injury or even death as a result.

Mr. El-Hanafi knows that his experience is hardly unique. This past spring, Mr. El-Hanafi watched helplessly as his cellmate suffered from a severe stomach ailment without medical attention. Late at night, after many hours of vomiting and diarrhea the man lay screaming on the floor of the locked cell the two men shared. A corrections officer informed Mr. El-Hanafi's cellmate that there was no medical staff available during the night shift and, even if it was a life or death situation, there was simply not enough staff to take him to the hospital. And as this Court is aware, these delays are not limited to pre-trial facilities but are inherent in the federal prison system, where medical care, by definition, can never be the BOP's first priority.[18]

### b. Probation's recommendation of 13 years is based upon a survey of other defendants convicted of terrorism in district courts

The Probation Office has recommended that Mr. El-Hanafi be sentenced to 156 months imprisonment. (PSR at 22.) Probation reached this conclusion in part based on a survey of

---

[18] In *United States v. Reynold Hector*, 10 Cr. 283 (KMW), a case before this Court in which present counsel was appointed as associate counsel, the defendant, a man with congestive heart failure who was being closely monitored by his doctors prior to incarceration, was permitted by the Court to self-surrender to a Federal Medical Facility. Mr. Hector surrendered on a Friday, and died over the weekend, without access to the high level of care he had received on the outside.

sentences of other defendants convicted of terrorism-related charges, some of whom received sentences of twelve years' incarceration and some of whom were sentenced to life. Probation stated that Mr. El-Hanafi "as shown by his actions, his personal circumstances and his apparent intent," was more in line with the former group. (PSR at 23.)

The government strongly disagrees with this conclusion and notes that the information from government witnesses, including their report that Mr. El-Hanafi directed Hasanoff to surveil the New York stock exchange, was not available to Probation at the time of the recommendation. But there is no reason to assume that this information would have changed Probation's calculus. A review of some recent sentences shows that even taking into consideration this newly reported conduct, Mr. El-Hanafi's conduct is comparable to defendants who received far less than even Probation's recommended 156 months.

Here are a few examples. The defendant in *United States v. Warsame*, No. 04 Cr. 29 (D. Minn. 2009), admitted that he attended an al-Qaeda training camp in Afghanistan, was trained in the use of AK-47 rifles, Uzis and other weapons, as well as training in tactics and navigation, fought for the Taliban and was exposed to heavy fighting. He admitted to sending approximately $2,000 (Canadian) to one of his former training camp commanders and exchanged e-mail messages with and provided information to several individuals associated with al-Qaeda. He was sentenced to 92 months for conspiracy to provide material support and resources to a designated foreign terrorist organization, although the government had asked for 150 months.

In *United States v. Mohamed Ibrahim Ahmed*, 10 Cr. 131 (PKC) (S.D.N.Y. 2013), the defendant traveled to Somalia to receive "jihad" training in weapons and explosives at an al

Shabaab camp and contributed a total of 3,000 Euros to al Shabaab, a designated foreign terrorist organization. He was sentenced to 111 months incarceration.

In *United States v. Jamal Yousef*, 08 Cr. 1213 (JFK) (S.D.N.Y. 2012), the defendant, who had a history of trafficking in drugs, weapons, and fake travel documents, conspired to provide an arsenal of military-grade weapons to the designated foreign terrorist organization FARC in exchange for a large shipment of cocaine. He was given a below-Guidelines sentence of twelve years imprisonment.

In *United States v. Yusuf*, 10 Cr. 4551 (S.D. Cal. 2012) the defendant, who recruited and encouraged other Americans to engage in jihad on behalf of al-Shabaab and to "kill infidels everywhere" was sentenced to eight years.

In contrast, the twenty-year sentence advocated by the government is closer to the sentences imposed on defendants who had concrete plans to kill civilians. For example, in *United States v. Viktor Bout*, 08 Cr. 365 (SAS) (S.D.N.Y. 2012), the defendant was convicted after trial of conspiracy to kill U.S. nationals, conspiracy to kill officers and employees of the U.S., conspiracy to acquire and use anti-aircraft missiles, and harboring or concealing terrorists (material support conspiracy). He was sentenced to twenty-five years imprisonment.

In *United States v. Manssor Arbabsiar*, 11 Cr. 897 (JFK) (S.D.N.Y. 2013), the defendant pleaded guilty to committing and conspiring to commit murder-for-hire and to conspiring to commit an act of terrorism transcending national boundaries against the United States. The defendant was involved in a plot with members of the Iranian military to assassinate the Saudi Arabian Ambassador to the United States in Washington, D.C.  The defendant admitted, among

other things, that he had agreed with officials in the Iranian military to cause the assassination of

the Ambassador while the Ambassador was in the United States, that he had agreed to pay $1.5

million to an individual in order to murder the Ambassador, and that he had arranged for

$100,000 to be wired to that individual as a down payment for the murder. He was also

sentenced to 300 months (twenty-five years) imprisonment. We respectfully submit that

sentences in this range are not appropriate for Mr. El-Hanafi.

This Court has a responsibility "to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct." 18 U.S.C.

§ 3553(a)(6). The United States Sentencing Commission reports that the average sentence

imposed for providing material support to designated foreign terrorist organizations or for

terrorist purposes is 111 months. (*See* U.S. Sentencing Comm.*, Quick Facts: Offenses Involving

National Defense* (2012)).[19] Mr. El-Hanafi's conduct is not so drastically different from other

defendants convicted of providing material support for terrorism as to warrant the twenty year

sentence requested by the government.

<u>**CONCLUSION**</u>

Wesam El-Hanafi has pled guilty to crime that is beyond serious, and he takes full

responsibility for his appalling choices. As he wrote in his letter to the Court,

> I've learned many lessons over my time in prison. I inflicted so much pain on the
> people I love most and they have shown me nothing but love and support. I feel
> ashamed by my actions and by the ideology I embraced. An ideology that slowly
> took away my sense of reason and replaced it with blind following. My actions

---

[19] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_National_Defense.pdf.

> are so embarrassing to me that I cannot bear to even mention them to anyone and
> I'm at a loss at how at some point in my life I supported these actions and beliefs.

(*See* El-Hanafi Sentencing Memo. Ex. B, ECF No. 133) (Letter from Wesam El-Hanafi to Hon. Kimba M. Wood.)   He recognizes that living in the United States has been a privilege, that he has enjoyed opportunities for education and advancement, and lived in relative comfort and safety, in stark contract with "the dangers and injustices that my relatives back home and many others in the world face every day." (*Id.*)  Despite the suffering that Mr. El-Hanafi has endured, receiving delayed and inadequate medical care and enduring physical debilitation and crippling pain, he is nonetheless grateful for his arrest in this case. Mr. El-Hanafi's incarceration has given him the opportunity to reflect on his choices, to repair and strengthen his relationships with family, and to change the course of his life.

Mr. El-Hanafi knows that he will never be able to change the past, and that he must live with the horror of his actions for the rest of his life. He is committed to living each day making up for the wrong he has done.

For the reasons outlined above and in our prior submission, we respectfully ask this Court to impose a significantly reduced non-guidelines sentence due to the suffering and harm endured by the defendant.

Dated: Brooklyn, New York
July 25, 2014

Respectfully submitted,

Sarah Kunstler
Rebecca Heinegg
*Attorneys for Wesam El-Hanafi*
315 Flatbush Avenue #103
Brooklyn, NY 11217
(718) 783-3682

cc:     AUSA John Cronan, AUSA Aimee Hector
        Dawn Doino, USPO
        Wesam El Hanafi