F1KJELHS                          Sentence

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                          10 Cr. 162 KMW

 5    WESAM EL-HANAFI,

 6                Defendant.

 7    ------------------------------x

 8

 9                                         January 20, 2015
                                           New York, New York
10

11

12    Before:

13                        HON. KIMBA M. WOOD,

14                                         District Judge

15

16                        APPEARANCES

17

18    PREET BHARARA,
           United States Attorney for the
19         Southern District of New York
      JOHN P. CRONAN,
20    MICHAEL D. LOCKARD,
           Assistant United States Attorneys
21

22    LAW OFFICE OF SARAH KUNSTLER,
           Attorneys for defendant El-Hanafi
23    BY:  SARAH KUNSTLER, Esq.
           REBECCA HEINEGG, Esq.
24                 Of counsel

25
```

1              (In open court)

2              (Case called)

3              THE COURT:  Good morning.  Please have a seat.  Good

4     morning, Mr. El-Hanafi.  We are here for the sentencing of Mr.

5     El-Hanafi.  I'd like to begin by asking Ms. Kuntsler, have you

6     and Mr. El-Hanafi had an adequate opportunity to review the

7     presentence report?

8              MS. KUNSTLER:  Yes, your Honor.

9              THE COURT:  Are the corrections you wished to have

10    made to it the same as in your June 17th, 2013 letter to me?

11             MS. KUNSTLER:  Yes, your Honor.

12             THE COURT:  In Paragraph 12, you object to the amounts

13    sent per week by Mr. El-Hanafi and Mr. Hasanoff to Al-Qaeda.

14    It seems to me it might be more appropriate to simply state the

15    total that the two of them sent.

16             MS. KUNSTLER:  That is acceptable to us, your Honor.

17             THE COURT:  Is the total 70,000 or less than that?

18             MR. CRONAN:  Your Honor, I believe the total

19    forfeiture was 70,000 because the total was 67,000 and then

20    approximately $3,000 in other equipment such as computer

21    equipment.

22             THE COURT:  All right.  So Paragraph 12 will now read:

23             "Starting in around 2007, El-Hanafi and Hasanoff sent

24    a total of approximately $67,000 to a senior Al-Qaeda operative

25    in Yemen."

F1KJELHS                              Sentence

1            MR. CRONAN:  No objection to that from the government,

2    your Honor.

3            MS. KUNSTLER:  No objection, your Honor.

4            THE COURT:  All right.  With respect to Paragraph 27,

5    you have a number of objections.  I propose the following:

6            "Wesam El-Hanafi also received various assignments

7    from CC-4 which he was instructed to relay to Hesanoff and

8    CC-1.  El-Hanafi was directed to research specific types of

9    military jackets, military boots, military pants, video

10   camcorders and remote control cars."

11           I would add this:  "The video cameras were to be used

12   by Al-Qaeda to record tactical operations against U.S. and

13   coalition forces to then use on the internet as propaganda."

14           With respect to the remote cars, "El-Hanafi was

15   directed to research cars with specific frequencies of radio

16   signals.  Al-Qaeda desired these remote control cars because

17   they could be modified into components for explosives.  After

18   researching these items, El-Hanafi directed Hasanoff to

19   purchase and ship such a remote control device to Al-Qaeda in

20   Yemen, which Hasanoff did."

21           MS. KUNSTLER:  One moment.  Ms. Heinegg is handling

22   the objections.  She has a question for Mr. El-Hanafi.

23           THE COURT:  Okay.

24           (Discussion off the record)

25           MS. HEINEGG:  Your Honor, as to Paragraph 27, rather

F1KJELHS                         Sentence

1      than adopt that modification, we would prefer to withdraw that

2      objection and leave it as it is.

3              THE COURT:  What is the government's view?

4              MR. CRONAN:  Your Honor, we don't think either

5      formulation is accurate based on the facts.

6              THE COURT:  All right.  I will leave Paragraph 27 as

7      it was originally written.

8              With respect to Paragraph 22, I propose to take out

9      the last two sentences.

10             MS. KUNSTLER:  Paragraph 22, your Honor?

11             THE COURT:  32.

12             (Discussion off the record)

13             MS. HEINEGG:  That is acceptable to us, your Honor.

14             MR. CRONAN:  Your Honor, so I understand, the entire

15     paragraph?

16             THE COURT:  No.  The first sentence remains, which

17     would state:

18             "In addition to recruiting CC-1 for Al-Qaeda, Wesam

19     El-Hanafi performed tasks for Al-Qaeda in New York City in May

20     2008."

21             MR. CRONAN:  That is acceptable, your Honor.  Thank

22     you.

23             THE COURT:  According to the Bureau of Prisons, Mr.

24     El-Hanafi's doctor's recommendations for future treatment and

25     placement will receive the most credence if a paragraph is

F1KJELHS                          Sentence

1  placed in the PSR.  So I would urge defense counsel to draft

2  and run by the government something consistent with the most

3  recent treating doctor, most recent expert's recommendations.

4          MS. KUNSTLER:  Your Honor, we'll do so.  We submitted

5  a letter, dated January 16th, from Dr. Weitz, and that will be

6  the basis on which --

7          THE COURT:  Right.  I considered attaching that, but I

8  think it carries more force if it is a paragraph in the PSR.

9  It could be a long paragraph.

10          MS. KUNSTLER:  Okay.

11          THE COURT:  I have read all the sentencing submissions

12  including a letter --

13          MR. CRONAN:  I apologize, your Honor.  Before we're

14  done with the PSR, there is one change the government was going

15  to request.  It was not in the draft, the original draft, so we

16  apologize for not raising it earlier.  It is a bit unusual, but

17  in the recommendation section at the very end, and specifically

18  Page 23, it may just be a matter of rephrasing the third

19  paragraph, but in light of the pending civil litigation

20  regarding the medical care, I think it is important to note

21  that to the extent the PSR reports the cause of Mr. El-Hanafi's

22  medical condition, it either not represent what caused it or

23  make clear it is according to Mr. El-Hanafi, and the Bureau of

24  Prisons disputes it.

25          Earlier in the PSR it makes clear Mr. El-Hanafi claims

1    the DVT was caused by his transport.  Here it was phrased more

2    categorically it was, in fact, caused by the transport.

3                THE COURT:  What are your specific proposals?

