UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES                                    10 Cr. 162 (KMW)

     - v. -

WESAM EL-HANAFI,

       *Defendant*.


---------------------------------------------------------------x


**EMERGENCY MOTION FOR SENTENCE REDUCTION
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

Sarah Kunstler, Esq.
Law Office of Sarah Kunstler
315 Flatbush Avenue #103
Brooklyn, NY 11217
Tel.: (718) 783-3682
Counsel for Wesam El-Hanafi

TO:   Geoffrey Berman, Esq.
      United  States Attorney
      Southern District of New York One
      St. Andrew's Plaza
      New York, New York 10007
      Attn: AUSA Michael Lockard, Esq.

## TABLE OF CONTENTS

**BACKGROUND** ................................................................................................ **1**

**ARGUMENT** ...................................................................................................**14**

    **I.**    **Because of an Ongoing Emergency, the Court Should Hear
Mr. El-Hanafi's Application to Reduce His Sentence Now.** .......................**15**

    **II.**    **The Court Should Grant Mr. El-Hanafi Compassionate Release.**..............**18**

**CONCLUSION** .................................................................................................**21**

## TABLE OF AUTHORITIES

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*,
2020 WL 1320886 (2d Cir. Mar. 20, 2020) ...................................................................13

*Hendricks v. Zenon*, 993 F.2d 664 (9th Cir. 1993) .........................................................15

*Maxwell v. New York Univ.*, 407 F. App'x 524 (2d Cir. 2010).......................................15

*United States v. Arberry*, No. 15 Cr. 594 (JPO),
ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019)...............................................................15

*United States v. Campagna*, No. 16 Cr. 78 (LGS),
2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020)................................................................12

*United States v. Dana*, No. 14 Cr. 405 (JMF),
ECF Docket No. 108 (S.D.N.Y. Mar. 31, 2020) ......................................................12, 17

*United States v. Ebbers*, S402CR11443VEC,
2020 WL 91399 (S.D.N.Y. Jan. 8, 2020)........................................................................18

*United States v. Gentille*, No. 19 Cr. 590 (KPF) (S.D.N.Y. Apr. 9, 2020)................12, 17

*United States v. Ghorbani*, Case No. 18-cr-255-PLF,
ECF Docket No. 129 (D.D.C. Apr. 3, 2020)...................................................................17

*United States v. Haney*, No. 19-CR-541 (JSR),
2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020).................................................................16

*United States v. Harris*, No. 18 Cr. 364 (PGG),
ECF Docket No. 413 (S.D.N.Y. Apr. 6, 2020) ...............................................................12

*United States v. Haynes*, Case No. 6:18-cr-6015,
ECF Docket No. 270 (W.D.N.Y. Apr. 14, 2020)............................................................17

*United States v. Hernandez*, No. 18 Cr. 834 (PAE),
ECF Docket No. 446 (S.D.N.Y. Apr. 1, 2020) ...............................................................12

*United States v. Jasper*, No. 18 Cr. 390 (PAE),
ECF Docket No. 441 (S.D.N.Y. Apr. 6, 2020) ..........................................................12, 17

*United States v. Kataev*, No. 16 Cr. 763 (LGS),
ECF Docket No. 779 (S.D.N.Y. Apr. 15, 2020)..............................................................12

*United States v. Knox*, No. 15 Cr. 445 (PAE),
ECF Docket No. 1088 (S.D.N.Y. Apr. 10, 2020)............................................................17

*United States v. Livingston*, No. 18-CR-416 (ENV),
2020 WL 1905202 (E.D.N.Y. Apr. 17, 2020) ...............................................................16

*United States v. Marin*, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020) .................9, 17

*United States v. McBride*, No. 15 Cr. 876 (DLC),
ECF Dkt. No. 73, (S.D.N.Y. Apr. 7, 2020) ....................................................................12

*United States v. Paciullo*, No. 15-CR-834 (KMW),
2020 WL 18622522 (S.D.N.Y. Apr. 14, 2020) ........................................................12, 17

*United States v. Perez*, No. 17 Cr. 513 (AT),
ECF Docket No. 98, (S.D.N.Y. Apr. 1, 2020) ......................................................9, 12, 16

*United States v. Powell*, No. 1:94-cr-316-ESH,
ECF Docket No. 98 (D.D.C. Mar. 28, 2020) ..................................................................17

*United States v. Resnick*, No. 12 Cr. 152 (CM),
ECF Docket No. 461 (S.D.N.Y. Apr. 2, 2020) ...............................................................12

*United States v. Roberts*, 2020 WL 170032 (S.D.N.Y. Apr. 8, 2020) ............................17

*United States v. Rodriguez*, No. 03 Cr. 271 (AB),
ECF Docket No. 135 (E.D. Pa. Apr. 1, 2020) ...................................................................9

*United States v. Russo*, 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020) ...........................17

*United States v. Santiago*, No. 12 Cr. 732 (WHP),
ECF Docket No. 235 (S.D.N.Y. Apr. 10, 2020) ..............................................................12

*United States v. Sawicz*, No. 08 Cr. 287 (ARR),
2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) .................................................................16

*United States v. Scparta*, No. 18 Cr. 578 (AJN) (S.D.N.Y. Apr. 19, 2020) ..............12, 16

*United States v. Skelos*, 15 Cr. 317 (KMW) (S.D.N.Y. Apr. 12, 2020) ..........................12

*United States v. Smith*, No. 12 Cr. 133 (JFK),
ECF Docket 197 (S.D.N.Y. Apr. 13, 2020) ..............................................................12, 16