4                Looking at the third full paragraph, do you want to

5    stop at the word, "foot"?

6                MS. HEINEGG:  Your Honor, we would be fine with

7    amending it to read or begin, "According to Mr. El-Hanafi."

8                MR. CRONAN:  Your Honor, I think that's right.  If we

9    start each of the sentences with "According to Mr. El-Hanafi,"

10   it would address any concerns that we have.

11               THE COURT:  Okay.  That is only in the third full

12   paragraph on Page 23?

13               MR. CRONAN:  That's right.  It would start with,

14   "according to Mr. El-Hanafi, Mr. El-Hanafi has suffered

15   permanent damage," and the sentence would continue.

16               THE COURT:  Yes.

17               MR. CRONAN:  Just to be perfectly clear, I would

18   suggest that each of the sentences in that paragraph also

19   starting --

20               THE COURT:  Also, "according to Mr. El-Hanafi," I'll

21   make those changes.  All right.

22               I have read all of the sentencing submissions

23   including a letter from Mr. El-Hanafi and the many letters from

24   Mr. El-Hanafi's family, attesting to his proactive kindness

25   toward all of them, and I learned during the course of the

F1KJELHS                         Sentence

 1   one-day hearing the extent to which Mr. El-Hanafi suffers from

 2   a debilitating illness.

 3           I would be glad to hear first from Ms. Kunstler, then

 4   defendant and then the government.

 5           MS. KUNSTLER:  Thank you, your Honor.  Would you mind

 6   if I stood at the podium?

 7           THE COURT:  Not at all.

 8           MS. KUNSTLER:  Thank you.

 9           Your Honor, all of us, the Court, the government and

10   defense counsel, have spent a long time on Mr. El-Hanafi's

11   medical condition.

12           I want to start out by thanking the court for giving

13   us this time, time for me to return from maternity leave and

14   assume responsibility for the case, time for Ms. Heinegg and I

15   to find Dr. Weitz, to review the materials in this case, time

16   for Dr. Weitz to review them and time for that very long

17   hearing that we had last week or week before.  It is blurring

18   together for me now.

19           As a result of this, we all better understand Mr.

20   El-Hanafi's, medical care Mr. El-Hanafi has received, his

21   medical needs going forward and the extent of his disability.

22   Last week's hearing was informative.  I don't want to dwell on

23   it partly because I'm still exhausted from it myself.  I think

24   it is clear, as it was clear from the reports that the doctor

25   submitted, that our experts have very different perspectives.

Their perspectives differ on how Mr. El-Hanafi's DVT began, the

quality of medical care he has received within the Bureau of

Prisons, and how that care impacted his ongoing disease and

disability.  What I would like to highlight from that hearing

is this:

       Our experts come to their conclusions from vastly

different sets of experiences.  Dr. Weitz, as the court knows,

has authored over 200 peer-reviewed articles on DVT.  He has

participated in numerous clinical trials.  He has been treating

patients with DVT for more than 30 years.  His opinions are

based on his experiences as a practitioner and researcher, but

they're also based on the peer-reviewed research of others in

the field which is used to support his conclusions.

       In contrast, Dr. McKinsey has not participated in

clinical studies on DVT, has not published peer-reviewed

articles on thrombosis, and his conclusions on the natural or

what he refers to as the natural progression of DVT is not

something that is documented in the medical literature, but

rather, according to his testimony, something that was based on

his experience and the experience of others who practice with,

more of a general knowledge.

       This experience, the experience in which he bases his

conclusions is far more limited than Dr. Weitz.  Dr. McKinsey

estimated I think he has treated 500 to 600 patients in his

career.  That is about or less than what Dr. Weitz treats in

F1KJELHS                          Sentence

1    the course of a single year.  He treats about, as he testified,

2    20 patients a week.

3          Unlike Dr. Weitz, Dr. McKinsey doesn't see the gamut

4    of patients with this condition.  He testified that the

5    patients he sees are the most severe, and that is his frame of

6    reference.  He doesn't often see patients that were presenting,

7    as it is our contention Mr. El-Hanafi was presenting, patients

8    in the early stage of a development, of developing DVT.

9          Further, Dr. McKinsey's conclusions that Mr.

10   El-Hanafi's DVT didn't begin earlier are based on a very narrow

11   reading of the BOP records, records that he interprets as

12   indicating isolated pain or swelling that he deemed

13   inconsistent with a DVT.

14         His conclusions are based on assumptions on how

15   drop-down methods are used to populate fields on medical

16   records and the meaning and comments.  His interpretation

17   strains credulity, not to mention the fact that the records he

18   was interpreting are records that the BOP at the very time was

19   creating them, was using to support continued inaction.

20         Given that the BOP wasn't planning on doing anything

21   and in fact didn't do anything in over a year of complaints,

22   they had an interest in minimizing his symptoms in the reports

23   they created after sick call verdicts where the decision was we

24   do nothing or we continue the course of ibuprofen, compresses,

25   elevate your leg.

1          Mr. El-Hanafi's own description of his pain and

2     symptoms which Dr. McKinsey testified that he reviewed but

3     could not specifically remember and were not addressed in his

4     timeline of symptomology and otherwise cited in his reports are

5     striking.  They are the desperate pleas of a person who is

6     experiencing their symptoms worsen and seeing his complaints

7     ignored, at 17 or 18 months he spent in pain with anxiety as

8     part of his conditions of confinement, part of what makes his

9     conditions of confinement qualitatively different from that of

10    the average inmate of the MCC.

11         So, finally after 15 months of symptoms and

12    complaints, an ultrasound was ordered, and two months passed

13    until it was performed.  Both experts agreed, they do agree

14    this is a long delay.  Dr. McKinsey has a machine in his

15    office.  Patients in his office rarely wait longer than an

16    hour.  A delay of two months is really unthinkable outside of

17    the prison context or possibly perhaps outside of the third

18    world.