*United States v. Wen*, No. 6:17-CR-06173 EAW,
2020 WL 1845104 (W.D.N.Y. Apr. 13, 2020) ...............................................................16

*United States v. Zukerman*, No. 16 Cr. 194 (AT),
2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) ...................................................................12

*Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019).........................................................15

**Statutes**

CARES ACT, Section 12003(b)(2) ...................................................................................14

18 U.S.C. § 3553(a) ..............................................................................................*passim*

18 U.S.C. § 3582(c)(1)(A) .....................................................................................*passim*


**Rules & Guidelines**
28 C.F.R. § 571.61....................................................................................................14

U.S.S.G. § 1B1.13, Application Note 1 .......................................................................12

Wesam El-Hanafi respectfully submits this motion seeking compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). Specifically, Mr. El-Hanafi requests that the Court promptly resentence him to time served (approximately 120 months), with the remaining custodial portion of his sentence (approximately 33 months, accounting for good time credit) to be served on home confinement. The Bureau of Prisons has determined that he poses minimum risk of recidivism. As the Court is surely aware, we are in the midst of an unprecedented health crisis. Mr. El-Hanafi, who suffers from a constellation of preexisting medical conditions, is among those most vulnerable to suffer serious, if not fatal, complications were he to contract the COVID-19 virus. He is currently imprisoned at FCI Butner, where 208 inmates have tested positive for COVID-19—the third highest number of confirmed cases at any BOP Facility. Mr. El-Hanafi therefore submits this emergency motion for relief.

## BACKGROUND

### Mr. El-Hanafi's  Conviction and Incarceration

On June 18, 2012, Mr. El-Hanafi pled guilty to Information S7 10 Cr. 162 (KMW) (the "Information"), pursuant to a plea agreement with the government. The Information charged two counts: (1) providing, and attempting to provide, material support and resources to a designated foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Section 2339B; and (2) conspiring to provide material support and resources to a designated foreign terrorist organization, namely, al Qaeda, in violation of Title 18, United States Code, Section 371.

On January 7, 2015, after receiving submissions from both parties on Mr. El-Hanafi's medical condition in the parties' sentencing submissions, this Court held a hearing focused on Mr. El-Hanafi's medical condition, at which it heard medical testimony from two doctors; Dr. Jeffery

Weitz, who testified for the defense, and Dr. James F. McKinsey, who testified for the

government. While the doctors disagreed as to the cause and extent of Mr. El-Hanafi's illness, it

was undisputed that he had suffered, throughout his incarceration, from deep vein thrombosis.

Mr. El-Hanafi was sentenced on January 20, 2015. In a letter to the Court, and at his

sentencing, Mr. El-Hanafi accepted responsibility for his actions, expressed remorse, and

disavowed the radical ideology that had motivated his criminal conduct. As he told your Honor at

his sentencing:

> I would like to apologize for my actions. I apologize to the court, the government
> and to my family and to the community. I regret my actions. I am embarrassed by
> what I did. I caused too much pain and suffering for people.
>
> Although I cannot change the past, I am dedicated to living every day being the
> person I should be, a person dedicated to living a moral and law-abiding life,
> rededicated to my family. That is who I was before I got involved with this
> terrible ideology and that is a part of the actions I am ashamed of. I have had a lot
> of time to reflect on my actions and consequences. I didn't just make the wrong
> choices. I made the worst choices. I take full responsibility. I have learned my
> lesson. I will not go down this path again.
>
>  Because of my arrest in this case, I am fortunate to  have the opportunity to
> change the path I was on and to meet  and be inspired with very outstanding
> individuals, the lawyers in my case, Ms. Fink, Heinegg and Kunstler. They helped
> me understand I am better than the worst actions that I have done and I can
> choose to live the rest of my life being that better person. That is what I choose.

(Sentencing Transcript, pp. 17-18) *See also* Mr. El-Hanafi's pre-sentence letter to the

Court, attached here as Exhibit A.)

While the advisory sentencing guidelines called for a sentence of 360 months to life, the

statutory maximum on the two counts was 20 years. At Mr. El-Hanafi's sentencing, the Court

noted "a number of factors" that "st[ood] out" and "counsel[ed] for a degree of leniency,"

including the fact that Mr. El-Hanafi had no prior criminal offenses, signs of Mr. El-Hanafi's

remorse and rehabilitation, including his letter to the Court and a spotless institutional record, and

his suffering while incarcerated with deep vein thrombosis, the Court sentenced Mr. El-Hanafi to

a non-guidelines sentence of 15 years' incarceration. (Sentencing Transcript, pp. 33-35).

The Court also acknowledged that Mr. El-Hanafi had developed anti-phospholipid

syndrome, and noted that as a result, he was "at high risk for further damage to his kidneys as well

as fatal pulmonary embolism." (*Id.*)

Given Mr. El-Hanafi's health needs, the Court asked the parties to agree on a paragraph to

include in the Presentence Report (PSR) that contained Dr. Weitz's recommendations on

necessary future treatment. (Sentencing Transcript, pp. 4-5.)