19         Even if Mr. El-Hanafi's DVT started at the time of the

20    ultrasound or the time the ultrasound is ordered, rather, Dr.

21    Weitz told us that even a delay of this long, a delay of two

22    months can lead to disastrous consequences and permanent

23    disability.  This is the kind of delay, your Honor, that

24    continues to happen.  I have here, which I have already

25    provided to the government, it is just a medical record that

F1KJELHS                        Sentence

just indicates -- and I can provide it to the court -- it is
not all that remarkable.  It just indicates that on November
19th, Mr. El-Hanafi got a referral for a nephrologist for the
mild renal insufficiency that was testified to at the hearing.

          That referral was made, and I apologize, I don't have
it, your Honor, but in addition to this, they normally have a
special referral sheet that says your condition has been
reviewed and you have been, you know, you will be scheduled for
a nephrology consult.  A sheet like that was also issued in the
same day as it was noted in the record.  This is dated November
19th, 2014.

          As of today's date, two months later, almost exactly
two months later, this nephrology consult has not happened.  I
spoke to the government before this hearing.  They informed me
it has been scheduled.  That is something I have also been
hearing from the BOP directly for weeks now as I e-mail them
and say do you know what is going on with this?

          It has been scheduled.  I point this out because a
delay of two months is not unusual.  Also because at the time
that referral was made, it was sheer luck it was made in the
first place.  Mr. El-Hanafi was taken to see a hematologist,
one of many he gets to see by the luck of the draw when he is
taken to the hospital.  This one happens to be a particularly
careful one who went through that day a series of records and
look and saw renal labs that were at that point six months' old

1    and said look at this, these numbers aren't right.  Let's have

2    you evaluated further.

3           I noted the BOP has provided a letter endorsing their

4    own ability to provide excellent care.  I do not doubt they

5    have this ability in theory, but what matters here is not what

6    they're theoretically able to do.  What matters is what they

7    actually do.  What the medical history in this case provides is

8    ample evidence of what they do in practice, they routinely

9    disregard symptoms and delay care or deny it altogether.

10          Your Honor, this is not my first experience of the

11   inadequacies of BOP medical care.  My experience is not limited

12   to pretrial facilities such as MCC or MDC, either.  I have had

13   clients who received extremely delayed cancer diagnoses while

14   in their designated facilities and despite complaints, one of

15   whom died there after a delayed diagnosis.

16          I had another client in a case before your Honor where

17   the client had extremely serious medical conditions,

18   surrendered on a Friday and unfortunately died over the

19   weekend, his first weekend in jail, first weekend at his

20   designated facility which was a medical facility.

21          Dr. Weitz told the court that it is more likely than

22   not that Mr. El-Hanafi's condition is worse because of the

23   delays in diagnosis in this case.  Your Honor pressed him to be

24   specific, and that is as specific as he can get, more likely

25   than not.  Mr. El-Hanafi has now a severe post-thrombosis

1   condition, continued pain, decreased mobility and he will have

2   this condition for the rest of his life.

3          Mr. El-Hanafi is a young man, too young to be this

4   disabled.  This course of events, the medical care Mr.

5   El-Hanafi's received, the disability and continuing medical

6   needs he now has and likely he will need, there is a

7   demonstrated prior performance that will inadequately provide

8   for those needs going for forward, is for this Court's

9   consideration under 3553 (a).

10          As for the abominable living conditions at the MCC for

11   last five years, those conditions are not unique to Mr.

12   El-Hanafi.  Those conditions, unfortunately, are endured by a

13   large number of detainees who live there.  Your Honor has a

14   letter from Mr. El-Hanafi's bunk mate, who is another person I

15   have spoken to about the conditions specifically on that unit,

16   who happens to be here in court as well to support him, and it

17   is something that I speak to a great many of my clients about

18   prior to sentence, where I ask them what the specific

19   conditions are, how the rodent problem and insect problem is,

20   and these are complaints I normally hear.  I do believe it is a

21   little worse in the dorms than it is in the cells where

22   Mr. El-Hanafi is, that the rodent and insect problem is worse

23   there because of the group living that is the nature of a

24   dormitory.

25          The government has long called Mr. El-Hanafi's medical

1    issues a red herring and a distraction, and I just want to say

2    again, I am done talking about the medical stuff, but I want to

3    say again that we recognize that the crime to which Mr.

4    El-Hanafi has pled guilty is incredibly serious, and I hope the

5    court knows that, and I also hope the court knows that we have

6    no intention of distracting from it or minimizing it or

7    minimizing Mr. El-Hanafi's culpability.  As we have stated many

8    times in our prior submissions, nothing we have presented to

9    the court is intended to do that.

10         Mr. El-Hanafi accepts absolute responsibility for his

11   actions and he understands he must pay for his criminal conduct

12   with a significant term of imprisonment.  Mr. El-Hanafi's

13   medical issues are important, but more important and more

14   striking to me is the change Mr. El-Hanafi's undergone since

15   his arrest in this case.

16         I met Mr. El-Hanafi, Ms. Heinegg met Mr. El-Hanafi

17   over three years ago, and at that point he had been in custody

18   for a year and a half.  I didn't spend so much time in the

19   beginning as Ms. Heinegg, but I have spent significant time

20   with him recently over the course of preparing for the medical

21   hearing, over the course of preparing for sentencing, and he is

22   a man who is a pleasure to sit down with and speak with.  He is

23   a man who always shows concern for me and asks about how I'm

24   doing.

25         He is a man who expresses on a regular basis to me his

1    sincere remorse for his actions.  He is a man, I watch him come

2    into the visiting room and I watched how he treats the guards

3    who staff the visiting room, and I watch how they treat him.

4    This is something that I experience on a regular basis with a