The parties prepared the following language, which upon information and belief, was

included in the final PSR:

> Mr. El-Hanafi had deep vein thrombosis and suffers from post-thrombotic
> syndrome. According to Doctor Jeffrey Weitz, an expert in thrombosis who has
> examined Mr. El-Hanafi and reviewed his medical records, "Mr. El-Hanafi is at
> risk for recurrent deep-vein thrombosis because (a) he has antiphospholipid
> syndrome as evidenced by a persistently positive anticardiolipin antibody, a
> lupus anticoagulant and an elevated anti-β2-glycoprotein 1 antibody, and
> (b) he is heterozygous for the factor V Leiden mutation...Other medical problems
> include, hypertension, which despite medication has not been particularly well
> controlled as evidenced by several recent diastolic blood pressure measurements in
> excess of 90 mmHg, and an increased serum creatinine level consistent with mild
> renal impairment. Control of the hypertension is important to lower his risk of
> bleeding and to reduce the possibility of further kidney damage."
>
> In order to effectively manage Mr. El-Hanafi's condition within the prison
> setting, Dr. Weitz recommends the following:
>
> - Long-term, if not life-long, anticoagulation therapy;
> - Regular monitoring to ensure that he has no bleeding complications and
>   to control his blood pressure;
> - Leg elevation to alleviate swelling;
> - Regular exercise of at least 1 hour twice per day;
> - Use of properly fitted compression stockings to alleviate the symptoms
>   of post-thrombotic syndrome. New stockings should be provided at
>   least every 6 months because they lose elasticity over time;
> - Use of flexi-plastic shackles if shackling is necessary during
>   transportation, and avoidance of tight, metal shackles which could
>   exacerbate symptoms of Mr. El-Hanafi's post-thrombotic syndrome;

3

- Housing Mr. El-Hanafi in a setting where fighting is less likely to occur because of his increased risk of bleeding, and where medical attention is readily available if needed; and
- Prompt referral to a nephrologist for advice regarding the cause and the management of the high blood pressure and the renal impairment.[1]

(*See* January 21, 2015 Joint Email from the Parties to the Court, attached as Exhibit B.)

Mr. El-Hanafi has since been serving his sentence at FCI Butner Low. In ten years of incarceration, he has incurred no incident reports and maintains an unblemished institutional record. Since his arrival at Butner in April of 2015, he has completed numerous courses providing cognitive behavioral therapy and critical thinking skills, including "Anger Management," "7 Habits of Highly Effective People," "Criminal Thinking," "Basic Cognitive Skills," "Faith Life Skills," "Men in Transition," and "Parenting." He has also taken a number of job readiness and skills courses, including "Mock Job Fair," "Keyboarding," "Microsoft Excel," "Microsoft Word," "Advanced Typing," and "Internet Basics." And he has maintained employment since September of 2019, working as a unit orderly.  (*See* Mr. El-Hanafi's BOP Individualized Re-entry Plan, attached as Exhibit C.)  Significantly, while convicted of a terrorism crime, he is housed at FCI Butner Low, a low security institution, which suggests that he has proven to the satisfaction of the Bureau of Prisons that he poses no security threat and is committed to his rehabilitation. Further, in a "Risk and Needs Assessment" conducted pursuant to the First Step Act, and employing PATTERN (the "Prisoner Assessment Tool Targeting Estimated Risk and Needs") Mr. El-Hanafi's "Recidivism Risk Level" was determined to be "minimum." (See Mr. El-Hanafi's December 13, 2019 Recidivism Risk Level Determination, attached as Exhibit D.) Were he not convicted of a terrorism crime, this risk level would be indicative of eligibility for early release under the First Step Act.

---

[1] Despite the Court's recommendation, at the time of sentencing, in January of 2015, for Mr. El-Hanafi's "prompt referral to a hematologist," he was not referred to a nephrologist until 2017. He has not seen a hematologist to evaluate the course of treatment for his deep vein thrombosis since 2015.

**The COVID-19 Pandemic**

As of this writing, the new strain of coronavirus which causes COVID-19 has infected over 3.24 million people leading to at least 229,436 deaths worldwide with the United States now leading the world with 1,067, 382 confirmed cases and 61,849 deaths.[2]

On March 11, 2020, the World Health Organization officially classified COVID-19 as a Pandemic.[3]  North Carolina Governor Roy Cooper declared a State of Emergency on March 10, 2020.[4] President Trump declared a State of Emergency for the Nation on March 13, 2020.[5] The town of Butner, North Carolina issued a state of emergency declaration on March 23 2020.[6]

As of today's date, there are 10,509 positive cases in North Carolina with 378 deaths.[7] A team of epidemiologists and data scientists from North Carolina's top universities and research institutions has now released new models forecasting a large spike in COVID-19 cases across the state with the three independent models using composite estimates indicating roughly 750,000 people being infected by the novel coronavirus in the State by June 1, 2020.[8] Likewise, these models also show North Carolina's hospitals will become overwhelmed by COVID-19 in the absence of social distancing measures.[9]

---

[2] See https://www.worldometers.info/coronavirus/ (continuously updated)

[3] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020) at https://bit.ly/2W8dwpS

[4] Governor.nc.gov/news/govemor-cooper-declares-state-emergency-respond-coronavirus-covid-19

[5] Whitehouse .gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak

[6] http://butnercreedmoornews.com/stories/granville-butner-creedmoor-under-state-of-emergency,204439

[7] https://www.ncdhhs.gov/divisions/public-health/covid19/covid-19-nc-case-count

[8] https://portcitydaily.com/local-news/2020/04/06/new-covid-19-model-750000-possible-cases-restrictions-might-be-needed-for-two-months-free-read/

[9] https://abc11.com/coronavirus-nc-cases-covid-19/6081002/

The Centers for Disease Control and Prevention ("CDC") and other public health organizations have identified individuals who are particularly susceptible to COVID-19, and who are at the greatest risk for life-threatening consequences should they contract it. These higher risk categories include older adults; individuals with HIV or other immune-compromising diseases; those with asthma and lung disease; and those with hypertension.[10]

**Mr. El-Hanafi's Serious Medical Issues**

Mr. El-Hanafi is 44 years old. He squarely falls within the CDC's high-risk classification because he suffers from immune-compromising diseases, hypertension, and kidney disease. Given Mr. El-Hanafi's multiple and complex issues, the BOP has classified him at "Care Level 3," the second highest care level, for "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications."[11] (*See* Exhibit C, at p. 2.)