5    lot of clients, and I can see I have clients who make eye

6    contact.  I have clients who ask the guards how they're doing.

7    I have clients -- and he is one of those people.  He is one of

8    those people.

9         Then I have clients on the other end of the spectrum

10   who acknowledge nothing and no one, sometimes not even me.  He

11   is one of those people who is aware of other people, who cares

12   about how other people are doing, and the people around him

13   notice that.  They notice that and they respond to him.  When I

14   hand them a paper that says I am seeing El-Hanafi, I can't

15   even -- it is not something tangible.  It is something, almost

16   like there is a little bit of a relaxed vibe that hits the air

17   because this is a person who is not going to give anyone any

18   trouble and this is a person who is going to be a human being,

19   who is going to treat them like he cares.

20        Mr. El-Hanafi knows that he'll never be able to change

21   the past, he will never be able to undo what he has done, but

22   he is a person who must live with the horror of what he has

23   done, but that is not going to to go away for him, not going to

24   go away for his family.  It is just not going to go away, but

25   he is a person who has a stated commitment, but also how he

1    actually behaves in the world, who is living a commitment to be

2    different.

3            Your Honor, I respectfully ask that this Court impose

4    a non-guideline sentence in this case that takes all of this

5    into account.  I am not going to request a specific sentence

6    here, although I do note that sentences for defendants

7    convicted of providing material support for terrorism without

8    more tend to fall in the 90 to 180-month range, and that the

9    most severe sentences of 20 years and more have in the vast

10   majority of cases been imposed only on defendants with explicit

11   and concrete plans to commit murder or terrorist acts involving

12   mass fatalities.

13           Those, too, are defendants without Mr. El-Hanafi's

14   medical issues and include defendants who went to trial, and

15   for those more similarly situated to Mr. El-Hanafi, those whose

16   sentences -- they pled guilty and accepted responsibility for

17   their conduct, for their actions as Mr. El-Hanafi has, I have

18   not met those defendants and I can't speak to the sincerity of

19   their remorse or sincere personal transformations they may have

20   undergone or the kind of people they are, but I can tell you

21   this:

22           In over nine years of practice, I have never met a

23   client as transformed as Mr. El-Hanafi.  With every breath he

24   takes, the furthers his commitment to live a moral and

25   law-abiding life, being mindful of and working to improve the

1    lives of his friends, his family and his fellow citizens.

2              Thank you.

3              THE COURT:  Mr. El-Hanafi, I have read your letter.

4    There is no requirement for you to speak, but if you would like

5    to speak, I would be glad to hear you now.

6              THE DEFENDANT:  I would like to apologize for my

7    actions.  I apologize to the court, the government and to my

8    family and to the community.  I regret my actions.  I am

9    embarrassed by what I did.  I caused too much pain and

10   suffering for people.

11             Although I cannot change the past, I am dedicated to

12   living every day being the person I should be, a person

13   dedicated to living a moral and law-abiding life, rededicated

14   to my family.  That is who I was before I got involved with

15   this terrible ideology and that is a part of the actions I am

16   ashamed of.  I have had a lot of time to reflect on my actions

17   and consequences.  I didn't just make the wrong choices.  I

18   made the worst choices.  I take full responsibility.  I have

19   learned my lesson.  I will not go down this path again.

20             Because of my arrest in this case, I am fortunate to

21   have the opportunity to change the path I was on and to meet

22   and be inspired with very outstanding individuals, the lawyers

23   in my case, Ms. Fink, Heinegg and Kunstler.  They helped me

24   understand I am better than the worst actions that I have done

25   and I can choose to live the rest of my life being that better

F1KJELHS                           Sentence

1    person.  That is what I choose.

2                I want to thank you, your Honor, for the help you gave

3    me for my medical attention while I was at MCC in the past four

4    years and thank you for giving me the opportunity to talk.

5                Thank you.

6                THE COURT:  Would the government like to be heard?

7                MR. CRONAN:  Thank your Honor.  Might I use the podium

8    as well?

9                THE COURT:  Yes, certainly.

10               MR. CRONAN:  Your Honor, for the past year and a half

11   the focus of this case obviously has been largely on Mr.

12   El-Hanafi's medical condition.  I think the first medical

13   report we got was in July of 2013 from a Dr. Laura Chalfin, and

14   since then we obviously had a lengthy hearing last week or the

15   week before.

16               There have been over a half dozen other medical

17   reports.  All of that was appropriate under Section 3553 (a).

18   It was completely proper for the court to consider the medical

19   condition of the defendant and the ability of the BOP to treat

20   him going forward.

21               But, your Honor, those medical issues have become such

22   a focus in this case over merely two years, and the defendant's

23   arrest now almost five years ago makes it easy to lose sight

24   about what this case is about.  It is easy to lose sight about

25   the unspeakable seriousness of the conduct of this man when he

decided to support Al-Qaeda.  It is easy to forget the

overwhelming demand for deterrence in cases involving

terrorism.  Those are far and away the most important

considerations for this Court when determining the appropriate

sentence.

Your Honor, this is a man who was born in Brooklyn,

benefited from every opportunity our country has to offer, a

great education.  He secured an excellent job.  He continues to

have a very loving family.  He was living the American dream.

Then he turned his back on America and aligned himself with our

country's greatest enemy.

He traveled from Dubai to Yemen, where he pledged an

oath of allegiance to Al-Qaeda, and this was no meaningless

pledge.  For this defendant, his actions spoke louder than his

words.  Over the course of nearly three years the defendant and

this co-conspirators worked tirelessly to support Al-Qaeda.

They provided extensive financial support.  They supplied