Throughout his incarceration, Mr. El Hanafi has suffered from recurrent, extensive deep vein thromboses,[12] for which he is currently prescribed Warfarin and Coumadin to regulate his

---

[10] *See* CDC, *Are You at Higher Risk for Severe Illness?*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk- complications.html; Anna Miller, et al., 10 common health conditions that may increase risk of death from the coronavirus, including diabetes and heart disease, Business Insider (Mar. 23, 2020) (collecting scientific reports of disease), available at https://www.businessinsider.com/hypertension-diabetes-conditions-that-make- coronavirus-more-deadly-2020-3.

[11] *See* Federal Bureau of Prisons, CARE LEVEL CLASSIFICATION FOR MEDICAL AND MENTAL HEALTH CONDITIONS OR DISABILITIES (May, 2019), available at https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf

[12] For a history of Mr. El-Hanafi's deep vein thromboses, please see our July 25, 2014 submission at Docket # 170, as well as the July 11, 2014 report of Dr. Weitz attached as Exhibit 4, to that submission.  In summary, Mr. El-Hanafi experienced his first symptoms shortly after his arrest, in May of 2010. After persistent efforts to receive care, on September 30, 2011 he was diagnosed with "acute, totally occlusive deep vein thrombosis extending from the groin to the calf" of his right leg. (Weitz Report, at p. 3.) Additional abnormalities were found during hospitalizations in August of 2013 and February of 2014, leading to a diagnosis of recurrent deep vein thrombosis.

INR ratios[13]. (*See* February 11, 2020 BOP Chronic Care Clinic Clinical Encounter, attached as Exhibit F.)  He also suffers from severe post-thrombotic syndrome and antiphospholipid syndrome, related conditions. (*Id*.) The latter is an acquired autoimmune disorder that is associated with clots in veins and also in arteries. In this condition, antibodies are formed against phospholipids or proteins bound to them. If these antibodies persist in the circulation, they can promote clotting and patients with these antibodies are at risk for recurrent clotting if they stop anticoagulant treatment. Furthermore, Mr. El-Hanafi is heterozygous for the factor V Leiden mutation. (*Id*.) Factor V Leiden is a mutation of one of the clotting factors in the blood. This mutation can increase a patient's chance of developing abnormal blood clots, most commonly in the legs or lungs.

Mr. El-Hanafi's other medical problems include hypertension, for which he is prescribed Lisinopril and Hydrochlorothiazide. (*See* Exhibit F.) Mr. El-Hanafi also suffers from chronic kidney disease. (*Id*.) According to BOP medical records, Mr. El-Hanafi's most recent eGFR (Glomular Filtration Rate) was 45 and his serum Creatinine level was 1.66 mg/dl, which means that over 50 percent of his kidney function is already lost and that Mr. El-Hanafi is at Stage 3 liver failure.[14] (*See*, e.g,. Mr. El Hanafi's March 11, 2020 Lab Test Results, attached as Exhibit G.)

Several of these conditions place Mr. El-Hanafi at high risk for life-threatening complications from COVID-19. First, hypertension is on the list of CDC conditions that place

---

(*Id*. at 4-5.) During the February 2014 hospitalization, Mr. El-Hanafi had an unnecessary IVC filer inserted in his inferior vena cava, which has further increased his risk of recurrent thrombosis. (*Id*. at 7.) Upon information and belief, after his January 2015 sentence, Mr. El-Hanafi experienced further recurrent clots in March of 2015 and October of 2015. For the sake of convenience, the full Weitz Report is re-appended here as Exhibit H.)

[13] INR stands for international normalized ratio, and is an assessment of the body's ability to clot. If the ratio is too low, a patient can be at risk for a blood clot.

[14] Test results going back to at least 2017 show consistent poor kidney performance.

individuals at higher risk for severe illness. In Mr. El-Hanafi's case, the risk is particularly

elevated, according to a recent article published in the Lancet, given that he takes Lisinopril, an

ACE inhibitor.[15] Second, as a result of his recurrent deep vein thrombosis and other clotting

syndromes, including his Factor V Leiden mutation, Mr. El-Hanafi frequently has elevated D-

dimer levels, which makes it more likely that he will not survive hospitalization for COVID-19.[16]

Further, doctors have identified a "mysterious" blood clotting complication that is killing COVID-

19 patients[17], a complication for which Mr. El-Hanafi, given his existing clotting disorders, may

be at particular risk.  This elevated clotting risk is the subject of a recent article about to be

published in Thrombosis Research, which analyzes three recent studies on patients admitted to

intensive care with COVID-19, and includes additional data from a new study on the thrombotic

complications of COVID-19 patients at a hospital in the United Kingdom.[18]

Finally, individuals, like Mr. El-Hanafi, who suffer from kidney disease also appear to be

at heightened risk for complications from COVID-19.[19] Given Mr. El-Hanafi's multiple and

complex medical issues, many of which place him at high risk of severe illness should he contract

COVID-19, the decision  to release him could mean life or death.