tangible items, items that Al-Qaeda required like computer

equipment, GPS devices, cold weather gear, remote control

devices.  They lobbied over and over again to find a path to

travel to fight and possibly die in jihad.  They wanted to

fight with the mujahideen, the mujahideen who were fighting

America.  It was that conduct which should drive the sentence

and it is that conduct that calls for a sentence of 20 years

imprisonment.

 1          Your Honor, since the medical issues have been such a

 2    focus of this case, I want to spend some time at first talking

 3    about the defendant's medical condition and how from the

 4    government's perspective they should come into play at

 5    sentencing.  What should the court consider and what should the

 6    court not consider?

 7          The government submits that the court should consider

 8    the defendant's current condition, his prognosis going forward

 9    and the BOP's ability to provide adequate care during his

10    incarceration.  The question looking back of whether the Bureau

11    of Prisons has in the past provided optimal care should not be

12    addressed by this Court for a number of reasons:

13          First, that issue, the quality of medical care, should

14    not impact what the appropriate sentence is.  The question of

15    whether or not Mr. El-Hanafi received appropriate care in the

16    past doesn't go to his history or characteristics.  It doesn't

17    go to the seriousness of the offense.  It doesn't go for

18    deterrence or need to promote respect for the law.  The only

19    way it could come into play is under the guidelines analysis.

20          There is support that conditions of confinement can be

21    a basis for a downward departure.  In this case, under the plea

22    agreement, the parties are not authorized to seek a downward

23    departure or even to suggest that the court consider that.

24          The second, even if there were a downward departure

25    available, and even granting the most favorable interpretation

1   of the evidence presented by the defendant, the conditions were

2   not egregious enough to downwardly depart.  I am aware of one

3   case where the medical care received by a defendant was

4   considered by the court in granting a downward departure.  That

5   case is Mateo, and in Mateo, as I am sure the court is aware

6   from the briefing, a pregnant defendant went into labor while

7   in pretrial detention, didn't receive medical assistance for

8   over 15 hours, and gave birth at the detention center rather

9   than in a medical facility.

10          In that case, the government stipulated that there was

11  not appropriate medical care, and the court at sentencing

12  determined the trauma from that experience as well as the

13  defendant being a victim of sexual abuse by prison guards

14  warranted a downward departure.

15          The facts in this case, even most favorably viewing

16  them to the defendant, just simply aren't even in the same

17  universe as what was before the court in Mateo.  Again Mateo

18  was a downward departure issue which is not available here.  We

19  are not aware of any cases in which a court has reduced a

20  sentence under Section 3553 (a) under any other basis than

21  downward departure.

22          There is another reason this Court should not reach

23  the issue of standard of BOP care previously.  As I am sure the

24  court is aware, the defendant has a pending civil suit in this

25  courthouse against the United States.  That suit is pending

F1KJELHS                        Sentence

1    before Judge Gregory Woods, and that suit is the appropriate

2    venue if there was substandard care for the defendant to seek

3    any redress he is entitled to.

4              He is pursuing that, and that is the appropriate

5    forum.  I am sure in that case the government would argue that

6    a finding at a separate factual hearing in a criminal case in

7    which the BOP was not represented can't be used to estop

8    arguments in a civil case.  I think it is very important the

9    court avoid any sort of ruling in this context that can be used

10   against the Bureau of Prisons in a separate civil suit.

11             THE COURT:  I agree with you.

12             MR. CRONAN:  Your Honor, what should the court

13   consider?

14             First, the defendant's current medical condition and

15   his prognosis; and

16             Second, the appropriate treatment and the BOP's

17   ability to administer that.

18             We all agree that the defendant has deep vein

19   thrombosis and that that condition has reoccurred, and

20   depending on various considerations, it may occur again in the

21   future.  I think the parties all agree he has a genetic

22   predisposition to developing blood clots that at least makes

23   him somewhat more likely than the general population to have

24   deep vein thrombosis.

25             There is disagreement as to the seriousness of the

1    condition and how it will affect his future life.  Dr. McKinsey

2    opined basically that on the spectrum of patients he has seen,

3    while the defendant does have deep vein thrombosis, he is on

4    the less serious end of the spectrum and believes if the

5    defendant follows appropriate treatment, most notably

6    anti-coagulation therapy, compression stockings, leg elevation,

7    he can lead a normal life.

8          Your Honor, I want to take a moment to defend Dr.

9    McKinsey.  Dr. McKinsey is extremely well qualified.  He is a

10   vice chairman of surgery at Mt. Sinai.  He is a systems chief

11   for aortic intervention for the entire Mt. Sinai system.  He

12   has a clinical practitioner treating DVT.

13         Doctors disagree, but Dr. McKinsey is someone who knew

14   what he was talking about.  Dr. Weitz painted a much grimmer

15   picture, and I know your Honor appreciates this, but it was

16   also a picture that largely was based on the defendant's

17   reporting of his own pain or discomfort.

18         To state the obvious, an individual in that situation

19   had an incentive to exaggerate.  I understand the court

20   appreciates that.  We don't know about the level of pain and

21   discomfort he is under, but we don't need to know because both

22   doctors are largely in agreement as to appropriate treatment

23   going forward.

24         The submissions made by the Bureau of Prisons,

25   especially the one made last Friday, made clear the BOP can

1    administer the treatment that is recommended.  First, I know

2    the court knows the defendant has been designated as care Level

3    4 inmate by the Bureau of Prisons.  At that care level, the

4    defendant will be designated to one of six Bureau of Prisons

5    medical referral centers.