---

[15] *See* Lei Fang et. al., *Are Patients with Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?* , Lancet (Mar. 11, 2020), at
1,  https://www.thelancet.com/pdfs/journals/lanres/PIIS2213-2600(20)30116-8.pdf
[16] *See* Lewis Ricki, PhD, *Risk factors for death from COVID-19 identified in Wuhan patients*, available at https://www.the-hospitalist.org/hospitalist/article/218841/coronavirus-updates/risk-factors-death-covid-19-identified-wuhan-patients
[17] *See* Eunjung Cha, Ariana, *A mysterious blood-clotting complication is killing coronavirus patients,* The Washington Post, April 22, 2020
https://www.washingtonpost.com/health/2020/04/22/coronavirus-blood-clots/
[18] *See* W. Thomas, J. Varley, A. Johnston, et al., *Thrombotic complications of patients admitted to intensive care with COVID-19 at a teaching hospital in the United Kingdom*, Thrombosis Research (2020), https://doi.org/10.1016/ j.thromres.2020.04.028
[19] *See* National Kidney Foundation, *Kidney Disease and COVID-19*, available at
https://www.kidney.org/coronavirus/kidney-disease-covid-19

**Conditions at FCI Butner**

It is axiomatic that conditions at FCI Butner create an ideal environment for the transmission of contagious disease.[20] "Prisons are tinderboxes for infectious disease."[21] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe" making "infection control challenging in these settings."[22]

Given what we know about COVID-19, the BOP is on the precipice of an uncontrollable and lethal explosion of the virus. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[23] There are already confirmed COVID-19 cases in numerous BOP facilities, including FCI Butner. Inmates in these facilities face a serious risk of contracting this virus because they cannot take precautionary measures recommended by the CDC to avoid the virus, including social distancing, avoiding contact with infected persons, regular hand hygiene, and sanitizing their living spaces, among other measures. Inmates cycle in and out of Bureau of Prisons (BOP) facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing.

---

[20] Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, available at https://bit.ly/3cLcntD
[21] *United States v. Rodriguez*, No. 03 Cr. 271 (AB), ECF Docket No. 135 (E.D. Pa. Apr. 1, 2020) (granting inmate's compassionate release motion and collecting research explaining the greater risk of infectious disease spread in detention facilities); *see also United States v. Marin*, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020) (granting compassionate release to defendant based on special risks he faced from COVID-19 in BOP custody); *United States v. Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020) (same).
[22] Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS
[23] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), available at https://www.businessinsider.com/coronavirus-contagious-r-naught-average- patient-spread-2020-3.

The FCI Butner Complex has a high number of COVID-19 cases.[24] On April 15, 2020, the BOP website listed 61 infected inmates total at the Butner Complex, including 14 infected inmates at Butner Low (along with 28 infected staff total), and 4 deaths. These numbers are increasing exponentially; as of today's writing, the website lists 227 infected inmates, including 12 at Butner Low, and 19 deaths.[25] Given the limited availability of testing in prisons, these numbers are likely even higher. According to media reports, BOP facilities have "stopped testing prisoners who are symptomatic for the coronavirus due to 'sustained transmission'…."[26] Furthermore, the BOP is only providing numbers for positive test results and not the numbers of inmates presenting with symptoms consistent with COVID-19.

I spoke with Mr. El-Hanafi on Friday, April 24, 2020. He explained to me that he is presently housed in a dorm that houses 150-160 inmates. The space is divided up by a 4-foot high wall into 2 and 3-man cubicles. On his unit, there are two aisles or walkways running the length of the cubicles where the inmates live, with 75-80 inmates streaming up and down each aisle. On April 16, 2020, inmates at Butner were informed that the Bureau of Prisons' "nation-wide lockdown" would continue until May 18, 2020. (*See* April 16, 2020 Memorandum from Warden Lyn, attached as Exhibit J.) While, pursuant to the Warden's Memorandum, inmates have been instructed to "remain in [their] assigned cubicle[s]," this is seldom the case. walking the aisles is the only form of exercise or recreation available. Inmates use the aisles for exercise and

---

[24] *A North Carolina prison complex has 60 inmates and 23 staff members with coronavirus*, by Mitchell McCluskey, Chris Boyette and Susannah Cullinane, April 12, 2020, CNN, https://www.cnn.com/2020/04/12/us/butner-prison-coronavirus-cases/index.html (last visited April 13, 2020).

[25] https://www.bop.gov/coronavirus/, visited on April 15, 2020 and April 30, 2020.

[26] Walter Pavlo, *"Bureau of Prisons Underreporting Outbreaks of COVID-19 in Prison,"* Forbes (April 1, 2020) at https://www.forbes.com/sites/walterpavlo/ 2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#278e3b907ba3.

recreation, streaming back and forth, working out, play dominoes, and conversing with friends. Despite the lockdown, inmates in essential jobs leave the unit for work daily, and staff moves between the different units.

Mr. El-Hanafi explained that it was impossible to practice "social distancing" in this environment and that in close contact with other inmates at all times. Two weeks ago, the inmates on his unit were provided with three (3) washable masks each. Mr. El-Hanafi stated that other inmates were inconsistent about washing their hands and wearing the masks.

The danger to Mr. El-Hanafi's health and life is very real, and increases with each passing day. Today, counsel learned that a few days ago, a new inmate was transferred to Mr. El-Hanafi's unit from Virginia. The transferred inmate was given two nasal swab tests for COVID-19, but remained on the unit for at least a full day before he was removed after a likely positive result. Following the removal of this inmate, the remaining inmates on the unit were given temperature checks, but on information and belief, no further COVID-19 testing was done, and no effort was made to isolate any inmates who might have had contact with the infected inmate.