6         The BOP letters talked about the care level at those

7    centers, but in short, they provide inpatient care to seriously

8    ill inmates and a variety of medical services.  We are talking

9    more specifically about the care that this defendant needs.

10   The BOP's letter makes clear that the BOP can administer the

11   specific care that both doctors have recommended.

12        The doctor recommended anti-coagulation medication.

13   That is currently happening at the MCC.  The Bureau of Prisons

14   has implemented a protocol which we provided to the court for

15   the administration of anti-coagulation medication.  The BOP

16   provides compression stockings when medically indicated, and

17   the BOP also regularly revisits that to determine whether or

18   not the stockings continue to be required.

19        Ultrasounds can be conducted on site or at a local

20   facility.  All BOP facilities provide inmates with the

21   opportunity to exercise.  The BOP facilities provide materials

22   to help an inmate elevate his or her leg if it is medically

23   indicated.  When the BOP transports an inmate, it can assure

24   transportation without immobilization for more than four hours.

25        There was testimony at the hearing a couple of weeks

1   ago about the defendant's high blood pressure and possible

2   renal issues.  The BOP monitors hypertension and provides

3   appropriate medication to control hypertension.  Some BOP

4   institutions, especially medical referral centers, have a

5   nephrologist on site, and if not, there is consultation and

6   treatment provided at local facilities.

7          All BOP facilities have procedures in place to provide

8   emergency care for inmates.  In fact, as I think your Honor is

9   well aware, the BOP medical referral centers are located close

10  to some of the country's finest doctors and hospitals.  That is

11  a long way of saying the BOP can handle the treatment that this

12  defendant needs.

13         What should drive the sentence in this case?

14         Again, most importantly is the nature of the offense.

15  Your Honor, providing support to Al-Qaeda without question

16  stands at the apex of the most serious offenses anyone, let

17  alone a U.S. citizen can commit against the United States.  The

18  defendant chose to support a group that is publicly declared

19  war against the United States and a group that has followed

20  through with that declaration.

21         His involvement with the group's extreme ideology

22  dated back to 2003 when he was living in Brooklyn.  After that

23  initial radicalization, he traveled to the United Arab

24  Emirates, where he made contact with a facilitator, someone who

25  as your Honor is aware, was since been killed fighting in

1    Syria.  Through that facilitator, the defendant made contact

2    with more senior terrorist operatives in Yemen and began

3    providing financial and other support to those people.

4           He was fully intending that support was going to

5    Al-Qaeda.  The defendant was all-in with Al-Qaeda, and he

6    showed that over a course of years.  In February 2008 when he

7    traveled all the way to Yemen, he arrived in Yemen, was picked

8    up from a predetermined location, a hood was placed over his

9    head and he was driven to another location where he spent two

10   or three days staying with a senior terrorist operative who

11   went by the name The Doctor.

12          The defendant made this trip to Yemen so he could be

13   face-to-face with senior members of Al-Qaeda and demonstrate

14   his unwavering support to Al-Qaeda, and he succeeded.  I don't

15   say this to make light of Ms. Kunstler's presentation, but I am

16   sure Mr. El-Hanafi was very polite and pleasant when he met

17   with those terrorists out there.  So that is part of his

18   appeal, he is a likable person.  That is what drew them to him,

19   someone who was from the United States, who would be able to

20   travel to the United States seemlessly without detection and

21   insert himself into the American culture.

22          In Yemen he pledged that oath of allegiance to

23   Al-Qaeda and The Doctor.  He delivered a commuter to The

24   Doctor.  El-Hanafi delivered $12,000 in cash to The Doctor and

25   received assignments from those terrorist contacts that he

1   conveyed to Hasanoff.

2          In Dubai he received, the defendant himself received

3   an oath of allegiance from Hasanoff, and he traveled to New

4   York City where he met with another one of his co-conspirators,

5   the person identified as the cooperating witness in the

6   defendant's submission, to encourage that person to also join

7   Al-Qaeda.

8          Even before that February 1998 trip to Yemen, the

9   defendant was making regular financial contributions to

10  Al-Qaeda.  Money, even small sums of money can support

11  terrorism in so many ways.  It can buy guns, explosive devices,

12  help terrorist operatives travel.  It can help prepare

13  propaganda videos on the internet.  As we talked about earlier,

14  in total the defendant and his co-conspirators made $67,000 in

15  donations to Al-Qaeda.  What else?

16         The defendant and Sibirhan Hasanoff obtained items

17  sought by their terrorist contacts.  He researched remote

18  control devices, and Hasanoff later sent the remote control

19  devices to The Doctor.  The defendant and Hasanoff knew why

20  their terrorist contacts wanted these remote control devices;

21  so the item can be modified to be detonated at a distance, an

22  explosive that the defendants knew full well Al-Qaeda would

23  want to use against Americans.

24         The defendant worked to ingratiate himself with his

25  terrorist contacts in hopes of becoming mujahideen, to travel

1    and receive military-style traveling and fight in armed combat.

2    On top of all of this, the defendant received an assignment

3    from terrorist contacts to arrange for surveillance of

4    locations in the United States, including the New York City

5    Stock Exchange.

6          El-Hanafi directed Hasanoff to conduct that

7    surveillance during Hasanoff's November 8, 2008 trip to New

8    York and knew full well the only reason the terrorist

9    operatives in Yemen would have wanted that information was for

10   planning a future terrorist operation.

11         Your Honor, to be perfectly clear, the report Hasanoff

12   prepared was very basic, it was very rudimentary.  There was no

13   advance plot against the stock exchange, and the report that

14   Hasanoff actually drafted that the defendant sent along to the

15   contact in Yemen was of no use to them whatsoever.

16         What matters is El-Hanafi was willing to assign