**The First Step Act and this Court's Expansive Authority to Reduce a Sentence**

Under a section of the recently-enacted First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), a sentencing court,

> upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment …, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission ….

11

18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement defines "extraordinary and compelling reasons" to include a defendant's medical conditions, age, family circumstances, and "other reasons." *See* U.S.S.G. § 1B1.13, Application Note 1. The Commission also requires that the "defendant is not a danger to the safety of any other person or to the community." *Id.*

District Courts across the country are increasingly using this provision to grant compassionate release and reduce a defendant's sentence based on the unique dangers posed to that defendant by COVID-19. In the Southern District of New York, the Eastern District of New York, and the District of Connecticut, District Courts have granted compassionate release in over 30 cases based on the vulnerability of incarcerated defendants to COVID-19.[27] This Court has also taken notice of the danger the COVID-19 pandemic poses to large prison populations and has urged the BOP to provide its own systematic response. *See United States v. Paciullo,* No. 15-CR-834 (KMW), 2020 WL 18622522 (S.D.N.Y. Apr. 14, 2020); *United States v. Skelos*, 15 Cr. 317 (KMW) (S.D.N.Y. Apr. 12, 2020).

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to

---

[27] See, e.g. *United States v. Scparta*, No. 18 Cr. 578 (AJN) (S.D.N.Y. Apr. 19, 2020); *United States v. Kataev*, No. 16 Cr. 763 (LGS), ECF Dkt. No. 779 (S.D.N.Y. Apr. 15, 2020); *United States v. Smith*, No. 12 Cr. 133 (JFK), ECF Dkt. 197 (S.D.N.Y. Apr. 13, 2020); *United States v. Knox*, No. 15 Cr. 445 (PAE), ECF Dkt. No. 1088 (S.D.N.Y. Apr. 10, 2020); *United States v. Santiago*, No. 12 Cr. 732 (WHP), ECF Dkt. No. 235 (S.D.N.Y. Apr. 10, 2020); *United States v. McBride*, No. 15 Cr. 876 (DLC), ECF Dkt. No. 73, (S.D.N.Y. Apr. 7, 2020); *United States v. Jasper*, No. 18 Cr. 390 (PAE), ECF Dkt. No. 441 (S.D.N.Y. Apr. 6, 2020); *United States v. Harris*, No. 18 Cr. 364 (PGG), ECF Dkt. 413 (S.D.N.Y. Apr. 6, 2020); *United States v. Gentille*, No. 19 Cr. 590 (KPF) (S.D.N.Y. Apr. 9, 2020); *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020); *United States v. Resnick*, No. 12 Cr. 152 (CM), ECF Dkt. No. 461 (S.D.N.Y. Apr. 2, 2020); *United States v. Hernandez*, No. 18 Cr. 834 (PAE), ECF Docket No. 446 (S.D.N.Y. Apr. 1, 2020); *United States v. Perez*, No. 17 Cr. 513 (AT), ECF Docket No. 98, (S.D.N.Y. Apr. 1, 2020); *United States v. Dana*, No. 14 Cr. 405 (JMF), ECF Docket No. 108 (S.D.N.Y. Mar. 31, 2020); *United States v. Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020).

U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible."[28] And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

To date, the BOP has failed to take heed and protect those in its custody in any kind of concerted or systematic way.

**Mr. El-Hanafi's Application to the Bureau of Prisons**

On April 8, 2020, Mr. El-Hanafi submitted an internal request to the Bureau of Prisons to be released to serve the remainder of his sentence under home confinement because of his preexisting health conditions and the dangers that he faces as a result of COVID-19. (*See* April 8, 2020 Request to Staff, attached as Exhibit I.) Upon information and belief, this request was denied on or about April 20, 2020, due to Mr. El-Hanafi's conviction for a terrorism-related offense.

---

[28]https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%2
0COVID-19%20and%20FSA%20provisions%20-
%20final%20bipartisan%20text%20with%20signature%20blocks.pdf

On April 24, 2020, Mr. El-Hanafi submitted an internal request to the Bureau of Prisons seeking compassionate release on the grounds of "debilitated medical condition" and the dangers that he faces as a result of COVID-19.[29]

On April 27, 2020, Counsel wrote to the Warden in support of Mr. El-Hanafi's request for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) and 28 C.F.R. § 571.61. In the alternative, counsel requested that Mr. El-Hanafi be re-considered as a candidate for home confinement under Section 12003(b)(2) of the CARES Act. (*See* Counsel's April 27, 2020 Letter to the Warden, attached as Exhibit K.)

To date, there has been no response to Mr. El-Hanafi's request of April 24 request or counsel's letter of April 27, beyond an email acknowledging receipt. (*See* April 27, 2020 Email from the BOP Acknowledging Receipt, attached as Exhibit L.)

## ARGUMENT

This Court should grant Mr. El-Hanafi a sentence reduction, so that he can be immediately released from prison. The Court should convert his remaining sentence to home confinement by imposing a sentence of time served and 3 years of supervised release with a condition of approximately 33 months of home confinement (to expire on his currently projected release date of February 9, 2023).[30] This Court has the authority to make this reduction; this reduction would be fully consistent with the compassionate release statute and the 18 U.S.C. § 3553(a) sentencing factors; and this reduction is necessary to protect Mr. El-Hanafi's life and health.

---

[29] Counsel does not have a copy of this document, but spoke with Mr. El-Hanafi on the day it was filed.
[30] According to the BOP, Mr. El-Hanafi's current "Home Detention Eligibility Date" is August 9, 2022. (See Sentence Monitoring Computation Data as of 02-18-2020, attached as Exhibit E.