17   Hasanoff to conduct that surveillance.  He was asked by

18   terrorists who he understood were with Al-Qaeda to arrange for

19   surveillance of a densely populated area of Manhattan, and he

20   did that.  He did that to establish bona fides with Al-Qaeda,

21   and he did that because he was all-in with Al-Qaeda, and he

22   wanted Al-Qaeda to know.

23         Your Honor, let me briefly talk about deterrence.

24   Terrorism is a crime that demands maximum deterrence.  As your

25   Honor noted when Hasanoff was sentenced, perhaps the most

1    important factor in this sentencing is general deterrence.  A

2    message must be sent that if you support terrorism, whether

3    you're supporting Al-Qaeda like Gaddafi did, or some other

4    terrorist group or terrorist cause, you will be caught, you

5    will be prosecuted and you will face a long sentence.  It is

6    hard to envision many crimes that carry a stronger demand for

7    deterrence.  Any level for support for terrorism requires

8    criminal deterrence.  A terrorist doesn't need huge sums of

9    money to achieve its causes.

10           With respect to individual live deterrence and

11   protecting the public from future crimes in particular

12   committed by this particular defendant, it is good to hear Mr.

13   El-Hanafi's comments.  The court needs to keep in mind his

14   ability to provide support to Al-Qaeda was not predicated on

15   his youth or physical ability.  He wanted to fight with

16   Al-Qaeda, but the support he, in fact, provided was financial

17   in nature.  He sent money, he sent items and provided technical

18   training based on his sophistication in computers.  He can

19   still do that notwithstanding his medical condition.

20           The court also asked the parties to brief comparable

21   sentences in terrorism cases.  The briefing was pretty

22   extensive, and I know the court has reviewed them and I won't

23   go into detail, except I would disagree with the

24   characterization that 90 to 180 months is a common sentence for

25   this sort of conduct.  I think the conduct that might be most

F1KJELHS                    Sentence

comparable was Iyman Faris, in the Eastern District of
Virginia, who received a 20-year sentence.  Obviously, the most
comparable sentence was the Hasanoff sentence before this Court
who received 18 years' imprisonment.

Let me say a few things about that sentence.
Hasanoff's conduct was extremely serious, as reflected by the
sentence.  The 18 years, as the court may recall that Hasanoff
got, reflected what I believe the court indicated was more or
less a two-year reduction based on his rehabilitation in
prison.  I believe there was a letter from the chaplain at the
MCC at that sentencing.

I would submit this defendant played a more important
role than Sibirhan Hasanoff in this scheme.  This defendant,
the one who traveled to Yemen, he is the one who had the
face-to-face contacts with the Al-Qaeda operatives.  He is the
one who trained them in encryption.  He received the
assignments and he is the one who assigned Hasanoff to conduct
surveillance at the stock exchange.

Lastly, your Honor, as the court did with respect to
Hasanoff, the court should order forfeiture in this case, as
agreed by the parties.  There was a consent order of forfeiture
signed previously, and a forfeiture now should be $70,000 joint
and severally liable as it was for Hasanoff.

Your Honor, there is simply no aspect of this case
that calls for any leniency or mercy in sentencing the

F1KJELHS                        Sentence

1    defendant.  A sentence of 20 years of imprisonment, as the

2    guidelines recommend, is appropriate.

3           THE COURT:  Thank you very much.

4           I need to begin with calculating the advisory

5    sentencing guidelines.  I adopt as correct the calculation

6    agreed to by the parties in the plea agreement which results in

7    a total offense level of 37.  Although Mr. El-Hanafi has no

8    criminal convictions other than the one for which he is being

9    sentenced today, his criminal history is at the highest level,

10   a Level 6, because he is subject to Section 3A1.4 (b) of the

11   sentencing guidelines which mandates a criminal history of 6

12   for any crime intended to promote terrorism.

13          This results in an advisory sentencing guideline level

14   of 360 months to life.  However, the maximum terms of

15   imprisonment pursuant to statute in this case are 15 years for

16   Count 1 and 5 years for Count 2, bringing the maximum possible

17   sentence down to 20 years.

18          I turn now to the sentencing factors mandated by

19   Section 3553, beginning with the seriousness of the offense.

20   As I explained when sentencing Mr. El-Hanafi's co-defendant,

21   Mr. Hasanoff, the criminal conduct in this case was extremely

22   serious and demands a substantial sentence both to impose just

23   punishment and to effect general deterrence.  Mr. El-Hanafi

24   swore an oath to Al-Qaeda, a terrorist organization, intent on

25   harming the United States and its citizens and provided

material and technical support to its operatives over the

course of several years.

Mr. El-Hanafi provided tens of thousands of dollars to

Al-Qaeda.  He sought military training and he tried

unsuccessfully to be sent to fight jihad.  He was unsuccessful

in trying to get to a battlefield in part because his senior

Al-Qaeda contact wanted to use him and his American

co-conspirators instead to destroy targets in the United

States, something that Mr. El-Hanafi and his American

co-conspirators were willing to do.

Among the material Mr. El-Hanafi provided to his

Al-Qaeda contact were video camcorders that could be used by

Al-Qaeda to record tactical operations against the U.S.

military for use on the internet as propaganda, a remote

control car with specific frequencies of radio systems which

could be modified and used as components for explosives, a

laptop computer, an Atlas translation device and encryption

software, a hot spot BPN which creates a secure tunnel between

a user and a secured server that encrypts and allows the user

to mask the user's IP address.

He also provided technical guidance to his Al-Qaeda

contacts and taught them how to use what he brought to them.

He recruited another American to work for Al-Qaeda.  In total,

he and Mr. Hasanoff provided $67,000 in cash to their Al-Qaeda

contact.

1          Although Mr. El-Hanafi and Mr. Hasanoff were directed

2     to obtain information to assist in blowing up a large American

3     dam and the New York Stock Exchange, Mr. El-Hanafi asked Mr.

4     Hasanoff to obtain information about the New York Stock

5     Exchange, but not the dam.  Mr. Hasanoff's ensuing report was,

6     as Mr. Cronan said, so rudimentary as to be useless to his