I.      **Because of an Ongoing Emergency, the Court Should Hear Mr. El-Hanafi's Application to Reduce His Sentence Now.**

As reflected in the statutory language, a defendant can apply directly to the sentencing court for compassionate release, even if the Bureau of Prisons declines to bring a motion on his behalf. Per the statute, Mr. El-Hanafi may apply directly to this Court 30 days after the BOP warden receives his request or after he has exhausted his administrative remedies, whichever is earlier.

Although 30 days has not yet passed since Mr. El-Hanafi made his internal request, we submit that this is an emergency situation in which the Court is empowered to immediately hear Mr. El-Hanafi's application.

Federal courts have previously found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is some emergency. *See United States v. Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. *See, e.g.*, *Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (citing *Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

Similarly, following the outbreak of the COVID-19 pandemic, many courts in the Southern and Eastern Districts of New York have recognized that the  administrative exhaustion

15

requirement is not jurisdictional because "[it] simply delineates the process for a party to obtain

judicial review, not referring to the adjudicatory capacity of courts" and thus "does not speak in

jurisdictional terms or refer in any way to the jurisdiction of the [federal] courts." *United States v.*

*Haney*, No. 19-CR-541 (JSR), 2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.)

*quoting Zipes v. Trans World Airlines, Inc*., 455 U.S. 385, 394 (1982); *United States v. Wen,* No.

6:17-CR-06173 EAW, 2020 WL 1845104, at *1 (W.D.N.Y. Apr. 13, 2020) (Wolford, J.) (A

court's conclusion that the 30-day rule is non-jurisdictional makes it "subject to the principles of

waiver and equitable estoppel."); *United States v. Perez,* No. 17 CR. 513-3 (AT), 2020 WL

1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (Torres, J.) (waiving exhaustion requirement of Sec.

3582(c) and granting release ); *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL

1910481, at *1 (S.D.N.Y. Apr. 20, 2020) (Nathan, J.) (same); *United States v. Smith*, No. 12 Cr.

133 (JFK), ECF Dkt. 197 (S.D.N.Y. Apr. 13, 2020) (same); *United States v. Livingston,* No. 18-

CR-416 (ENV), 2020 WL 1905202, at *1 (E.D.N.Y. Apr. 17, 2020) (Vitaliano, J.) (same);  *United*

*States v. Sawicz*, No. 08 Cr. 287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020)

(Ross, J.) (same).

    As Judge Vitaliano explained in *Livingston*:

> Painfully, these are hardly ordinary times and circumstances. The landmark
> compassionate release legislation was crafted and implemented long before the
> horrors of the COVID-19 pandemic could ever have been in the contemplation of
> mankind. In a little over a month's time, thousands upon thousands of deaths have
> been recorded in this district—the district that houses the federal Metropolitan
> Detention Center ("MDC"). A degree in epidemiology is not needed to
> understand that this novel coronavirus is fast moving, pervasive and can lead to a
> fatal result in short order after infection. When its threat is presented, the time for
> action is immediate. In the context of such extraordinary life-threatening
> circumstances, the crafting of judge-made exceptions to a statutory exhaustion
> requirement is not only appropriate, but compelled by the higher authority and
> God-made injunction to act, as the statute would otherwise permit, to save human
> life.

*Livingston*, 2020 WL 1905202, at *1.

Further, the government has agreed that the 30-day rule is not jurisdictional, and has consented to waive exhaustion in a number of cases. *United States v. Dana*, No. 14 Cr. 405 (JMF), ECF Docket No. 108 (S.D.N.Y. Mar. 31, 2020) (granting compassionate release motion without exhaustion of administrative remedies, where government consented); *United States v. Marin*, No. 15 Cr. 252 (PKC), ECF Docket No. 1325-1326 (E.D.N.Y. Mar. 30, 2020) (waiving exhaustion requirement and granting compassionate release on consent to defendant based on special risks he faced from COVID-19); *United States v. Russo*, 2020 WL 1862294, at *4-7 (S.D.N.Y. Apr. 14, 2020); *United States v. Haynes*, Case No. 6:18-cr-6015, Dkt. No. 270 (W.D.N.Y. Apr. 14, 2020); *United States v. Knox*, No. 15-cr-445, Dkt. No. 1086 (S.D.N.Y. Apr. 10, 2020) (same); *United States. v. Gentille*, 2020 WL 1814158, at *2 (S.D.N.Y. Apr. 9, 2020) (noting government "stated it would waive any argument that Gentille had failed to satisfy the exhaustion requirement"); *United States v. Roberts*, 2020 WL 170032, at *1 (S.D.N.Y. Apr. 8, 2020); *United States v. Jasper*, No 18-cr-390, Dkt.No. 440 (S.D.N.Y. Apr. 6, 2020) (government concession on exhaustion); *United States v. Ghorbani*, Case No. 18-cr-255-PLF, Dkt. No. 129 (D.D.C. Apr. 3, 2020) (joint government & defense submission acknowledging exhaustion can be waived); *United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case).

In at least two other cases, this Court has forged its own compromise by allowing the BOP more time to act by stating that it would not wait the full 30 days to determine a motion for compassionate release on the merits. *See Paciullo*, 15 Cr. 834 (KMW); *Skelos*, 13 Cr. 317 (KMW). In those cases, this Court also recognized that the government has the ability to waive the

17

administrative exhaustion requirement. *See also United States v. Knox*, 15 Cr. 445 (PAE) (S.D.N.Y. Apr. 9, 2020) (urging government to waive exhaustion where BOP could not commit to resolving defendant's compassionate release application).