7     Al-Qaeda contact.  It may have been intended to be useless

8     because at that time Mr. Hasanoff and Mr. El-Hanafi had begun

9     to suspect that their Al-Qaeda contact had no intention of

10    sending them to fight jihad.

11         The report on the New York Stock Exchange said only

12    that the New York Stock Exchange was bordered by four streets.

13    The streets were blocked off from vehicular traffic and someone

14    would have to walk into the building.

15         Turning to Mr. El-Hanafi's history and

16    characteristics, a number of factors stand out and counsel for

17    a degree of leniency in the sentencing:

18         First, Mr. El-Hanafi's childhood was marked by abuse

19    and poverty, but he nonetheless became a pillar of strength and

20    supportive love to his relatives, 24 of whom wrote what appear

21    to be heartfelt letters to the court, detailing his generosity

22    toward them.  Apart from his very serious offense in this case,

23    his record is unblemished;

24         Second, the defendant has demonstrated some signs of

25    remorse and rehabilitation during more than four years of

1    presentencing incarceration.  In a letter to the court, Mr.

2    El-Hanafi has expressed regret for what he describes as his

3    blind following of Al-Qaeda's ideology, which he now says he

4    repudiates.  He has also expressed appreciation for the

5    privilege of being born and educated in America, a privilege he

6    claims was recently thrown into relief by his relative's

7    struggles for freedom in Egypt.  Further, he appears to have

8    been an exemplary inmate.  His documented correspondence with

9    prison staff concerning his deteriorating health concerns have

10   been uniformly respectful, and he has committed no disciplinary

11   infractions during this over four-year period in custody;

12          Third, during his incarceration, he has suffered

13   considerably from a painful deep vein thrombosis and related

14   post-thrombotic syndrome in a leg.  That condition which

15   developed sometime after his arrest caused him at times acute

16   pain and substantially limited his mobility and his capacity

17   for recreational activity during a prolonged period during his

18   incarceration.

19          Although his symptoms are moderately well controlled,

20   his prior pain and suffering was considerable in part because

21   of delays in providing treatment after his diagnosis.  As a

22   result, the past four years of confinement have been

23   significantly harsher for the defendant than they would have

24   been for the average inmate.  Because he has developed, in

25   addition, Anti-phospholipid Syndrome, he is at high risk for

further damage to his kidneys as well as a fatal pulmonary

embolism.  His risks will be heightened if he encounters

violence in prison.

          Absent evidence of the defendant's remorse,

rehabilitation and physical suffering during confinement, I

would sentence Mr. El-Hanafi to a term somewhat higher than his

co-defendant Hasanoff's 18-year term, but in light of the

unique factors that counsel for leniency in Mr. El-Hanafi's

case, I find that a lower sentence is warranted.

          Please stand for sentencing.

          In order to effectuate general deterrence and taking

into account all the factors I have mentioned, I sentence you

on Count 1 to 15 years in prison, and on Count 2 to 5 years in

prison, to run concurrently, for a total of 15 years in prison.

          You will be on supervised release for three years,

which can be shortened if you are permitted to join your family

as you have contemplated in Egypt.  I impose no fine.  I impose

forfeiture in the amount of $70,000, which is payable jointly

and severely with your co-defendants.  I impose the special

assessment of $200.00, which is mandatory.  You may sit while I

read the conditions of supervision.

          The standard and mandatory conditions of supervision

will apply.  The following special conditions will apply.  You

must submit your person, residence, place of business, vehicle

or any other premises under your control to a search, if the

F1KJELHS                          Sentence

1    probation officer has a reasonable belief that contraband or

2    evidence of a violation of the conditions of release may be

3    found.  The search must be conducted at a reasonable time and

4    in a reasonable manner.  Failure to submit to a search may be

5    grounds for revocation.  You must inform any other residents

6    that the premises may be subject to search pursuant to this

7    condition.  You must report to the nearest Probation Office

8    within 72 hours of your release from custody.  You will be

9    supervised by your district of residence.

10            I take it the government moves to dismiss --

11            MR. CRONAN:  Correct, your Honor.

12            THE COURT:  -- the pending counts, and I do so now.

13            Is there anything further before I read the defendant

14   his appeal rights?  I note that I will grant the defense

15   request that Mr. El-Hanafi be incarcerated in Fort Devens.

16            MS. KUNSTLER:  Your Honor, I since have discussed that

17   with Mr. El-Hanafi, and we would actual like the court to

18   recommend FMC Butner, which is also a Level 4 medical facility

19   over Devens.

20            THE COURT:  Any objection?

21            MR. CRONAN:  No, your Honor.

22            THE COURT:  I will recommend FMC Butner.

23            MS. KUNSTLER:  Thank your Honor.

24            THE COURT:  Mr. El-Hanafi, I read every defendant his

25   appeal rights, and I am reading you yours now.

1          You can appeal your conviction if you believe that

2    your guilty plea was somehow unlawful or involuntary or if

3    there is some other fundamental defect in the proceedings that

4    was not waived by your guilty plea.

5          You also have a statutory right to appeal your

6    sentence under certain circumstances, particularly if you think

7    the sentence is contrary to law.  I am sure your lawyers will

8    discuss this with you afterwards if they have not already done

9    so.

10         With few exceptions, any notice of appeal must be

11   filed within 14 days of judgment being entered in your case.

12   Judgment is likely to be entered today or within the next few

13   days.  If you wish to appeal and you are not able to pay the

14   cost of an appeal, you may apply for leave to appeal in forma

15   pauperis.  If you request, the Clerk of the Court will prepare

16   and file a notice of appeal on your behalf.

17         I would like to thank counsel for their unstinting

18   work in the case, very good work, and to wish Mr. El-Hanafi

19   good luck.  Thank you.

20              (Court adjourned)

21

22

23

24

25