This is an emergency situation. Every additional day that Mr. El-Hanafi spends at FCI Butner Low increases the likelihood that he will contract COVID-19 and fall ill. Any delay in hearing this motion will cause irreparable injury to Mr. El-Hanafi.

**II.      The Court Should Grant Mr. El-Hanafi Compassionate Release.**

On the merits, this Court should grant Mr. El-Hanafi's motion to immediately reduce his sentence, so that he can be released from prison.

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) expressly authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

> i)      extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

After finding "extraordinary and compelling reasons," a court must then "consider[ ] the factors set forth in section 3553(a)." *United States v Ebbers*, S402CR11443VEC, 2020 WL 91399, at *7 (S.D.N.Y. Jan. 8, 2020); 18 U.S.C. § 3582(c)(1)(A). Those factors include (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the need for the sentence imposed;" (a) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" (b) the sentencing guidelines;

18

and (c) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

In considering these factors, the district court is not tasked with revisiting the sentencing court's original determination of the factors. Rather, the Court is asked to "assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *Ebbers*, 2020 WL 91399, at *7.

There is no question that in providing material support to a terrorist organization, Mr. El-Hanafi committed a serious crime. He acknowledged the terrible nature of his crime at his sentencing, he expressly disavowed the radical ideology that had guided him, and he expressed a commitment to live a law-abiding life from that day forward at his sentencing. The seriousness of Mr. El-Hanafi's criminal conduct will never change, but the calculus has. For the reasons outlined below, we submit that releasing Mr. El-Hanafi release to home confinement, 33 months before his scheduled release on a 15-year sentence, will in no way undermine the goals of your Honor's original sentence.

First, there are extraordinary and compelling reasons to grant this reduction. Because of his unique health issues, Mr. El-Hanafi faces a severe risk of contracting COVID-19 and suffering life-threatening consequences and complications if he does contract this disease. He is 44 years old and has multiple risk factors that are highly associated with death from this disease, including a preexisting clotting condition, hypertension, kidney disease and a severely compromised immune system. Under the current conditions at FCI Butner Low, he has very little ability to protect himself from contracting the disease and becoming severely ill. Because of the conditions of his confinement, he cannot avoid contact with infected areas or people, and he cannot take basic steps to ward off the disease. He obviously has no ability to self-isolate and no access to

protective gear, or even basic hygiene supplies. For his own safety, he needs to be removed from FCI Butner immediately.

Second, granting this reduction would be completely consistent with the § 3553(a) factors and the other statutory prerequisites for compassionate release. This application is based on a combination of Mr. El-Hanafi's health and the other unique factors described above—in that regard, it is perfectly consistent with the Sentencing Commission's guidance and easily fits within the "other reasons" contemplated by Application Note 1(D).

Further, Wesam El-Hanafi is a rehabilitated offender who does not present any danger to the community. To the extent that the Bureau of Prison appears to consider all terrorism-related offenses as beyond the reach of the First Step Act's compassionate release provision, there is simply no support for such a categorical bar. The appropriate inquiry is whether Mr. El-Hanafi poses a danger to the community. And there is sufficient evidence before this Court to ascertain that he does not. His offense of conviction is his only contact with the criminal justice system. Over the past ten years, Mr. El-Hanafi has repeatedly and consistently expressed sincere remorse for his offense and can reside safely in the community. While incarcerated, he has incurred no disciplinary infractions and has been a productive member of the prison population, participating in programming and working to the extent his illnesses permit. According to the BOP's own assessment tools, he poses minimal risk of recidivism. Neither specific deterrence nor rehabilitation are served by keeping Mr. El-Hanafi in prison.

Furthermore, the Sentencing Guidelines and the possibility of sentencing disparities would not be an issue in this case. Mr. El-Hanafi has already served a significant portion of his incarceratory sentence under particularly punitive and difficult conditions. This term of imprisonment, coupled with his continuing home incarceration, should be completely sufficient

for purposes of punishment and general deterrence. Nor is restitution an issue as there were no victims from Mr. El-Hanafi's crimes.

Outside the prison walls, Mr. El-Hanafi also enjoys strong support. At his sentencing, your Honor noted that apart from his involvement in the instant offense, Mr. El-Hanafi was a "pillar of strength and supportive love to his relatives" (Sentencing Transcript at p. 33), relatives with whom he has remained deeply connected throughout his incarceration. He is college-educated and has a long, documented, and impressive work history. He is in a stable, committed marriage and he is father of three children, ages 19, 16, and 12. The family unit, in spite of El-Hanafi's incarceration, remains exceptionally close. If he is released, he has a stable residence to which to return and has treating doctors at the ready.

Considering all of the statutory factors and given that they do not outweigh Mr. El-Hanafi's extraordinary life and death circumstances, the Court should grant Mr. El-Hanafi compassionate release.

**CONCLUSION**

For the reasons described above, the Court should immediately grant Mr. El-Hanafi's motion to reduce his sentence, and resentence him to time served, with three years of supervised release, with a special condition of thirty-three (33) months of home confinement during this supervised release term.

To the extent that the Court requests any further information or briefing regarding this motion, counsel respectfully requests that such proceedings be in writing or via videoconference or telephone conference.

Respectfully submitted,

*Sarah Kunstler*

Sarah Kunstler
Attorney for Wesam El-Hanafi

Dated:        New York, New York
              April 30, 2020